IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF SOUTH CAROLINA
~~FLORENCE~~ DIVISION
Columbia

RECEIVED
FLORENCE, SC
'05 OCT -4 P 3:27

| | |
|---|---|
| United States of America, ex rel.<br>Michael K. Drakeford, M.D., | C.A. No. 3:05-CY-2858-MJP |
| Plaintiff | |
| vs. | COMPLAINT<br>(Jury Trial Demanded) |
| | (False Claims Act, 31 U.S.C. § 3729-3733) |
| Tuomey Healthcare System, Inc. | **Do Not Place in Press Box**<br>**Do Not Enter on Pacer** |
| Defendant. | |

**FILED IN CAMERA AND UNDER SEAL**
**Pursuant to 31 U.S.C. § 3730(b)(2)**

## Introduction

1.   This is an action to recover treble damages and civil penalties brought by Michael K. Drakeford, M.D. ("Drakeford"), an individual, on behalf of the United States of America against Tuomey Healthcare System, Inc. ("Tuomey") arising from unlawful schemes to defraud the United States of America and the Medicare, CHAMPUS, and Medicaid programs, in particular by Tuomey's submission of false and fraudulent Medicare, CHAMPUS and Medicaid claims for reimbursement to the United States Government in violation of the False Claims Act, as amended, 31 U.S.C. § 3729, et. seq. ("False Claims Act").

2.     As required by the False Claims Act, 31 U.S.C. § 3730 (b)(2), Drakeford is providing to the Attorney General of the United States and to the United States Attorney for the District of South Carolina a statement of all material evidence and information related to the Complaint. This disclosure statement is supported by material evidence known to Drakeford at his filing establishing the existence of Defendant's false claims.

## Jurisdiction and Venue

3.     All of the alleged acts arose in the Florence district, in the State of South Carolina. Tuomey is a private, not for profit community hospital that maintains its offices and provides inpatient and outpatient medical services at its facilities in Sumter County, South Carolina.

4.     Tuomey provides medical and healthcare services to the public and receives a substantial amount of funds from the Medicare, CHAMPUS, and Medicaid programs. The submission of claims by Tuomey to these programs for payment or reimbursement includes a representation and certification that it will abide by and has abided by and that it will adhere to and has adhered to all the statutes, rules, and regulations governing the Medicare, CHAMPUS, and Medicaid programs. The actions attributed to Tuomey in this Complaint were taken by employees and/or agents of Tuomey acting within the scope of their employment and/or agency with Tuomey.

5.     This Court has jurisdiction over this Complaint under the provisions of 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

## In Camera Review

6.     Under the provisions of 31 U.S.C. § 3730(b)(2), this Complaint is to be filed in camera and is to remain under seal for a period of at least 60 days and shall not be served on Tuomey Healthcare System, Inc. until the Court so orders. The Government may elect to

intervene and proceed with the action within 60 days after it receives both the Complaint and the material evidence and information establishing the cause of action.

## Parties

7. Plaintiff Drakeford, the Relator in this action, is a citizen of the United States of America and the State of South Carolina. Drakeford is suing in the name of and on behalf of the United States of America. Drakeford brings this action based on his direct, independent, and personal knowledge and also on information and belief. At all times relevant to this Complaint and continuing to the present, Drakeford has been a board certified orthopedic surgeon, practicing orthopedic medicine and surgery as an employee of Palmetto Orthopedics and Sports Medicine Center, P.A. ("Palmetto") in Sumter, South Carolina, and maintaining active staff privileges at Tuomey. The other physicians employed by Palmetto are Danny H. Ford, M.D. ("Ford") and Kurt T. Stroebel, M.D. ("Stroebel").

8. Defendant Tuomey is a private, not for profit community hospital located in Sumter County, South Carolina. Tuomey is the recipient of federal funds from the Medicare, CHAMPUS, and Medicaid programs.

9. The United States of America ("U.S.") funds federal medical care reimbursement programs through the Department of Health and Human Services ("DHHS") and regulated by the Center for Medicare and Medicaid Services ("CMS").

10. At all times relevant to this action, Jay Cox ("Cox") has served and continues to serve as the President and Chief Executive Officer of Tuomey as well as serving on the Executive Committee of the Board of Trustees of Tuomey; Greg Martin ("Martin") serves as the Chief Financial Officer and James Wilson ("Wilson") serves as Chairman of the Board of Trustees of Tuomey.

