IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

CA NO.  3:05-CV-2858-MJP

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel., MICHAEL K. DRAKEFORD, M.D., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | FIRST AMENDED COMPLAINT OF THE UNITED STATES |
| TUOMEY d/b/a TUOMEY HEALTHCARE SYSTEM, INC. | ) ) ) | |
| Defendant. | ) ) ) | |

The United States of America, by and through the undersigned attorneys, hereby files this Amended Complaint and states:

**Jurisdiction And Venue**

1.    This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-33, and under common law theories of payment by mistake of fact and unjust enrichment.  This court has jurisdiction over this action under 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1345 and 1367(a).

2.    Venue is proper in the District of South Carolina, pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).

**Parties**

3.    Plaintiff, the United States of America, acting through the Department of Health and Human Services (HHS), administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act (Act), 42 U.S.C. §§ 1395 *et seq.*

("Medicare"), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Act, 42 U.S.C. §§ 1396 *et seq.* ("Medicaid").

4.    Defendant Tuomey, d/b/a Tuomey Healthcare System, Inc. (hereinafter "Tuomey") is a private, not-for-profit corporation incorporated in the State of South Carolina, with its principle place of business in Sumter, South Carolina.  Its registered agent is Jay Cox and its registered corporate address is 129 N. Washington Street, Sumter, South Carolina 29150 Tuomey's primary business is to own and operate Tuomey Hospital, located in Sumter, South Carolina, which is the business of providing inpatient and outpatient health care services. Tuomey bills for, and receives, a substantial amount of its revenue from Medicare and Medicaid, and has done so during all relevant times set forth in this Complaint.

5.    Tuomey is the sole owner (member) of Tuomey Professional Services, LLC (hereinafter "Tuomey Professional Services").

6.    Tuomey Professional Services is the sole owner of four other LLCs, Tuomey Gastroenterology Services, LLC (herein "Tuomey Gastroenterology"), Tuomey Surgical Services, LLC (herein "Tuomey Surgical"), Tuomey Ophthalmology Services, LLC (herein "Tuomey Ophtalmology") and Tuomey OB/GYN Services, LLC (herein "Tuomey OB/GYN") (herein jointly referred to as the "Tuomey Specialty Groups").

7.    Tuomey Professional Services and each of the Tuomey Specialty Groups were wholly controlled and directed by the officers and directors of Tuomey.

## The Law

8.      The False Claims Act (FCA) provides, in pertinent part that:

(a) Any person who (1) knowingly presents, or causes to be
presented, to an officer or employee of the United States
Government or a member of the Armed Forces of the United States
a false or fraudulent claim for payment or approval; (2) knowingly
makes, uses, or causes to be made or used, a false record or
statement to get a false or fraudulent claim paid or approved by the
Government; (3) conspires to defraud the Government by getting a
false or fraudulent claim paid or approved by the Government; . . .
or (7) knowingly makes, uses, or causes to be made or used, a false
record or statement to conceal, avoid, or decrease an obligation to
pay or transmit money or property to the Government,

* * *

is liable to the United States Government for a civil penalty of not
less than  $5,000 and not more than $10,000, plus 3 times the
amount of damages which the Government sustains because of the
act of that person . . . .
(b) For purposes of this section, the terms "knowing" and
"knowingly" mean that a person, with respect to information (1)
has actual knowledge of the information; (2) acts in deliberate
ignorance of the truth or falsity of the information; or (3) acts in
reckless disregard of the truth or falsity of the information, and no
proof of specific intent to defraud is required.

31 U.S.C. § 3729.

## The Medicare and Medicaid Programs

9.      In 1965, Congress enacted Title XVIII of the Social Security Act, known as the

Medicare program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is

based on age, disability or affliction with end-stage renal disease.  *See*  42 U.S.C. §§ 426, 426A.

Part A of the Medicare Program authorizes payment for institutional care, including hospital,

skilled nursing facility and home health care.  *See* 42 U.S.C.  §§ 1395c-1395i-4.

10.    HHS is responsible for the administration and supervision of the Medicare program.  The Centers for Medicare and Medicaid Services (CMS) is an agency of HHS and is directly responsible for the administration of the Medicare program.

11.    Under the Medicare program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient and outpatient services.  Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare program.

12.    As detailed below, Tuomey submitted or caused to be submitted claims both for specific services provided to individual beneficiaries and claims for general and administrative costs incurred in treating Medicare beneficiaries.

13.    Medicare has several parts, including Part A (which is primarily for hospital-based charges) and Part B (which is primarily for physician and other ancillary services).

14.    Providers who participate in Medicare part A must periodically sign an application for participation in the Medicare program.  On or about April 9, 1987, Louis H. Bremer, Jr., then Administrator of Tuomey, signed a Hospital Insurance Benefit Agreement (Form HCFA-1561) under which Tuomey agreed "to conform to the provisions of Section 1866 of the Social Security Act and applicable provisions in 42 CFR, Parts 405, 466, 420, and 489." On or about December 6, 2007, Paul Johnson, Tuomey's Chief Financial Officer, signed a new application and agreement on CMS Form 855A and submitted it to the United States.  On the page directly before his signature is a "Certification Statement" that contains, *inter alia*, the following language, "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . .  I understand that payment of a claim by Medicare is conditioned

4

upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare."

