**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* MICHAEL K. DRAKEFORD, M.D., | ) ) ) ) | CA No.: 3:05-CV-02858-MJP |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| TUOMEY HEALTHCARE SYSTEM, INC., | ) ) | **ANSWER AND DEFENSES** |
| Defendant. | ) ) | |

**INTRODUCTION**

Tuomey Healthcare System, Inc. is a charitable, nonprofit corporation which provides hospital and health care services to the people of Sumter County South Carolina and the surrounding area. Like many other hospitals serving poor, rural communities, Tuomey has incurred significant financial losses in recent years. Tuomey has also faced an increasingly difficult time recruiting and retaining physicians to meet the health care needs of the community it serves in order to meet needs. In 2004, Tuomey's subsidiaries began to negotiate part-time employment contracts with physicians on its medical staff. These contracts were designed to assure that needed physician services would remain available to the community. Tuomey received legal opinions from two prominent law firms that the contracts were legal.

One of the physicians who had been offered a part-time employment contract, Dr. Michael Drakeford, demanded better financial terms than Tuomey was prepared to offer. When Tuomey declined to offer Dr. Drakeford more money, he began to raise bogus compliance concerns about the contracts. Notwithstanding its belief that the contracts were valid and legal, Tuomey's Board directed its lawyers to disclose the contracts to and seek guidance from the United States Government. Tuomey's lawyers did so. However, after this disclosure was made to the Government, and after two of Dr. Drakeford's physician employees voluntarily left his practice and went to work for Tuomey, Dr. Drakeford filed this lawsuit. It is the position of

1

Tuomey, for the reasons set forth below, that the subject part-time employment contracts are legal, and that the lawsuit is baseless and should be dismissed.

**DEFENSES**

Tuomey interposes the following Defenses to the claims asserted in the Second Amended Complaint, and incorporates Paragraphs 1 through 139 of its Answer below as if fully restated herein:

**First Defense**

**Justification**

**Charitable Status and Mission of Tuomey**

1. Tuomey is a South Carolina nonprofit corporation, which since its founding in 1913 has been organized and operated exclusively for the charitable purpose of caring for the health needs of the people of Sumter County and the surrounding area.

2. As a result of its charitable mission and operations, Tuomey has been officially recognized as exempt from federal income taxation by the Internal Revenue Service under Section 501(c)(3) of the Internal Revenue Code.

3. Tuomey is ultimately governed and managed by a Board of Trustees who are representatives of the community it serves. The elected members of that Board serve without compensation.

4. Sumter County has been officially recognized as a medically underserved area by the Health Resources Services Administration of the United States Department of Health and Human Services.

5. Tuomey's medical staff development plan indicates that there is an acute shortage of physicians in the community, including a shortage of general surgeons, gastroenterologists, ophthalmologists and obstetrician/gynecologists.

6. Tuomey has been officially recognized by the federal Medicare and Medicaid programs as serving a disproportionately high number of Medicaid and medically indigent patients.

7. Tuomey also serves as the hospital for the uniformed and civilian personnel stationed at nearby Shaw Air Force Base, since the base hospital closed in 2004.

8. During the fiscal years when the subject part-time employment contracts were in effect, Tuomey's audited financial statements indicate that Tuomey donated charity care to medically indigent individuals in the following amounts when measured at Tuomey's established rates:

    FYE 9/30/2005        $20,853,000

    FYE 9/30/2006        $13,563,000

    FYE 9/30/2007        $42,682,667

9. In its fiscal year ended September 30, 2007 alone, Tuomey provided nearly $26,000,000 in subsidies for the cost of providing hospital services to federal beneficiaries enrolled in the Medicare, Medicaid and Champus/Tricare programs. Much of this unpaid and underpaid hospital care was accompanied by unpaid and underpaid physician care.

10. All of the part-time employment contracts referred to in the Second Amended Complaint were entered into by Tuomey's subsidiaries for the purpose of furthering its charitable mission of making needed health care services available to the people of the medically underserved Sumter County.

11. All of the part-time employment contracts provided for and resulted in compensation being paid to the physician employees that was commercially reasonable and reflected the fair market value of their services.

