UNITED STATES DISTRICT COURT
FOR DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

```
----------------------------x
UNITED STATES OF AMERICA,    :
ex rel, MICHAEL K.DRAKEFORD, :
                             :
          Plaintiff,         :
                             :
          v.                 : No. 3:05-CV-2858-MIP
                             :
TUOMEY HEALTHCARE SYSTEMS,   :
INC.,                        :
                             :
          Defendant.         : Volume 2
----------------------------x
```

Washington, D.C.

Tuesday, December 2, 2008

Continued Deposition of

KEVIN G. MCANANEY

a witness, recalled for further examination by

counsel for Defendant, pursuant to notice and

agreement of counsel, continuing at approximately

10:00 a.m., at the law offices of Patton Boggs,

2445 M Street, NW., Washington, D.C., before

Teague Gibson of Anderson Court Reporting, notary

public in and for the District of Columbia, when

were present on behalf of the respective parties:

National Court Reporters, Inc.
888.800.9656

2

```
 1     APPEARANCES:

 2        On behalf of Plaintiffs:

 3           G. NORMAN ACKER, III, ESQUIRE
             United States Department of Justice
 4           Civil Division
             601 D Street, NW., Room 9138
 5           Washington, D.C. 20004
             (202) 307-0474
 6
          On behalf of Defendant:
 7
             A. CAMDEN LEWIS, ESQUIRE
 8           Lewis & Babcock
             P.O. Box 11208
 9           Columbia, South Carolina 11208
             (803) 771-8000
10

11                      *   *   *   *   *

12

13

14

15

16

17

18

19

20

21

22
```

National Court Reporters, Inc.
888.800.9656

3

1                    C O N T E N T S

2    EXAMINATION BY:                              PAGE

3        Counsel for Defendant                       4

4        Counsel for Plaintiff                      20

5    FURTHER EXAMINATION BY:

6    Counsel for Defendant                          25

7    DEPOSITION EXHIBITS:

8    No. 1 - Representation Letter                   6

9

10

11                    *   *   *   *   *

12

13

14

15

16

17

18

19

20

21

22

National Court Reporters, Inc.
888.800.9656

4

```
 1                P R O C E E D I N G S

 2   Whereupon,

 3                KEVIN G. MCANANEY

 4   was recalled as a witness and, having been

 5   previously duly sworn, was examined and testified

 6   further as follows:

 7                EXAMINATION BY COUNSEL FOR DEFENDANT

 8                CONTINUED

 9                BY MR. LEWIS:

10        Q    Give us your name, please.

11        A    Kevin McAnaney.

12        Q    Is it all right if I call you Kevin?

13        A    Yes.

14        Q    This is a continuation of a prior time

15   we were here for your deposition.  Do you

16   understand that?

17        A    Yes.

18        Q    And as such, I understand that you had

19   no contact with any lawyers, except for a

20   paralegal in making corrections or making

21   additions to the prior transcript of your earlier

22   portion of this deposition; is that correct?
```

5

```
 1          A     That is correct.

 2          Q     And no one's talked to you or called you

 3     other than to schedule or something like that?

 4          A     That's correct.

 5          Q     One thing when you answer a question,

 6     I'm going to assume you understood the question?

 7          A     Yes.

 8          Q     If you don't understand the question,

 9     ask me to clarify it and I will attempt to do so.

10     If I cut you off it'll be by mistake and you just

11     tell me I've cut you off and I'll let you answer

12     because I don't mean to, I just get excited.  If

13     I'm doing something you don't like, you say, Cam,

14     I don't like what you're doing and I will attempt

15     to stop doing that?

16          A     Okay.

17          Q     Is that fair?

18          A     That's fair.

19          Q     We were here last time and it turned out

20     that you were engaged by two parties, that is Mr.

21     Drakeford and Tuomey Hospital in a joint

22     representation; is that correct?
```

National Court Reporters, Inc.
888.800.9656

6

```
 1        A     That's correct.

 2        Q     And looking at Exhibit Number 1.

 3                   (Deposition Exhibit No. 1 was

 4                    marked for identification.)

 5              BY MR. LEWIS:

 6        Q     Would be your joint representation

 7   letter; is that correct?

 8        A     Yes.

 9        Q     And I believe --

10              MR. ACKER:  Excuse me, Cam.  Is this a

11   new exhibit?  Are you starting the numbering over?

12              MR. LEWIS:  Yes, I am.

13              MR. ACKER:  I just want to clarify for

14   the record that we had this continuation of the

15   deposition and we had Deposition Exhibit 1 and 2

16   previously, so can we somehow differentiate this?

17              MR. LEWIS:  This will be Defendant's

18   Exhibit 1.

19              MR. ACKER:  Thank you.

20              BY MR. LEWIS:

21        Q     I believe you described your

22   representation as you were a tie breaker?
```

7

1       A   Yes.

2       Q   And as a tie breaker there must have

3  been a difference of opinion between the two

4  people, tie breaker one had one position, the

5  other one had another position and you were going

6  to try to bring them together?

