IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

CA NO.  3:05-CV-02858-MJP

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel., | ) | |
| MICHAEL K. DRAKEFORD, M.D., | ) | |
| | ) | |
| Plaintiffs, | ) | UNITED STATES' |
| | ) | OPPOSITION TO |
| v. | ) | DEFENDANT'S MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| | ) | |
| TUOMEY d/b/a TUOMEY HEALTHCARE | ) | |
| SYSTEM, INC. | ) | |
| | ) | |
| Defendant. | ) | |

The Stark Statute, 42 U.S.C. § 1395nn, makes absolutely clear that the Medicare program

will not pay any claims submitted by a hospital for services rendered by a physician with whom

the hospital has a prohibited financial relationship, unless the hospital can demonstrate that it

meets the requirements of a statutory or regulatory exception.  Defendant Tuomey Healthcare

System, Inc. ("Tuomey") entered into contracts with some 20 physicians that unquestionably fall

within the broad reach of the Stark prohibition, and it is Tuomey's burden to demonstrate that its

relationships with these physicians are (a) for fair market value compensation; (b) do not take

into account the value or volume of patient referrals; and (c) would be commercially reasonable

even in the absence of anticipated referrals.  On the evidentiary record that has been developed in

this case, Tuomey cannot meet its burden of proof.  Indeed, the legal authority and evidentiary

record are so lopsided in favor of the Government that partial summary judgment should be

granted upon the Government's motion, and denied upon Tuomey's.  See United States' Motion

for Partial Summary Judgment On Count IV Of The Second Amended Complaint (filed July 31,

2009) (Dkt 288) and Memorandum in support of same (filed July 31, 2009, as corrected Aug. 6,

2009) (Dkt 327-2).[1]

Tuomey further seeks a summary judgment ruling by the Court that it has not violated the

False Claims Act, 31 U.S.C. §§ 3729-33 (the "FCA"). While ample record evidence supports the

Government's contention that Tuomey's Stark violations also violate the FCA, there are disputed

issues of material fact regarding whether Tuomey engaged in the misconduct "knowingly," as

defined by the FCA, and summary judgment is therefore not appropriate regarding the

Government's FCA claim or Tuomey's "good faith" and "advice of counsel" affirmative

defenses. The Government respectfully submits that the Court should grant summary judgment

in favor of the Government on Count IV of the Second Amended Complaint, deny Tuomey's

motion altogether, and set a trial regarding Tuomey's liability under the FCA and the quantum of

damages for which Tuomey is liable to the Government.

<u>Argument</u>

## I.     THE STANDARD FOR SUMMARY JUDGMENT IS UNCHANGED.

Contrary to Tuomey's claims in its motion, the Supreme Court's recent rulings in

<u>Ashcroft v. Iqbal</u>, ___ U.S. ___, 129 S. Ct. 1937 (2009), and <u>Bell Atlantic Corp. v. Twombly</u>,

550 U.S. 544 (2007), have not altered the well-established standard for summary judgment set

out in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), and <u>Anderson v. Liberty Lobby, Inc.</u>, 477

---

[1]For brevity's sake, we cite the Government's Memorandum in Support of the Motion for Partial Summary Judgment on Count IV of the Second Amended Complaint (as corrected) as "Govt Motion at ____," and Tuomey's Memorandum in support of its Motion for Summary Judgment as "Deft Motion at ____." References to the Appendix filed in Support of the Government's Motion are cited as "A___"; references to the Supplemental Appendix filed in support of this Opposition are cited as "SA___."

U.S. 242 (1986). <u>Twombly</u> and <u>Iqbal</u> hold that, for a complaint to meet the Fed. R. Civ. P. 8(a)

sufficiency standard, it must contain sufficient factual matter, which when accepted as true, states

a claim for relief that is "plausible on its face." <u>Iqbal</u>, 129 S. Ct. at 1949; <u>Twombly</u>, 550 U.S. at

570. Tuomey appears to argue that the Court should import the "plausibility" inquiry into the

summary judgment standard, failing to recognize that <u>Liberty Lobby</u> already requires a party

opposing summary judgment to identify sufficient admissible evidence to allow a rational

factfinder to rule in that party's favor at trial. <u>Liberty Lobby</u>, 477 U.S. at 249. It is unclear

exactly what, if any, alteration to this familiar summary judgment standard Tuomey is proposing,

but the <u>Iqbal</u> and <u>Twombly</u> cases simply have no bearing at this stage of the case. Even if the

"plausible on its face" standard did apply at this stage, it has clearly been met for the reasons

stated in our Opposition to Defendant's Motion to Dismiss (filed Jan. 28, 2008) (Dkt 69), and

amplified both here and in our partial summary judgment motion.

## II.    TUOMEY IS NOT ENTITLED TO SUMMARY JUDGMENT BECAUSE, AS A MATTER OF LAW, ITS CONTRACTS WITH THE SPECIALTY PHYSICIANS VIOLATE THE STARK STATUTE.

The Stark Statute applies broadly to ownership and compensation relationships between

hospitals and physicians who participate in, and receive public funds from, the Medicare

program.[2] The fundamental question before the Court on both parties' summary judgment

---

[2]Tuomey's baseless argument that the Government's enforcement of the Stark Statute somehow conflicts with the Medicare Statute barely merits response. <u>See</u> Deft Motion at 16-17. The Stark Statute was enacted as an amendment to the Social Security Act, which includes Medicare. Thus, all participants in the Medicare program are required to abide by the Stark Statute. Numerous courts have held that submitting claims to the Medicare program that violate the Stark referral prohibition can be grounds for liability under the False Claims Act. <u>E.g.</u>, <u>United States ex rel. Kosenske v. Carlisle HMA, Inc.</u>, 554 F.3d 88 (3rd Cir. 2009); <u>United States v. Rogan</u>, 517 F.3d 449, 452 (7th Cir. 2008); <u>United States ex rel. Thompson v. Columbia/HCA</u>

(continued...)

motions is whether Tuomey violated the Stark Statute by entering into the subject contracts with 20 specialty physicians.[3]

It is critical to understand that the only services that the hospital has contracted for with the physicians are services that generate referrals to the hospital. It is also critical to understand that the only medical services for which the hospital was forced to compete in Sumter before entering into these contracts were the very outpatient surgical and gastroenterological procedures that are covered by the contracts. The contracts do not cover office visits and other services the doctors might perform that do not necessarily yield a hospital referral. And, as the only hospital for perhaps 30 miles, Tuomey has no real competition for its inpatient services. But when the GI physicians announced they were considering moving their outpatient procedures into their own offices, and when the Wesmark Ambulatory Surgery Center ("ASC") began operations, suddenly Tuomey had competition for one of its main revenue-producing lines of business. It is not disputed that Tuomey's desire to quash this competition led to the development of these limited-scope contracts with specialty physicians whom Tuomey feared might otherwise take their

---

[2](...continued)
Healthcare Corp., 125 F.3d 899 (5th Cir. 1997); United States ex rel. Fry v. The Health Alliance of Greater Cincinnati, 2008 U.S. Dist. LEXIS 102411 (S.D. Ohio Dec. 18, 2008); United States ex rel. Pogue v. Diabetes Treatment Centers of America, 2008 U.S. Dist. LEXIS 55432 (D.D.C. July 21, 2008).

[3]Tuomey casually dismisses the Government's common law theories of payment under mistake of fact, unjust enrichment and disgorgement as "tag-a-long" claims. Deft Motion at 2. They are not. The Stark Statute makes clear that Medicare will not pay any claims for designated health services ("DHS") rendered in violation of the statute. Tuomey admits that it has filed Medicare and Medicaid claims for DHS, namely, outpatient hospital services, referred by the physicians with whom it has contracts. Thus, if the Court concludes, as we urge, that these financial relationships violated the Stark Statute, then Tuomey is liable for the return of the Medicare funds it has improperly received from the Treasury under the theory of payment under mistake of fact, unjust enrichment or disgorgement. At bottom, however, the operative question is whether the contracts between Tuomey and the physicians violate the Stark Statute.

outpatient referral business elsewhere.  Indeed, Tuomey itself admits that it wanted to eliminate any possibility of "divided loyalties" the physicians might feel in deciding where to refer their outpatient procedures.  Deft Motion at 4-5. These contracts are all about the referrals.  Tuomey does not deny that all of this is true; Tuomey simply contends that its actions were legal.  But Tuomey's legal arguments would require the Court to narrow the Stark Statute beyond recognition and to disregard not only the plain language of the statute and regulations, but also Congress' clear intent to broadly encompass within the statute's reach all potentially abusive compensation arrangements involving hospitals and referring physicians.

Both parties agree that "[t]he existence of a financial relationship between the referring physician . . . and the [hospital] is the factual predicate for triggering the application of [the Stark Law]."  69 Fed. Reg. at 16057; Deft Motion at 18.  The Stark analysis involves two steps.  First, the Court must determine whether a "financial relationship" exists between the hospital and the physicians.  Congress crafted the statute to broadly encompass any compensation arrangement in which remuneration is paid, "directly or indirectly, in cash or in kind," by a hospital to a referring physician.  42 U.S.C. §§ 1395nn(a)(2)(B), (h)(1); 42 C.F.R. § 411.354(c).  Second, if the Stark Statute is held to apply, the hospital must prove it meets an exception.  U.S. ex rel Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 95 (3rd Cir. 2009); United States v. Rogan, 459 F. Supp. 2d 692, 716 (N.D. Ill. 2006), aff'd, 517 F.3d 449 (7th Cir. 2008).

