IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

CA NO.  3:05-CV-02858-MJP

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel., MICHAEL K. DRAKEFORD, M.D., | ) ) ) | |
| Plaintiff, | ) ) | **UNITED STATES' MEMORANDUM IN IN OPPOSITION TO** |
| v. | ) ) | **DEFENDANT'S MOTION TO EXCLUDE CERTAIN** |
| TUOMEY d/b/a TUOMEY HEALTHCARE SYSTEM, INC. | ) ) ) | **INFORMATION NOT COMMUNICATED TO DEFENDANT** |
| Defendant. | ) ) | |

This motion is yet another attempt by Tuomey to exclude evidence that (1) establishes Tuomey's knowledge that its compensation arrangements with approximately 20 specialty physicians violated the Stark Statute, 42 U.S.C. § 1395nn, and that Tuomey therefore violated the False Claims Act, 31 U.S.C. §§ 3729-33, by submitting claims for reimbursement by the Medicare program for services provided by the physicians in violation of the Stark Statute; and (2) defeats Tuomey's "advice of counsel" and "good faith" defenses.  As set forth below, Tuomey's own memorandum makes a compelling case for the inclusion of the very evidence it seeks to exclude. At best, Tuomey's motion is premature.  Either way, the Court should reject it.

## Background

As the Court will remember, Tuomey sought advice about the physician compensation arrangements from at least three firms: Nexsen Pruet; Kevin McAnaney, Esq.; and Hall Render Killian Heath and Lyman ("Hall Render").  At issue in this motion are the internal

communications within the Hall Render firm – the firm that provided Tuomey with two

favorable opinions after Tuomey refused to obtain a formal written opinion from Kevin

McAnaney, the former Department of Health and Human Services Office of Counsel to the

Inspector General official who had assessed the arrangements as, among other things, "risky" and

a relatively easy case for the government to prosecute.[1]

Hall Render's two opinions were inconsistent with each other and with Nexsen Pruet's

earlier opinion. Like the Nexsen Pruet opinion, the first Hall Render opinion, dated July 25,

2005, did not question that the physician contracts were subject to the Stark Statute, but observed

that "if the Federal government disregards the [intervening entity] and views it as merely an alter

ego of Tuomey, then Tuomey must rely on the [bona fide] employment exception." Ex. 1, at 3.

Citing reliance upon the fair market value opinion provided by Cejka Consulting ("Cejka") (*id.* at

2), the first opinion concluded that Tuomey could meet the conditions of either the indirect

compensation exception or the bona fide employment exception.

The second Hall Render opinion, dated September 20, 2005, asserted – inconsistently

with both the first Hall Render opinion and the Nexsen Pruet opinion – that the Stark Statute did

not apply at all to these arrangements. Ex. 2, at 12. But the second Hall Render opinion also

raised the possibility – not mentioned in either the first opinion or in Nexsen Pruet's opinion –

that Tuomey's contract with the gastroenterology ("GI") group "will be misunderstood as an

arrangement that ties the amount of the base compensation to the volume of [designated health

---

[1]The facts involved in Mr. McAnaney's engagement, and Tuomey's abrupt termination of
that engagement, are set forth more fully in the United States' Opposition to Defendant's Motion
for Summary Judgment (filed Aug. 31, 2009) (Dkt 358) ("U.S. Summary Judgment Opp.") and
in the United States' Opposition to Tuomey's Motion *In Limine* to Exclude Testimony from or
Other Evidence Relating to Kevin McAnaney, filed today. We incorporate those statements and
do not repeat them here.

service] referrals made by the GIs" and advised that the compensation scheme for those

physicians be changed.  Ex. 2, at 15-16.  The change recommended by Hall Render was never

made by Tuomey.

Significantly, the first Hall Render opinion contained the assertion that Tuomey entered

into the contracts with each physician for the purposes recited in Section 14.14 of the contracts.

Hall Render stated in the first opinion that the purposes cited in Section 14.14 of the contracts

"are consistent with the reasons provided to us in our discussions with Tuomey's management.

