IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION


CA NO.  3:05-CV-02858-MJP


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel., | ) | |
| MICHAEL K. DRAKEFORD, M.D., | ) | |
| | ) | **UNITED STATES'** |
| Plaintiff, | ) | **MEMORANDUM IN** |
| | ) | **IN OPPOSITION TO** |
| v. | ) | **DEFENDANT'S MOTION** |
| | ) | **REGARDING RUBEN STECK** |
| | ) | **AND IN SUPPORT OF CROSS-** |
| TUOMEY d/b/a TUOMEY HEALTHCARE | ) | **MOTION TO PRECLUDE** |
| SYSTEM, INC. | ) | **DEFENDANT FROM** |
| | ) | **CHALLENGING MEDICARE** |
| Defendant. | ) | **CLAIMS EVIDENCE** |

This is a case brought under the False Claims Act, 31 U.S.C. §§ 3729-33, and the

common law.  The Government alleges that defendant Tuomey Healthcare System, Inc.

("Tuomey"), violated the False Claims Act by knowingly submitting, or causing to be submitted,

claims for payment to the Medicare program that violated the Stark Statute, 42 U.S.C. § 1395nn.

The Government further alleges that Tuomey is liable under the False Claims Act for treble

damages and penalties for each false claim submitted.  In its motion in limine, Tuomey

apparently seeks to exclude both the actual claims that are the subject of this case, as well as the

testimony of the Government's witness who analyzed the claims records drawn directly from the

Medicare program's claims datasets, and computed the number and value of the claims relevant

to this action.  The Government timely disclosed all relevant information, and there is no basis

for the Court to exclude either the claims records or Mr. Steck's testimony about his analysis of

the records.  By contrast, Tuomey failed to provide the Government with its own records of the

relevant claims until long after the close of discovery, and then only provided a flawed data set. Accordingly, the Court should not only allow Mr. Steck's testimony about his analysis of the claims records, but pursuant to Fed. R. Civ. P. 37(b) and (c), the Court should also prohibit Tuomey from challenging any of that evidence or the underlying claims records.

### Factual and Procedural Background

The United States alleges that contracts between Tuomey Healthcare System, Inc., ("Tuomey") and approximately 20 specialty physicians violate the Stark Statute, 42 U.S.C. § 1395nn. The contracts became effective in 2005 and 2006. Except for one physician who has moved from the area, all of the contracts apparently remain in effect to this day.

Specifically, the Government contends that Tuomey's contracts with these physicans constitute improper financial relationships under the provisions of the Stark Statute, and accordingly, that Tuomey was (and is, so long as the arrangements remain in place) prohibited from submitting claims to the Medicare program for reimbursement for services referred by these physicians to Tuomey. 42 U.S.C. § 1395nn(a)(1). "The Stark Statute establishes the clear rule that the United States will not pay for items or services ordered by physicians who have improper financial relationships with a hospital." *United States v. Rogan*, 459 F. Supp. 2d 692, 711 (N.D. Ill. 2006), *aff'd* 517 F.3d 449, 452 (7th Cir. 2008). "[T]he Stark Amendment forbids payment of any claim that arises from medical services rendered to a patient who has been referred improperly." *Rogan*, 517 F. 3d at 452 (citing *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997)). The Stark Statute and regulations require Tuomey to refund to the Government the total amount of the reimbursements Tuomey has improperly received, plus accrued interest. 42 U.S.C. § 1395nn(g)(1); 42 C.F.R. § 411.353. The

2

Second Amended Complaint (Dkt No. 151) seeks these refunds under the common law theories of payment under mistake of fact and unjust enrichment.

The Government also contends that Tuomey "knowingly" submitted the tainted claims to Medicare, thereby violating the False Claims Act, 31 U.S.C. §§ 3729–33.[1]  As part of its False Claims Act case, the Government must prove that Tuomey presented, or caused to be presented, false claims for payment to the United States.  31 U.S.C. §§ 3729(a)(1), (2) and (7); *see* United States Second Amended Complaint Counts I-III.

For both its False Claims Act and common law theories of recovery, the Government must prove the amount of its single damages – that is, the total value of the tainted claims for which Tuomey improperly received reimbursement from the Medicare program.  Additionally, the False Claims Act requires the imposition of a penalty for each false claim submitted.  31 U.S.C. § 3729(a).  Accordingly, the actual number of false claims that Tuomey presented, or caused to be presented, must be determined at trial so that the Court may impose the appropriate number of statutory penalties, if the Government prevails.

## I.     United States' Disclosures of Its Claims Data and Damages Expert

In order to meet its burden of proof at trial and its discovery obligations, the Government obtained electronic copies of potentially relevant claims records from TriCenturion, Inc., which at the time served as Program Safeguard Contractor for South Carolina under contract to the

---

[1]Under the False Claims Act, a defendant submits false claims "knowingly" when it acts with actual knowledge that the claims were false, or with reckless disregard or deliberate ignorance of the truth or falsity of the claims.  31 U.S.C. § 3729(b).

