1

```
 1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF SOUTH CAROLINA
 2                    COLUMBIA DIVISION

 3

 4   UNITED STATES OF AMERICA,
     ex rel, MICHAEL K.
 5   DRAKEFORD, M.D.,

 6          Plaintiff(s),

 7      vs.                   Case No.: 3:05-cv-2858-MJP

 8   TUOMEY HEALTHCARE SYSTEM, INC.,

 9          Defendant(s).

10                   V I D E O T A P E D

11                   D E P O S I T I O N

12      (This transcript contains confidential portions.)

13   WITNESS:        RUBEN STECK

14   DATE:           Tuesday, May 20, 2009

15   TIME:           10:09 a.m.

16   LOCATION:       Lewis & Babcock
                     1513 Hampton Street
17                   Columbia, South Carolina

18   TAKEN BY:       Attorneys for the Defendant(s)

19   REPORTED BY:    SHERI L. BYERS
                     Registered Professional Reporter
20

21   ------------------------------------------------
                       COMPUSCRIPTS, INC.
22           A Full-Service Court Reporting Agency
                     Post Office Box 7172
23              Columbia, South Carolina 29202
                        803-988-0086
24                     1-888-988-0086
                   www.compuscriptsinc.com
25
```

EXHIBIT 10

Ruben Steck 5/19/2009

11

1   editor, helped me clean up some of the, you know,
2   improper grammar, things like that.
3        Q.   Who was the coworker that worked on this with
4   you?
5        A.   Michael Flanigan.
6        Q.   And what's your wife's name just for the
7   record?
8        A.   Kristin Whitting.
9        Q.   But all she did was do basically proofreading
10  or editing of the final report?
11       A.   Yes.
12       Q.   What did Mr. Flanigan do to assist you in
13  preparing the report?
14       A.   The way that we tend to do things at Steck
15  Consulting is to verify the work that goes out and the
16  way that we do that is to have different people use
17  different approaches and we make sure that the numbers
18  that we get as a result are matching to the penny or to
19  the -- you know, to the unit.  And so he independently
20  verified the numbers that are in that report.
21       Q.   How did he go about independently verifying
22  the numbers that are in the report?
23       A.   He prepared programs or queries to do the
24  same type of analysis that I did and represented in the
25  report using his own style, I guess is the best way to

www.compuscripts.com

Ruben Steck 5/19/2009

12

1   put it.
2     Q.  When you were doing these queries in
3   analyzing the data, were you analyzing the same data
4   that had been provided to you as stated in the report?
5     A.  Yes.
6     Q.  All right.  And as I recall, you had two sets
7   of data.  One was a CD that was given to you by
8   TriCenturion --
9     A.  Yes.
10     Q.  -- which contained Medicare claims; is that
11   correct?
12     A.  That's correct.
13     Q.  And the other was information that Ms. Hilmer
14   gave you which purported to have Medicaid claims on it,
15   correct?
16     A.  Yes.  Yes.
17     Q.  But when you and Mr. Flanigan were working on
18   this, did you work from the same set of data, those two
19   CDs that you received that contained the claims data
20   for Medicare and Medicaid?
21     A.  Well, we remove -- I mean, we downloaded off
22   of the CD.
23     Q.  I see.
24     A.  So we didn't operate on the data on the CD.
25   We operated on a copy of the data on a computer.

Ruben Steck 5/19/2009

69

1    Q.   Stark law.  Do you have any personal
2    knowledge of any violation of any federal law by Tuomey
3    or its officers, directors, employees, agents or
4    attorneys?
5    A.   No.
6    Q.   Do you have any personal knowledge of any
7    other wrongdoing by Tuomey or its officers, directors,
8    employees, agents or attorneys?
9    A.   No.
10   Q.   Are you personally aware, do you have any
11   firsthand knowledge of any false or fraudulent claims
12   for payments submitted by Tuomey to Medicare or
13   Medicaid?
14   A.   Can you ask that again?
15   Q.   Yeah.  Do you have any personal knowledge of
16   any false or fraudulent claims for payment submitted by
17   Tuomey to Medicare or Medicaid?
18   A.   I hope I'm not being too technical about it,
19   but I have personal knowledge of the representation of
20   the claims that were submitted and insofar as there's a
21   violation, then I would have knowledge of those claims
22   that do.
23   Q.   But you're assuming that there's a violation
24   to make that statement that you just made, correct?
25   A.   Yes.