## Factual Background

11. During the early part of 2004, Drakeford, Stroebel, and Ford (hereinafter collectively "Palmetto Physicians"), along with other area physicians, were approached by owners of Wesmark Ambulatory Surgery Center, LLC, ("Wesmark") with a potential offer to purchase an interest in Wesmark. Wesmark is a privately owned and operated licensed ambulatory surgery center in Sumter, South Carolina. Shortly thereafter, and in response to the Wesmark threat to Tuomey, area surgeons, including the Palmetto Physicians, were approached by Jay Cox with a proposal for entering into a part time employment agreement ("Employment Agreement") with Tuomey. The compensation formula and structure of the Employment Agreement were presented to Drakeford and his partners by Tuomey and Cejka consulting firm, acting on behalf of Tuomey. This presentation is attached to this Complaint as Exhibit A and incorporated herein by reference.

12. Shortly thereafter, area surgeons including Drakeford and his partners were offered part-time Employment Agreements by Tuomey incorporating the Cejka compensation formula as well as an illegal noncompetition clause and a commercially unreasonable term. The proposed Palmetto Physician Employment Agreements are attached as Exhibit B and incorporated herein by reference.

13. Under the terms of the Employment Agreements, Palmetto Physicians would receive, in the form of salary and benefits, compensation in excess of the net collections received by Tuomey as a result of their professional services rendered as employees of Tuomey. Under the compensation formula, the economic value to the physician was guaranteed to exceed the monetary collections of Tuomey for services rendered by the physicians under the Employment

4

Agreements. This economic loss would increase as the production of the physician increased, in direct proportion thereto.

14.     Drakeford was advised by Cox that more than 15 physicians had entered part-time Employment Agreements under the terms set forth in Exhibits A and B during 2004 and 2005. These employment agreements are currently in effect. All the Employed Physicians were practicing in the Tuomey market area prior to entering the Employment Agreements.

15.     The reason given to by Tuomey for entering into these Employment Agreements, in spite of the fact that each contract represented an economic loss to Tuomey, was that Tuomey was willing to enter into the Employment Agreement because the loss would be made up by capturing the collections for referrals from employed physicians for inpatient and outpatient hospital services, occurring as a result of the Employment Agreement. This reason for the Employment Agreements was confirmed by counsel for Tuomey, Tim Hewson. Drakeford and the Palmetto Physicians refused to enter into these illegal Employment Agreements.

16.     On or about January 27, 2005, Drakeford was presented with a second proposal by Tuomey. This proposal was for the formation of a management company to manage the outpatient surgical department of Tuomey ("OSC JV Proposal"). At the time of the Proposal, the outpatient surgical department was in place and operating.

17.     When Drakeford raised concerns that the terms of the OSC JV Proposal were violative of federal Stark and anti-kickback provisions, Cox advised him that the OSC JV Proposal was both legal and reasonable. Thereafter, Steve Pratt, legal counsel for Tuomey employed to assist with the OSC JV Proposal, provided to Greg Smith, counsel for Drakeford, and to Tim Hewson, local counsel for Tuomey, an email on June 26, 2005 outlining five recommendations to address the "anti-kickback risk."

5

18. Tuomey never incorporated the Pratt recommendations into the OSC JV Proposal.

19. On July 8, 2005, Cox sent a letter to Drakeford, Ford, and Stroebel again offering the Palmetto Physicians either the Employment Agreement or an investment interest in the OSC JV under its originally proposed terms. The offer letter and OSC JV Term Sheet are attached as Exhibit C and incorporated herein by reference. The OSC JV Proposal also contained a exclusivity agreement. Under the terms of the offer letter, the offers would expire, if not accepted on July 22, 2005. The offers expired without acceptance by Drakeford or any other Palmetto Physician.

20. Greg Martin ("Martin"), Chief Financial Officer for Tuomey, advised Drakeford that in order to invest in the OSC JV, physicians who currently have Employment Agreements with Tuomey would have to terminate those agreements. In addition, Tim Hewson advised Greg Smith that the Board of Trustees of Tuomey had only authorized a maximum benefit of $60,000 for each physician accepting one of the two offers. Upon information and belief, the OSC JV Proposal has not been offered to any other physicians and was made available to Palmetto Physicians only because they had rejected the Employment Agreements.

21. A third proposal was made to Drakeford and the Palmetto Physicians by Tuomey involving a real estate investment ("Real Estate Investment") in a medical office building ("MOB") adjacent to Tuomey's hospital campus. The terms of this investment offer are attached as Exhibit D and incorporated herein by reference. The investment is only open to physicians on staff at Tuomey and requires divestiture by any owner physician upon relinquishment or loss of staff privileges at Tuomey. The investment has a projected annual return of 15.5 percent (15.5%) to each physician investor, guaranteed by Tuomey's lease of all unoccupied space in the building. The debt on the MOB is guaranteed in full by Tuomey. No

Physician Investor is required to guarantee the debt. All physician investors must sign a noncompetition agreement with Tuomey, as set forth on Exhibit E.