15.     To assist in the administration of Medicare Part A, CMS contracts with "fiscal intermediaries." 42 U.S.C. § 1395h. Fiscal intermediaries, typically insurance companies, are responsible for processing and paying claims and cost reports.

16.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a Form UB-92.

17.     As a prerequisite to payment by Medicare Part A, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as the hospital cost report. Cost reports are the final claim that a provider submits to the fiscal intermediary for items and services rendered to Medicare beneficiaries.

18.     After the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary, stating the amount of Part A reimbursement the provider believes it is due for the year. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. 42 C.F.R. §§ 405.1803, 413.60 and  413.64(f)(1).

19.     Tuomey was, at all times relevant to this complaint, required to submit annually a hospital cost report to the fiscal intermediary.

20.     During the relevant time period, Medicare Part A payments for hospital services were determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s) during the course of the fiscal year.  On the hospital cost report, this Medicare liability for services is then totaled with any other Medicare Part A  liabilities to the provider.  This total determines Medicare's true liability for services rendered to Medicare Part A beneficiaries during the course of a fiscal year.  From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Part A program or the amount due the provider.

21.     Under the rules applicable at all times relevant to this complaint, Medicare, through its fiscal intermediaries, had the right to audit the hospital cost reports and financial representations made by Tuomey to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made.  42 C.F.R. § 413.64(f).

22.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

23.     For fiscal years 2005 and 2006, the responsible provider official was required to certify, and did certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report]
> is a true, correct and complete statement prepared from the books
> and records of the provider in accordance with applicable
> instructions, except as noted.

6

> I further certify that I am familiar with the laws and regulations
> regarding the provision of health care services, and that the
> services identified in this cost report were provided in compliance
> with such laws and regulations.

24.    Thus, the provider was required to certify that the filed hospital cost report is

(1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct,

*i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with

applicable instructions; (3) complete, *i.e.*, that the hospital cost report is based upon all

information known to the provider; and (4) that the services provided in the cost report were

billed in compliance with applicable laws and regulations, including the Stark Statute (described

below).

25.    Tuomey submitted cost reports for fiscal years 2005 and 2006. Said cost reports

were signed by Paul Johnson, who attested, among other things, to the certification quoted above.

26.    For fiscal years 2005 and 2006, the hospital cost report certification page included

the following notice:

> Misrepresentation or falsification of any information contained in this cost
> report may be punishable by criminal, civil and administrative action, fine
> and/or imprisonment under federal law.  Furthermore, if services identified
> in this report were provided or procured through the payment directly or
> indirectly of a kickback or where otherwise illegal, criminal, civil and
> administrative action, fines and/or imprisonment may result.

27.    A hospital is required to disclose all known errors and omissions in its claims for

Medicare Part A reimbursement (including its cost reports) to its fiscal intermediary.  42 U.S.C.

§ 1320a-7b(a)(3) specifically creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting
> (A) his initial or continued right to any such benefit or payment . . .
> conceals or fails to disclose such event with an intent fraudulently to
> secure such benefit or payment either in a greater amount or quantity than

7

is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

28.    To assist in the administration of Medicare Part B, CMS contracts with "carriers." Carriers, typically insurance companies, are responsible for processing and paying claims.

29.    Doctors or other providers submit Medicare Part B claims to the carrier for payment.

30.    Under Part B, Medicare will generally pay 80 percent of the "reasonable" charge for medically necessary items and services provided to beneficiaries.  *See* 42 U.S.C. §§ 1395l (a)(1), 1395y(a)(1).  For most services, the reasonable charge has been defined as the lowest of (a) the actual billed charge, (b) the provider's customary charge, or (c) the prevailing charge for the service in the locality.  42 C.F.R. §§ 405.502-504.

31.    Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.  The federal involvement in Medicaid is largely limited to providing matching funds and ensuring that states comply with minimum standards in the administration of the program.

32.    The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP).  42 U.S.C. §§ 1396 *et seq*.

33.    Each state's Medicaid program must cover hospital services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

34.    In South Carolina, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to beneficiaries to the South Carolina Department of Human Services for payment.

8

## The Stark Statute

35.    Enacted as amendments to the Social Security Act, 42 U.S.C. § 1395nn (commonly known as the "Stark Statute") prohibits a hospital (or other entity providing designated health services) from submitting Medicare claims for designated health services (as defined in 42 U.S.C. § 1395nn(h)(6)) based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital, and prohibits Medicare from paying any such claims.  The regulations implementing 42 U.S.C. § 1395nn expressly require that any entity collecting payment for a healthcare service "performed under a prohibited referral must refund all collected amounts on a timely basis."  42 C.F.R. § 411.353 (2006).

36.    The Stark Statute establishes the clear rule that the United States will not pay for designated health services prescribed by physicians who have improper financial relationships with other providers.  The statute was designed specifically to prevent losses that might be suffered by the Medicare program due to questionable utilization of designated health services.