12. But for the part-time employment contracts, a number of the physician employees would likely have left the Sumter community, thereby making the acute physician shortage only worse.

13. Therefore, Tuomey has not, by virtue of the part-time employment contracts or otherwise, violated the False Claims Act, caused the United States to make any payment to it under mistake of fact, been unjustly enriched, or engaged in any other conduct that would entitle the United States to relief in the form of disgorgement, the imposition of a constructive trust, or an accounting.

14. To the contrary, the part-time employment contracts referred to in the Second Amended Complaint have actually *benefited* the United States by enabling Tuomey and the physicians employed by Tuomey to provide needed medical and hospital services to the residents of a medically underserved area, to the beneficiaries of federal entitlement programs, including the poor and elderly covered by Medicaid and Medicare, individuals

## Second Defense
## Lack of Subject Matter Jurisdiction
## Self-Disclosure by Tuomey

15. The False Claims Act, at 31 U.S.C. §3730(e)(4)(A), provides that "[n]o court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or Governmental Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information." Because Tuomey reported the subject part-time employment contracts to the United States Government before Dr. Drakeford brought his suit, Dr. Drakeford is not the "original source" and thus his suit fails due to lack of subject matter jurisdiction.

16. The False Claims Act, at 31 U.S.C. §3730(e)(4)(B), defines an "original source" as "an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

17. On August 25, 2005, Attorney Ralph Barbier from the Columbia law firm of Nexsen Pruet, acting on behalf and at the direction of Tuomey, placed a telephone call to Jennifer Aldrich, an Assistant United States Attorney for the District of South Carolina. During that telephone conversation, Mr. Barbier informed Ms. Aldrich that he wished to meet with her to discuss an issue that one of his hospital clients had concerning physician contracts. Ms. Aldrich agreed to meet with Mr. Barbier to discuss the matter.

18. On September 2, 2005, Mr. Barbier and his partner, Attorney Timothy Hewson, met with Ms. Aldrich in the United States Attorney's Office in Columbia. At this meeting, Mr. Barbier and Mr. Hewson informed Ms. Aldrich of the nature and substance of the part-time employment contracts between Tuomey and its physicians. They also informed Ms. Aldrich that another physician (Dr. Drakeford) had questioned whether the part-time

employment contracts complied with the law. Mr. Barbier and Mr. Hewson told Ms. Aldrich that, in their opinion, the part-time employment contracts did comply with the law and that the concerns raised about them by Dr. Drakeford were not raised in good faith because Dr. Drakeford had been negotiating with Tuomey, had asked for more money, and was raising bogus compliance concerns to get better negotiating leverage. Mssrs. Barbier and Hewson asked Ms. Aldrich for guidance as to an appropriate course of action. Ms. Aldrich told them that she would discuss the matter with the Office of Inspector General of the Department of Health and Human Services ("OIG") and then get back to them.

19. On September 15, 2005, Ms. Aldrich called Mr. Barbier to inform him that she had a potential conflict of interest with respect to the matter and would not be further involved. Ms. Aldrich instructed Mr. Barbier to send the Tuomey contracts to Mr. Chris Lott, an agent with the Columbia office of the OIG, and then to find out what Mr. Lott wanted them to do.

20. Shortly after his telephone conversation with Ms. Aldrich, on September 15, 2005, Mr. Barbier placed a telephone call to Mr. Lott, to inform Mr. Lott of his conversation with Ms. Aldrich concerning Tuomey and to inform Mr. Lott that he would be sending the Tuomey part-time physician contracts to him.

21. On September 27, 2005, Mr. Barbier had templates of the Tuomey part-time employment contracts hand delivered to Mr. Lott. The United States Government was hereby notified.

22. On October 3, 2005, Dr. Drakeford filed the original Complaint in this action with the Court under seal, along with his supporting Memorandum of Material Evidence.

23. At no time prior to this date had any representative of the federal government informed any representative of Tuomey that Dr. Drakeford or any of his attorneys or representatives had contacted them about the matters referred to in his Complaint. In fact, Tuomey had no knowledge about the existence of this lawsuit until after the Complaint was partially unsealed on March 17, 2006.