7       A   Well, I wouldn't say I was supposed to

8  bring them together as a mediator.  I was supposed

9  to give them my opinion.

10      Q   Your assessment?

11      A   My assessment, yes.

12      Q   They were going to have your assessment

13  because they couldn't agree?

14      A   That's how I understood it.

15      Q   And when they hired you they jointly

16  hired you?

17      A   Yes.

18      Q   And they jointly hired you to give them

19  an assessment over a question upon which they

20  could not agree?

21      A   Or they had differences.  I don't know

22  whether they couldn't agree or not exactly, but

8

1    they clearly had different views.

2          Q    And they hired you to help them with --

3    assess those positions?

4          A    I guess they did.

5          Q    You were given certain information to

6    look at with reference to your engagement, were

7    you not?

8          A    Yes, I was.

9          Q    You were given a contract that Dr.

10   Drakeford was asked to sign?

11         A    I actually can't recall exactly what I

12   was given now.  I produced what I was given.

13         Q    You produced one contract.  Did you see

14   any other contract?

15         A    Not if that's all that was there.

16         Q    Did you ever see the mission of the

17   hospital?

18         A    Not if it wasn't in those exhibits.

19         Q    Did you ever see any billings of the

20   doctors that were going to be under these

21   contracts to see how much they billed?

22         A    Only if they may have been in the

9

1    evaluations, they may have given some RVUs.  I

2    don't know.  I can't recall.

3         Q    Are billings and RVUs the same thing?

4         A    No, they may have had billings in there

5    as well.

6         Q    But you don't know?

7         A    I can't recall.

8         Q    You don't know if you looked at those or

9    didn't look at them?

10        A    Well, if they were in the valuations I

11   would have.

12        Q    Here today, you made an assessment.  Did

13   you make an assessment using any billings or not?

14        A    I made an assessment looking at the

15   valuations.

16        Q    The valuations, that is the CEJKA

17   evaluations?

18        A    Yes, in part, yup.

19        Q    Anything other than -- did you look at

20   other than the CEJKA evaluations?

21        A    No, just the information they provided

22   me and my general knowledge of the laws.

10

1      Q    All I'm asking is what information

2    specific to this case did you look at.  Did you

3    look at anything other than the CEJKA information?

4      A    Yes.

5      Q    What?

6      A    I looked at whatever documents were

7    provided to me by the parties.

8      Q    Do you have those with you?

9      A    No, I didn't bring them with me.  I

10    thought they would be here?

11      Q    We are under the impression that Exhibit

12    Number 1 to the last deposition, Deposition

13    Exhibit 1, was your file and what you were

14    furnished was contained in there?

15      A    Yes, that looks to be the file.

16      Q    Were you given any billings?

17      A    Well, I don't know that I was directly,

18    although the valuations included what they were

19    making in their current practice verse what they

20    would make under the proposal, so to that extent

21    it included billings.

22      Q    Billings are different than collections?

11

```
 1        A    I understand that.

 2        Q    I want to know if you had anything in

 3   there that showed what they billed?

 4        A    I will look.  I don't see anything, only

 5   collections.

 6        Q    Only collections.  So we can, from our

 7   little examination, we can find that you did not

 8   look at billings, correct?

 9        A    Correct.

10        Q    Now, look at what the doctors in Sumter

11   actually made and monies, how much they got paid

12   and how much did they make a year, is that --

13        A    Indirectly in the valuations they had

14   what they were making, what their practices were

15   making compared to what they would make under the

16   projected.

17        Q    Them who?  How many of them?

18        A    The ones that were given to me as

19   examples.  This is the opinion.  These are for the

20   three.  These is for Dr. Drakeford, Dr. Ford and

21   Dr. Stroebel.

22        Q    Anybody else?
```

12

1          A     Dr. Tate.  And then they had another, I
2     believe there were other valuations they had given
3     me.  I don't think so.  I thought there were, but
4     I don't see them.
5          Q     There were what?
6          A     I thought there were some similar things
7     for some other physicians that we used as
8     examples.
9          Q     There weren't?
10         A     Okay.
11         Q     You only looked at Dr. Drakeford's
12    practice and what they furnished you about Dr.
13    Drakeford, isn't that true, in his practice and
14    his partners; isn't that right?
15         A     As I said, I can't recall.  I don't see
16    it here flipping through.  I thought there was
17    actually some other -- another practice that they
18    showed me that I was not to share.
19         Q     You didn't -- it's not in your documents
20    that you say was your file?
21         A     I don't see it.  It's sort of hard to
22    flip through.