The regulations promulgated by the Department of Health and Human Services ("HHS") regarding indirect compensation arrangements are consistent with this approach.  As explained by HHS in the 2001 commentary, the regulatory treatment of indirect compensation arrangements was intended to "more clearly parallel[ ] the analysis and treatment of direct compensation arrangements" by (1) establishing a test to "identif[y] the universe of potentially

improper arrangements," and (2) carving out an exception for which "most nonabusive indirect compensation arrangements can readily qualify." 66 Fed. Reg. at 865, 866.

Tuomey's contracts with the specialty physicians vary with, and also take into account, the value and volume of outpatient surgical and gastroenterological referrals. The contracts clearly meet the test for indirect compensation arrangements, and thus those contracts fall within the "universe of financial relationships that potentially triggers disallowance of claims." Id. at 865. Because the undisputed facts demonstrate that the contracts take into account the value or volume of referrals, Tuomey cannot meet the test for the indirect compensation exception as a matter of law.

Additionally, substantial evidence exists that the entities between Tuomey and the physicians are mere alter egos of Tuomey and therefore, the contracts should be viewed as direct compensation arrangements. Either way, as a matter of law, the contracts established "financial relationships" between Tuomey and the 20 specialty physicians to which the Stark Statute applies, and the Court need look no further than the language and operation of the contracts themselves to reach this conclusion.

A.    **Tuomey's Contracts With The Physicians Are "Financial Relationships" Subject To The Stark Prohibition**.

Both sides agree that "financial relationships" to which the Stark Statute applies include both direct and indirect compensation arrangements. Both sides agree that the regulatory definition of "indirect compensation arrangements" has three elements, as set forth in 42 C.F.R. § 411.354(c)(2), two of which Tuomey concedes are established. See Deft Motion at 18-19; Deft Reply Mem. in Support of Motion to Dismiss (Dkt 73) at 1. The only element of the definition that Tuomey contests is whether:

> the referring physician . . . receives aggregate compensation from the person or entity within the chain with which the physician . . . has a direct financial relationship that varies with, or otherwise reflects, the volume or value of referrals or other business generated by the referring physician for the hospital. . . .

42 C.F.R. § 411.354(c)(2)(ii).[4]  As HHS has consistently explained, "referrals" and "other business generated"[5] do not include services personally performed by physicians.  As HHS also has consistently explained, these terms **do** include any corresponding technical component of a service that is billed by a hospital or other DHS entity, such as the technical components Tuomey billed (or was able to bill) for the outpatient services performed under its contracts with the specialty physicians.  66 Fed. Reg. at 871 (corresponding technical components are "referrals"); 69 Fed. Reg. at 16063 (same); id. at 16068 ("[T]he technical component corresponding to a physician's personally performed service would be considered other business generated for the entity.").  The compensation arrangements between Tuomey and the specialty physicians satisfy element (ii) of the indirect compensation arrangement definition because each and every time the physicians perform a service under the contract, that service generates a corresponding technical component that is either a "referral" to or "other business generated by the referring physician for" Tuomey.  As we have shown in our motion and discuss in further detail below, **by design**, the compensation received by the physicians varies with, and also otherwise reflects/takes into

---

[4]As noted in our motion, in 2007, HHS  replaced "otherwise reflects" with "takes into account," but explained that the change was "non-substantive" and intended simply to make the language more consistent with other parts of the regulation.  72 Fed. Reg. 51012, 51027, 51087 (Sept. 5, 2007).

[5]The term "other business generated" includes non-Medicare or Medicaid referrals to the hospital (such as those covered by other Federal healthcare programs, private insurance or those without any insurance).  66 Fed. Reg. at 877.

account, the value or volume of the technical components for which Tuomey can bill. Thus, as a matter of law that these contracts are "financial relationships" to which the Stark Statute applies.

### 1.    The Physicians' Compensation Varies Directly With The Value Or Volume Of Their Outpatient Referrals To Tuomey.

As demonstrated in our motion at 31-33, the operation of the contracts themselves satisfies element (ii) of the indirect compensation definition because each and every time the physicians perform a Medicare-covered procedure under their Tuomey contract, the cash components of the physicians' salaries vary with the volume or value of Medicare-covered referrals and other business generated by the physicians for the hospital under the contracts. Tuomey admits this is true (A80-81 (Revised Request for Admission No. 1); A86 (Request for Admission No. 9)), and no more is required to bring these agreements within the scope of the Stark Statute.

Tuomey, however, contends that its contracts with the specialty physicians escape Stark scrutiny merely because it uses "personally performed services" of the physicians as the driver of the cash compensation. Stark contains no such exemption. As explained above, the problem here, and the factor that brings this arrangement within the broad reach of the Stark Statute, is that the compensation plans are designed to pay the physicians each time Tuomey receives a corresponding referral for outpatient surgical services. The plans may not explicitly say that the physicians' compensation is tied to their referrals, but neither the statute nor the regulation requires such a facial admission. Here, the operation of the contracts is such that the physicians' compensation varies with the number of referral-generating procedures they perform.

Yet Tuomey appears to contend that the Court should consider only the language of the agreements, and not their actual operation. Thus, merely because the the physicians' "personally

performed" work is some factor of their compensation, Tuomey argues the Court should ignore

the fact that the services that generate this compensation for the physicians simultaneously

generate a referral of a corresponding technical component to Tuomey.  Tuomey's interpretation

has no basis in law or logic. Indeed, if Tuomey's interpretation were to be adopted, that result

would create a loophole to the Stark prohibition that could devour its very basis.  With a wink

and a nod – much like this case – providers could easily evade a standard that prohibited only

compensation based explicitly on the value or volume of referrals.  That outcome would defeat

Congress' intent to broadly capture within Stark's purview compensation schemes between

hospitals and referring physicians that involve any type of remuneration, even if paid "indirectly"

or "covertly."  42 U.S.C. §§ 1395nn(a)(h)(1); 42 C.F.R. § 411.351.

Tuomey also contends that the rules regarding productivity bonuses exempt their

financial arrangements with these physicians from Stark.  This contention is inapt for two

reasons.  First, the productivity bonus rules come into play only at the **exception** stage and do not

affect the question whether, as an initial matter, the financial relationship falls within the scope

of the Stark Statute.  69 Fed. Reg. at 16066-68.  Second, it is not only the 80 to 85.6%

"productivity" and "quality" bonuses that Tuomey pays the physicians that vary with the value or

volume of referrals Tuomey receives from the doctors; rather, as shown in our motion, even the

base salaries that Tuomey pays the physicians vary with the value or volume of referrals, and the

productivity bonus rules do not apply to base salaries.

Indeed, the base salary scales for the general surgeons and the ophthalmologist are set in

such a way that as the physician performs more procedures under the contracts, he captures not

only a large dollar amount, but also a greater percentage of the collections for his professional

services as part of his base salary for the next year.  A391.  For example, if in one year Dr.

Crabbe (a general surgeon) performs procedures that generate $225,000 of professional collections, he receives a base salary the next year of $15,000, or 6.7% of his collections.  But if Dr. Crabbe performs procedures that generate $470,000 of professional collections in the first year, then he receives $55,000 the next year, or 11.7% of the prior year's collections.  A203. Likewise, if Dr. Goodson (the ophthalmologist) performs procedures that generate $150,000 of professional collections in the first year, he receives a base salary of $10,000 the next year, or 6.7% of his collections.  But if he performs enough procedures to generate $525,000 in professional collections, his salary the next year will be $75,000, or 14.3% of his collections. A184.

The GI physicians' base salaries are expressly determined by the number of outpatient **procedures** they perform at Tuomey.  If a GI physician performs fewer than 615 procedures in a given contract year, his base salary will be cut in half the next year.  A166.  Thus, these physicians' base salaries under the contracts are determined each year by whether they have performed the requisite volume of referral-generating procedures at Tuomey.  Even under Tuomey's unduly narrow interpretation of the indirect compensation definition, these contracts would be indirect compensation arrangements.

        2.      **The Physicians' Compensation Otherwise Reflects Or Takes Into Account The Value Or Volume Of Their Outpatient Referrals To Tuomey.**

By their very design, not only do these financial relationships vary with the value or volume of the physicians' referrals to Tuomey, but they also meet the alternate test for indirect compensation arrangements because they otherwise reflect or take into account the value or volume of referrals.  In the Government's Motion at 10-23, the following were among the

10

undisputed facts showing that the compensation arrangements took into account the value or volume of referrals by the physicians to Tuomey for outpatient procedures:

- For several years, outpatient surgery referrals have been one of only three revenue-producing activities for Tuomey Hospital.   Tuomey initially opposed the creation of the Wesmark ASC because it worried about the negative impact on its overall profit of not having all the urologists' surgical revenues.

- When Tuomey learned that the GI physicians were considering taking their outpatient procedures away from Tuomey and performing them in their own offices, Tuomey management commissioned a study to analyze how much revenue the hospital would lose over 13 years if that happened.  When the Wesmark ASC was about to open and compete with Tuomey for outpatient work, Tuomey commissioned analyses similar to the one for the GI physicians to determine the "net present value of a non-compete clause" for other surgical specialties whose referral business Tuomey wanted to secure.

- Through its outside law firm, Nexsen Pruet, Tuomey engaged Cejka Consulting ("Cejka") to develop compensation plans to offer to the GI physicians and surgical specialists. Cejka calculated a "net present value of non-compete clause" payment amount for each of the physicians being offered a contract by Tuomey.  See also SA305-07 (upper right hand box showing estimated individual physician non-compete payment).  Cejka also was informed what Tuomey's "desired net gain above collections" was for each of the physicians, and used those figures to "back into" the physicians' salary amounts.