We know of no reason to believe that Tuomey has reasons other than those recited in Section

14.4[sic]."  Ex. 1, at 1.  The second Hall Render opinion corrected the citation to Section 14.14

of the contracts, but otherwise essentially repeated the above statement from the first opinion.

Ex. 2, at 2.  The second opinion went on to recite in full Section 14.14 of the contracts:

> 14.14  Purpose of Agreement.  Both parties agree that it is in the best interest of
> high quality patient care and for the efficient delivery of health care at the
> Hospital at a reasonable cost, that a contract of this type be entered into by
> each of the Physicians to provide for the Services at the Hospital.  Such
> arrangement will:  (a) facilitate the administration of the Hospital's
> outpatient surgical services; (b) facilitate the training of personnel
> involved in provided [sic] Services at the Hospital; (c) afford effective
> selection, maintenance and utilization of the Hospital's equipment; (d)
> assure consistency of service, quality control and the needs of the patients;
> (e) provide for prompt availability of Services; (f) allow the needs of the
> patients to be met effectively and efficiently at a reasonable and fair cost;
> (g) provide continuous availability of Services for consultation with
> attending physicians; and (h) provide consistency with customary patterns
> for the administration of the Services and promote the ability of the
> Hospital to deliver high quality care efficiently, effectively and at a fair
> and reasonable cost.

*Id.* at 2.

Two Hall Render attorneys worked on the opinions.  Steven Pratt, who wrote the July

2005 opinion on his own and signed both, was a partner of the firm.  Mark Swearingen who

provided research and substantial drafting assistance on the September 2005 opinion, was an

associate.  As noted in the Government's Opposition to Tuomey's motion for summary

judgment, Mr. Swearingen appealed to Mr. Pratt at least three times to recognize the serious

Stark problems that he (Mr. Swearingen) found in the arrangements based upon his meticulous

research.  Mr. Pratt ignored the pleas and rendered opinions that supported the arrangements.

## Argument

In attempting to exclude the internal communications within the Hall Render firm (upon

whose opinion Tuomey says it relies), Tuomey recites a version of the facts in support of its

motion that has not been accepted by the Court and that Tuomey will be hard-pressed to prove to

a jury.  In any event, Tuomey's own recitation of the "facts" demonstrates precisely why the Hall

Render evidence is relevant and admissible.  Certainly, there is no justification for the Court to

rule at this time that the Hall Render evidence is immaterial.

**I.     THE HALL RENDER EVIDENCE IS PLAINLY RELEVANT TO TUOMEY'S
        *SCIENTER* AND TO ITS AFFIRMATIVE DEFENSES**

Fed. R. Evid. 401 defines "relevant evidence" as "evidence having any tendency to make

the existence of any fact that is of consequence to the determination of the action more probable

or less probable than it would be without the evidence."  Evidence that is not relevant is

inadmissible.  Fed. R. Evid. 402.  However, "relevance typically presents a low barrier to

admissibility." *United States v. Leftenant*, 341 F.3d 338, 346 (4th Cir. 2003).  Thus, "evidence is

relevant if it is 'worth consideration by the jury' or has a 'plus value.'" *United States v. Basham*,

561 F.3d 302, 332 (4th Cir. 2009) (citing *United States v. Queen*, 132 F.3d 991, 998 (4th Cir.

1997) (internal quotation marks omitted)).

Under the False Claims Act, the government must prove not only that Tuomey submitted, or caused to be submitted, false claims in violation of the Stark Law, but that it did so "knowingly." 31 U.S.C. § 3729(a)(1).  Under the False Claims Act, "knowing" and "knowingly" mean that the defendant:  "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information . . . ."  *Id.* § 3729(b).

Tuomey also has asserted affirmative defenses of "advice of counsel" and "good faith." To establish an "advice of counsel" defense, Tuomey acknowledges that it must prove:   (1) that the advice was sought in good faith; (2) that Tuomey provided full and accurate information to its attorneys; (3) that the advice can reasonably be relied upon; and (4) that Tuomey faithfully followed the attorney's advice.  *United States v. Newport News Shipbuilders*, 276 F.Supp. 2d 539 (E.D. Va. 2003).