Centers for Medicare & Medicaid Services ("CMS").[2]  *See* Ex. 1, ¶ 2 (Declaration of Theresa A. Schultz).  The Government also engaged Ruben Steck to analyze the relevant claims records and to identify and quantify the relevant claims.  In December 2007, Mr. Steck received records directly from Tricenturion pursuant to a further request made by Government counsel.  Ex.1(B) at 2 (3/16/09 Steck Report).[3]  The claims records that Mr. Steck considered in preparing his report were encrypted and placed on a disk labeled 10-0001.  By October 15, 2008, the Government produced Disk 10-0001 to Tuomey's counsel at least twice and then assisted Tuomey's counsel in opening the data files.  Ex. 5.

The records contained on Disk 10-0001 reflected claims paid by Medicare to Tuomey for inpatient and outpatient hospital services provided by the physicians at issue in this case from January 9, 2003 through November 30, 2007.  Ex. 1(B) at 2.  From the time it served Tuomey with its Rule 26(a) initial disclosures on May 28, 2008, the Government clearly and repeatedly stated its intent to update its preliminary damages figures closer to trial, since the contracts at issue have remained in place to the present.  The Government specifically noted that the damages figures included in the disclosures "are preliminary, and do not include all data from the end of 2007 or any data from 2008. . . ."  Ex. 6 , No. 3, at 5.  The Government repeated this statement in its supplemental disclosures served on Tuomey on April 22, 2009.  Ex. 7, No. 3, at 8.  Likewise, in its responses to Tuomey's First Set of Interrogatories, served October 2, 2008, the Government disclosed its intention to use Mr. Steck as an expert witness and expressly stated that "[Mr.

---

[2]CMS is the agency within the Department of Health and Human Services that administers the Medicare and Medicaid programs.

[3]Certain physician identifiers have been redacted from "Attachment A" to both of Mr. Steck's reports.  Tuomey has unredacted copies of Mr. Steck's initial and supplemental reports.

Steck's] opinion will identify and quantify the claims submitted by Defendant for services performed by the physicians named in Paragraph 79 of the Amended Complaint and Dr. Steven Lauzon **during the existence of the unlawful compensation arrangements.**" Exhibit 8 at 18 (U.S. Response to Defendant's Interrogatory No. 6(c) (emphasis added). Tuomey can hardly have been surprised that the Government supplemented its damages disclosures and had Mr. Steck supplement his expert report once the trial date was set, given these clear indications over nearly a year that the Government intended to do just that. Further, at no time did Tuomey ever indicate it would object to such a supplementation. To the contrary, as discussed below, Tuomey designated its own belated production of its own claims data as "supplementation." Ex. 9(C).

On March 16, 2009, the Government produced Mr. Steck's expert report to Tuomey, according to the discovery plan set by the Court in this case. Mr. Steck reported the total number of claims, and their value, paid by the Medicare and Medicaid programs for services referred by the specialty physicians while they had the contracts with Tuomey that the Government alleges violate the Stark Statute. Mr. Steck also reported the number of claims, and their value, specifically of the outpatient surgeries where one of the physicians at issue in this case was reported on the claims form as the "attending" or "operating" physician. Mr. Steck provided a very similar analysis to the district court in the *Rogan* case, and his analysis formed the basis for that court's damages ruling. *See Rogan*, 459 F. Supp. 2d at 710-11[4]; *see* Ex. 10 (Steck Dep. 108:15-20 ("Q [by Tuomey's counsel]: When you prepared your final report in this case, were

---

[4]While Mr. Steck is not mentioned by name in the *Rogan* ruling, the district court's summary of the number of tainted claims submitted each year to Medicare by the hospital in question for services provided by the physicians with whom the hospital had improper financial relationships are based upon the testimony and demonstrative exhibits prepared by Mr. Steck – a fact he can certainly testify to at the appropriate time during trial.

5

you doing the same thing that you did in the *Rogan* case for the government when you testified in that case?  A [by Mr. Steck]: We did everything that we did in the *Rogan* case and then some.").

Tuomey deposed Mr. Steck on May 20, 2009.  During his deposition, Mr. Steck stated that he expected to update his analysis using more current data.  Exhibit 10 (Steck Dep.) at 114:14-19.

The duties previously performed by Tricenturion as PSC for South Carolina were awarded to another company on September 30, 2009, and effective October 31, 2009, Tricenturion's contract with CMS for those duties formally expired (with the exception of a fifteen-day extension for historical archive work only).  Exhibit 2 (Schultz Dec.) ¶ 3.  Rather than utilize Tricenturion for the task, the Government obtained updated claims records for the trial from Acumen, LLC, another CMS contractor with access to the relevant CMS records.  *See* Exhibit 3 (Declaration of Chris M. Worrall); Exhibit 4 (Declaration of Thomas E. MaCurdy, Ph.D.).  Acumen has a data use agreement that gives it access to depositories containing original Medicare claims records.  As explained in Acumen's report concerning the data extraction it performed for this case:

> Our source of Medicare Part A and Part B claims come from CMS (Centers for Medicare & Medicaid Services) depositories containing original claims: the Standard Analytic Files (SAF) and Medicare's Common Working Files (CWF).  Regional CMS contractors, which formally pay providers, upload processed claims to CWF files on a weekly basis.  CMS constructs SAF files each year as an archive of the CWF files.
>
> Through our duties as a CMS contractor, our group directly downloads SAF data annually through a dedicated network directly linked to the CMS mainframe, and similarly downloads the entirety of new CWF data on a weekly schedule.  We process Medicare Part A and B claims according to CMS rules to create a single integrated database.  In the database used for extraction, all data fields in claims are left unaltered.