Ruben Steck 5/19/2009

70

1    Q.    All right.  And you said you had no personal
2  knowledge of any violation of the law on the part of
3  Tuomey or its representatives, correct?
4    A.    Right.  Other than -- other than the data and
5  if it is.
6    Q.    Yeah.  So all you know is that the data says
7  what it says in your report?
8    A.    Yes.
9    Q.    Do you have any personal knowledge that
10 anyone submitted claims to the government with an
11 intent to defraud the government at Tuomey?
12   A.    I don't have personal knowledge of that.
13   Q.    And do you have any personal knowledge that
14 any of the information contained in the claims
15 submitted by Tuomey to the government for any service
16 contained false information?
17   A.    I don't know that.
18   Q.    Now, if you could turn to the top of page 2,
19 this actually carries over from the bottom paragraph of
20 page 1.  There's a statement that the claims that you
21 discuss on page 1 would be used as a factor in the
22 government's damage calculations.
23         Do you see where I'm referring to at the top
24 of the page?
25   A.    I do.

www.compuscripts.com

Ruben Steck 5/19/2009

97

1    A.   Yes.  It may have come up before then as
2  well.
3    Q.   Do you also recall a discussion about your
4  being a summary witness?
5    A.   Yes, I think so.
6    Q.   Did anyone tell you what it might mean if you
7  were a summary witness?
8    A.   Yes, I think the idea of basically saying
9  what we did.
10   Q.   And was it also your report that you were
11 being asked to provide expert testimony?
12   A.   Say that again.
13   Q.   Was it also your understanding that the
14 government was asking you to provide an expert report
15 and expert testimony in this case?
16   A.   Yes.
17   Q.   When you performed the analysis that
18 ultimately allowed you to prepare your report, did you
19 use any software that was proprietary to Steck
20 Consulting in doing that?
21   A.   Yes, we did.
22   Q.   All right.  And what's that software called,
23 do you have a name for it?
24   A.   We don't.
25   Q.   Is it something that only you have access to

Ruben Steck 5/19/2009

98

1   at Steck Consulting?
2       A.   Yes.
3       Q.   Or rather something that only Steck
4   Consulting employees have access to?
5       A.   Yes.
6       Q.   I take it Mr. Flanigan has access to the
7   software?
8       A.   Yes.
9       Q.   Did you design the software yourself?
10      A.   Again, at the risk of going into too great of
11  detail, we actually used a programming language, which
12  is not proprietary, to write queries specific to
13  this -- to this case and to this analysis, and so
14  technically, it's a mix of things that we wrote
15  ourselves as well as taking advantage of commercially
16  available software.
17      Q.   And what was the commercially available
18  software that you used to create the queries that you
19  just referenced?
20      A.   It's the programming language called Perl,
21  which is spelled P-e-r-l.
22      Q.   And do you know who owns the Perl program or
23  licenses that?
24      A.   I believe it's an open-source license.
25      Q.   I see.  Do you license the proprietary

Ruben Steck 5/19/2009

99

1  software that you described that allows you to do the
2  queries on the data that you reviewed?  Do you license
3  it to anyone outside of Steck Consulting?
4       A.   We don't.
5       Q.   If you could, turn to page 484, 000484, of
6  Mr. Flanigan's notes.  Do you recall a telephone call
7  with Tracy Hilmer and Niall O'Donnell, you and
8  Mr. Flanigan around February 23rd of this year?
9       A.   Again, probably did happen.
10      Q.   Now, the first entry under the names Tracy,
11 Niall and Ruben appears to read, "Tracy - Medicare/MIAD
12 do not contain a field called 'referral.'"  Is that how
13 you read that entry?
14      A.   Yes.
15      Q.   Do you recall a discussion about whether or
16 not Medicare and Medicaid claims forms contained a
17 field called "referral"?
18      A.   I think so.
19      Q.   What do you recall about that conversation?
20      A.   That we talked about what fields were
21 available and that referral isn't one of them.  It's
22 not named that in the data.
23      Q.   Now, if you could, look at page 000481 of
24 Mr. Flanigan's notes.  There seems to be a reference to
25 a conference call with Rube, Tracy, Norman and Niall on

Ruben Steck 5/19/2009

108

1           Did I read that correctly?
2      A.   Yes.
3      Q.   What does this footnote refer to, if
4  anything? Why did you put this footnote in that draft
5  of the report?
6      A.   I'm not exactly sure other than to -- I think
7  maybe that I was planning to include a reference to it
8  here.
9      Q.   I see. Your final report doesn't mention a
10 Rogan case, does it?
11     A.   It doesn't other than --
12     Q.   The list of cases where you testified, right?
13     A.   Right. Yes. So I'm -- I can imagine that I
14 wanted to include that but then chose not to.
15     Q.   When you prepared your final report in this
16 case, were you doing the same thing that you did in the
17 Rogan case for the government when you testified in
18 that case?
19     A.   We did everything that we did in the Rogan
20 case and then some.
21     Q.   Okay. What, if anything, additional did you
22 do in this case that you didn't do in the Rogan case?
23     A.   The, what we call, physician service linking.
24     Q.   I see. Was there anything that you did in
25 the Rogan case that you did not do in this case?