22. Drakeford was advised by Jay Cox that if he and the Palmetto Physicians accepted the Real Estate Investment, that Tuomey would buy his current medical office building at a favorable and attractive price. Cox further advised that if Drakeford invested, he would ensure that Drakeford's brother, a local architect, could perform all the needed architectural upfit for the building.

23. Drakeford and the Palmetto Physicians did not enter into the illegal Real Estate Investment.

24. On July 18, 2005, Drakeford and the Palmetto Physicians declined the offer to accept either the Employment Agreement or the OSC JV Proposal and requested a meeting with the Tuomey Board of Trustees, along with legal counsel for both parties, in an attempt to resolve the compliance problems with both proposals. Drakeford and the Palmetto Physicians also sent a letter to the Board of Trustees outlining the illegality of the proposals in their current form. On the same day, Cox notified Drakeford and the Palmetto Physicians that it was Tuomey's intent to recruit other orthopedic surgeons to the area to who would compete with the Palmetto Physicians.

25. In response to the request for a meeting with the Board of Trustees of Tuomey, James Wilson, the Chairman of the Board of Trustees, and Cox notified Drakeford and the Palmetto Physicians that the Board of Trustees had just adopted a policy to deal with requests for meetings. A copy of this response and the policy is attached as Exhibit E and incorporated herein by reference. This policy was adopted in direct response to Drakeford's request to

7

directly address his concerns regarding the illegality of the Employment Agreements and the OSC JV investment proposal.

26. Drakeford responded to this policy by notifying Cox and the other members of the Board of Trustees that the policy failed to provide a nonburdensome process and failed to provide for independent review of compliance concerns, as set forth in recommendations by the Center for Medicare and Medicaid Services and the Office of the Inspector General in their corporate compliance plan guidance for hospitals in addressing compliance concerns raised by hospital staff. As of the date of the filing of this Complaint, he has received no response to this notification.

### First Cause of Action
### (False Claims Act Liability for Violation of 42 U.S.C. § 1395nn)
### (Employment Agreements)

27. The allegations set forth above in paragraphs 1 – 26 are incorporated and realleged as if fully set forth herein.

28. Defendant entered into more than 15 Employment Agreements with physicians ("Employed Physicians") on staff at Tuomey which do not meet the fair market value and commercial reasonableness requirements of the employment exception to the referral prohibition for designated health services under the provisions of The Ethics in Patient Referrals Act of 1989, 42 U.S.C. § 1395nn ("Stark Law"). Tuomey knew that the Employment Agreements did not meet the fair market value and commercial reasonableness requirements of the Stark Law.

29. Referrals by the Employed Physicians to Tuomey for designated health services, as defined in 42 U.S.C. § 1395nn(h)(6), were prohibited referrals under 42 U.S.C. §1395nn(a)(1)(A).

30. Defendant knowingly and willfully violated the provisions of 42 U.S.C. § 1395nn (a)(1)(B) by presenting bills for designated health services furnished pursuant to referrals from the Employed Physicians which were prohibited by the Stark Law.

31. Defendant knowingly and willfully submitted false claims to the government by certifying that all claims submitted were in compliance with all applicable statutes and regulations when Defendant had been advised and was aware that submission of these claims was prohibited under the Stark Law.

32. The United States government, unaware of the falsity of the claims and in reliance on the accuracy thereof, paid the claims for the prohibited referrals.

## Second Cause of Action
### (False Claims Act Liability for Violation of 42 U.S.C. § 1395nn)
### (Real Estate Investment)

33. The allegations set forth above in paragraphs 1 – 32 are incorporated and realleged as if fully set forth herein.

34. Defendant entered into a real estate venture with four physician groups, Sumter Ob/GYN; Sumter Surgical Associates, Palmetto Family Practice, and Drs. Lovice and Evangelisti ("Physician Investors") under terms that constitute a "financial arrangement" which does not meet an exception to the referral prohibition for designated health services under the provisions of The Ethics in Patient Referrals Act of 1989, 42 U.S.C. § 1395nn ("Stark Law"). Tuomey knew that the Real Estate Investments did not meet the ownership exceptions to the referral prohibitions of the Stark Law.

35. Referrals by the Physician Investors to Tuomey for designated health services, as defined in 42 U.S.C. § 1395nn(h)(6), were prohibited referrals under 42 U.S.C. § 1395nn(a)(1)(A).

9

36. Defendant knowingly and willfully violated the provisions of 42 U.S.C. § 1395nn (a)(1)(B) by presenting bills for designated health services furnished pursuant to referrals from the Physician Investors which are prohibited by the Stark Law.