37.    Congress enacted the Stark Statute in two parts, commonly known as Stark I and Stark II.  Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider unless a statutory or regulatory exception applies.  *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204.

38.    In 1993, Congress extended the Stark Statute (Stark II) to referrals for ten additional designated health services.  *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152.

39.   The Stark Statute prohibits a hospital from submitting a claim to Medicare for "designated health services" that were referred to the hospital by a physician with whom the hospital has a "financial relationship," unless a statutory exception applies.  "Designated health services" include inpatient and outpatient hospital services. 42 U.S.C. § 1395nn(h)(6).

40.   In pertinent part, the Stark Statute provides:

(a)      Prohibition of certain referrals

(1) In general

Except as provided in subsection (b) of this section, if a physician   . . . has a financial relationship with an entity specified in paragraph (2), then –

(A)      the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and

(B)      the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S. C. § 1395nn(a)(1).

41.   Moreover, the Stark Statute provides that Medicare will not pay for designated health services billed by a hospital when the designated health services resulted from a prohibited referral under subsection (a).  42 U.S.C. § 1395nn(g)(1)

42.   "Financial relationship" includes a "compensation arrangement," which means any arrangement involving any remuneration paid directly or indirectly to a referring physician.  42 U.S.C. §§ 1395nn(h)(1)(A) and (h)(1)(B).

10

43.    The Stark Statute and regulations contain exceptions for certain compensation arrangements.  These exceptions include, among others, "bona fide employment relationships" and "personal services arrangements."

44.    In order to qualify for the Stark Statute's exception for bona fide employment relationships, compensation arrangements must meet, inter alia, the following statutory requirements:  (A) the amount of the remuneration is fair market value and not based on the value or volume of referrals, and (B) the remuneration would be commercially reasonable even in the absence of referrals from the physician to the hospital.  42 U.S.C. §§ 1395nn(e)(2)(B) and (e)(2)(C).

45.    In order to qualify for the Stark Statute's exception for personal services arrangements, a compensation arrangement must meet, inter alia, the following statutory requirements: (A) the compensation does not exceed fair market value, and (B) is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties (unless it falls within a further "physician incentive plan" exception as described in the statute).  42 U.S.C. § 1395nn(e)(3)(A)(v).

46.    A "physician incentive plan" under § 1395nn(e)(3) is defined very narrowly, and only applies to compensation arrangements that "may directly or indirectly have the effect of reducing or limiting services provided with respect to individuals enrolled with the entity." 42 U.S. C. §  1395nn(e)(3)(B)(ii).

47.    The Stark Statute also applies to claims for payment under Medicaid, and federal funds may not be used to pay for designated health services through a state Medicaid program. 42 U.S. C. § 1396b(s).

11

### The Fraud Scheme

48.    Beginning in January 2005 and continuing at least until September 2007, Tuomey devised a scheme by which it:

      a.    entered into compensation arrangements with physicians in violation of the Stark Statute, specifically by paying the physicians (who referred designated health services) under contracts that exceeded fair market value, were not commercially reasonable and which took into account the volume or value of the referrals or other business generated between the physician and Tuomey;

      b.    submitted and caused others to submit false and fraudulent claims for payment to Medicare and Medicaid, which included claims relating to inpatient and outpatient designated health services rendered to patients who were referred to the hospital by the physicians who had improper contracts which violated the Stark Statute.

### Outpatient Surgery Services in Sumter, South Carolina

49.    Tuomey is the only hospital located in Sumter County, South Carolina.

50.    Certain specialty group practices in Sumter (including without limitation gastroenterology) are the only group practice in the town or the county providing those specialty services.

51.    On or about October 26, 2001, Sumter Urological Surgery Center, LLC (hereinafter "Sumter Urology") submitted an application for a Certificate of Need to build a freestanding

Ambulatory Surgery Center ("ASC") in Sumter, South Carolina, which was ultimately operated under the name "Westmark Ambulatory Surgery Center."

52.    In South Carolina, ASCs are required to obtain a Certificate of Need to ensure that there is a need for the facility so that there will be less likelihood for there to be excess capacity for expensive health care facilities in a given community.

53.    ASCs are freestanding outpatient surgery centers which are authorized to perform less complicated and lower risk outpatient surgeries outside the confines of a hospital.

54.    In its application for an ASC, Sumter Urology indicated that the cost of services at its ASC would be considerably lower than for the same services at Tuomey.

55.    On or about February 21, 2002, almost four months after the submission of Sumter Urology's ASC application, Tuomey also applied for a Certificate of Need for its own ASC. Before Tuomey completed its ASC, however, it requested that its Certificate of Need for an ASC be converted to a Certificate of Need for an Outpatient Surgery Center ("OSC").

56.    Ultimately, both Sumter Urology's and Tuomey's requests for Certificate of Need were granted, and both Certificates of Need were officially issued on or about September 22, 2002.

57.    Westmark constituted the first substantial competition Tuomey would have for surgical services in Sumter County.

**Negotiations with Gastroenterologists and Hewson Opinion Letters**

58.    One of the physician specialty groups in Sumter County was a group of gastroenterologists who operated under the name of Sumter Medical Consultants, and had the

13

following physicians on its staff: Ted Williams, Kent Cunningham, Floyd Angus and Scott R. McDuffie (hereinafter collectively referred to as the "Gastroenterologists").