24. The United States commenced an investigation relating to the part-time employment contracts as a result of Hewson's disclosure on behalf of Tuomey.

25. As a result of the voluntary disclosure to the United States Attorney's office and the subsequent investigation of the United States, the allegations contained in Drakeford's

original Complaint, as well as the Second Amended Complaint filed by the United States, were publicly disclosed within the meaning of 31 U.S.C. §3730(e)(4)(A) prior to the filing of Drakeford's original Complaint.

26. Drakeford was not the "original source" of the information contained in his original Complaint, Amended Complaint, or the Second Amended Complaint filed by the United States within the meaning of 31 U.S.C. §3730(e)(4)(B) because he lacked direct and independent knowledge of the information on which the allegations in the original Complaint, Amended Complaint, and Second Amended Complaint was based, and because of Hewson's prior voluntary disclosure of that information to the United States on behalf of Tuomey.

27. Therefore, this Court lacks subject matter jurisdiction over the action brought by Drakeford.

### Third Defense
### Advice of Counsel

28. Throughout the process of developing and implementing the part-time employment contracts referred to in the Second Amended Complaint, Tuomey sought and followed the advice of its legal counsel and other advisors.

29. On January 20, 2004, Tuomey received an evaluation of the concept of employing specialist physicians on a part-time basis from Richard P. Kusserow, the President of Strategic Management Systems, Inc. Mr. Kusserow is the former Inspector General of the federal Department of Health and Human Services.

30. On January 28, 2004, Tuomey's legal counsel, Nexsen, Pruett, LLC, furnished a reasoned legal opinion, updated on November 22, 2004, which concluded that the proposed part-time employment contracts were legal.

31. Tuomey obtained opinions from the Cejka Consulting group that the compensation paid pursuant to each of the part-time employment contracts was reasonable and reflected the fair market value of their services.

32. Tuomey received another reasoned legal opinion from the nationally recognized health law firm of Hall, Render, Killian, Heath & Lyman dated October 26, 2005, confirming that the part-time employment contracts were legal.

33. Any certifications that Tuomey may have made to the United States on its cost reports or otherwise relative to compliance with applicable rules and regulations were made in reliance of the advice Tuomey received from the aforementioned attorneys and advisors and with the reasonable belief that said certifications were true and thus did not violate the False Claims Act.

34. To the extent that any of the allegations alleged in the Second Amended Complaint to have been taken by Tuomey occurred, said actions were taken in reliance of the advice Tuomey received from the aforementioned attorneys and advisors and not with any improper or illegal purpose or intent.

## Fourth Defense
## Good Faith

35. In all matters related to the part-time employment contracts referred to in the Second Amended Complaint, Tuomey relied and acted upon the advice of its attorneys and advisors, so that any certifications that Tuomey may have made to the United States on its cost reports or otherwise relative to compliance with applicable rules and regulations did not violate the False Claims Act.

36. Tuomey reasonably believed and continues to believe that the part-time employment contracts referred to in the Second Amended Complaint comply with all applicable laws and regulations.

37. Any certifications that Tuomey may have made to the United States on its cost reports or otherwise relative to compliance with applicable rules and regulations were made in good faith and with the reasonable belief that said certifications were true and thus did not violate the False Claims Act.

38. To the extent that any of the allegations alleged in the Second Amended Complaint to have been taken by Tuomey occurred, said actions were taken in good faith and not with any improper or illegal purpose or intent.

## Fifth Defense
## Failure to State a Claim for which Relief Can be Granted
I

39. The part-time employment contracts referred to in the Second Amended Complaint do not constitute a "financial relationship" between Tuomey and the physicians who are parties to said part-time employment contracts as that term is defined in the Stark Law or the regulations thereunder.

40. To the extent that the part-time employment contracts referred to in the Second Amended Complaint were found to constitute a "financial relationship" between Tuomey and the physicians who are parties to said part-time employment contracts as that term is defined in the Stark Law or the regulations thereunder, said contracts comply with applicable exceptions set forth in the Stark Law or the regulations thereunder.