National Court Reporters, Inc.
888.800.9656

1          Q    I want you to look.  Take all the time

2     you want.  I want you to find me where you say

3     that you saw some other practice, because we

4     hadn't found it?

5          A    Okay.  No.

6          Q    No what?

7          A    No, I did not look at -- I didn't have

8     any other billing information other than -- or

9     collection information, practice information,

10    other than for the Drakeford practice.

11         Q    You had no billing information for them

12    and you only had collecting information for the

13    Drakeford practice, right?

14         A    Yes.

15         Q    And you only looked at -- that was one

16    specialty, right, they were orthopaedic surgeons;

17    is that what they were?

18         A    Yes.

19         Q    So you looked at no other specialty?

20         A    No.

21         Q    And they did not sign a contract, do you

22    know that?

14

```
 1          A    I think I do.

 2          Q    And so it's fair to state that you

 3     looked at no contract that was signed?

 4          A    I think that's correct.

 5          Q    Did you ever hear the term patient mix?

 6          A    Yes.

 7          Q    Did you look at the patient mix of

 8     Drakeford's group?

 9          A    No.

10          Q    Did you look at the patient mix of any

11     group?

12          A    No.

13          Q    Do you know what charity cases are?

14          A    Yes.

15          Q    Did you look at the charity cases that

16     the doctors would do?

17          A    No.

18          Q    Not Drakeford or anybody else?

19          A    No.

20          Q    Did you look and see how many different

21     specialty groups, like how many orthopaedic

22     surgeon groups, how many general surgery -- how
```

15

1      many different groups were in Sumter?

2          A    No.

3          Q    Did you look to see what would happen

4      if, say, the thoracic surgeons would withdraw from

5      Tuomey Hospital?

6          A    I don't understand that question.

7          Q    Let's say they didn't want to work there

8      anymore and they left, what would happen to Tuomey

9      Hospital if they had no thoracic surgeons?  Do you

10     know what happened?

11         A    No.

12         Q    You don't know what happened to Tuomey

13     Hospital if they lost some of these doctors, do

14     you?

15         A    No.

16         Q    Do you know what tri-care is?

17         A    Yes.

18         Q    Do you know how much tri-care Tuomey

19     Hospital does?

20         A    No.

21         Q    Do you know if tri-care's important to

22     the area because of Shaw Air Force Base?

National Court Reporters, Inc.
888.800.9656

16

1          A     It could be.

2          Q     Did you look at that?

3          A     No.

4          Q     I think you communicated with Mr. Smith

5     and Mr. Houston; is that right?

6          A     Yes.

7          Q     Nobody else?

8          A     No, not that I recall.  I don't believe

9     so.

10         Q     And what I think your assessment, as I

11    read your assessment, I want to make sure I got

12    that down because that's what we're here for, your

13    assessment.  You said that what you saw in that

14    little group of documents, Exhibit Number 1, to

15    the government would raise questions?

16         A     Yes.

17         Q     And another place you said was raise

18    concerns, the government would look at, it might

19    raise concerns with the government?

20         A     Yes.

21         Q     And another time you said that it would

22    raise a red flag, but of course that doesn't end

17

1    the matter?

2          A    Correct.

3          Q    And so the sum total of what you told

4    them in your assessment was that the government

5    might look askew at these arrangement that you

6    were given in the one contract for the one

7    specialty?

8          A    That's correct.

9          Q    And that was the end of your assignment?

10         A    That's correct.

11         Q    You also said that you don't opine on

12   the fair market value of a question?

13         A    That's correct.

14         Q    And you call them -- those are what they

15   call valuation consultants?

16         A    I think so.

17         Q    That's what I think, too.  We know that

18   that's what we're talking about now, that those

19   are the valuation consultants.  Have you heard of

20   the Pinnacle Health Care Group valuation that do

21   those valuations?