- Tuomey knew when it entered the agreements with the specialty physicians that it would lose $1-2 million each year on those arrangements, and that has in fact occurred.

11

Tuomey itself has now added to the undisputed evidence identified in the Government's Motion showing that the contracts took into account the value or volume of DHS referrals in entering these agreements.  Tuomey admits in its brief that it entered these agreements out of concern that it faced actual and potential competition from the Wesmark ASC and the GI physicians' consideration of performing their outpatient procedures in their own offices instead of at Tuomey.  Tuomey also admits that its decision to enter these arrangements was motivated by concern that the physicians on its staff not have any "divided loyalties."  Deft Motion at 4-5.

Further proof is provided by the December 8, 2004 memorandum from Tuomey Chief Operating Officer Gregg Martin to the hospital's Board of Trustees recommending the formation of the LLCs to employ the specialty physicians.  In describing the components of the physicians' compensation under the contracts, Martin explained that both the base salary and the productivity component are "partial consideration for the covenant not to compete."  Deft Motion Ex. 10, Item B(1), (2) (Bates Tuomey0011525).  This explanation to the Board simply confirms what Tuomey's outside counsel, Al Pollard, told physicians who were considering entering into the proposed contracts with Tuomey in August 2004:

> [A]t the end of the day, what we're trying to do is we're trying to protect the mission of this medical center by sharing revenues with those people who might otherwise, frankly, go out and compete with us . . . .
>
> That means you get paid for giving up the right to go elsewhere.

A114, 116.

The only competition Tuomey faced when it decided to enter these contracts with the specialty physicians was for outpatient referrals.  The only medical services covered by these contracts are outpatient procedures.  Tuomey's management expressly recommended, and its Board approved, the inclusion of payments to each physician not to take their outpatient referrals

elsewhere.  Tuomey's own attorney, in the presence of Tuomey's senior management, explained

to the physicians that they would be sharing in the revenues of the outpatient surgery center, and

indeed they do.  The physicians receive more in compensation and benefits than they can

possibly generate in earnings, and Tuomey must subsidize the LLCs that directly employ the

physicians.  To do this, Tuomey draws upon funds that include its reimbursements from the

technical component of the outpatient surgeries that the physicians refer to it.  A325-26.  Tuomey

has locked up the outpatient referral revenue stream with these agreements, as was its plan all

along.  The design of the compensation plans indisputably took into account, or otherwise

reflected, the value or volume of those outpatient referrals to Tuomey.  This type of arrangement

– which skews medical decisionmaking, pays excess compensation to physicians in order to

squelch competition for medical services and leads to higher costs for federal healthcare

programs and for patients – is exactly what Congress intended to target with the Stark Statute.

### 3.    Significant Record Evidence Suggests That Tuomey Has Direct Financial Relationships With The Physicians.

There also is substantial evidence that the agreements between Tuomey and the

physicians are really direct compensation arrangements because the intervening entities between

Tuomey and the physicians are mere alter egos of Tuomey.  In the Fourth Circuit, the decision to

pierce the corporate veil rests on a two-prong test.  Keffer v. H.K. Porter Co., Inc., 872 F.2d 60,

65 (4th Cir. 1989); DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681,

685–87 (4th Cir. 1976).  The first prong involves a  factual inquiry into several factors, including

(1) gross undercapitalization for the purposes of the corporate undertaking; (2) failure to observe

corporate formalities and maintain proper formalities; (3) the non-payment of dividends; (4)

insolvency; (5) siphoning of funds of the corporation by the dominant stockholder; (6) non-functioning of other officers or directors; (7) absence of corporate records; and (8) the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders. DeWitt, 540 F.2d at 685–87; see also U.S. Fire Ins. Co. v. Allied Towing Corp., 966 F.2d 820, 828–29 (4th Cir. 1992) (citing overlap of directors as additional factor); Keffer, 872 F.2d at 65 (same, and also including overlapping officers).  No single factor is decisive, and any decision to disregard the corporate form "must involve a number of such factors."  DeWitt, 540 F.2d at 687. The second prong requires that there be "an element of injustice or fundamental unfairness" such that it justify "a disregard of the corporate entity in furtherance of basic and fundamental fairness."  Id.; see also Keffer, 872 F.2d at 65.  Proof of plain fraud is not a necessary element in a finding to disregard the corporate entity.  DeWitt, 540 F.2d at 684 (citing Anderson v. Abbott, 321 U.S. 349, 362 (1944)).

        In applying the above factors to determine whether a corporation acted as an "instrumentality" or "alter ego" of another such that the corporate veil should be pierced, "a court must focus on 'reality and not form, [on] how the corporation operated and the individual defendant's relationship to that operation.'" Ost-West-Handel Bruno Bischoff GmbH v. Project Asia Line, Inc., 160 F.3d 170, 174 (4th Cir. 1998) (quoting DeWitt, 540 F.2d at 685).  In Keffer, for example, the Fourth Circuit upheld a decision to pierce the corporate veil where the subsidiary was grossly undercapitalized for its corporate purpose; the parent company continued to pay for the subsidiary employees' medical coverage and life insurance benefits after the subsidiary had closed; and the parent and subsidiary had some common officers and directors. 872 F.2d at 65.

Here, Tuomey created the intervening LLCs solely to employ the specialty physicians, and in fact they have no other purpose and no other employees besides those physicians. Although organized as for-profit entities, the subsidiary LLCs are severely undercapitalized and require $1-2 million dollars in cash infusions from Tuomey each year simply to fund their operations.  A62 (". . . Tuomey Healthcare System pays all expenses of Tuomey Professional Services, LLC. . . . Tuomey Healthcare System has made no loans, capital contributions or dividend payments to Tuomey Professional Services, LLC.").  Tuomey is the sole owner; Tuomey employees and officers serve as the intervening LLCs' officers and directors; all administrative functions are contracted back to Tuomey.  A61, 62. Tuomey revised its health insurance plan to allow the physicians employed by the LLCs to participate regardless of how many hours they actually work each week, even though the hospital's own employees who work fewer than 35 hours per week are not eligible for those same benefits.  SA363-65 (Watkins Dep. 104:10-106:1).  The LLCs share common bank accounts and do not have their own phone numbers.  A314; SA86-87 (Responses to Interrogatory No. 29); SA367 (Luebbert Dep. 96:4-20). Further, as noted in our motion at 15-16, Tuomey's attorney Al Pollard, whose firm drafted the contracts and created the LLCs (SA470-71) told the physicians at the August 27, 2004 meeting: "[W]e believe a relationship can be created between each of you, many of you and the medical center **or some alter ego of the medical center** . . . where you can where you can share in those revenues, but you might technically be considered a part-time employee. . . ."  A116.  Thus there is ample record evidence to satisfy the first prong of the DeWitt test.

Ample evidence also supports the "injustice" element of the DeWitt test.  A factfinder could readily conclude from Martin's December 8, 2004 memorandum to the Tuomey Board that

15

the main reason these LLCs were created as for-profit entities was to avoid any inquiry by the IRS into the excessive salaries being paid to the specialty physicians.  If, instead of separate entities, Tuomey had simply hired the physicians directly, it would have run the risk that the IRS would consider the excessive payments to the physicians a "private inurement" and would consequently withdraw Tuomey's tax-exempt status.  See Deft Motion Ex. 10 (Bates Nos. Tuomey0011528-29).  Further, the fact that Tuomey enjoys tax-exempt status and yet is using tax savings in part to subsidize "for-profit" LLCs so they can pay physicians more than they could possibly earn for themselves, and to squelch competition that could reduce expenditures by federal healthcare programs (and, by extension, federal taxpayers) and by patients suggests an unjust purpose that should not be tolerated by the Court.  If Tuomey's purpose in setting up these LLCs was to evade the Stark prohibition, as Pollard's statement to the physicians quoted above certainly suggests, it has clearly failed in that effort, but such a purpose also would be unjust, unfair and abusive and would warrant piercing the corporate veil.

The Court need not reach the alter ego issue, however, because it can and should find, as a matter of law, that Tuomey's contracts with the specialty physicians on their face are indirect compensation arrangements to which the Stark Statute applies, as shown above.  The only remaining question is whether Tuomey has demonstrated that it falls within an exception. For the reasons stated below and in the Government's Motion, Tuomey cannot carry this burden of proof.

**B.** **Toumey Cannot Establish That The Contracts Fall Within A Statutory or Regulatory Exception.**

Tuomey argues that even if its contracts with the physicians do implicate the Stark Statute (which they do), the contracts meet the regulatory exception for indirect compensation arrangements. As discussed in the Government's Motion at 7, the indirect compensation arrangement has several elements pertinent here:

(1)     "The compensation received by the physician . . . is fair market value for services and items actually provided and not determined in any manner that takes into account the value or volume of referrals or other business generated by the referring physician" for the hospital.

(2)     The compensation arrangement must be in writing, signed by the parties, specifying the services covered by the agreement, except in the case of a bona fide employment relationship, "in which case the agreement need not be in writing, but must be for identifiable services and be commercially reasonable even if no referrals are made to the employer."

(3)     The compensation does not violate the Anti-Kickback Statute or any other federal or state law regarding billing and claims submission.