Tuomey bears the burden of proving each of these elements.  To meet this burden, it is not enough for the defendant to show that it received and followed some advice selectively. Rather, "evidence of reliance on the advice of counsel and outside experts does not necessarily bar a fact-finder from finding that the contractor acted with reckless disregard; the contractor might have acted recklessly in relying on the advice because, for example, the advice might be shown to be patently unreasonable and thus not worthy of reliance or because the contractor's reliance on that advice was recklessly incomplete."  *Id.* at 565.  A "crucial element" of the advice of counsel defense is that the defendant secured the advice **before** taking the action in question.  *United States v. Polytarides*, 584 F.2d 1350, 1352 (4th Cir. 1978).  Moreover, a defendant cannot rely on the defense if the defendant is advised by counsel that a contemplated course of action is legal, but the defendant subsequently discovers counsel's advice to be

-5-

incorrect or discovers reason to doubt the advice. *United States v. Benson*, 941 F.2d 598, 614

(7th Cir. 1991), *cited by United States v. Biller*, No. 1:06CR14, 2007 WL 325798, at \*10

(N.D.W. Va. Jan. 31, 2007). Where a defendant has already taken "significant steps" toward the

completion of a potential action, and has been warned of the illegality of the potential action,

proof of subsequent advice does not support a valid defense based upon advice of counsel.

*Polytarides*, 584 F.2d at 1353.

As the Third Circuit explained in *Glenmede Trust Co. v. Thompson*, a defendant's

assertion of "advice of counsel" places at issue the information the attorney received in forming

his or her opinion:

> The party opposing the defense of reliance on advice of counsel
> must be able to test what information had been conveyed by the
> client to counsel and vice-versa regarding that advice—whether
> counsel was provided with all material facts in rendering their
> advice, whether counsel gave a well-informed opinion and whether
> that advice was heeded by the client.

56 F.3d 476, 486 (3d Cir. 1995).

Tuomey appears to be concerned with avoiding jury scrutiny of the views expressed by

Mr. Swearingen to Mr. Pratt. Most particularly, Tuomey apparently would prefer that the jury

not see the August 2005 email sent by Mr. Swearingen to Mr. Pratt entitled "Tuomey and Stark,

Sittin' in a Tree." Ex. 3. That email showed that the Tuomey contracts violated the Stark

Statute. Mr. Swearingen warned Mr. Pratt:

> The bottom line is that these Agreements involve the physicians being
> compensated not on the basis of how many of *hospital's* patients the physician
> slices up, but for how many of the *physician's own* patients he/she slices up *at the
> hospital*. Moreso than an employment agreement, these Agreements basically
> constitute the acquisition of the physicians' outpatient surgeries. Those surgeries
> are already being provided by the physicians in the community. These agreements
> only change the <u>location</u> of the surgery. So, at the end of the day, the practice is

paying the physician more than it collects for the physician's professional services in return for the physician's performing his/her surgeries at the hospital, for which the hospital is able to bill a technical fee. If the physician was to provide and bill for the professional services in his or her own right, he/she could get no more than 100% of collections, by definition. Under these agreements, the physicians are being paid more than 100% of collections (more than they could get on their own) for the very same services . . . . Which begs the question . . . Why? Because the hospital gets the technical fee they otherwise wouldn't get (which is a referral under Stark)? Because the arrangement will keep the physician from opening up or referring to a freestanding ASC across the street? Are those legitimate and supportable reasons?

*Id.* (emphasis in original). Mr. Swearingen's email captures the essence of the Stark violation embodied in Tuomey's arrangements with the specialty physicians, but his analysis was ignored.

The Hall Render evidence, including the above-quoted email and the other materials in Mr. Swearingen's files, are relevant to at least three of the elements that Tuomey must prove to succeed with its advice of counsel defense, regardless of whether anyone at Tuomey actually saw the materials at the time of their creation.

> **A.    The Hall Render Evidence Shows That Tuomey Did Not Seek Advice From Hall Render In Good Faith**.