6

Exhibit 4  ¶¶ 2, 3 (MaCurdy Declaration) & Exhibit A to same (Acumen Report) at 4.[5]

On or about October 27, 2009, Acumen provided Mr. Steck with a disk labeled 10-0002 that contained an encrypted file of claims records for services with billing dates from January 1, 2003 through June 30, 2009, and which were processed on or before September 25, 2009. Exhibit 4(A) (Acumen Report) at 9.   The Government produced Disk 10-0002 to Tuomey's counsel on November 12, 2009.  Mr. Steck used the updated claims records to supplement his expert report.  The supplemental expert report was provided to Tuomey on November 17, 2009, along with the Government's other proposed trial exhibits.

## II.    Tuomey's Failure to Produce Claims Records

The parties exchanged their initial disclosures on May 28, 2008.  Beginning at that time, and over the course of more than 18 months thereafter, the United States repeatedly requested that Tuomey provide its own version of the relevant claims data.  These requests were made by phone, letter, and formal discovery requests.  The Government's First Set of Interrogatories and Requests for Production of Documents, served upon Tuomey on August 8, 2008, specifically requested that Tuomey:

> INTERROGATORY NO. 6:
> Identify all claims submitted to Medicare, Medicaid, or TRICARE by Tuomey for itself seeking reimbursement for services performed by any of the physicians named in Paragraph 79 of the Amended Complaint in connection with such physicians' part-time employment by Tuomey and/or any designated health services in connection with referrals from the physicians named in Paragraph 79 of the Amended Complaint.

---

[5]The Acumen Report as filed here has been redacted to remove unique identification numbers. Tuomey, however, has received an unredacted copy of the report, subject to the Court's Protective Order Governing Health Information (filed Aug. 6, 2008) (Dkt. No. 123).

INTERROGATORY NO. 7:
Identify all claims submitted to Medicare, Medicaid, or TRICARE by Tuomey on
behalf of any of the physicians referenced in Paragraph 79 of the Amended
Complaint seeking reimbursement for services performed by each such physician
in connection with his or her part-time employment by Tuomey and/or any
designated health services in connection with referrals from the physicians named
in Paragraph 79 of the Amended Complaint

INTERROGATORY NO. 8:
For all claims identified in interrogatories 7–8 above [sic], identify all records
showing reimbursement by Medicaid, Medicare, or TRICARE to Tuomey, and
state

> (a) the individual amount of each payment; and
> (b) the identity of the physician(s) for whose services the payments
> were made and the nature of those services; and
> (c) identify all documents that reflect any such reimbursement.

REQUESTS FOR PRODUCTION OF DOCUMENTS
1.       Produce all documents identified in your response to the plaintiff's First
Set of Interrogatories.

Ex. 11.  Tuomey did not produce the requested data.  *See* Exhibit 5 (Oct. 15, 2008 email from

Government counsel T. Hilmer to Tuomey Counsel J. Harling).

On January 13, 2009, Tuomey produced a summary of sample claims data that Mr. Steck

could not utilize.  Ex. 10 (Steck Dep. at 110:24-111:11).  When notified of this by Government

counsel, and after some more back and forth between counsel, Tuomey agreed to produce its

actual claims data and stated that it would treat the claims data as supplemental discovery

responses.  Exhibit 9(C).  On September 1, 2009, Government counsel specified the claims

record information Mr. Steck needed from Tuomey to perform a comparison analysis to the CMS

records.  Ex. 9(D).  However, Tuomey did not fulfill this commitment until November 3, 2009,

after additional prodding from the Government.  Ex. 9(F).  The parties were required to exchange

their proposed trial exhibits on November 17, 2009.  Tuomey's late submission of data left Mr.

Steck insufficient time to evaluate that data before updating his report for inclusion in the Government's trial exhibits.

Moreover, Mr. Steck's preliminary review of the data indicates serious deficiencies (specifically, months where no claims activity is reported at all—in contrast to the claims data drawn directly from the CMS database) that have not been explained.  Ex. 1 and 1(A) (Steck Dec.)  Additionally, Tuomey did not provide any of the claims submitted by the physicians for their own services under Part B of the Medicare program, even though Tuomey's counsel had agreed to do so and had specifically been requested to do so in the Government's August 2008 written discovery requests.  *Id.*; *see also* Ex. 11.  While the problems with the Tuomey data might have been correctible if it had been provided in 2008, as it should have been, or at least in September 2009, Tuomey's delay in delivering the data until November 3, 2009 came too late in the day for Mr. Steck to use it in his supplemental report.