www.compuscripts.com

Ruben Steck 5/19/2009

110

```
 1              MR. ACKER:  I have just a few.
 2              EXAMINATION
 3      BY MR. ACKER:
 4         Q.   Mr. Steck, you were asked by Mr. Mulholland
 5      if you had personal knowledge about claims submitted by
 6      Tuomey.  Do you recall that line of questions?
 7         A.   I do.
 8         Q.   Is it your experience that the kind of data
 9      that you receive generally does reflect the actual
10      claims that were submitted in -- submitted by hospital
11      and paid by Medicare?
12         A.   Yes.
13         Q.   And so you have no reason to know that those
14      claims -- or to believe that those claims were not
15      submitted by Tuomey; is that correct?
16         A.   That's correct.
17         Q.   And in fact, you believe they were submitted
18      by Tuomey if they were in that data?
19         A.   That's my belief, yes.
20         Q.   Is there any way that you can think that
21      Tuomey would have been paid for those claims if they
22      hadn't submitted those claims?
23         A.   Not by the Medicare or Medicaid payors.
24         Q.   Okay.  Were you given any data that was
25      provided by the hospital for you to analyze in terms of
```

Ruben Steck 5/19/2009

111

1  the hospital's copies of the claims that they
2  submitted?
3      A.  We received a PDF of what appeared to be some
4  summary information, but we weren't able to use it.
5      Q.  Why weren't you able to use it?
6      A.  Some of the numeric fields were not legible.
7      Q.  Okay.  And did you ask the government if that
8  data was available in electronic form?
9      A.  I did.
10     Q.  Did you ever receive that data?
11     A.  We did not.
12     Q.  If you will, take a look at Exhibit 8 in
13  front of you.  It's Mr. Flanigan's notes.  And look at
14  page Steck Consulting 000477.
15     A.  Yes.
16     Q.  Can you read that?  Go ahead and read it out
17  loud.
18     A.  Okay.  "Request for data from hospital.  Use
19  it to check against TriCenturion data."
20     Q.  And if you had electronic data of the
21  hospital's copies of its claims, would you be able to
22  check it against the TriCenturion data?
23     A.  Yes.
24     Q.  And did you want to do that?
25     A.  We did.

Ruben Steck 5/19/2009

112

1  Q. And if you receive that information now,
2  would you be able to do that?
3  A. Yes, we would.
4  Q. You mentioned this Perl programming language.
5  Is that widely available to people that want to obtain
6  Perl?
7  A. Yes.
8  Q. And on the other hand, is it -- would a
9  normal person off the street know how to use the Perl
10 programming language?
11 A. It's the word "normal" that you use. I'm
12 having a hard time --
13 Q. Would the average person on the street, would
14 a majority of people in the society know how to use
15 Perl programming language?
16 A. Probably not.
17 Q. How did you learn to use it?
18 A. Through my training as a computer scientist
19 and through the use of it on many projects.
20 Q. If someone else had the Perl programming
21 language and the knowledge to use it and the data that
22 you were given from TriCenturion, would they be able to
23 reproduce the results that you had?
24 A. Yes.
25 Q. Would they need certain specialized knowledge

Ruben Steck 5/19/2009

114

1    A.    I don't believe that it did.

2    Q.    Is it your experience there's generally a lag

3    in the data?  In other words, do you believe that you

4    had all the information for November of 2007?

5    A.    No.

6    Q.    And why?

7    A.    Because the dates specified are the dates of

8    payment, and so it takes a certain amount of time for

9    claims to go from submission to actual payment and

10   the -- there's, you know, some statistical distribution

11   of how many get paid at a certain time, and so with

12   adjudication and adjustments and things like that,

13   sometimes that can stretch to a long period.

14   Q.    And I believe you testified earlier that the

15   government has indicated that at such time as we get

16   closer to trial you may be asked to update your

17   analysis using the same analysis you had done for more

18   current data?

19   A.    That's correct.

20         MR. ACKER:  I have no other questions.

21         MR. MULHOLLAND:  Just a couple more,

22   Mr. Steck.

23              REEXAMINATION

24   BY MR. MULHOLLAND:

25   Q.    You mentioned that you would be able to do