37. Defendant knowingly and willfully submitted false claims to the government by certifying that all claims submitted were in compliance with all applicable statutes and regulations when Defendant had been advised and was aware that submission of these claims was prohibited under the Stark Law.

38. The United States government, unaware of the falsity of the claims and in reliance on the accuracy thereof, paid the claims for the prohibited referrals.

### Third Cause of Action
### (False Claims Act Liability for Violation of 42 U.S.C. § 1320a-7b(b)(2))
### (Employment Agreements)

39. The allegations set forth above in paragraphs 1 – 38 are incorporated and realleged as if fully set forth herein.

40. Defendant entered into more than 15 Employment Agreements with physicians ("Employed Physicians") on staff at Tuomey in which the remuneration provided to the Employed Physicians was not commercially reasonable and far exceeded the fair market value for the services provided. This excess compensation was paid to induce the physicians to refer patients to Tuomey for services for which payment was made in whole or in part under a Federal healthcare program. In addition, in order to receive the compensation under the Employment Agreement the Employed Physicians were contractually bound not to compete with Tuomey by providing medical services which could be referred to Tuomey.

10

41. Tuomey knowingly and willfully entered into the Employment Agreements, fully aware that they were not commercially reasonable and provided for compensation in excess of exceeded the fair market value of the services provided, with the express intention of capturing all referrals for medical services made by the Employed Physicians.

42. Defendant knowingly and willfully violated the provisions of 42 U.S.C. § 1320a-7b(b)(2) ("The Anti-kickback Statute") by paying remuneration to induce referrals by the Employed Physicians to Tuomey.

43. Defendant knowingly and willfully submitted false claims to the government by certifying that all claims for these prohibited referrals were submitted in compliance with all applicable statutes and regulations when Defendant had been advised and was aware that these claims arose out of illegal referrals under the provisions of The Anti-kickback Statute.

44. The United States government, unaware of the illegality of the referrals, and in reliance of the accuracy of the representations and certifications of Tuomey made in submission of those claims, paid the claims for the illegal referrals.

## Fourth Cause of Action
### (False Claims Act Liability for Violation of 42 U.S.C. § 1320a-7b(b)(2))
### (Real Estate Investment)

45. The allegations set forth above in paragraphs 1 – 44 are incorporated and realleged as if fully set forth herein.

46. Defendant entered into a real estate venture ("Real Estate Investments") with four physician groups, Sumter Ob/GYN; Sumter Surgical Associates, Palmetto Family Practice, and Drs. Lovice and Evangelisti (hereinafter collectively referred to as "Physician Investors") under terms which were not commercially reasonable and thereby provided prohibited remuneration to the Physician Investors. These Real Estate Investments contained provisions prohibiting the

11

Physician Investors from owning interests in ventures that competed with Tuomey for referrals for medical services. Tuomey offered these investments for the purpose of inducing the Physician Investors to make referrals for medical services to Tuomey and the Physician Investors could participate in the investment only for so long as they were on the clinical staff of Tuomey and therefore in a position to refer patients to Tuomey for medical services.

47. Tuomey knew that its actions were illegal under the Anti-kickback Statute at the time the Physician Investors purchased ownership interests in the venture.

48. Defendant knowingly and willfully violated the provisions of 42 U.S.C. § 1320a-7b(b)(2) ("The Anti-kickback Statute") by paying remuneration to induce referrals by the Physician Investors to Tuomey.

49. Defendant knowingly and willfully submitted false claims to the government by certifying that all claims for these prohibited referrals were submitted in compliance with all applicable statutes and regulations when Defendant had been advised and was aware that these claims arose out of illegal referrals under the provisions of The Anti-kickback Statute.

50. The United States Government, unaware of the falsity of the claims and in reliance on the accuracy thereof, paid the claims for the illegal referrals.

WHEREFORE, Plaintiff/Relator respectfully requests this Court enter judgment against the Defendant as follows:

(a) That the United States Government be awarded damages in the amount of three times the damages sustained by the United States because of the false claims alleged within the Complaint, to the full extent provided by the Civil False Claims Act, 31 U.S.C. §§ 3729 et seq.;

(b) That civil penalties of $11,000.00 be imposed for each and every false claim that defendant presented to the United States government and/or its grantees;

(c)     That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the relator necessarily incurred in bringing and pressing this case;

(d)     That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act for which redress is sought in this Complaint;

(e)     That the relator be awarded the maximum amount allowed to him pursuant to the False Claims Act; and

(f)     That this Court award such other and further relief as it deems just and proper.

Kevin M. Barth, Esquire (Fed. #1584)
Ballenger Barth & Hoefer, LLP
Post Office Box 107
Florence, SC  29503
843.662.6301
*Attorney for Plaintiff*

October 3, 2005
Florence, South Carolina

13