59.    At approximately the same time Tuomey was attempting to open its ASC (or OSC), specifically in or about 2003, Tuomey conducted (or commissioned) a study to determine the estimated lost revenue to Tuomey if the Gastroenterologists stopped doing a majority of their endoscopies at Tuomey.  The study concluded that the most likely result would be that the Gastroenterologists would redirect approximately 80% of their endoscopy practice away from Tuomey, and that this would result in lost revenue over a thirteen year period (discounted to net present value) of approximately $9,638,019.00.

60.  The study also concluded that Tuomey should "come up with a formula and also a fair market opinion letter that would be a reasonable range of pure productivity based incentive 20% for overhead %of collections for procedures (less overhead) specify that these #s are above and beyond their professional fees." (sic)

61.    Beginning at about the time of this study, Tuomey began negotiations with the Gastroenterologists to enter into a contract to hire them as full time employees of Tuomey.

62.    On or about August 19, 2003, following up on the negotiations with the Gastroenterologists, Tim Hewson (hereinafter "Hewson"), an attorney with the Nexsen Pruet law firm, gave Tuomey an opinion letter concerning two proposed contract arrangements with the Gastroenterologists.  That letter analyzed two possible agreements with the Gastroenterologists: (a) a full time employment contract, in which the physicians would run their office practice as a hospital clinic, and be employed full time by the hospital; or (b) an exclusive services contract. The letter recommended not entering into the exclusive services contract, in part because it might

14

violate the Stark Statute.  The letter said (concerning the proposed exclusive services contract),

"The compensation paid by the hospital is in return for the exclusivity and the covenant not to

compete under the agreement, which are harder to value than services, so there is a strong

appearance that the payment, all or part of it, is actually for referrals.  Furthermore, exclusive

agreements for gastroenterology that include subsidies are not common.  This could bring into

question whether the agreement is commercially reasonable."

63.    Sometime during the fall of 2003, the Gastroenterologists made clear to Tuomey

that they were not interested in a full-time employment contract.

64.    Thereafter, Tuomey came up with a new proposal for a compensation arrangement

with the Gastroenterologists, and presented it to Hewson for legal review.

65.    On or about January 19, 2004, Hewson gave Tuomey another opinion letter,

analyzing a new proposed contract between the Gastroenterologists and Tuomey.  In that letter,

he gave the opinion that as proposed at that time, the part-time employment contracts would not

qualify for the "bona fide employment" exception under the Stark Statute.  This letter stated that

under the IRS rules governing who is a "bona fide employee," there must be a certain degree of

control over the employee by the employer.  The letter further stated that under the proposed

arrangement, the physicians would be functioning in almost the same manner under the proposed

contract as they were prior to the contract – specifically, that they would be scheduling the

surgeries; they would be deciding what surgeries to perform; the patients would all be referred by

the physicians' private practice; and the physicians would continue to bill for the services.

Hewson concluded, "we believe that it is more likely than not that a Court or the IRS would hold

that the Physicians are not employees with respect to the endoscopic procedures."  Hewson

recommended that the proposed contract be amended such that Tuomey, and not the physicians, would submit the bills for the professional services, and that the physicians' earnings be reported on a W-2, which "would improve the chances that a court or the IRS would view the physicians as employees."

66.     Later in 2004, in an opinion letter dated "January 28, 2004, updated November 17, 2004," Hewson told Tuomey that the revised proposed contracts with the Gastroenterologists would fall within the "bona fide employment" exception to the Stark Statute.  Hewson referenced a report given by a healthcare consulting company called Cjeka Consulting "opining that the compensation to be paid for the professional and administrative services outlined in the Proposed Employment Agreement is both fair market value and commercially reasonable." Hewson went on to say that "Based upon the Cjeka report and the significant professional and administrative duties to be performed by the physicians . . . it is our belief that the Hospital has established that the employment arrangements meet the Stark and Anti-kickback exceptions for bona fide employment relationships."

**Cjeka Consulting's Opinions Concerning Fair Market Value**

67.     Cjeka Consulting (hereinafter "Cjeka") was a company that provided health care consulting services, but is no longer in operation.

68.     Cjeka helped design the compensation package that was offered to both the Gastroenterologists and other physicians, and knew that the compensation package was designed to pay the physicians, on average, 131% of the amount received as payment for their professional services covered by the contracts.

16

69. Sometime in 2004, Cjeka gave Tuomey a report saying that, in its opinion, the proposed compensation to the physicians was within "fair market value" for the services rendered.