41. The certifications of compliance contained in the Medicare cost reports referred to in the Second Amended Complaint are not required as a condition of payment by Medicare or Medicaid. Therefore, even if said certifications were incorrect or false, that fact would not give rise to an action under the False Claims Act.

42. Any claims for payment for services rendered to Medicare patients are submitted by Tuomey to its fiscal intermediary and not directly to the Centers for Medicare & Medicaid Services and therefore are not presented to an officer or employee of the United States Government so as to be actionable under the False Claims Act.

43. The facts alleged in the Second Amended Complaint do not entitle the United States or Drakeford to the relief requested as a matter of law.

## II

44. The Second Amended Complaint improperly sets forth allegations in violation of Fed. Rule of Evidence 408, as set forth in Tuomey's prior Motion to Exclude Evidence and/or Strike, and Memoranda in support thereof, which are incorporated by reference herein.

45. Therefore, the Second Amended Complaint fails to state a claim for which relief can be granted.

### Sixth Defense
### Lack of Wrongful Conduct

46. Tuomey did not present or cause to be presented any false claim, record or statement to the United States Government.

47. Tuomey did not violate any provisions of any laws, rules or regulations.

48. Tuomey did not breach any duties under any laws, rules or regulations.

49. Tuomey did not engage in any wrongful conduct, any knowing misrepresentations, or any fraud with respect to the State of South Carolina or the United States.

## Seventh Defense
## Unconstitutionality of False Claims Act

50. To the extent that penalties under the False Claims Act exceed any actual damage incurred by the Government as a result of any claims paid, said Act violates the Excessive Fines Clause of the Eighth Amendment to the United States Constitution, and therefore is void.

## Eighth Defense
## Standing

51. Dr. Drakeford has no standing to assert a claim that Tuomey violated the Stark law or to assert a claim for relief under the common law or equitable theories of Payment Under Mistake of Fact (Count IV), Unjust Enrichment (Count V), or Disgorgement, Constructive Trust and Accounting (Count VI). Therefore, these claims must be dismissed as to Drakeford.

## ANSWER

Tuomey answers the allegations contained in the Second Amended Complaint of the United States as follows:

1. Denied.
2. Admitted.
3. Admitted.
4. Admitted.
5. Admitted.
6. Admitted.
7. Denied.
8. It is admitted that the sections quoted in this Paragraph are part of the False Claims Act. Except as so admitted, the allegations in this Paragraph are denied.
9. Admitted.

10. Admitted.

11. It is admitted that under the Medicare program, CMS makes payments to hospitals for inpatient and outpatient services, and that Medicare enters into provider agreements with hospitals. Except as so admitted, the allegations contained in this Paragraph are denied.

12. It is admitted that Tuomey submitted or caused to be submitted claims both for specific services provided to individual beneficiaries and claims for costs incurred in treating Medicare beneficiaries. Except as so admitted, the allegations contained in this Paragraph are denied.

13. Admitted.

14. It is admitted that providers who participate in Medicare Part A must periodically sign an application for participation in the Medicare program. It is admitted that on or about April 9, 1987, Louis H. Bremer, then Administrator of Tuomey, signed a Hospital Insurance Benefit Agreement (Form HCFA-1561), and that on or about December 6, 2007, Paul Johnson, Tuomey's Chief Financial Officer, signed a new application on CMS Form 855A and submitted it to the United States. Except as so admitted, the allegations contained in this Paragraph are denied.

15. Admitted.

16. Admitted.

17. Admitted.

18. It is admitted that after the end of each hospital's fiscal year, the hospital files its hospital cost report with the fiscal intermediary, stating the amount of Part A reimbursement the provider believes it is due for the year. Tuomey is without knowledge and information sufficient to form a belief as to the truth of the remaining allegations in this Paragraph.

19. Admitted.

20. Denied.

21. Admitted.

22. Admitted.

23. Denied.

24. Denied.

25. It is admitted that Tuomey submitted cost reports for fiscal years 2005 and 2006. Except as so admitted, the allegations contained in this Paragraph are denied.