22         A    I may have.  It doesn't ring a bell.

National Court Reporters, Inc.
888.800.9656

```
 1          Q     How about Home, LLC?

 2          A     I don't think I've ever heard them, no.

 3          Q     How about Health Care Appraisers,

 4    Incorporated?

 5          A     That sounds familiar.

 6          Q     How about Clark Consulting?

 7          A     That also sounds familiar.

 8          Q     How about Integrated Health Care

 9    Strategies?

10          A     Yes.

11          Q     The Well Springs Group?

12          A     Yes.

13          Q     How about Moore Gates, or Gates Moore?

14          A     Doesn't ring a bell.

15          Q     How about Valuation Management Group?

16          A     Perhaps, they all sort of sound the

17    same.

18          Q     That's right.  But you did specifically

19    say you knew the Wells Spring Group and the

20    Integrated Health Care Strategies?

21          A     Yes.

22          Q     Are those two groups okay as far as you
```

19

1    know?

2         A    As far as I know.

3         Q    And then the other ones, I guess,

4    Pinnacle Health Care Group you don't know whether

5    they're good or bad because you don't remember

6    hearing of them?

7         A    I think I've seen the name.  I don't

8    know that I've ever come across their work.

9         Q    So you don't know whether -- you heard

10   nothing bad about them anyway, right?

11        A    No.

12        Q    Or Home, LLC you just had never heard

13   of?

14        A    Correct.

15        Q    And the Health Care Appraisers, Inc. you

16   hadn't heard anything bad about them?

17        A    Correct.

18        Q    And Moore Gates or Gates Moore you never

19   heard of?

20        A    Yes.

21        Q    And the Valuation Management Group you

22   just never heard anything bad about them, you just

National Court Reporters, Inc.
888.800.9656

20

```
 1    don't remember?

 2         A    I don't think so.  I'm not sure I've

 3    heard the name or not.

 4              MR. LEWIS:  Can I take a break a minute?

 5                  (Recess)

 6              MR. LEWIS:  Norman, got any questions?

 7              MR. ACKER:  Are you done?

 8              MR. LEWIS:  Yeah.

 9              MR. ACKER:  Yeah.

10                  (Recess)

11              EXAMINATION BY COUNSEL FOR PLAINTIFF

12              BY MR. ACKER:

13         Q    Mr. McAnaney, as Mr. Lewis pointed out,

14    this is a continuation of the deposition that was

15    taken earlier.  Do you recall the initial part of

16    this deposition?

17         A    Yes.

18         Q    And you were shown a few minutes ago

19    Exhibit 1 from that earlier part of the deposition

20    and you looked through it quickly to see if you

21    could find reference to any other physicians that

22    you had reviewed their billing or collection
```

21

1    records for?

2         A    Yes.

3         Q    Let me draw your attention to pages

4    006-123 through 006-127 of the McAnaney Deposition

5    Exhibit 1?

6         A    Yes.

7         Q    See if this -- take your time in looking

8    through that and see if that refreshes your

9    recollection about any other physicians that you

10   looked at?

11        A    Yes, that's the document to which I had

12   thought I had seen, but when I reviewed it it

13   doesn't have detailed billing information.

14        Q    But this does give you some indication

15   that there were other physicians with whom Tuomey

16   had proposed or actual part-time employment

17   agreements other than the orthopaedics?

18             MR. LEWIS:  Object to the form.

19             THE WITNESS:  Yes, I knew there were

20   other contracts.

21             BY MR. ACKER:

22        Q    You spoke to Mr. Smith and Mr. Houston

22

1    on June 22nd of 2005; is that correct?

2        A    I need to review my time sheet.  Yes.

3        Q    And after you gave your assessment or

4    your opinion about Dr. Drakeford's proposed

5    contract, did Tuomey ever ask you to give any

6    opinions about any other of the contracts?

7            MR. LEWIS:  Object to the form.

8            THE WITNESS:  No.

9            BY MR. ACKER:

10       Q    Mr. Lewis asked you a series of

11   questions a few minutes ago about what information

12   you did not have when you gave your opinion.  Did

13   Tuomey have the right to give you anything it

14   considered important?

15           MR. LEWIS:  Object to the form.

16           THE WITNESS:  Yes.

17           BY MR. ACKER:

18       Q    And did you receive information from

19   Tuomey?

20       A    Yes.

21       Q    And did Tuomey ever tell you they didn't

22   think you had all the necessary information to

23

1     make your assessment?

2               MR. LEWIS:  Object to the form.

3               THE WITNESS:  Not that I recall.

4               BY MR. ACKER:

5         Q     So to your knowledge, did Tuomey give

6     you everything that it considered important?

7               MR. LEWIS:  Object to the form.  You

8     have no idea what Tuomey thinks.

9               THE WITNESS:  I believe so.

10              BY MR. ACKER:

11        Q     After the June 22nd, 2005 conference

12    call that you had with Mr. Houston and Mr. Smith,

13    did Tuomey ever come back and say here's more

14    information that we want you to have?