42 C.F.R. § 411.357(p). Tuomey must prove that its contracts with the physicians satisfy all three of the above elements in order to qualify for the exception.[6]

**1.** **The Physicians' Compensation Was Determined In A Manner That Took Into Account The Value or Volume of Their Outpatient Referrals To Tuomey.**

To qualify for the indirect compensation exception, Tuomey must show that the arrangements with the physicians were "not determined in any manner that takes into account the

---

[6]If the contracts are regarded as direct arrangements, Tuomey has stated it will rely upon the bona fide employment exception. 42 U.S.C. § 1395nn(e)(3); 42 C.F.R. §§ 411.357(c). That exception would also require Tuomey to prove that the compensation paid the physicians was fair market value, not determined in any manner that took into account the value or volume of referrals, commercially reasonable even in the absence of referrals, and not in violation of the Anti-Kickback Statute. Id. Accordingly, the same facts cited here would preclude Tuomey from establishing entitlement to the protection of the bona fide employment exception.

volume or value of referrals or other business generated by the referring physician" for the hospital.  As explained extensively in the Government's Motion and in Section II(A), above, Tuomey cannot possibly meet this burden.  To the contrary, the undisputed record shows that Tuomey did determine the physicians' compensation in a manner that took the value or volume of the physicians' outpatient referrals, and that it did so to secure their "loyalties" and fend off the potential competition for those referrals from the Wesmark ASC and the possibility that the GI physicians would move their outpatient procedures into their own offices.  Tuomey even admits in its brief that these concerns motivated it to enter into the compensation arrangements with the specialty physicians.  Deft Motion at 4-5.  This alone is sufficient to compel the conclusion that Tuomey took the value or volume of the outpatient referrals into account when it designed and entered into the compensation contracts with the specialty physicians.  Added to the undisputed record evidence cited previously in our motion at 10-23 and above, as a matter of law, these admissions only make even more clear that Tuomey cannot find shelter in the indirect compensation exception.

Tuomey is correct that the Stark Statute is a strict liability statute, and that no scienter need by shown by the Government to establish a violation.  What that means is that Tuomey would still be liable even if it had violated the Stark Statute unwittingly (which, as discussed in detail below, is clearly not the case).  However, Tuomey errs when it argues that the Court should not consider the direct and circumstantial evidence of the factors that motivated Tuomey to enter into these arrangements in the first place – including, prominently, Tuomey's desire to quash the competition that had begun to emerge in Sumter for outpatient referrals and its express inclusion of an amount to pay the physicians for agreeing not to compete with it.  The Court is not limited, as Tuomey suggests, to a review of what appears solely on the face of the contract; it may also

consider how the contract operates in practice and what the agreement was designed to achieve. Toward that end, the pre- and post-contractual conduct of the hospital and the physicians is clearly relevant. The Court is entitled to rely upon the undisputed record evidence cited here and in the Government's Motion, as well as Tuomey's admission in its motion that it entered into these agreements to fend off actual and potential competition for outpatient referrals and to ensure that referring physicians did not have "divided loyalties," and to conclude that no triable issue exists on this question: the undisputed facts and admissions establish that the compensation Tuomey paid to the physicians was determined in a manner that took into account the value or volume of referrals or other business generated by the physicians for the hospital.

2.     **Substantial Evidence Exists That The Compensation Arrangements With The Physicians Exceeded Fair Market Value.**

In the 2001 commentary to the Stark regulations, HHS explained its criteria for an adequate demonstration of the fair market value:

> To establish the fair market value (and general market value) of a transaction that involves compensation paid for assets or services, we intend to accept any method that is commercially reasonable and provides us with evidence that the compensation is comparable to what is ordinarily paid for an item or service in the location at issue, by parties in arm's-length transactions who are not in a position to refer to one another.

66 Fed. Reg. at 944. Both parties have engaged experts to provide opinions to address the issues of fair market value and commercial reasonableness. Tuomey makes much of the fact that the Government's valuation expert, Kathy McNamara, concluded that two of the physician groups (the general surgeons and ob/gyns) do not receive **cash compensation** that exceeds fair market value. What Tuomey does not disclose in its brief is that Ms. McNamara **did** conclude that the general surgeons' and ob/gyns' **total compensation** was not commercially reasonable. SA172, 185. In addition, Tuomey does not disclose that the GI physicians and the ophthalmologist

19

receive cash compensation in excess of fair market value (id.), and that Tuomey's own expert, Steven Rice, has not challenged the accuracy of McNamara's computations (see Deft Motion Ex. 38, at 43).

Tuomey also does not disclose that its expert performed an evaluation of the fair market value of the benefits Tuomey provided to the specialty physicians and opined that Tuomey provided the general surgeons and the ob/gyn physicians "a level of benefits that generally exceeds what we have seen for other physicians, especially given their limited service level/FTE status with Tuomey." Deft Motion Ex. 38, at 32-34. McNamara reached essentially the same conclusion by opining that the benefits provided to these two groups were excessive and "not commercially reasonable in the absence of referrals." SA 185, 237-238. The definition of "compensation" under the Stark Statute includes "any remuneration, direct[ ] or indirect[ ], overt[ ] or covert[ ], in cash or in kind." 42 U.S.C. §§ 1395nn(a)(h)(1); 42 C.F.R. § 411.351. Thus, Tuomey's own expert questions the fair market value of Tuomey's benefit payments to the general surgeons and the ob/gyn physicians. While Rice states in his conclusion that these benefits are fair market value, he does not explain anywhere in his report how that conclusion squares with the results of his analysis showing that the general surgeons and ob/gyns received excessive benefits compared to their level of activity under the contracts. Certainly, summary judgment is not appropriate in Tuomey's favor on this issue with respect to any of the physician practice groups.

While we believe the evidence that Tuomey's total remuneration to all of the specialty physicians exceeded fair market value and was not commercially reasonable in the absence of referrals, we recognize that courts are reluctant to resolve "battles of the experts" at the summary judgment stage. See, e.g., United States ex rel. Pogue v. Diabetes Treatment Centers of America,

2008 U.S. Dist. LEXIS 55432, at *24-27 (D.D.C. July 21, 2008).  Accordingly, we do not ask the

Court to render a conclusion on this element of the Stark exception at this time.  However, in

further support of our position, we note the following record evidence:

              (a) Rice relied upon a highly questionable methodology to reach his

conclusion that the compensation Tuomey paid the physicians was within fair market value.

Specifically, Rice measured the physicians' compensation against their <u>charges</u>, not their

collections or another commonly used measure of productivity called work relative value units

(WRVUs).  Doug Cardinal and Kim Saccone, formerly of Cejka, dismissed charges as "not real

money" and therefore inappropriate to use in a fair market value calculation because physicians

can set their charges at any level they wish, although that does not mean anyone will actually pay

those charges.  SA369-70; 375-76; <u>see</u> <u>also</u> SA231-32 (McNamara Rebuttal Report). The data

Rice collected regarding the physicians' payor mix (e.g., Medicare, Medicaid, Tricare, private

insurance and self-pay/uninsured) confirms that the physicians were paid their actual charges less

than 7% of the time.  SA302-03.  Rice admitted as much during his deposition, and also admitted

that charges therefore do not represent the fair market value of the price of these physicians'

services in Sumter.  SA474-91.  Using collections data, Rice concluded, consistently with

McNamara, that the physicians were consistently paid above the 90th percentile of all physicians

within their specialty; using WRVU data, Rice concluded that the GI physicians, the

ophthalmologist and, for that matter, most of the ob/gyns were paid at or above the 85th percentile

of physicians in their specialty groups.  <u>Compare</u> Deft Ex. 38, at 26-30, Tables 3-7 (Rice) <u>with</u>

SA188, 189, 232 (McNamara).  Lacking from Rice's report is any "evidence that the

compensation is comparable to what is ordinarily paid for an item or service in the location at

issue, by parties in arm's-length transactions who are not in a position to refer to one another."
66 Fed. Reg. at 644.

> (b)     Tuomey's reliance upon Cejka's methodology also has been seriously drawn into question. Cejka maintained that the compensation packages it designed were fair market value as long as the total remuneration did not exceed 150% of the 90th percentile of physician compensation reported in the surveys. SA523-42; see also Deft Motion Ex. 35, at 2-3; Ex. 36, at 3 (draft opinion letters). Tuomey's expert refused to defend this methodology and stated in his deposition that his firm does not use this methodology and he does not know the basis for it. SA492-94. The fair market value opinions rely upon this measure and even describe it as a "generally accepted" benchmark for determining whether productivity-based compensation formulas are fair market value. SA526; see also Deft Motion Ex. 35, 36. Kim Saccone, who designed the compensation packages and prepared the opinion letters after receiving samples from Doug Cardinal did not know the basis for this statement or the methodology; she used it mechanically as "boilerplate" as she had received it from her supervisor, Doug Cardinal. SA377-78. Cardinal testified that the 150% of the 90th percentile formulation derived from an "IRS exemption letter" that he had received in redacted form from the law firm of Vinson & Elkins. SA371-73. That letter appears in our supplemental appendix at SA260-63.[7] The letter is simply a request, on behalf of an unknown entity, that the IRS find the compensation paid to the physicians acceptable for purposes of qualifying the physicians' employing entity as a tax-exempt organization. It is **not** a ruling of any kind by the IRS itself,

---

[7]This letter was not initially produced by Cardinal in response to the subpoena duces tecum that was issued to him before his May 6, 2009 deposition. It was produced only after we failed to locate the letter in any published IRS source and thus specifically requested that Cardinal produce his copy of the letter.

and indeed our research has identified no such ruling by the IRS. There is, in fact, no evidence that the IRS or any other government agency has ever accepted this methodology. Moreover, the compensation package described in the Vinson & Elkins letter differs substantially from the compensation Tuomey provides to the specialty physicians. Significantly, the compensation described in the redacted letter indicates that the total remuneration (salary and benefits combined) paid by the unknown entity to the physicians in question will be subject to an absolute dollar limit and will not exceed 54% of the physicians' annual production.[8] That is in marked contrast to this case, where all of the physicians, by design, received remuneration greater than 100% of their annual collections, without any dollar limit on what they can be paid. By contrast, Saccone stated that the Cejka did not opine on the fair market value of the **total** remuneration (including all benefits) that Tuomey provided to the specialty physicians, and provided no opinion at all on the commercial reasonableness of the plan it designed. SA379-84. Accordingly, the "fair market value" edifice upon which Tuomey's compensation plan was built has no foundation at all, and even Tuomey's current expert refuses to support it.