We argued in our Summary Judgment Opposition at 36-41 that Tuomey did not seek legal advice from Hall Render in good faith, but rather sought "cover" from the negative assessment it had just received from Mr. McAnaney about the substantial Stark compliance problems raised by the physician contracts. Tuomey refused to allow McAnaney – who had absolutely no personal or professional stake in any of the proposed deals going forward – to put his assessment in writing, and instead sought an opinion from Mr. Pratt, whom it already knew was "committed to the deal." This phrase, "committed to the deal" comes from a voice mail that Steve Pratt left for Tim Hewson (Ex. 7) – one of the Nexsen Pruet attorneys who worked most closely with Tuomey to establish the physician arrangements – arguing that Tuomey should

either not hire, or be very careful of advice given by, Kevin McAnaney because Mr. McAnaney was not "committed to the deal." A jury could very reasonably infer from this exchange that Mr. Pratt included himself among those "committed to the deal", and that Mr. Hewson understood that point as well when he asked Mr. Pratt to provide an additional opinion on Tuomey's behalf. A jury could also conclude that the voicemail accurately describes Tuomey's general mindset in seeking out advice on the physician contracts – *i.e.,* that Tuomey never wanted to hear a discouraging word.

Tuomey admitted in its Memorandum in Support of its Motion for Summary Judgment that the motivation for these contracts was the competition and potential competition from the Wesmark Ambulatory Surgery Center that had been opened by the local urology group and from the GI physicians' consideration of performing endoscopies in their own offices. Deft Mem. In Support of Motion for Summary Judgment at 3-5 (filed July 31, 2009) (Dkt 255). Yet in the contracts themselves, which were drafted by and in conjunction with Tuomey's attorneys at Nexsen Pruet, the issue of the lost revenues or lost profits is conspicuously absent from the description of the contracts' "purposes." In fact, Tuomey Chief Executive Officer Jay Cox admitted in his deposition that the "purposes" clause set out in paragraph 14.14 of the contracts were added after the initial draft. Ex. 4 (Cox Dep.) at 215:20-221:23). Cox admitted that the desire not to lose revenue is not mentioned at all in paragraph 14.14. *Id.* at 221:5-222:15. A reasonable jury could, and should, conclude from this evidence that Tuomey intentionally omitted from the contracts a primary purpose (if not **the** primary purpose) for the hospital to enter the contracts in order to try to get legal "cover" for what it knew were probably illegal contracts.

Moreover, Mr. Swearingen's August 2005 email (among other materials in the file) shows that he and Mr. Pratt understood that the purposes set out in Section 14.14 of the Agreements were **not** the "only" reasons for Tuomey to enter into these contracts that plainly overpaid the physicians, and were not even the **main** reasons for the hospital to do so. As Mr. Swearingen put it in his email:

> Under these agreements, the physicians are being paid more than 100% of collections (more than they could get on their own) for the very same services . . . . Which begs the question . . . Why?  Because the hospital gets the technical fee they otherwise wouldn't get (which is a referral under Stark)?  Because the arrangement will keep the physician from opening up or referring to a freestanding ASC across the street?  Are those legitimate and supportable reasons?

Ex. 3.  The question posed by Mr. Swearingen to Mr. Pratt is precisely the question the jury will have to answer when it considers the False Claims Act claim.

Additionally, this email shows that Mr. Pratt at least had reason to suspect the hospital had purposes for entering into these contracts other than the benign boilerplate statements set out in Section 14.14 of the Agreements – reasons that showed Tuomey did take into account the value or volume of referrals it would get from the physicians, and reasons that therefore showed these agreements violated the Stark Statute and its implementing regulations.  *See* 42 C.F.R. §§ 411.354(c)(2)(ii), 411.357(p).  Thus, the evidence also goes to the question whether Tuomey gave full and accurate information to Mr. Pratt and whether Tuomey reasonably relied upon the advice it received from Mr. Pratt.  The Government is certainly entitled to explore what Mr. Pratt knew about the hospital's physician arrangements at the time he rendered each of his opinions, and why the opinions are inconsistent with each other.