### Argument

The Government timely and properly disclosed to Tuomey the records of the claims it contends violate the Stark Statute and the False Claims Act.  Further, the Government timely and properly identified Ruben Steck as an expert witness to testify about the number and value of claims the Government contends were improperly submitted to, and paid for by, the Medicare program.  Mr. Steck easily qualifies as an expert witness, but he also qualifies a summary witness under Federal Rule of Civil Procedure 602 to testify about the electronic Medicare claims records.  The Government designated Mr. Steck as an expert witness and made all the disclosures required by Fed. R. Civ. P. 26 (a)(2) to avoid any possible argument by Tuomey about whether or not it should have received such disclosures.  Whether Mr. Steck is designated as an "expert

witness" or a "summary witness," his information is relevant and reliable, and (in contrast to the deficient data that Tuomey only recently provided to the Government) this information has been fully and timely disclosed to Tuomey.  Accordingly, the claims records and Mr. Steck's testimony about them should be admitted at trial.  Further, because of Tuomey's untimely and inadequate response to the Government's requests for Tuomey's own copy of the data in question, Tuomey should be precluded from challenging the claims records or Mr. Steck's analysis of those records at trial.

## I.      Mr. Steck Will Testify Regarding Tuomey's Medicare Claims.

As stated in his updated report, Mr. Steck's current analysis, and thus his testimony at trial, will concern only claims submitted by Tuomey to, and paid for by, the Medicare program. Mr. Steck will not offer an analysis of Tuomey's Medicaid claims.  Therefore, Tuomey's objections to Mr. Steck's testimony about Medicaid claims are moot.  Likewise, this brief will address Tuomey's motion only with respect to Medicare claims.

## II.     The Government Properly Designated Ruben Steck as an Expert Witness.

Federal Rule of Evidence 702 states that:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The United States designated Ruben Steck as an expert witness under Fed. R. Evid. 702 because he possesses technical and specialized expertise in analyzing electronic Medicare claims

10

data.  Using his knowledge of databases and a software program specific to this case, Mr. Steck

was able to identify and quantify claims paid for Medicare inpatient and outpatient services

rendered by the subject physicians while they have had contracts with Tuomey that violate the

Stark Law.

Mr. Steck clearly meets the criteria established by Rule 702.  Tuomey points to Mr.

Steck's deposition testimony to assert that "he did not need to have any specialized knowledge to

prepare his report."  Tuomey's Mot. In Limine at 2.  Notwithstanding his unduly modest self-

appraisal, Mr. Steck clearly possesses specialized technical knowledge regarding how to conduct

an analysis of voluminous electronic claims records according to multi-level criteria.  As stated

in his expert reports and in his deposition, Mr. Steck has over twenty years' experience in

providing algorithmic and methodological analyses of voluminous electronic data, including

Medicare claims data.  Ex. 1(B) and (C).  Mr. Steck designed a unique, proprietary computer

program to analyze raw Medicare claims data.  *See* Ex. 10 (Steck Dep.) at 97:17-99:4.  Mr. Steck

used this program and his technical and specialized expertise in data analysis and computer

science to analyze thousands of raw electronic claims, each containing dozens of data fields; to

identify the specific claims presented to and paid by the Medicare program as a result of

Tuomey's unlawful physician contracts; and to quantify the resulting number of claims and the

amount paid by the Medicare program for those claims.   This is not something the average

person without such training could do.  *See id.* at 112:13-19.  It is significant that, as noted

above, Mr. Steck's analysis was credited and relied upon by Judge Darrah of the Northern

District of Illinois in the non-jury *Rogan* trial.  Although Mr. Steck was presented to and

accepted by the *Rogan* court as a summary witness, there is no doubt that Mr. Steck's testimony

11

in this case likewise will help the jury to understand the same type of evidence that was presented to Judge Darrah in *Rogan*.

As noted above, Mr. Steck's testimony is relevant to three questions the United States must address in this case: (1) What is the value of the claims that were paid by the United States to Tuomey under a mistake of fact or by which Tuomey has been unjustly enriched; (2) What are the false claims that were presented to the Government for payment?; and (3) What are the damages and penalties arising from those false claims? The claims that Mr. Steck analyzed are electronic claims records submitted by the hospital to CMS in order to request reimbursement. Before mid-2007, these records were called "UB-92" forms.[6] The *Rogan* court concluded that "[f]alse claims to Medicare, including Medicare cost reports and UB-92s . . . are actionable under the civil FCA," and "[t]he submission of UB-92s in violation of the Stark Statute constitutes a violation of the FCA." *Rogan*, 459 F. Supp. 2d at 717. The fact that Tuomey was unable to produce usable claims records from its own systems, despite taking more than 18 months for the task, speaks volumes about the need for a person to have technical expertise in order to sift through the electronic records to identify the relevant claims and then to analyze that data to address the specific questions at issue in the trial. An expert, or at least an exceptionally skilled summary witness, is required to explain the nature of the claims, how they were sorted and analyzed, and what the final results of that analysis are. Mr. Steck unquestionably fills the bill.