70. Later, Cjeka gave specific opinion letters concerning fair market value on the following dates in connection with the following physicians:

| Physician(s) | Date of Opinion Letter(s) |
|---|---|
| Ted Williams | December 21, 2004 and July 28, 2005 |
| Kent Cunningham | December 21, 2004 and July 28, 2005 |
| Floyd Angus | December 21, 2004 and July 28, 2005 |
| Scott R. McDuffie | December 21, 2004 and July 28, 2005 |
| David E. Brown | February 28, 2005 |
| James Goodson | February 28, 2005 |
| John Britton | May 6, 2005 |
| Barney Williams | May 6, 2005 |
| Thomas Hepfer | May 6, 2006 |
| Murrell Smith | May 6, 2005 |
| Samuel Riddle | May 6, 2005 |
| Tessa Kincade | May 6, 2005 |

17

| | |
|---|---|
| Helen Latham | May 6, 2005 |
| Michael Drakeford | May 10, 2005 |
| James W. Ellett | July 27, 2005 |
| Henry P. Moses | July 27, 2005 |
| Mark M. Crabbe | July 27, 2005 |
| Jon Stanford | July 27, 2005 |
| Hans Brings | July 27, 2005 |

71.  In these opinion letters, Cjeka provided data from national or regional sources indicating the total compensation and net collections for physicians practicing the same medical specialty of the physician for whom the letter applied.  The total compensation and net collections was given for physicians who represented the 25th, 50th, 75th and 90th percentile of physicians in that specialty.  In each case, the total compensation described for a typical physician at each percentile was substantially less than 100% of the average physicians' net collections at that same percentile.

72.  As an example, in the December 21, 2004 letter concerning the Gastroenterologists, the data presented by Cjeka indicated that gastroenterologists at the 25th percentile of earnings had net collections of $592,860, and total compensation of $287,357 (which means that compensation was approximately 49% of net collections); those at the 50th percentile of earnings had net collections of $719,958 and total compensation of $362,073 (or approximately 50% of net collections); those at the 75th percentile of earnings had net collections of $839,973 and total compensation of $527,795 (or approximately 63% of net collections); and those at the 90th

18

percentile of earnings had net collections of $1,097,801 and total compensation of $669,346 (or

61% of net collections).

73.    Despite the fact that Cjeka's own data showed (on the face of the opinion letter) that

gastroenterologists received, on average, between 49% - 63% of their net collections, Cjeka

opined that Tuomey promise to pay these physicians, on average, 131% of their net collections

represented fair market value.

74.    On its face, however, the proposal to pay physicans 31% above and beyond their

total net collections plainly exceeded fair market value for the physicians' services and was not

commercially reasonable.  Tuomey therefore could not reasonably have relied upon Cjeka's

opinion to determine that the compensation arrangements in these contracts was fair market value

for the physicians' services or was commercially reasonable.

### Tuomey's Recruitment of Physicians

75.    During 2004 and 2005, Tuomey undertook substantial efforts to recruit physicians

to enter into part-time employment contracts.

76.    Cjeka, on behalf of Tuomey (and with the knowledge and consent of Tuomey), told

the physicians that the compensation package would result in the physicians being paid, on

average, 131% of the professional fees collected by Tuomey for the services covered under the

contracts.

77.    In the course of recruiting the physicians to sign the part time employment

contracts, Tuomey told one or more of these physicians that the arrangements did not violate the

Stark Statute.

19

78.   In the course of recruiting the physicians to sign the part time employment contracts, Tuomey also advised one or more of the physicians that the hospital had opinion letters from more than one attorney indicating that the proposed part time employment contracts did not violate the Stark Statute or other federal laws.

## The Physician Contracts

79.   Tuomey, through the respective Tuomey Specialty Groups (as identified in paragraph 6 above) entered into contracts with the following physicians on the following dates, all indicating that the physicians would be part time employees of Tuomey, providing outpatient surgery professional services:

| Physician | Date |
| --- | --- |
| Ted Williams | January 1, 2005 |
| Kent Cunningham | January 1, 2005 |
| Floyd Angus | January 1, 2005 |
| Scott R. McDuffie | January 1, 2005 |
| David E. Brown | January 1, 2005 |
| John Britton | January 1, 2005 |
| Barney Williams | January 1, 2005 |
| Thomas Hepfer | January 1, 2005 |
| Murrell Smith | January 1, 2005 |
| Samuel Riddle | January 1, 2005 |
| Tessa Kincade | January 1, 2005 |

| | |
|---|---|
| Helen Latham | January 1, 2005 |
| James Goodson | January 1, 2005 |
| James W. Ellett | May 1, 2005 |
| Henry P. Moses | May 1, 2005 |
| Mark M. Crabbe | May 1, 2005 |
| Jon Stanford | May 1, 2005 |
| Hans Brings | September 1, 2005 |

80.    Although there are minor differences in the various contracts, they all provide that the physicians will be paid a base salary, and various bonuses.  The bonuses include a productivity bonus that is based upon either the dollar value of the receipts of the applicable Tuomey Specialty Group received in connection with that physician's services or the number of procedures performed by that physician.  Tuomey represented to the physicians that the bonuses would result in, on average, the physicians receiving approximately 131% of the actual amount of payments received in connection with the physicians' services (regardless of whether such payments were received from  patients, insurance, Medicare, Medicaid or other sources).  In addition, each of the contracts requires the physicians to perform all outpatient surgeries (or "invasive outpatient gastroenterology procedures") at Tuomey.  The contracts also each contain an "Agreement Not to Compete" that prohibits the physicians from performing outpatient surgeries at any other location, including specifically any ambulatory surgical center within 30 miles of the hospital for the period that the contract is in place, plus up to two years following the termination of the contract. Each of these contracts provided that the bills for the physicians' services would be submitted in the name of the respective Tuomey Specialty Group; however,

21

the physicians' private offices have actually continued to prepare and submit all the bills on behalf of the respective Tuomey Specialty Group.