26. Admitted.
27. Denied.
28. Admitted.
29. Admitted.
30. Admitted.
31. Admitted.
32. Admitted.
33. Admitted.
34. Admitted.
35. Denied.
36. Denied.
37. Denied.
38. Denied.
39. Denied.
40. Denied.
41. Denied.
42. Denied.
43. Denied.
44. Denied.
45. Denied.
46. Denied.
47. Denied.
48. Denied.
49. Admitted.
50. Admitted.
51. Admitted.
52. Denied.
53. Admitted.
54. Tuomey is without knowledge and information sufficient to form a belief as to the truth of the allegations in this Paragraph.
55. Admitted.

56. Admitted.
57. Denied.
58. Admitted.
59. Denied.
60. Denied.
61. It is admitted that Tuomey began negotiations with gastroenterologists to enter into a contract to hire them as full-time employees. Except as so admitted, the allegations contained in this Paragraph are denied.
62. It is admitted that on or about August 19, 2003, Mr. Hewson gave Tuomey an opinion letter. Except as so admitted, the allegations contained in this Paragraph are denied.
63. Admitted.
64. Denied.
65. It is admitted that on or about January 19, 2003, Hewson gave Tuomey another opinion letter. Except as so admitted, the allegations contained in this Paragraph are denied.
66. It is admitted that Hewson gave Tuomey another opinion letter dated January 28, 2004, updated November 17, 2004. Except as so admitted, the allegations contained in this Paragraph are denied.
67. Admitted.
68. It is admitted that Cejka helped design the compensation package that was offered to both the Gastroenterologists and other physicians. Except as so admitted, the allegations contained in this Paragraph are denied.
69. It is admitted that sometime in 2004, Cejka gave Tuomey a report. Except as so admitted, the allegations contained in this Paragraph are denied.
70. Admitted.
71. It is admitted that Cejka provided data from national or regional sources. Except as so admitted, the allegations contained in this Paragraph are denied.
72. It is admitted that Cejka presented data in its December 21, 2004 letter. Except as so admitted, the allegations contained in this Paragraph are denied.
73. It is admitted that Cejka opined that Tuomey's proposal to pay the physicians represented fair market value. Except as so admitted, the allegations contained in this Paragraph are denied.

74. Denied.
75. Denied.
76. Denied.
77. It is admitted that Tuomey told one or more physicians that the arrangements did not violate the Stark statute. Except as so admitted, the allegations contained in this Paragraph are denied.
78. It is admitted that Tuomey advised one or more physicians that the hospital had opinion letters from its attorneys indicating that the proposed part-time employment contract did not violate the Stark statute or other federal laws. Except as so admitted, the allegations contained in this Paragraph are denied.
79. It is admitted that the respective Tuomey Specialty Groups entered into part-time employment contracts with the physicians listed in this Paragraph on the effective dates listed in this Paragraph. Except as so admitted, the allegations contained in this Paragraph are denied.
80. It is admitted that said part-time employment contracts provide that the physicians will be paid a base salary and various bonuses listed in this Paragraph on the effective dates listed in this Paragraph. Except as so admitted, the allegations contained in this Paragraph are denied.
81. It is admitted that a part-time employment contract was offered to Dr. Drakeford. Except as otherwise admitted, the allegations contained in this Paragraph are denied.
82. Admitted.
83. Tuomey is without knowledge and information sufficient to form a belief as to the truth of the allegations in this Paragraph.
84. Tuomey is without knowledge and information sufficient to form a belief as to the truth of the allegations in this Paragraph.
85. It is admitted that Hewson and Smith discussed the issue of whether the contract violated the Stark statute. Except as so admitted, the allegations contained in this Paragraph are denied.
86. It is admitted that Tuomey and Drakeford agreed to jointly retain another attorney. Except as so admitted, the allegations contained in this Paragraph are denied.
87. Denied.

88. Admitted.

89. It is admitted that Tuomey and Drakeford hired McAnaney. Except as so admitted, the allegations contained in this Paragraph are denied.