15              MR. LEWIS:  Object to the form.

16              THE WITNESS:  No.

17              BY MR. ACKER:

18        Q     Did they ever give you any more

19    information after June 22nd?

20        A     Well, I think we had a subsequent phone

21    call about the joint venture arrangement.

22        Q     That was on June 23rd?

National Court Reporters, Inc.
888.800.9656

24

```
 1          A     June 23rd.  I think after that I didn't

 2     have any further substantive conversation.

 3          Q     Did you ever receive a request from

 4     anyone to put your opinion in writing?

 5                MR. LEWIS:  Object to the form.

 6                THE WITNESS:  I can't recall if I was

 7     specifically asked to put it in -- I do recall a

 8     conversation, I believe, with Greg Smith that

 9     indicated that the Tuomey board might want

10     something in writing.

11                BY MR. ACKER:

12          Q     And did you put your opinion in writing?

13                MR. LEWIS:  Object to the form.

14                THE WITNESS:  No.

15                BY MR. ACKER:

16          Q     And why not?

17          A     Because I was subsequently contacted by

18     Tim Houston and told not to put anything in

19     writing without his agreement and they did not

20     agree.  I forget exactly, sent me a letter I

21     believe.

22          Q     What, if anything, did Tim Houston tell
```

National Court Reporters, Inc.
888.800.9656

25

```
 1    you as to the reason why you should not put your

 2    opinion in writing?

 3         A    He didn't.

 4              MR. ACKER:  I have no other questions.

 5              MR. LEWIS:  I just have one follow-up

 6    question.

 7              FURTHER EXAMINATION BY COUNSEL FOR

 8              DEFENDANT

 9              BY MR. LEWIS:

10         Q    Over my objection, the government keeps

11    saying your opinion, but you specifically said you

12    were not to give your -- to opine but to give an

13    assessment?

14         A    Right.  I was not giving -- I was never

15    asked and specifically not to give an opinion as

16    to the legality of the arrangement.

17         Q    You were -- it was an assessment?

18         A    It was an assessment.

19              MR. LEWIS:  That's all I wanted.  Thank

20    you very much.  Nothing further.

21                   (Whereupon, at 10:45 a.m., the

22                   deposition of KEVIN G. MCANANEY was
```

26

1                    adjourned.)

2

3                    *   *   *   *   *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

27

```
1              ERRATA SHEET FOR THE DEPOSITION OF

2                    _____

3       Case Name: _____

4                        CORRECTIONS

5       Pg1.  Ln.  Now Reads      Should Read      Reasons:

6       _____ _____ _____ _____

7       _____ _____ _____ _____

8       _____ _____ _____ _____

9       _____ _____ _____ _____

10      _____ _____ _____ _____

11      _____ _____ _____ _____

12      _____ _____ _____ _____

13      _____ _____ _____ _____

14      _____ _____ _____ _____

15      _____ _____ _____ _____

16      _____ _____ _____ _____

17      _____ _____ _____ _____

18      _____ _____ _____ _____

19      _____ _____ _____ _____

20      _____ _____ _____ _____

21         Reviewed by:                  Date:

22      _____ _____
```

National Court Reporters, Inc.
888.800.9656

28

1              To the Witness:

2              Please note any errors and the

3       corrections thereof, on this errata sheet.  Any

4       change or correction should have a reason.  It may

5       be a general reason, such as "To correct

6       stenographic error," or "To clarify the record,"

7       or "To conform with the facts."  Once you have

8       completed the sheet, signed and dated it, return

9       the sheet to your attorney, not to the court

10      reporting agency.  Attorneys should exchange

11      errata sheets among the parties.

12

13

14

15

16

17

18

19

20

21

22

29

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2

 3     I, Carleton J.  Anderson, III do hereby certify

 4     that the forgoing electronic file when originally

 5     transmitted was reduced to text at my direction;

 6     that said transcript is a true record of the

 7     proceedings therein referenced; that I am neither

 8     counsel for, related to, nor employed by any of

 9     the parties to the action in which these

10     proceedings were taken; and, furthermore, that I

11     am neither a relative or employee of any attorney

12     or counsel employed by the parties hereto, nor

13     financially or otherwise interested in the outcome

14     of this action.

15                  /s/Carleton J.  Anderson, III

16                  Notary Public # 351998

17                  in and for the Commonwealth of Virginia

18     My Commission Expires:  November 30, 2008

19

20

21

22
```

National Court Reporters, Inc.
888.800.9656