> **3.     Tuomey Cannot Establish That The Physicians' Compensation Is Commercially Reasonable, Even In The Absence Of Referrals.**

As with the fair market value analysis, the parties' experts differ sharply in their commercial reasonableness opinions. McNamara concludes, unequivocally, that none of the compensation packages makes any business sense in the absence of anticipated referrals, because, among other things, they all cost Tuomey substantial amounts of money each and every

---

[8]The redacted letter also does not specify the measure of production it relies upon, whether collections, WRVUs, or even charges. Indeed, this letter raises many more questions than it answers, not the least of which is how any reasonable compensation consultant or attorney could possibly rely upon it as authority.

year and there is no clear prospect that will ever change.  SA180-81; <u>see</u> <u>also</u> A319 (Johnson

Dep.).  While Rice acknowledges the substantial losses that Tuomey incurs in sustaining these

arrangements – totaling $4.4 million just through the end of 2008 (Deft Motion Ex. 38, at 38,

Table 11), he nonetheless concludes that various "facts and circumstances" make the transactions

commercially reasonable.  The Government has substantial challenges to Rice's conclusions,

some of which are set forth in McNamara's Rebuttal Report (SA221-49), but it is clear that this

issue – like the fair market value issue – is not susceptible to resolution on summary judgment,

but requires credibility determinations and the weighing of disputed evidence.

Tuomey makes the unsupported argument that commercial reasonableness is not required

here because the subject contracts are in writing.  This deliberate and nonsensical misreading of

the regulatory language, however, offers Tuomey no shelter.  The relevant portion of the

exception requires the party invoking it to show that:

> The compensation arrangement. . . is set out in writing, signed by the parties, and
> specifies the services covered by the arrangement, except in the case of a *bona*
> *fide* employment relationship between an employer and an employee, in which
> case the arrangement need not be set out in a written contract, but must be for
> identifiable services and be commercially reasonable even if no referrals are made
> to the employer.

42 C.F.R. § 411.357(p)(2).  This regulatory language tracks the Stark Statute's exception for

bona fide employment agreements in the case of direct financial relationships.  That provision

does not require a written agreement for bona fide employment arrangements, but **does** require

that the compensation be commercially reasonable even if no referrals are made to the employer.

<u>See</u> <u>id..</u> § 1395nn(e)(2)(C).  Further, and dispositively, the HHS commentary introducing the

indirect compensation exception expressly states that "in the case of a bona fide employment

relationship, the arrangement need not be set out in a written contract, but it must be for

identifiable services and be commercially reasonable even if no referrals are made to the

employer." 66 Fed. Reg. at 867. Any employment agreement, written or unwritten, must be

commercially reasonable to qualify for the Stark exception.

*                    *                    *

In sum, while there are disputed issues of material fact regarding fair market value and

commercial reasonableness that preclude summary judgment in favor of Tuomey, these disputes

do **not** affect the Government's entitlement to summary judgment on Count IV of its Second

Amended Complaint. As shown above and in our motion, Tuomey cannot carry its burden to

prove that the compensation agreements with the specialty physicians were "not determined in

any manner that [took] into account the value or volume of referrals or other business generated

by the referring physician[s]" for the hospital. 42 C.F.R § 411.357(p)(1). Because Tuomey is

unable to make the showing required to establish this essential element of the indirect

compensation exception, the Government is entitled to judgment as a matter of law that Tuomey

does not qualify for the indirect compensation exception to the Stark prohibition. See Celotex,

477 U.S. at 322.

## III.    TUOMEY IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE FALSE CLAIMS ACT CLAIMS.

As set out above and in the Government's Motion for Partial Summary Judgment, no

disputed issues of material fact exist on the issue of whether or not Tuomey violated the Stark

Statute, and the Government is entitled to judgment as a matter of law that Tuomey did violate

the Stark Statute. However, unlike Stark, which is a strict liability statute, the False Claims Act

requires a showing that the defendant has submitted the false claims "knowingly," that is, with

actual knowledge that the claims were false, or with reckless disregard or deliberate ignorance of

25

the truth or falsity of the claims.  31 U.S.C. § 3729(b).  Courts have held that this scienter

requirement is difficult to resolve at the summary judgment stage because the factfinder fact must

often evaluate the credibility of the witnesses and determine whether the facts support a

determination that the defendant acted "knowingly."

In the case at bar, as argued above, there are no disputed facts concerning **whether** the

hospital's compensation arrangement with the specialty physicians "took into account" the

volume or value of referrals (which is prohibited under Stark).  But there are potentially disputed

facts concerning whether the hospital (acting through its officers, agents and/or attorneys)

submitted claims for payment to the Medicare program **with actual knowledge** that the

arrangements violated the Stark Statute, or in **reckless disregard or deliberate ignorance** of the

Stark violation.

### A.     The Scienter Requirement Under The False Claims Act

In pertinent part, Section 3729(a)(1) of the FCA, as amended,[9] imposes liability upon any

person who:

> (A)     knowingly presents, or causes to be presented, a false or fraudulent claim
>          for payment or approval;
>
> (B)     knowingly makes, uses, or causes to be made or used, a false record or
>          statement material to a false or fraudulent claim; [or]
> . . .
>
> (G)     knowingly makes, uses, or causes to be made or used, a false record or
>          statement material to an obligation to pay or transmit money or property to
>          the Government, or knowingly conceals or knowingly and improperly

---

[9]Congress amended the FCA in 2009 with the Fraud Enforcement and Recovery Act of
2009 ("FERA"), Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621-25 (2009), to clarify certain
provisions of the FCA "to reflect the original intent of the law."  Id.  In addition, the numbering
system in the statute was changed.  Current Sections 3729(a)(1)(A)–(G) previously were Sections
3729(a)(1)–(7).

avoids or decreases an obligation to pay or transmit money or property to
the Government.

The FCA defines "knowingly" as "actual knowledge," "reckless disregard," or "deliberate
ignorance" of the truth or falsity of the information, and expressly "require[s] no proof of specific
intent to defraud." Id. § 3729(b)(1)(B) (as amended).

Defendant misstates the Supreme Court's holding in Allison Engine Co., Inc., v. United
States ex rel. Sanders, 128 S. Ct. 2123, 2126 (2008).  That case only interpreted former FCA
Sections 3729(a)(2) and(a)(3).  The case did **not** address the language of former Sections
3729(a)(1) or (a)(7).  The United States has asserted claims in this action under former Sections
3729(a)(1), (a)(2), and (a)(7) (now respectively designated as Sections 3729(a)(1)(A), (B) and
(G)).  2d Am. Compl. Counts I, II and III.  Moreover, the recent amendments to the FCA
expressly supersede the Supreme Court's decision in Allison Engine.

In Allison Engine, the Court interpreted the phrase in former Section 3729(a)(2) that a
defendant must have created or used a false statement or record "to get" a false or fraudulent
claim paid to require a showing that the person submitting the false statement knew (1) that he or
she was seeking payment by the Government for the claim and (2) that the Government would
rely upon the false record or statement to approve the payment.  Id. at 2129–30.  However,
Congress amended the FCA in May 2009 and deleted the phrase "to get" from former Section
3729(a)(2).  The amendment to former Section 3729(a)(2) expressly applies to all FCA actions
pending as of June 7, 2008, and therefore applies here.  FERA § 4(f), 123 Stat. at 1625.

Further, there is no serious question that Tuomey's actions here would satisfy the Allison
Engine inquiry even if it did apply.  Contrary to Tuomey's assertion that Allison Engine requires
a showing of specific intent to defraud, the Court took pains to state that its holding did not in

27

any way alter the FCA's scienter requirement, including the provision that "no proof of specific intent is required." Id. at 2130 n.2 (quoting 31 U.S.C. § 3729(b) (2008)). Tuomey intended to obtain payment from the federal government when it submitted, or caused to be submitted to the Medicare and Medicaid programs claims and cost reports for DHS services provided by the specialty physicians, and Tuomey intended the Government to rely upon those submissions in approving requested payments. A4-8, 44, 45 (2d Amended Complt and Answer ¶¶12, 18, 19, 25, 26, 31-34).

**B.     Application Of The Scienter Requirement**

As stated above, the undisputed factual record proves that the remuneration paid by Tuomey to the physicians under the subject contracts "takes into account" the volume or value of referrals. It is also undisputed that Tuomey submitted claims for designated health services that were referred by those physicians during the time the contracts were in place. Therefore, the Court should find, as a matter of law, that Tuomey violated the Stark Law, and grant the Government partial summary judgment on Count IV of the Second Amended Complaint. As a matter of law, that finding also will satisfy the FCA's requirement of a "false or fraudulent claim for payment." Rogan, 459 F. Supp. 2d at 722 ("The claims were false because the Stark Statute provides the United States will not pay for claims submitted by [a hospital] for services to patients referred by a physician . . . with whom the hospital has a prohibited financial relationship, i.e., the hospital has paid any 'compensation' to a referring physician.").