**B.**     **Certain Of The Hall Render Evidence Shows That Tuomey Failed to Provide Full And Accurate Information To Its Attorneys.**

Tuomey has failed to identify any particular evidence that it wants excluded from the thousands of pages produced by Hall Render in response to the Government's subpoena. However, in order to establish an "advice of counsel" defense, Tuomey will have to prove that it provided **full and accurate information** to its attorneys, not selective and skewed information. One possible conclusion from the facts set out above is that Tuomey hid the true purposes of the contracts from Hall Render, but they deduced those facts anyway and simply omitted those facts from their opinion.  Another serious question will be whether Tuomey fully informed the Hall Render attorneys of the "methods" that Cejka used to develop the physicians' salaries, including taking into account the net present value of a non-compete clause and "backing into" the individual physician salaries.  *See* U.S. Summary Judgment Opp at 11.  The only way to test what information Tuomey gave to Hall Render is to examine the material contained in the Hall Render files, the written communications between Messrs. Pratt and Swearingen made at the time they were working on the opinions, and the testimony of Messrs. Pratt and Swearingen about these matters.

There is also a question about how much information Mr. Pratt had concerning Mr. McAnaney's negative assessment of the physician agreements.  In his deposition, Mr. Pratt repeatedly claimed a lack of recollection about knowing that Mr. McAnaney was even involved in the matter (despite multiple emails and voicemails sent by Mr. Pratt to Mr. Hewson in 2005 about Mr. McAnaney's involvement), yet Mr. Hewson testified that Mr. Pratt was fully informed about Mr. McAnaney's views because he participated in the phone call with Tuomey Chief Operating Officer Gregg Martin in which those matters were discussed.  *Compare* Ex. 5 (Pratt

Dep.) at 160:19-163:4, 252:20-253:10 *with* Ex. 6 (Hewson Dep.) at 220:20-221:19.  Thus, the

Hall Render materials, and the testimony of Mr. Swearingen, will be important to the jury's

assessment of both Mr. Pratt's and Mr. Hewson's credibility.

Clearly, the content of the Hall Render files and the emails and conversations between

Pratt and Swearingen are relevant to this point not only because of what they do contain, but also

because of what they do **not** contain.  This is precisely the type of evidence the Third Circuit held

in *Glenmede Trust*, *supra*, must be available to the party challenging an advice of counsel

defense.  The Government must be permitted to utilize those documents and testimony to

challenge Tuomey's contention that it provided "full and accurate information" to Hall Render.

**C.     The Hall Render Evidence Shows That Tuomey Did Not Reasonably Rely Upon Hall Render's Opinion.**

As noted above, a defendant cannot rely on the advice of counsel defense if the defendant

is advised by counsel that a contemplated course of action is legal, but the defendant

subsequently discovers counsel's advice to be incorrect or discovers reason to doubt the advice.

*See United States v. Benson*, *supra*.   Tuomey's violation of the Stark Statute and the False

Claims Act is ongoing to this day, notwithstanding that their counsel have had access to Hall

Render's entire file, including Mr. Swearingen's August 2005 email, for at least a year.  Even

assuming Tuomey was unaware of Mr. Swearingen's views in 2005, Tuomey nonetheless lacked

justification for relying upon the Hall Render opinions at that time for at least two reasons:  (1)

the July and September opinions are, on their face, inconsistent with each other and with Nexsen

Pruet's opinion; and (2) it appears that Hall Render did not have "full and accurate information"

concerning Cejka's work and perhaps other important facts that Tuomey failed to provide.

However, seeing Mr. Swearingen's "Tuomey and Stark, Sittin' in a Tree" email should have

been the death knell for Tuomey's continued reliance upon the Hall Render opinion.  Yet that has

not been the case, and so the contents of the Hall Render file and the testimony by Messrs. Pratt

and Swearingen about their communications are relevant not only to the timeframe in which the

opinions were provided, but also to the present because of Tuomey's ongoing violations.

In sum, the Hall Render evidence is relevant and admissible under Rules 401 and 402.