---

[6]In mid-2007, CMS replaced the UB-92 claim form with the UB-04 claim form. *See* http://www.cms.hhs.gov/Transmittals/downloads/R1104CP.pdf

**III.    At a Minimum, Mr. Steck Should Be Permitted to Testify as a Summary Witness.**

Even if the Court were to conclude that Mr. Steck is not an expert witness, he would still be able to testify as a summary witness under Federal Rules of Evidence 602 and 1006 as to his personal knowledge of the claims records submitted by Tuomey.  Rule 602 states that a witness may only testify to matters about which he or she has personal knowledge, while Rule 1006 specifically provides for summary evidence where the contents of voluminous records "cannot conveniently be examined in court."  Rule 1006 recognizes the practice of providing summary evidence when "[t]he admission of summaries of voluminous books, records, or documents offers the only practicable means of making their contents available to judge and jury."  F.R.E. 1006 committee notes (1972).  Summary witnesses may therefore testify as to their personal knowledge of voluminous evidence for reasons analogous to those underlying F.R.E. 1006, where admission of summary evidence is, realistically, the only way the evidence can be presented in court.  Charles Alan Wright, Victor James Gold, 27 Fed. Prac. & Proc. Evid. § 6026 (3d ed.).

The Medicare claims records at issue in this case are (a) in electronic form, and (b) extremely voluminous.  As he testified in his deposition, Mr. Steck will testify at trial based on his personal knowledge of that claims data.  Ex. 10 (Steck Dep.) 69:15–70:5.  Such a summary analysis of the claims data "offers the only practicable means" of making the contents of the records available to the Court and to the jury, who would otherwise be required to individually inspect and sort voluminous electronic data without context or reference.  As noted above, Mr. Steck was accepted as a summary witness by the district court in *Rogan* to provide exactly this type of testimony.   The Government designated Mr. Steck as an expert witness in this case to

13

avoid any argument by Tuomey that it was deprived of the appropriate disclosures about his

testimony.  Whether the Court elects to treat Mr. Steck as an expert or as a summary witness, it is

beyond question that Mr. Steck's testimony is highly relevant to the Government's claims, and it

is also beyond question Tuomey has received all the disclosures about his testimony to which it

could possibly be entitled.  Therefore, even if the Court were to find that Mr. Steck is not an

expert, he should be permitted to serve as a summary witness before the jury based on his

personal knowledge of the Medicare claims data.

IV.    **Mr. Steck's Conclusions Are Based on his Personal Knowledge of Admissible
       Materials.**

   A.    <u>**The claims data provided by TriCenturion and Acumen and used by Mr.
         Steck are the actual claims data at issue in this case and are therefore not
         hearsay.**</u>

Tuomey incorrectly asserts that the claims data analyzed by Mr. Steck is hearsay.  To the

contrary, the claims data used by Mr. Steck in his reports are not "statement[s] . . . offered in

evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Rather, the electronic

claims records used by Mr. Steck are the matter itself—the very false claims that are at issue in

this case.  As summarized by the district court opinion in *Rogan*, health care providers submit

electronic claims data along with annual cost reports to the Medicare program for

reimbursement:

> To submit claims for specific Medicare patients, the hospital completed and
> electronically sent form "UB-92" (also known as form "HCFA-1450").  The
> UB-92 form required each hospital to use a unique provider number, which
> identified the hospital as the place where services were rendered.  The UB-92
> form also identified the attending physician by placing the physician's Universal
> Provider Identification Number (UPIN) in Boxes 82 and 83 of the UB-92 form.
> The Center [sic] for Medicare and Medicaid Services ("CMS") maintained those

> electronic claims in the National Claims History, the agency's official repository
> of adjudicated claims. . . .
>
> In addition, CMS required that hospitals . . . submit an annual cost report. The
> cost reports were the final "claim" that a provider submitted to the Medicare
> program for services rendered to Medicare beneficiaries.  After the end of each
> hospital's fiscal year, the hospital filed its cost report with its designated Medicare
> fiscal intermediary, stating the amount of reimbursement the provider believed it
> was due for the year.

459 F. Supp. 2d at 708 (footnote omitted.)  The claims data provided by Tricenturion and

Acumen are, quite simply, electronic records.

The Fourth Circuit has held that raw data generated by machines do not constitute

"statements" subject to the hearsay rule.  In *United States v. Washington*, 498 F.3d 225, 231 (4th

Cir. 2007), *cert. denied*, 129 S. Ct. 2856 (2009), the Fourth Circuit ruled on the admissibility of

toxicology data generated by lab machines testing a defendant's blood sample.  In finding that the

machines producing the data were not persons or declarants within the meaning of Rule 801, the

Circuit Court stated:

> [A] "statement," . . . is an "(1) oral or written assertion or (2) nonverbal conduct
> of a person, if it is intended by the person as an assertion."  Only a person may be
> a declarant and make a statement.  Accordingly, "nothing 'said' by a machine . . .
> is hear-say." . . . .  In short, the raw data generated by the machines do not
> constitute "statements," and the machines are not "declarants."  As such, no
> out-of-court statement implicating the Confrontation Clause was admitted into
> evidence through the testimony of [a witness who testified as to the result of the
> toxicology report].