### Recruitment of Dr. Drakeford

81.    One of the physicians Tuomey attempted to hire as a part-time physician under a similar contract was Dr. Michael Drakeford (hereinafter "Drakeford"), who is the Relator in this lawsuit.  The contract that Tuomey proposed to Drakeford was materially the same as the contracts with the other physicians, described in paragraphs 79-80 above.

82.    Drakeford is an orthopedic surgeon, who, at the time Tuomey approached him, owned the only orthopedic clinic in Sumter County.

83.    In or about September 2004, Drakeford hired an attorney, Greg Smith (of the Womble Carlyle law firm) (hereinafter "Smith") to review the contract proposal and advise him about the proposed arrangement with Tuomey.

84.    Smith advised Drakeford not to sign the contract proposed by Tuomey because, in his opinion, it clearly violated the Stark Statute (in addition to other problems, including potentially violating other federal laws as well).

85.    Smith (Drakeford's attorney) and Hewson (Tuomey's attorney) discussed the issue of whether the contract violated the Stark Statute, but did not agree on the answer to this question.

86.    Tuomey and Drakeford agreed to jointly retain another attorney to advise them further about this issue.

## Consultations with Kevin McAnaney

87.    Tuomey and Drakeford jointly hired attorney Kevin McAnaney (hereinafter "McAnaney") to advise them about whether the proposed contract with Drakeford complied with the Stark Statute and other applicable laws and regulations.

88.    From 1997 until May 2003, McAnaney had served as the Chief of the Industry Guidance Branch of the Office of Counsel to the Inspector General of the Department of Health and Human Services.   The Industry Guidance Branch is and was responsible for issuing formal guidance to health care providers through advisory opinions and fraud alerts.

89.    The agreement between the parties to hire McAnaney was memorialized in an engagement letter dated May 6, 2005.  This letter provided that both Tuomey and Drakeford were his joint clients, that they could each provide information independently to McAnaney, that if they specifically requested that such information be kept confidential from the other client, McAnaney would keep that information confidential, but that all other information would be freely shared among the clients.

90.    Both Tuomey and Drakeford, through their respective attorneys, provided McAnaney with information, pursuant to the May 6, 2005 engagement letter, including, without limitation the following:  memo from Greg Smith to Tim Hewson analyzing the agreements, executive summaries of the gastroenterology agreements prepared by Tim Hewson and presented to the Tuomey Board of Directors describing the proposed agreements and analyzing the legal issues involved, sample contracts, sample opinion letters from Cjeka, and a copy of the powerpoint presentation prepared by Cjeka that was used for physician recruitment.

23

91.    McAnaney prepared notes for his own use in preparation for a conference call between the parties' attorneys, in which he wrote, inter alia, that fair market value would not be accepted by the government, that the agreement was very risky, that pay is more than fair market value, that one can't pay for referrals, and that the consultant's (i.e. Cjeka's) presentation bothered him – that it showed 31% above fair market value.

92.    On or about June 22, 2005, Tuomey's attorney (Hewson) and Drakeford's attorney (Smith) conducted a telephone conference call with McAnaney to discuss the proposed contract with Drakeford.

93.    During that conference call, McAnaney told Hewson and Smith, inter alia, the following:  that the contracts were problematic, that there was a  problem under the Stark Statute based on fair market value, that the non-compete agreement was a problem because it locked in referrals and was for more than one year, that the background concerning the ASC (i.e. Westmark) created a problem, that the fair market value issue would be an easy issue for the government to go after, and that compensation above fair market value was an easy case under the Stark Statute.

94.    On or about August 19, 2005, Drakeford's attorney requested that McAnaney put this opinion in writing for both parties.

95.    Tuomey objected to McAnaney putting this opinion in writing.  Instead, in a letter dated September 2, 2005, Tuomey's attorney told McAnaney that "at this time, you are not authorized to do any further work in this matter, including preparing a written opinion."

96.    At least by June 22, 2005 (based upon McAnaney's statements and Tuomey's refusal to allow McAnaney to put his opinion in writing), Tuomey had actual knowledge or, at a

minimum, acted in deliberate ignorance or reckless disregard of the fact that the compensation

arrangements with the physicians specified in paragraphs 79-80 above were in violation of the

Stark Statute.

### Hall & Render Opinion Letter

97.    Sometime after instructing McAnaney to cease all work on the matter, Tuomey

sought and obtained a legal opinion from the firm of Hall & Render.

98.    The opinion letter from Hall & Render said that the financial relationships between

"Tuomey, the Practice Groups, and the Physicians is unlikely to violate the Stark Law." The

letter also stated, "Risk is unavoidable because a jury or governmental entity could mistakenly

conclude that something of value passing between the hospital and a third party was intended to

induce referrals."