90. It is admitted that Tuomey and Drakeford provided McAnaney with information. Except as so admitted, the allegations contained in this Paragraph are denied.

91. Tuomey is without knowledge and information sufficient to form a belief as to the truth of the allegations in this Paragraph.

92. Admitted.

93. Denied.

94. Admitted.

95. It is admitted that a letter dated September 2, 2005 was sent to McAnaney. Except as so admitted, the allegations contained in this Paragraph are denied.

96. Denied.

97. It is admitted that Tuomey sought and obtained a legal opinion from Hall Render. Except as so admitted, the allegations contained in this Paragraph are denied.

98. It is admitted that Tuomey received a legal opinion from Hall Render. Except as so admitted, the allegations contained in this Paragraph are denied.

99. It is admitted that Tuomey received a legal opinion from Hall Render. Except as so admitted, the allegations contained in this Paragraph are denied.

100. It is admitted that Tuomey received a legal opinion from Hall Render. Except as so admitted, the allegations contained in this Paragraph are denied.

101. It is admitted that Tuomey did not make changes to the part-time employment contracts. Except as so admitted, the allegations contained in this Paragraph are denied.

102. It is admitted that Drakeford made a request to James Wilson, chairman of Tuomey's Board of Trustees, to meet with the Board at its meeting on July 25, 2005. Except as so admitted, the allegations contained in this Paragraph are denied.

103. It is admitted that on or about July 19, 2005, James Wilson wrote a letter to Drakeford. Except as so admitted, the allegations contained in this Paragraph are denied.

104. Tuomey is without knowledge and information sufficient to form a belief as to the truth of the allegations in this Paragraph.

105. It is admitted that at the July 25, 2005 meeting, the Board adopted a policy. Except as so admitted, the allegations contained in this Paragraph are denied.
106. Denied.
107. It is admitted that on or about July 28, 2005, Tuomey informed Drakeford of the policy. Except as so admitted, the allegations contained in this Paragraph are denied.
108. Denied.
109. Denied.
110. Denied.
111. Denied.
112. Denied.
113. Denied.
114. Denied.
115. Tuomey incorporates Paragraphs 1 through 114 of this Answer as if fully restated herein.
116. Denied.
117. Denied.
118. Denied.
119. Tuomey incorporates Paragraphs 1 through 118 of this Answer as if fully restated herein.
120. Denied.
121. Denied.
122. Denied.
123. Tuomey incorporates Paragraphs 1 through 122 of this Answer as if fully restated herein.
124. Denied.
125. Denied.
126. Denied.
127. Tuomey incorporates Paragraphs 1 through 126 of this Answer as if fully restated herein.
128. Denied.
129. Denied.
130. Denied.
131. Tuomey incorporates Paragraphs 1 through 130 of this Answer as if fully restated herein.
132. Denied.
133. Denied.

134. Tuomey incorporates Paragraphs 1 through 133 of this Answer as if fully restated herein.

135. Denied.

136. Denied.

137. Denied.

138. Denied.

139. Denied.

## DEMAND FOR JURY TRIAL

A jury trial is demanded.

## PRAYER FOR RELIEF

WHEREFORE, Tuomey prays this Honorable Court to dismiss all claims against it, with prejudice, and to award Tuomey all costs and such other relief as the Court deems just and equitable including, to the extent permitted by law, attorneys' fees and costs of defense.

Respectfully Submitted,

A. Camden Lewis, Fed. ID No. 2669
Mary G. Lewis, Fed. ID No. 2675
W. Jonathan Harling Fed. ID No. 9291
LEWIS & BABCOCK, L.L.P.
Post Office Box 11208
Columbia, SC  29211
803-771-8000

By:    s/  A. Camden Lewis
         A. Camden Lewis

E. Bart Daniel, Esquire
Seven State Street
Charleston, SC  29401
843-722-2000

Daniel M. Mulholland III
HORTY, SPRINGER & MATTERN, P.C.
4614 Fifth Avenue
Pittsburgh, PA  15213
412-687-7677

Attorneys for Defendant
Tuomey Healthcare System, Inc.

November 18, 2008