Thus, the only remaining element needed for the Government to establish Tuomey's liability under the FCA is proof that Tuomey "knowingly" submitted these false claims. As noted above, the Government can meet this burden by showing: (a) that Tuomey had actual knowledge that the claims violated the Stark Statute, **or** (b) that Tuomey acted with reckless disregard

concerning whether the claims violated the Stark Statute, **or** (c) that Tuomey acted with deliberate ignorance about whether the claims violated the Stark Statute. 31 U.S.C. § 3729(b). Substantial record evidence demonstrates that Tuomey acted "knowingly" under all three alternative statutory definitions.

### 1.     Actual Knowledge

In the August 27, 2004 meeting between Tuomey officials and physicians (in which Tuomey was trying to convince the doctors to enter into the contracts), both Tuomey attorneys and Tuomey executives made statements clearly indicating that they had actual knowledge that the doctors were going to be paid for their referrals, which violates the Stark Statute. For example, one of the attorneys told the doctors that the hospital's goal was to "provide some economic incentive legally to physicians to have them and continue to be **loyal to Tuomey in terms of referrals.**" A111 (emphasis added). Al Pollard, one of the attorneys, said that the hospital wanted to enter into a deal that was "financially beneficial to everyone" and that "would **reward you economically** for using the ambulatory surgery center, to take your patients there to work on them," and that the hospital was interested in "**sharing revenues** with those people who might otherwise, frankly, go out and compete with us by trying to build their own center." A114-15 (emphasis added). Again, Mr. Pollard tried to convince the doctors by saying that "we believe a relationship can be created between each of you, many of you and the medical center or some alter ego entity of the medical center, I assume Jay will be willing to do that, where you can **share in those revenues**, but you might technically be considered a part-time employee." A116 (emphasis added).

At the same meeting, one of the hospital representatives said that the doctors would be "paid for giving up the right to go elsewhere" and that the doctors would be "paid for the fact that

he is, as an employee, is obligated to come here with his surgical cases."  A120.  Mr. Cox said

that he wanted to "really drive a significant amount of audience through the ASC."  A127.  Yet

again, the hospital representatives told the doctors that it wanted to "share these revenues with

you guys" and "share in some of the return."  A127-28, 132.  Finally, in that meeting, the hospital

representatives explained that the reason the hospital was willing to enter into these relationships

with the surgeons and the GI doctors, and not with the radiologists and anesthesiologists was

that:  "It wouldn't make sense for us to do some of the **volume-driven** things with them because

they don't create the volume.  You all create the volume."  A146 (emphasis added).

Another similar meeting held earlier, on December 15, 2003, also provides evidence from

which a reasonable jury could conclude not only that Jay Cox knew that the proposed

arrangements took into account the "value and volume of referrals," but also that he knew that

the arrangements would violate the law.[10]  During that meeting, a physician asked if his

compensation under the agreements would vary based on the value or the volume of his cases.

Gregg Martin responded, "Yeah, the value of that, Paul, my understanding is, comes from that

initial calculation of what your employment's worth. . . . So that's the value part. Yes."  The

doctor then asks, "So that it's indirectly tied to volume?"  And Gregg Martin responds, "Yes.

Yes."  The doctor continues, "And does it change year to year?"  SA342.  Gregg Martin begins to

respond, but Jay Cox interrupts him and says the following:

> Yes.  The answer to that is yes, also.  Can it change year to year?  You all, I hope
> you read – I've got to keep saying read between the lines.  None of you all ever
> want to be sitting on the stand, and all we're trying to do is help everybody
> through this.  If we find a way to get legally dollars into your hand that you can

---

[10] A copy of the audio recording of this meeting is attached as SA309, which is the actual
evidence.  In addition, a transcript is being provided for the convenience of the Court as SA310-
59.

somehow go sit down with a pencil yourself and say, "Ah ha!"  You know, I just
want to figure out the legal way to do it right.

(Id. at 34)  Although, in this quote, Jay Cox says that he wants to find a "legal" way to tie the

compensation to the value or volume of referrals, he also says that the doctors need to "read

between the lines" because they don't want to "be sitting on the stand."  He implies that the

contracts will not accurately describe the true nature of the agreements, and that the doctors

should "read between the lines" and say "Ah ha!" because they can figure out on their own the

subterfuge that the hospital is engaged in.  His reference to the doctors not wanting to "be sitting

on the stand" (see SA342-43) clearly refers to the fact that Jay Cox anticipated these contracts

could be challenged in court as being illegal, especially if they accurately described the true

nature of the agreements.  A reasonable jury could, and should, conclude that this evidence

proves that Jay Cox had actual knowledge that the contracts violated the Stark Law.

### 2.     Reckless Disregard

If a jury was not convinced that the evidence was sufficient to show that Tuomey actually

knew that the contracts violated the Stark Law, a jury could clearly find that Tuomey acted with

reckless disregard in determining whether the contracts violated the Stark Law.  In particular,

Tuomey acted recklessly when it failed to follow up on the warnings given to it by Richard

Kusserow, the former Inspector General of the Department of Health and Human Services.

In early 2004, Tuomey's compliance officer suggested that Tuomey consult with

Kusserow concerning the proposed employment agreements.  SA147.  On or about January 13,

2004, Kusserow had a telephone conference call with Cox, Tuomey's outside attorney, Tim

Hewson, its compliance officer George Rikard, and several other representatives of Tuomey to

discuss the proposed physician contracts.  SA99-100, 147-48.  During that telephone

31

conversation, Kusserow expressed a number of concerns about the proposed contracts.  Id.  He

followed up with a brief, fairly generic description of various concerns the following day, and

then, about a week later, gave an 11-page "white paper" to Tuomey, warning about his concerns

and a number of "potentially troubling issues" that had not been addressed.  SA100-02.

Kusserow then followed up by asking his colleague, Al Bassett, to follow up with Tuomey's

compliance officer to ensure that Tuomey understood that he had only scratched the surface of

this risky proposal, and that Tuomey would be well-advised to hire Kusserow's firm or a law

firm specializing in these issues to advise the hospital.  SA102, 148.

Despite Kusserow's concerns, expressed both orally and in writing, Tuomey decided not

to pursue any additional details from him or follow his advice about hiring an expert in the Anti-

Kickback or Stark Statutes.  SA 102-03, 148-49, 466-68.  At a minimum, this failure to follow up

on warning signs constituted reckless disregard by Tuomey.

### 3.    Deliberate Ignorance

Alternatively, the hospital's failure to follow up with Kusserow constituted deliberate

ignorance of Kusserow's warnings because it didn't want to know the truth about the legality of

these contracts.  Rather, it wanted to "stick its head in the sand" like an ostrich, and ignore the

truth.

This interpretation of events is supported by the way the hospital subsequently handled

(and deliberately ignored) the additional warnings given by Kevin McAnaney, the former Chief

of the Industry Guidance Branch of the Office of the Inspector General for HHS.  In both the

Kusserow and McAnaney situations, Tuomey actively ran away from the advice of attorneys and

advisors – both former high-level officials in HHS with detailed knowledge of the Government's

enforcement priorities and standards, as well as of the Anti-Kickback and Stark Statutes and

32

regulations – who raised red flags about the transactions, and sought out only those attorneys and advisors who were "committed to the deal."[11]

Like Kusserow, McAnaney expressed concerns about the contract being "very risky," and told Tuomey's attorney (Hewson) that it raised "red flags" and that it didn't pass the "red face test" (SA445-47).  McAnaney further explained his concern in his deposition:

> Q.    Let's stop there.  What do you mean by the "red face test."
>
> A.    Well, it's just hard to say with a straight face.  I mean, it just doesn't – it doesn't – it's pretty hard to believe.
>
> Q.    Hard to believe that the compensation arrangement outlined in for Dr. Drakeford, hard to say that with a straight face that it meets the fair market value test?
>
> A.    Well, a compensation arrangement that appears to pay someone significantly above what they are actually earning or revenue generating from their fees for you.  I mean, it's just hard to believe anyone would employ someone for that, that's all.

SA446-47.

Tuomey ignored these warnings completely.  Not only did Tuomey ignore McAnaney's warnings, but it came up with a bogus explanation as to why it was ignoring the advice.  Both Tim Hewson and Gregg Martin claimed that Greg Smith (Dr. Drakeford's attorney) had "poisoned the well" or had otherwise influenced McAnaney to be "predisposed to refute the credibility of the plans."  SA401-21, SA264.

---

[11]This phrase, "committed to the deal" comes from a voice mail that Steve Pratt left for Tim Hewson (included as SA299), arguing that Tuomey should either not hire or be very careful of advice given by Kevin McAnaney because McAnaney was not "committed to the deal" like Pratt and Hewson.  A jury could conclude that the email accurately describes Tuomey's general mindset in seeking out advice on this issue.

Soon after McAnaney gave his legal advice to the hospital orally, there arose a dispute between the hospital and Drakeford's attorney concerning exactly what McAnaney had said. SA265, 519-22.  In an effort to clarify it, Drakeford's attorney requested that McAnaney put his opinion in writing.  SA266-69.  However, Tuomey refused to allow McAnaney to clarify his position, and instructed him to cease all work on the matter.  SA277-79.