**II.    NO UNDUE PREJUDICE WILL RESULT FROM THE ADMISSION OF THE HALL RENDER EVIDENCE**

Fed. R. Evid. 403 allows a court to exclude otherwise relevant evidence if, *inter alia*, "its

probative value is substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury . . . ." *Id.* (emphasis added).  The Fourth Circuit has construed

Rule 403 to require exclusion of evidence as unfairly prejudicial only in those instances where

"there is a genuine risk that the emotions of the jury will be excited to **irrational behavior**, and

that this risk is disproportionate to the probative value of the offered evidence." *United States v.*

*Van Metre*, 150 F.3d 339, 351 (4th Cir. 1998) (quoting *United States v. Powers*, 59 F.3d 1460,

1467 (4th Cir. 1995) (internal quotation marks omitted)) (emphasis added).  "The mere fact that

the evidence will damage the defendant's case is not enough—the evidence must be *unfairly*

prejudicial, and the unfair prejudice must *substantially* outweigh the probative value of the

evidence." *United States v. Hammoud*, 381 F.3d 316, 341 (4th Cir. 2004) (quotation omitted,

emphasis in original), *vacated on other grounds*, 543 U.S. 1097 (2005).

Tuomey has not even attempted to meet the standard set by Rule 403 for exclusion of the

Hall Render evidence on the grounds that it is unduly prejudicial.  Tuomey itself has asserted the

advice of counsel defense, so it can hardly object to the Government testing the knowledge and

credibility of the lawyers it hired to provide a helpful opinion after hearing Mr. McAnaney's

negative opinion of the arrangements.  If the evidence shows that Tuomey "attorney-shopped"

and gave selective information to Hall Render so that Hall Render would give it the opinions it

wanted, rather than those it deserved, the jury is entitled to hear that evidence.  There is nothing

particularly confusing about the course of events here: Kevin McAnaney voiced concerns about

the arrangements, and Tuomey stifled those concerns.  Then, Tuomey sought cover from an

attorney who had pronounced himself "committed to the deal."  When that attorney's junior

colleague raised specific concerns (that happened to echo the concerns expressed by Mr.

McAnaney and to presage the arguments made by the Government in this very case), the junior

attorney's concerns were also suppressed.  If the jury concludes that the evidence shows the Hall

Render opinions were a baked cake from the outset, that will be because they have understood

the import of the Hall Render evidence, not because they have been confused by it.

Tuomey's Rule 403 argument is unsupported and unsupportable.  The Court should waste

no time rejecting it.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that the Court deny

Tuomey's Motion in Limine to Exclude Certain Information Not Communicated to Defendant.

Respectfully submitted,

TONY WEST
Assistant Attorney General

/s/ G. Norman Acker, III

_____

G. NORMAN ACKER, III
Special Attorney and
Assistant United States Attorney
Eastern District of North Carolina
310 New Bern Ave., Suite 800
Raleigh, NC 27601

-13-

Telephone:  (919) 856-4530
Facsimile:   (919) 856-4820
E-mail:  norman.acker@usdoj.gov

/s/ Tracy L. Hilmer

_____

JOYCE R. BRANDA
MICHAEL D. GRANSTON
TRACY L. HILMER
NIALL M. O'DONNELL
Attorneys, Civil Division
United States Department of Justice
Post Office Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 307-0474
Facsimile:  (202) 514-0280
E-mail:  tracy.hilmer@usdoj.gov

Attorneys for the United States

## CERTIFICATE OF SERVICE

I do hereby certify that I have this 25th day of January 2010, served a copy of the foregoing upon the below-listed parties electronically through the Court's electronic case filing system or by placing a copy of the same in the U.S. Mails, addressed as follows:

Kevin M. Barth, Esq.
Ballenger Barth & Hoefer, LLP
205 North Irby Street
P.O. Box 107
Florence, SC 29503

A. Camden Lewis, Esq.
Mary G. Lewis, Esq.
William J. Harling, Esq.
Lewis & Babcock, LLP
P. O. Box 11208
Columbia, SC 29211

Daniel M. Mulholland, III, Esq.
Horty, Springer & Mattern, P.C.
4614 Fifth Avenue
Pittsburgh, PA 15213

E. Bart Daniel
Attorney at Law
7 State Street
P. O. Box 856
Charleston, SC 29402

/s/ Tracy L. Hilmer

_____
Tracy L. Hilmer