*Id.* (citations omitted.)  Moreover, the Fourth Circuit stated that "[a]ny concerns about the

reliability of such machine generated information is addressed through the process of

authentication not by hearsay or Confrontation Clause analysis."  *Id.*

For his initial and supplemental expert reports, Mr. Steck received actual electronic CMS

claims records directly from two sources authorized by CMS to access its electronic claims

repositories:  TriCenturion and Acumen.  Both TriCenturion and Acumen provided actual

electronic claims extracted directly from CMS systems of records.

Since Medicare providers generally submit claims to Medicare electronically, *Rogan*, 459

F. Supp. 2d at 708, the claims data provided by TriCenturion and Acumen are the actual

Medicare claims data at issue in this case, and so cannot be hearsay.  Just as there can be no

hearsay objection to a hospital's cost reports, there is no legitimate objection to the individual

patient claims records analyzed by Mr. Steck.  Moreover, because the claims data generated from

CMS depositories do not constitute "statements" subject to the hearsay rule, *Washington*, 498

F.3d at 231, any challenge to the records would be limited to questions of authenticity.  *Id.*

However, even under Tuomey's assertion that the claims data themselves are hearsay,

which they clearly are not, two exceptions to the hearsay rule would permit their admission at

trial.

**B.      The claims data qualify as "business records" under Fed. R. Evid. 803(6).**

Rule 803(6) provides as follows:

The following are not excluded by the hearsay rule, even though the declarant is
available as a witness:
* * * * * *
(6) Records of regularly conducted activity.—A memorandum, report, record, or
data compilation, in any form, of acts, events, conditions, opinions, or diagnoses,
made at or near the time by, or from information transmitted by, a person with
knowledge, if kept in the course of a regularly conducted business activity, and if
it was the regular practice of that business activity to make the memorandum,
report, record, or data compilation, all as shown by the testimony of the custodian
or other qualified witness, or by certification that complies with Rule 902(11),
Rule 902(12), or a statute permitting certification, unless the source of
information or the method or circumstances of preparation indicate lack of
trustworthiness.  The term "business" as used in this paragraph includes business,
institution, association, profession, occupation, and calling of every kind, whether
or not conducted for profit.

16

Even if the Medicare claims records at issue here constituted hearsay (which they do not), these records, which derive from CMS claims repositories and were extracted by contractors authorized by CMS to access those records for governmental use, would clearly qualify under the "business record" exception to the hearsay rule.  These claims records are maintained by CMS in the regular course of its business.  Ex. 3 (Worrall Dec.) ¶ 2.

## C.    The claims data qualify as public records under Fed. R. Evid. 803(8).

In addition to qualifying as business records under Rule 803(6), the claims records also fall within the public records and reports exception found in Rule 803(8)(A).  Rule 803(8)(A) provides for admission of "[r]ecords, reports, statements, *or data compilations, in any form*, of public offices or agencies, setting forth (A) the activities of the office or agency . . . ."  Fed. R. Evid. 803(8)(A) (emphasis added).  Where the evidence meets the requirements of Rule 803(8), "[t]he party opposing admission has the burden to establish unreliability."  *Zeus Enters., Inc. v. Alphin Aircraft, Inc.*, 190 F.3d 238, 247 (4th Cir. 1999).

The claims data used by Mr. Steck in his reports were taken directly from CMS claims depositories by two CMS contractors, TriCenturion and Acumen, who were specifically authorized by CMS to access its claims databases for these purposes.  These databases include all patient-specific claims information submitted to the Medicare program by Tuomey Hospital for the periods in question in this case.  Ex. 3 (Worrall Dec.) ¶ 2.  The data extracted by TriCenturion and Acumen for this case constitute electronic records of claims paid by Medicare and clearly qualify under Rule 803(8) as public records.

17

**V.      Tuomey's Challenges to Mr. Steck's Supplementation of His Expert Report Are Without Merit.**

      **A.      Mr. Steck supplemented his expert report well in advance of the time required by the Rules.**

Not only was Mr. Steck's updated report not a surprise to Tuomey, but Mr. Steck supplemented his expert report far in advance of the time required by the Rules.  Fed. R. Civ. P. 26(e)(2) specifies that all changes or updates to expert reports must be disclosed by the time the party's pretrial disclosures are due.  Local Rule 26.05 requires the parties to file their pretrial disclosures "at least five (5) business days prior to the date set for jury selection in the term of court in which the case is set for trial unless another date is ordered by the Court."  Mr. Steck's supplemental report was produced to Tuomey with the Government's other proposed exhibits on November 17, 2009.  At that time, jury selection in this case was scheduled to begin January 5, 2010, so supplemental expert reports would have been due December 28, 2009.[7]