99.    Hall & Render's opinion letter relied on Cjeka's "fair market value" opinion letters,

and indicated that Cjeka's conclusion concerning "fair market value" was "critical to [their]

analysis."

100.    Hall Render's opinion letter recommended that two changes be made in the

contracts in order to "reduce the risks" created by the compensation agreements with the

physicians described in paragraphs 79 and 80 above.  The first recommended change was to

amend all of the physicians' part-time employment contracts to provide that "the exclusive use

requirement is not applicable if the patient expresses a different preference, or if in the

Physician's judgement the referral to Tuomey is not in the patient's best medical interest."  The

second recommended change was to amend the contract with the "GI" (i.e. Gastroenterologist)

physicians so that the "compensation methodology for the Gis" would be "the same as the methodology used for the other physicians."   The letter went on to say, "In other words, the amount of base compensation for the Gis would be adjusted based upon the revenue collected, not the procedures performed . . . ."

101.   Tuomey did not make these two changes as recommended by Hall & Render.

## Tuomey Board of Directors

102.   Shortly before July 19, 2005, Drakeford made a request to James Wilson, chairman of Tuomey's Board of Trustees, to meet with the Board at their regularly scheduled meeting on July 25, 2005, to discuss his (Drakeford's) concerns about the proposed part-time employment agreements.

103.   On or about July 19, 2005, James Wilson wrote a letter to Drakeford asking him to put his request in writing, and also saying that the Board would "not be able to hear from you at the July 25, 2005 meeting but will consider your request expeditiously."

104.   On or about July 19, 2005, Drakeford put his request in writing.

105.   At the July 25, 2005 meeting, the Board adopted a policy which said that any request by any person to speak to the Board of Trustees could only be presented to "the Chairman of the Board or the President and CEO of Tuomey."   The new policy also said that "if the Chairman decides that an issue(s) should be heard, he or she will decide if the full Board, Executive Committee, or other Board Committees should hear the issue(s)."   The policy also said, "In no event shall legal counsel for the requestor be allowed to present to the Board or

Committees, nor shall the requestor's legal counsel be allowed to attend any meeting as outlined"
in the policy.

106.    The effect of this policy was to put the decision of whether to allow any person to
make a presentation to the Board in the sole hands of the Chairman of the Board and the CEO of
Tuomey, and to prevent any person's attorney from attending the meeting, if his request to speak
were allowed.

107.    On or about July 28, 2005, Tuomey informed Drakeford of the new policy, but did
not respond specifically to his written request to meet with the board (other than to send him a
copy of the new policy).

### False and Fraudulent Claims and Statements

108.    The physicians with whom Tuomey entered into financial relationships specified
in paragraphs 79-80 above referred patients, including Medicare and Medicaid patients, to
Tuomey in violation of the Stark Statute.

109.    Tuomey, in turn, presented, or caused to be presented through the fiscal
intermediary and carrier, claims for payment to the Medicare program for designated health
services provided on referrals from the physicians with whom it had entered into prohibited
financial relationships as set forth in paragraphs 79-80.  Tuomey also presented, or caused to be
presented through the State of South Carolina Department of Health and Human Services, claims
for payment to the Medicaid program for designated health services provided on referrals from
the physicians with whom it had entered into prohibited financial relationships as set forth in

paragraphs 79-80. Tuomey thereby obtained payments from the United States in violation of the Stark Statute.

110. Under the False Claims Act, 31 U.S.C. § 3729(a)(1), the claims set forth in paragraph 109 above were false and/or fraudulent because Tuomey was prohibited by the Stark Statute from obtaining payment from the United States upon claims for designated health services provided on referrals from the physicians with whom it had entered into financial relationships as set forth in paragraphs 79-80.

111. Tuomey also violated the False Claims Act, 31 U.S.C. § 3729(a)(2), by making false statements, or causing false statements to be made by the fiscal intermediary and carrier, to get claims paid by Medicare for designated health services provided on referrals from the physicians with whom it had entered into financial relationships as set forth in paragraphs 79-80. Tuomey's certifications on its cost reports that its statements were "true" and/or "correct" and that it was entitled to payment of its claims for such services were false or fraudulent because the Stark Statute prohibited Tuomey from receiving payments from the United States for those claims.

112. Tuomey knowingly made, used, and caused to be made or used false records and statements to conceal, avoid or decrease its obligations to pay or transmit money to the United States (i.e. to avoid refunding payments made in violation of the Stark Statute) by certifying on their annual cost reports that the services were provided in compliance with federal law, all in violation of the False Claims Act, 31 U.S.C. § 3729(a)(7). The false certifications, made with each annual cost report submitted to the government, were part of Tuomey's unlawful scheme to defraud Medicare and other government healthcare programs.

113.    All claims submitted to Medicare or Medicaid by Tuomey (including the Tuomey Practice Groups identified in paragraph 6 above) for designated health services referred by any of the physicians identified in paragraph 79 after the date of the contracts specified in paragraphs 79 and 80 above were false claims submitted to the United States.

114.    Tuomey presented, or caused to be presented, all of said false claims with actual knowledge of their falsity, or in deliberate ignorance or reckless disregard that such claims were false and fraudulent.