Although Tuomey has given multiple explanations as to why it did not want McAnaney to put his opinion in writing, the reason that rings most true is the one given by a board member to Jay Cox during a meeting over a meal at the hospital.  In a CD labeled "August 22 [2005] "Executive Communication" (Bates number 178426), which is another audio recording of a meeting involving Jay Cox and an unnamed female (presumably a board member), Jay Cox is discussing the decision to not ask McAnaney put his opinion in writing.  The female says to Mr. Cox, "[T]he reason he's telling you that is that he doesn't want to put that in writing is in the event it's adverse," to which Mr. Cox responds, "Sure."  SA361.[12]  This female board member's common-sense understanding of why Tuomey didn't want McAnaney to put his opinion in writing is the same conclusion that a reasonable jury is likely to draw based on the evidence in the case.  Again, this follows the pattern of Tuomey seeking out only attorneys and advisors who agree with it, and actively rejecting attorneys and advisors who disagree.

Based on this evidence, it is clear that there is sufficient evidence from which a reasonable jury could conclude that Tuomey had either actual knowledge that the contracts violated the Stark Statute, or that it acted with reckless disregard or deliberate ignorance in

---

[12]A copy of the audio recording of this meeting is attached as SA360, which is the actual evidence.  In addition, a transcript is being provided for the convenience of the Court as SA361.

determining whether the contracts violated Stark.  Thus, Tuomey is not entitled to summary

judgment on the False Claims Act claims.

      **B.**     **Advice of Counsel Defense**

      Despite this substantial evidence that Tuomey acted "knowingly" under the False Claims

Act, Tuomey contends that it is entitled to summary judgment on its "advice of counsel" defense.

To establish this defense, Tuomey must prove:   (1) that the advice was sought in good faith; (2)

that the client provided full and accurate information to the attorney; (3) that the advice can

reasonably be relied upon; and (4) the client faithfully followed the attorney's advice.  U.S. v.

Newport News Shipbuilders, 276 F.Supp. 2d 539 (E.D. Va. 2003).

      Tuomey bears the burden of proving each of these elements.  To meet this burden, it is

not enough for the defendant to show that it received and followed some advice selectively.

Rather, "evidence of reliance on the advice of counsel and outside experts does not necessarily

bar a fact-finder from finding that the contractor acted with reckless disregard; the contractor

might have acted recklessly in relying on the advice because, for example, the advice might be

shown to be patently unreasonable and thus not worthy of reliance or because the contractor's

reliance on that advice was recklessly incomplete."   Id at 565.  A "crucial element" of the advice

of counsel defense is that the defendant secured the advice before taking the action in question.

United States v. Polytarides, 584 F.2d 1350, 1352 (4th Cir. 1978).  Moreover, a defendant cannot

rely on the defense if the defendant is advised by counsel that a contemplated course of action is

legal, but the defendant subsequently discovers counsel's advice to be incorrect or discovers

reason to doubt the advice.  United States v. Benson, 941 F.2d 598, 614 (7th Cir. 1991) cited by

United States v. Biller, No. 1:06CR14, 2007 WL 325798, at *10 (N.D.W. Va. Jan. 31, 2007).

Where a defendant has already taken "significant steps" toward the completion of a potential

action, and has been warned of the illegality of the potential action, proof of subsequent advice does not support a valid defense based upon advice of counsel.  Polytarides, 584 F.2d at 1353.

The Newport News court denied the defendant's claim for summary judgment on its advice of counsel defense, ruling that the scope and nature of the reliance raised issues of fact for the factfinder.  Likewise, in the case at bar, there are substantial issues of credibility on disputed issues of fact that preclude summary judgment on this issue.  The United States did not ask for summary judgment on its FCA claims because issues of knowledge, reasonable reliance, good faith reliance and reckless disregard are almost always issues that require the fact-finder to assess the credibility of the witnesses and decide what inferences can reasonably be drawn from the evidence as a whole.  The same is true with Tuomey's advice of counsel defense.  Furthermore, there are substantial facts contradicting each element of the defense.

### 1.     The advice was not sought in good faith.

There is substantial evidence from which a reasonable fact-finder could conclude that Tuomey did not seek advice from its attorneys in good faith.  In addition, there is substantial evidence that the hospital went "attorney shopping" to "cherry pick" the attorneys and other advisors who would give Tuomey the answer it wanted, rather than impartial advice.

### (a)     The purpose and nature of the contracts

Tuomey admits in its Memorandum that the motivation for these contracts was the competition and potential competition from the Wesmark ASC and from the GI physicians' consideration of performing endoscopies in their own offices.  Deft Motion at 3-4.  Mr. Cox had previously described his concerns about lost profit to the hospital, both to the Sumter County Council and to the Tuomey Board of Trustees.  A285, 257-60.  Mr. Cox also acknowledged that

a study had been done by the hospital which concluded that the likely value of the lost referrals, just from the gastroenterologists, would be approximately $9.6 million.  SA386-87; A246-48.

Similarly, in a meeting on August 27, 2004, in which Jay Cox and Tuomey's attorneys from Nexsen Pruet were attempting to convince the doctors to enter into these employment agreements, the hospital's representatives acknowledged that they were entering into these contracts to protect the hospital's profit stream generated by surgical and gastroenterological referrals.[13]  In that meeting, Mr. Cox told the doctors that "the hospital only today makes money, earns income off of very, very few things that we do anymore" and that two of the primary areas of profit were gastroenterology and surgery (and especially surgery).  A97.  Cox told the doctors that he wanted to enter into these employment agreements because he was concerned about **"putting at risk any of those profit centers** that support everything else we do."  A98 (emphasis added).

Yet in the contracts themselves, which were drafted by and in conjunction with Tuomey's attorneys, the issue of the lost revenues or lost profits is conspicuously absent from the description of the contracts' "purposes."  In fact, Mr. Cox admitted that the "purposes" clause set out in paragraph 14.14 of the contracts were added after the initial draft.  SA388-94, 280-98. Cox admitted that the desire not to lose revenue is not mentioned at all in paragraph 14.14. SA395.

A reasonable jury could, and should, conclude from this evidence that Tuomey did not seek the advice from Nexsen Pruet in good faith.  Instead, the hospital intentionally omitted from

---

[13]See Govt Motion at 16 & n.5 regarding CD labeled A89 and corresponding unofficial transcript at A94-151.

the contracts a (if not, the) primary purpose for the hospital to enter the contracts in order to try to get legal "cover" for what it knew were probably illegal contracts.

### (b)     "Attorney-shopping" and "cherry picking" advisors

In evaluating the advice of counsel defense, the jury should consider **all** the advice given to the defendant, not just the favorable advice.  As stated in Akeva L.L.C. v. Mizuno Corp., 243 F.Supp.2d 418 (M.D.N.C. 2003), a party invoking the advice of counsel defense "may not pick and choose between what opinions will be relied upon and which will be discarded.  The totality of the circumstances test requires that all knowledge gained by the [party invoking the defense] relating to the advice subject matter must be revealed so that the factfinder can make its own determination as to whether the reliance was reasonable."[14]

Critical to showing "good faith" in seeking the advice of counsel is evidence that the defendant sought out well-qualified advisors to provide impartial advice.  Yet the record here shows that Tuomey disregarded, and even attempted to suppress, advice it received from highly credentialed, knowledgeable counselors about the substantial risk that these contracts did not comport with federal healthcare laws.  As shown above, no one at Tuomey even bothered to pick up the phone to call Kusserow, the former HHS Inspector General, to find out specifically what

---

[14] The principle that a party invoking the advice of counsel defense must disclose all advice regarding the subject matter is also expressed in cases addressing claims of privilege where the defense has been asserted.  See Minnesota Specialty Crops, Inc. V. Minnesota Wild Hockey Club, L.P., 210 F.R.D. 673 (D. Minn. 2002) ("'Fairness dictates that a party may not use the attorney-client privilege as both a sword and a shield,' and therefore, parties asserting the advice-of-counsel defense 'may not selectively disclose privileged communications that it considers helpful while claiming privilege on damaging communications relating to the same subject.'" quoting SNK Corp. Of America v. Atlus Dream Ent. Co. Ltd., 188 F.R.D. 566, 570 (N.D. Cal. 1999)); Chiron Corp. v. Genentech, Inc., 179 F. Supp. 2d (E.D. Cal. 2001) ("A party, therefore, may not selectively disclose privileged communications that it considers helpful while claiming privilege on damaging communications relating to the same subject.").

his concerns about the proposed agreement were, nor did Tuomey direct Hewson to do so. A factfinder could reasonably conclude that Tuomey avoided any further contact with Kusserow because they did not want to hear (or, worse, have a record of having heard) any advice against moving ahead with the physician contracts. Likewise, Tuomey refused to have McAnaney – one of the principal authors of the Stark regulations – put into writing his assessment of the contracts' legality because Tuomey knew the assessment would be negative. This pattern demonstrates that Tuomey was not seeking advice in good faith, but rather was "cherry picking" the advice it wanted from those hand-picked attorneys and advisors who would tell the hospital what it wanted to hear.