Rather than wait until that time, the Government produced Mr. Steck's updated report on November 17, 2009, at the same time as the parties' exchange of exhibits.  Therefore, the Government produced Mr. Steck's updated report over six weeks before the deadline specified by the Local Rules.  This was done out of an abundance of caution, and this early supplementation has actually benefitted Tuomey by providing it with materials well in advance of the time specified by the Rules.  Moreover, Tuomey's suggestion that the updated report was

---

[7]Now that the date for jury selection has been deferred to March 2, 2010, in order to accommodate the parties' joint request to allow time for mediation of their dispute, Tuomey has even less justification to complain about receiving Mr. Steck's supplemental report, based upon updated claims records, on November 17, 2009.

18

"tucked away" in the exhibits produced is simply not true.  The Government specifically

identified Mr. Steck's updated report in its descriptions of its exhibits.

**B.**     **Tuomey was notified repeatedly that Mr. Steck would update his expert report.**

Tuomey complains that Mr. Steck has updated his report to include claims paid by

Medicare since November 2007.  In other words, Tuomey demands a free ride for more than 18

months of additional false claims.  First, it must be emphasized that the Government has

informed Tuomey from the outset that it would update its damages computation to include more

recent claims as the trial approached.[8]   In addition, Tuomey was informed that Mr. Steck would

update his initial expert report to account for later claims, so it has no grounds to object to that

supplementation.  Mr. Steck specifically testified in his deposition that he planned to supplement

his initial report to account for claims that where submitted and paid after the date of his initial

report.  Ex. 10 (Steck Dep.) at 114:14–19.  Mr. Steck also testified in his deposition that he

planned to update his report in order to account for the fact that he had not received claims data

for claims paid after November 30, 2007.  *Id.*  Further, Mr. Steck testified that he would like to

receive Tuomey's claims data so that he could check it against the CMS claims he analyzed and

make any changes necessary to his computations.  *Id.* at 110:24–112:3.

Moreover, in July 2009, Tuomey agreed to produce its actual claims data and stated that

such production would be treated as supplemental discovery responses.  Ex. 9(C).  There is no

---

[8] This is no different, really, than a wrongfully-discharged Title VII plaintiff updating her claim for backpay if she remains out of work between the date of her deposition and the trial.  The defendant in such a case does not get to cut off the plaintiff's entitlement to backpay as of the date of her deposition, yet that is essentially what Tuomey is trying to do here to the Medicare program.

reason why Tuomey should be able to characterize its long-delayed provision of claims data as a "supplementation," while at the same time declaring Mr. Steck's updated report to be entirely "new material" and not a timely supplementation under Rule 26(e)(2).

**C.**     **Tuomey has no basis to question the reliability of the claims data used by Mr. Steck.**

Tuomey has no basis for claiming that differences between Mr. Steck's initial and updated report are significant, or that these minor differences call into question the reliability of the data he used.  First, any such discrepancies are likely due, in part, to the fact that the claims data used by Mr. Steck in his initial report was reported by calendar year, while the claims data used by Mr. Steck in his updated report was reported by fiscal year.  Second, as Mr. Steck testified in his deposition, changes to claims data occur over time in part due to the lag time between claims and actual payment, adjudication, and adjustments.  Ex. 10 (Steck Dep.) 114:2–13.  These lags, adjudications, and adjustments occur as part of the normal Medicare claims payment process.  Regardless, Mr. Steck can explain any discrepancies through testimony at trial, which would go to the weight that the jury gives his testimony, not its admissibility.

Tuomey also has no basis for suggesting that Mr. Steck's use of two sets of Medicare claims records calls into question the reliability of his expert report.  As stated earlier, the records used in Mr. Steck's initial report were extracted by TriCenturion and included claims with payment dates from January 9, 2003, to November 30, 2007.  TriCenturion's contract with CMS for PSC duties covering South Carolina expired on October 31, 2009, a month after those duties were awarded by CMS to a different company.  The Government sought a full set of the relevant claims records from Acumen, a CMS contractor with ongoing access to the relevant Medicare

claims repositories.  The records used in Mr. Steck's updated report were extracted by Acumen

from CMS' Common Working Files and Standard Analytic Files datasets, and included all

claims from Tuomey with payment dates from January 2003 through June 2009 that had been

processed as of September 25, 2009.  Ex. 4 and 4(A).  Moreover, the United States produced to

Tuomey the records obtained from Tricenturion and the records obtained from Acumen in raw

format to enable Tuomey to check its accuracy for itself.   Tuomey has offered no evidence that

the data supplied on either of these occasions is anything other than what it purports to be:  actual

records of claims paid by Medicare to Tuomey for inpatient and outpatient services provided by

the specialty physicians while they had the challenged financial relationships with Tuomey.