**Count I**
**False Claims Act, 31 U.S.C. § 3729(a)(1)**
**Presenting Claims to Medicare and Medicaid**
**for Designated Health Services Rendered as a Result of**
**Violations of the Stark Statute**

115.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

116.    Tuomey knowingly presented, or caused to be presented, false and fraudulent claims for payment or approval to the United States, including those claims for reimbursement (identified in paragraphs 108-114 above)  for designated health services rendered to patients who were referred by physicians with whom Tuomey had entered into prohibited financial relationships in violation of the Stark Statute.

117.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

118.    By virtue of the false or fraudulent claims made by the Tuomey, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of

29

an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

*See* 28 U.S.C. Section 3729(a) and 28 C.F.R. Section 85.3(a)(9).

## Count II
## False Claims Act, 31 U.S.C. § 3729(a)(2)
## Use of False Statements

119.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

120.    Tuomey made, used, and caused to be made or used, false records or statements — *i.e.,* the false certifications and representations made and caused to be made by Tuomey when initially submitting the false claims for interim payments and the false certifications made by Tuomey in submitting the cost reports — to get false or fraudulent claims paid and approved by the United States.

121.    Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

122.    By virtue of the false or fraudulent claims made by Tuomey, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act in an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Count III
## False Claims Act, 31 U.S.C. § 3729(a)(7)
## False Record to Avoid an Obligation to Refund

123.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

30

124.    Tuomey made and used or caused to be made or used false records or false statements — *i.e.*, the false certifications made or caused to be made by Tuomey in submitting the cost reports — to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

125.    Said false records or statements were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

126.    By virtue of the false records or false statements made by Tuomey, the United States has suffered damages and therefore is entitled to recovery as provided by the False Claims Act of an amount to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## Count IV
## Payment Under Mistake of Fact

127.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

128.    This is a claim for the recovery of monies paid by the United States to Tuomey (directly or indirectly) as a result of mistaken understandings of fact.

129.    Tuomey was not entitled to receive payment from the United States for designated health services rendered by any physician who was in a financial relationship prohibited by the Stark Statute.

130.    The United States paid Tuomey for claims for designated health services rendered by physicians who were in a financial relationship prohibited by the Stark Statute without knowledge of material facts, and under the mistaken belief that Tuomey was entitled to receive

31

payment for such claims.  The United States' mistaken belief was material to its decision to pay Tuomey for such claims.  Accordingly, Tuomey is liable to account and pay to the United States the amounts of the payments made in error to Tuomey by the United States.

## Count V
## Unjust Enrichment

131.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

132.    This is a claim for the recovery of monies by which Tuomey has been unjustly enriched.

133.    By directly or indirectly obtaining government funds to which it was not entitled, Tuomey was unjustly enriched, and is liable to account and pay such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

## Count VI
## Disgorgement, Constructive Trust, and Accounting

134.    Plaintiff incorporates by reference all paragraphs of this complaint set out above as if fully set forth.

135.    This is a claim for disgorgement of profits earned by Tuomey because of excess payments Tuomey made to physicians.

136.    Tuomey concealed its illegal activity through false statements, claims, and records, and failed to abide by their duty to disclose such information to the United States.

137.    The United States did not detect Toumey's illegal conduct.

32

3:05-cv-02858-MBS   Date Filed 12/21/07   Entry Number 59   Page 33 of 34

138.     This court has the equitable power to, among other things, order Tuomey to disgorge the entire profit Tuomey earned from business generated as a result of their violations of the Stark Statute, the common law and the False Claims Act.

139.     By this claim, the United States requests a full accounting of all revenues (and interest thereon) and costs incurred by Tuomey on referrals from physicians to whom it paid excess remuneration, disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States on those profits.


**Prayer For Relief**

WHEREFORE, plaintiff, United States requests that judgment be entered in its favor and against Tuomey as follows:

1.     On the First, Second, and Third Counts under the False Claims Act for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper.

2.     On the Fourth and Fifth Counts, for payment by mistake and unjust enrichment, for the damages sustained and/or amounts which Tuomey received in error or by which Tuomey was unjustly enriched, plus interest, costs, and expenses, and all such further relief as may be just and proper.

3.     On the Sixth Count, for disgorgement of illegal profits, for an accounting of all revenues unlawfully obtained by Tuomey, the imposition of a constructive trust upon such revenues, and the disgorgement of the illegal profits obtained by Tuomey and such further equitable relief as may be just and proper.

**Jury Demand**

The United States demands a trial by jury.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General


G. NORMAN ACKER, III
Special Attorney and
Assistant United States Attorney
Eastern District of North Carolina
310 New Bern Ave., Suite 800
Raleigh, NC 27601
Telephone: 919-856-4530
Facsimile:  919-856-4820
Email:  norman.acker@usdoj.gov


(f—) JOYCE R. BRANDA
MICHAEL D. GRANSTON
TRACY L. HILMER
NIALL M. O'DONNELL
Attorneys, Civil Division
United States Department of Justice
Post Office Box 261, Ben Franklin Station
Washington, D.C.  20044
Telephone:  202.307.0474
Email: tracy.hilmer@usdoj.gov

Attorneys for the United States

34