Finally, despite the fact that Gregg Martin claims that he believed Tuomey didn't need any additional advice about this matter (which was one of his explanations as to why Tuomey did not agree to have McAnaney put his opinion in writing) (SA401), nevertheless, Tuomey set out to hire another attorney that would give it a favorable legal opinion – again to give the hospital legal "cover" for its actions. That attorney was Steve Pratt, who acknowledged that he was "committed to the deal." SA299. In fact, Steve Pratt was so committed to the deal that he ignored the repeated pleas of his associate, whose legal analysis, set forth at length in an August 2005 email entitled "Tuomey and Stark, sitting in a tree," showed that the contracts violated the Stark Statute. The associate, Mark Swearingen, warned Pratt:

> The bottom line is that these Agreements involve the physicians being compensated not on the basis of how many of *hospital's* patients the physician slices up, but for how many of the *physician's own* patients he/she slices up *at the hospital*. Moreso than an employment agreement, these Agreements basically constitute the acquisition of the physicians' outpatient surgeries. Those surgeries are already being provided by the physicians in the community. These agreements only change the <u>location</u> of the surgery. So, at the end of the day, the practice is paying the physician more than it collects for the physician's professional services

in return for the physician's performing his/her surgeries at the hospital, for which the hospital is able to bill a technical fee.  If the physician was to provide and bill for the professional services in his or her own right, he/she could get no more than 100% of collections, by definition.  Under these agreements, the physicians are being paid more than 100% of collections (more than they could get on their own) for the very same services . . . . Which begs the question . . . Why?  Because the hospital gets the technical fee they otherwise wouldn't get (which is a referral under Stark)?  Because the arrangement will keep the physician from opening up or referring to a freestanding ASC across the street?  Are those legitimate and supportable reasons?

SA300 (emphasis in original).  Swearingen's email captures the essence of the Stark violation embodied in Tuomey's arrangements with the specialty physicians, but his analysis was ignored.

A reasonable jury could, and should, conclude that Tuomey did not seek legal advice from Nexsen Pruet and from Steve Pratt in good faith because it was "cherry picking" only the advice it wanted to hear, and ignoring all other advice, and that Pratt well understood that Tuomey only wanted a favorable opinion, and not an honest one that would properly warn the hospital that its arrangements ran afoul of the law. .

### (c)    Admissions by Tim Hewson showing lack of good faith

According to Greg Smith, Dr. Drakeford's attorney, Tim Hewson made a startling admission which a reasonable jury could find casts additional doubt on whether Tuomey sought Nexsen Pruet's advice in good faith.  According to Smith, he and Hewson were having a conversation soon before the June 22, 2005 conference call with McAnaney.  SA152-67.  In response to Smith's argument that the contract offered to Dr. Drakeford was not commercially reasonable because it was a mathematical certainty that the hospital would lose money, Hewson said words to the effect that:  "You are not going to want to hear this but the Hospital does not lose money because it makes money on the facility fees and ancillary revenues (CTs, MRIs, PT,

and labwork) related to the physicians' referrals." SA153. Smith confirmed that Hewson had

made this statement in a memo he later sent to both Hewson and McAnaney.[15]  A reasonable

jury could, and should, conclude that Hewson's admissions demonstrate that the hospital knew

that it was paying the doctors in return for referrals, which resulted in facility fees and ancillary

services, in violation of the Anti-Kickback and Stark Statutes, and that the legal opinions were

therefore not sought by Tuomey in good faith, but rather as legal "cover" for the decision they

had already made to enter into these deals.

### 2.    There is a factual issue as to whether Tuomey provided full information.

The second prong of the "advice of counsel" defense is that the defendant must have

provided full information to its attorney(s).  In the case at bar, there are material issues of fact left

unresolved on this issue, in two respects.

First, as discussed in detail above, Tuomey had true motives and purposes for entering

into these agreements, yet those purposes are not set out in paragraph 14.14 of the contract itself.

Instead, high-minded, self-serving purposes are set out in the contract.  One possible conclusion

from the facts set out above is that Tuomey hid the true purposes from its attorneys.  The other

possible conclusion is that Tuomey colluded with its attorneys.  Because the jury will have to sort

out these conflicting facts (all coming from Tuomey's representatives at different times), there is

a material issue of disputed fact that precludes summary judgment in favor of Tuomey.

---

[15]A copy of a memorandum from Greg Smith making this allegation was sent to both Hewson and McAnaney, and was found in McAnaney's file.  A copy of the memorandum and the cover email to McAnaney appear at SA270-76.

Likewise, there is conflicting evidence as to whether Steve Pratt was given all the information prior to his forming his opinion.  In his opinion letter, he says that he is not aware of any purposes other than those in paragraph 14.14 of the contracts (even though, as set out above, there are additional purposes).  A jury will have to determine whether Steve Pratt is telling the truth on this issue.  Furthermore, there is conflicting evidence about whether Steve Pratt was told about McAnaney's concerns.  Pratt testified that he was not aware of this, but the documentary evidence indicates otherwise.  SA453-464.

Therefore, there are material issues of fact on the second prong of the "advice of counsel" defense, which precludes summary judgment.

### 3.    Tuomey did not reasonably rely on the advice.

It was not reasonable for Tuomey to rely on Nexsen Pruet's legal advice, because Tim Hewson and his partner, Al Pollard, said things in the presence of Jay Cox and Gregg Martin that were inconsistent with Nexsen Pruet's written legal opinion.  In addition to the portions of the tape mentioned above, there is an additional inconsistent and unexplained statement made by Tim Hewson at a meeting, about which Gregg Martin testified.  Starting on page 146 of Martin's deposition (SA397), Martin listens to a portion of audio recording, and identifies both the speaker and the words spoken.  On page 147, he identifies the speaker as Tim Hewson.  And on page 148, he confirms that he hears Mr. Hewson say, "Because of the Stark and Anti-Kickback laws, you can't **explicitly** say, 'Well, it's because we are getting all the referrals with these patients.  **And of course, that's what we're doing**.  And of course, that's not illegal consideration."  (Emphasis added.)  However, on page 149, Martin says that his understanding of

the law is that you cannot pay for referrals, and he cannot explain why Mr. Hewson would have said what he said.  SA397-400.

Given the history of these transactions, the discrepancies concerning the purposes of the agreement, and the blatant admissions by Hewson and Pollard that the hospital, in fact, was paying for referrals, it was certainly not "reasonable" for Tuomey to rely on Tim Hewson's (and Nexsen Pruet's) advice.[16]  A reasonable jury could, and should, find that Tuomey did not reasonably rely on Nexsen Pruet's advice.

### 4.    Tuomey did not follow the advice was followed.

There are at least four pieces of advice given by various attorneys and advisors that Tuomey did not follow:

a.    Tuomey did not follow Kusserow's advice to hire an expert in these matters before entering into the contracts.[17]

b.    Tuomey did not follow McAnaney's implicit advice to reconsider its level of risk in the transactions or to get a second valuation appraisal.

---

[16]There are significant additional issues for a jury to decide about whether the reliance was reasonable, including whether the hospital followed its own compliance policy (SA495-99), whether the statements made in the Cejka opinion letters raised concerns that any reasonable hospital administrator should have been aware of (SA523-42), and whether the warnings from Kusserow should have put a reasonable hospital administrator on notice that he should not have relied on the advice given by Nexsen Pruet.  All of these are issues for the jury to decide, based on the credibility determinations it makes in relation to all of the witnesses in this case.

[17]Tuomey may argue that it did follow this advice, by hiring Nexsen Pruet, but a jury will need to decide whether Kusserow's advice explicitly or implicitly indicated that he did not intend for his advice to include Nexsen Pruet, who had already reviewed this arrangement, that Kusserow considered to be "very risky" and required additional expert advice.

c.    Tuomey did not follow the advice given by Cejka that the compensation should be reviewed periodically because the compensation plans were "aggressive."[18]

d.    Tuomey did not follow Steve Pratt's advice that the compensation formula for the GI Physicians be changed.  SA469.

For a defendant to take advantage of the "advice of counsel" defense, it must follow all of the advice it gets from its attorneys on the subject matter.  A reasonable jury could, and should, find that Tuomey did not follow the advice of its attorneys and advisors.

## Conclusion

For all of the foregoing reasons, and for those set forth in the Government's Memorandum in Support of Its Motion for Partial Summary Judgment on Count IV of the Second Amended Complaint, the Court should grant the Government summary judgment on Count IV of the Second Amended Complaint and deny Tuomey's Motion for Summary Judgment altogether.

Respectfully submitted,

TONY WEST
Assistant Attorney General

/s/ G. NORMAN ACKER, III
G. NORMAN ACKER, III
Special Attorney and
Assistant United States Attorney
Eastern District of North Carolina

---

[18]Martin acknowledged in his deposition that he was aware of this advice from Cejka, that he understood that the compensation reviews should take place every 2-3 years, that more than 4 years had passed, and that none of the compensation reviews had taken place.  SA422-24.

3l0 New Bern Avenue, Suite 800

Raleigh, NC  2760l-l46l

Telephone: (9l9) 856-4530

Facsimile: (9l9) 856-4821

Email: norman.acker@usdoj.gov


/s/ TRACY L. HILMER_____

JOYCE R. BRANDA

MICHAEL D. GRANSTON

TRACY L. HILMER

NIALL M. O'DONNELL

Attorneys, Civil Division

United States Department of Justice

Post Office Box 261

Ben Franklin Station

Washington, DC 20044

Telephone: (202) 307-0474

Email: tracy.hilmer@usdoj.gov


Dated: Aug. 31, 2009          Attorneys for the United States

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 31, 2009, a copy of the foregoing United States'

Opposition to Defendant's Motion for Summary Judgment and Supplemental Appendix in

support thereof were served upon the below-listed counsel by filing the same upon the Court's

electronic case filing system:

Kevin M. Barth, Esquire
Ballenger Barth & Hoefer, LLP
Florence, SC 29503

A. Camden Lewis
Mary G. Lewis
Attorneys at Law
P. O. Box 11208
Columbia, SC 29211

Daniel M. Mulholland, III
Attorney at Law
4614 Firth Avenue
Pittsburgh, PA 15213

E. Bart Daniel
Attorney at Law
7 State Street
P. O. Box 856
Charleston, SC 29402

    /s/   Tracy L. Hilmer
Tracy L. Hilmer