Tuomey has no basis to complain just because the Government obtained the updated claims from

a different CMS contractor than the one that initially provided claims records.  The claims are

what they are, no matter who opens the virtual file drawer and pulls the pertinent ones out.

By contrast, Tuomey failed to produce timely and usable claims data of its own.  Thus,

Tuomey is hard-pressed to challenge the accuracy or reliability of the claims data produced

directly from CMS's claims repositories by TriCenturion and Acumen.  After a year and a half of

repeated requests from the Government, Tuomey produced institutional claims data that appears

to be unreliable for a substantial number of months and does not include the accompanying

physician claims.  Ex. 1 and 1(A).  Because of its failure to meet its own disclosure and

discovery obligations, Tuomey should be precluded from challenging the validity of the records

used by Mr. Steck in his report.  Certainly, Tuomey cannot use its own tardy and unreliable

claims production as a basis for insinuating that the claims records produced by the Government

are unreliable.

**D.    Tuomey Incorrectly Asserts that Mr. Steck Did Not Verify the Claims Data He Analyzed.**

Tuomey makes the unsupported assertion that Mr. Steck did not verify the claims data upon which he based his analysis.  In fact, Mr. Steck specifically stated in his initial expert report that he **did** verify and validate the data.  Exhibit 1(B) (3/16/09 Steck Report) at 3.  Mr. Steck also testified in his deposition:  (1) that he received the electronic claims data from CMS's claims-processing contractor, Tricenturion; (2) the electronic claims data he analyzed were are of the type and in the format he is accustomed to seeing in his reviews of such data; (3) he had no reason to believe that the claims data he analyzed were not submitted by Tuomey; and (4) the data indicated that Medicare and Medicaid had paid the claims, and there would be no way that Medicare and/or Medicaid would have paid Tuomey for these claims if Tuomey had not submitted those claims.  Ex. 10 (Steck Dep.) at 110:4–23.  In addition, Mr. Steck also had another employee at his firm independently verify the results of his expert report in order to ensure that his conclusions were accurate.  *Id.* at 11:12–12:1.  Tuomey's argument that Mr. Steck should have performed some other, unspecified verification of the claims data that he received from CMS contractors is without merit.

Mr. Steck similarly stated in his supplemental expert report that he verified and validated the claims records data he received from Acumen.  Ex. 1(C).  Acumen's own very detailed report about its methodology in extracting the records from CMS files, which it then provided to Mr. Steck, and its own steps in verifying and validating the data lay to rest any possible doubt that the claims records have been adequately verified and validated.  *See* Ex. 4 and 4(A).

Moreover, Tuomey is no position whatsoever to challenge the validity of the claims records, since Tuomey failed for a year and a half to provide its own electronic records to the Government despite formal discovery demands and numerous follow-up requests, and on top of that, the it data finally produced were deficient.  Mr. Steck testified at his deposition that he had not received Tuomey's claims records and would have liked to review those records to check against the Tricenturion-produced records.  Exhibit 10 (Steck Dep.) at 110:24-112:3.  Tuomey has failed to produce usable records responsive to the Government's many requests, and it should be foreclosed from raising any challenges at trial to the records produced by the Government.

## **CONCLUSION**

For the reasons stated above, the United States respectfully requests that the Court deny Tuomey's Motion in Limine Regarding Ruben Steck and grant the Government's Cross-Motion to Preclude Defendant from Challenging Medicare Claims Evidence.

Respectfully submitted,

TONY WEST
Assistant Attorney General

/s/ G. Norman Acker, III

_____
G. NORMAN ACKER, III
Special Attorney and
Assistant United States Attorney
Eastern District of North Carolina
310 New Bern Ave., Suite 800
Raleigh, NC 27601
Telephone:  (919) 856-4530
Facsimile:  (919) 856-4820
E-mail:  norman.acker@usdoj.gov

23

/s/ Tracy L. Hilmer

_____

JOYCE R. BRANDA
MICHAEL D. GRANSTON
TRACY L. HILMER
NIALL M. O'DONNELL
Attorneys, Civil Division
United States Department of Justice
Post Office Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 307-0474
Facsimile:  (202) 514-0280
E-mail:  tracy.hilmer@usdoj.gov

Attorneys for the United States

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that I have this 25 day of January 2010, served a copy of the foregoing upon the below-listed parties electronically through the Court's electronic case filing system or by placing a copy of the same in the U.S. Mails, addressed as follows:

Kevin M. Barth, Esq.
Ballenger Barth & Hoefer, LLP
205 North Irby Street
P.O. Box 107
Florence, SC 29503

A. Camden Lewis, Esq.
Mary G. Lewis, Esq.
William J. Harling, Esq.
Lewis & Babcock, LLP
P. O. Box 11208
Columbia, SC 29211

Daniel M. Mulholland, III, Esq.
Horty, Springer & Mattern, P.C.
4614 Fifth Avenue
Pittsburgh, PA 15213

E. Bart Daniel
Attorney at Law
7 State Street
P. O. Box 856
Charleston, SC 29402

/s/ Tracy L. Hilmer

_____
Tracy L. Hilmer