Page 1

1               IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF SOUTH CAROLINA

3                      COLUMBIA DIVISION

4                 C.A. No. 3:05-CV-2858-MJP

5

6

7    UNITED STATES OF AMERICA, ex rel.,

8    MICHAEL K. DRAKEFORD, M.D.,

9                   Plaintiff(s),

10   v.

11   TUOMEY d/b/a TUOMEY HEALTHCARE

12   SYSTEM, INC.,

13              Defendant(s).

14

15        DEPOSITION OF KEVIN G. MCANANEY, ESQUIRE

16                    Washington, DC

17               Thursday, October 9, 2008

18                    10:00 a.m.

19

20   Job No. 10128

                          CERTIFIED COPY

21   Volume I Pages 1-162

22   Reported by:  Linda S. Kinkade, CSR, RMR, CRR

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 2

1

2        Deposition of KEVIN G. MCANANEY, ESQUIRE held

3  at the offices of:

4

5

6        United States Department of Justice

7        Civil Division

8        601 D Street, N.W.

9        Washington, DC

10

11

12

13        Pursuant to applicable Rules of Civil

14  Procedure, before Linda S. Kinkade, CSR, RPR/RMR, CRR,

15  a Notary Public, in and for the District of Columbia.

16

17

18

19

20

21

22

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 3

```
 1    APPEARANCES:

 2        On Behalf of the United States:

 3            G. NORMAN ACKER, III, ESQUIRE

 4            Special Attorney and

 5            Assistant United States Attorney

 6            Eastern District of North Carolina

 7            310 New Bern Avenue, Suite 800

 8            Raleigh, North Carolina 27601

 9            Telephone: (919) 856-4530

10            E-mail:  norman.acker@usdoj.gov

11

12            TRACY L. HILMER, ESQUIRE

13            NIALL M. O'DONNELL, ESQUIRE

14            Attorneys, Civil Division

15            United States Department of Justice

16            601 D Street, N.W.

17            Washington, DC 20044

18            Telephone: (202) 307-0474

19            E-mail:  tracy.hilmer@usdoj.gov

20            E-mail:  niall.odonnell@usdoj.gov

21

22
```

```
                                                        Page 4
 1    APPEARANCES (continued):

 2

 3        On Behalf of Defendant Tuomey Healthcare System,

 4    Inc.:

 5            A. CAMDEN LEWIS, ESQUIRE

 6            MARY G. LEWIS, ESQUIRE

 7            Lewis & Babcock, LLP

 8            1513 Hampton Street

 9            Columbia, South Carolina 29211

10            Telephone: (803) 771-8000

11

12

13            DANIEL M. MULHOLLAND, III, ESQUIRE

14            Horty, Springer & Mattern

15            4614 Fifth Avenue

16            Pittsburgh, Pennsylvania 15213

17            Telephone: (800) 245-1205

18            E-mail: dmulholland@hortyspringer.com

19

20

21    Also present:  Brett Elliott, Jo Williamson, Jay Cox,

22    Kevin Barry, (telephonically) Agent Brian Dimler
```

Kevin G. McAnaney, Esq.                                          October 9, 2008
                              Washington, DC

Page 5

1                              I N D E X

2

3    EXAMINATION OF KEVIN G. MCANANEY, ESQUIRE          PAGE

4       BY MR. ACKER                                      7

5

6

7                          E X H I B I T S

8                     (Attached to transcript)

9

10   EXHIBIT   DESCRIPTION                            PAGE

11   1         Documents Bates labeled 006-1          6

12             through 006-194, inclusive

13   2         Stipulation                            19

14   3         Documents provided by witness at       52

15             deposition (to be Bates labeled)

16

17

18

19

20

21

22

Page 6

1                P R O C E E D I N G S

2          (Exhibit No. 1 marked for identification and

3     attached hereto.)

4               THE REPORTER:  Counsel, if you could state

5     your appearances for the record, please.

6               MR. ACKER:  Norman Acker with the United

7     States Attorney's Office.

8               MS. HILMER:  Tracy Hilmer with the United

9     States Department of Justice, Civil Division.

10              MR. O'DONNELL:  Niall O'Donnell with the

11    United States Department of Justice, Civil Division.

12              MR. BARRY:  Kevin Barry with the Office of

13    Counsel to the Inspector General and HHS.

14              MS. ELLIOTT:  Brett Elliott, Civil Division.

15              MR. COX:  Jay Cox, Tuomey Healthcare.

16              MS. LEWIS:  Mary Lewis of Lewis & Babcock

17    here on behalf of Tuomey Healthcare.

18              MS. WILLIAMSON:  Jo Williamson, Tuomey

19    Healthcare.

20              MR. LEWIS:  Cam Lewis of Lewis & Babcock

21    here for Tuomey.

22              MR. MULHOLLAND:  Dan Mulholland from Horty,

Kevin G. McAnaney, Esq.                                      October 9, 2008
                          Washington, DC

                                                               Page 7
1    Springer and Mattern representing Tuomey.

2              THE REPORTER:  And on the telephone?

3              MS. HILMER:  Brian Dimler, special agent

4    with the Office of Inspector General for the

5    Department of the Health and Human Services.

6                                      (10:13 a.m.)

7              KEVIN MCANANEY, ESQUIRE,

8        Being first duly sworn, testified as follows:

9                     EXAMINATION

10   BY MR. ACKER:

11       Q    Would you state your name for the record?

12       A    Kevin McAnaney.

13       Q    And what town do you live in?

14       A    Bethesda, Maryland.

15       Q    And where do you work?

16       A    At 1800 K Street, Washington, DC.

17       Q    And what do you do for a living?

18       A    I'm a lawyer.

19       Q    Are you in solo practice?

20       A    I am.

21             MR. MULHOLLAND:  Mr. Acker, before you get

22   very far, I just want to put an objection on the

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 8

1    record relevant to this deposition.  Tuomey would like

2    to have the following objections on the record.

3         First, as we state in our motion to preclude

4    evidence under Federal Rules of Evidence 408,

5    Mr. McAnaney was jointly retained by Tuomey and

6    Palmetto Orthopaedics to provide a means of settling a

7    dispute between those parties.  Furthermore, at the

8    conclusion of his engagement, he was instructed not to

9    perform any further services in connection with this

10   matter.  Therefore, anything that he did in connection

11   with the joint engagement is privileged.  Furthermore,

12   he was not authorized to do anything beyond September

13   2nd, 2005.  So even this deposition is not authorized

14   and any of his testimony would be privileged as well

15   under the attorney-client and attorney work-product

16   privileges that Tuomey can assert.  Tuomey reserves

17   the right to move to strike Mr. McAnaney's testimony

18   today.

19        Second, in the government's response to

20   Tuomey's interrogatories, the government listed

21   matters that Mr. McAnaney has knowledge about.  We'll

22   object to the extent that the government asks

Kevin G. McAnaney, Esq.
Washington, DC
October 9, 2008

Page 9

1   Mr. McAnaney about matters that go beyond the matters

2   set forth in its response to our interrogatories.

3        And, furthermore, we'll object to the extent

4   that the government attempts to use Mr. McAnaney's

5   testimony today at trial except as permitted by

6   Federal Rule of Civil Procedure 32.

7        In addition, to the extent that the government

8   attempts to qualify Mr. McAnaney as an expert and ask

9   him for expert testimony or opinion, we'll object to

10  the extent that the procedures for identifying and

11  disclosing expert opinions have not yet been followed

12  by the government.

13       Just wanted to put that on the record.

14       One other objection that we believe -- and

15  we'll make this clear in a future filing in the

16  court -- we believe that the government's responses to

17  the interrogatories in terms of what Mr. McAnaney

18  might testify about were inadequate.

19            MR. ACKER:  Mr. Mulholland, can I ask a

20  clarification?

21            MR. MULHOLLAND:  Sure.

22            MR. ACKER:  You indicated privilege a couple

Page 10

1    of times in which you stated one time you were

2    specific in naming the attorney-client privilege and

3    the work-product privilege.  Are there any other

4    privileges that you are claiming?

5          MR. MULHOLLAND:  The other privilege is

6    under Federal Rules of Evidence 408 as set forth in

7    our prior pleadings with the court relative to the

8    motion to preclude evidence in our motion to strike,

9    which the judge, I believe, has held in abeyance.  He

10   didn't grant that nor, as I understood, did he deny

11   that motion with prejudice.

12         MR. ACKER:  And it's my understanding that

13   this is a continuing objection to all the questions

14   and that we will not require you to make an objection

15   at each question.

16         MR. MULHOLLAND:  That's correct.  And if

17   that's understood, we won't need to do so.

18         MR. ACKER:  That's understood.

19         THE WITNESS:  May I ask?  I thought the

20   privilege was waived.

21         MR. ACKER:  We'll ask you about that.

22         THE WITNESS:  Okay.

Kevin G. McAnaney, Esq.                                                          October 9, 2008
                          Washington, DC

Page 11

1    BY MR. ACKER:

2          Q    Let me start off by asking, have you ever

3    had your deposition taken before?

4          A    Yes.

5          Q    And how many times have you had your

6    deposition taken approximately?

7          A    Maybe three, four at most, something like

8    that.

9          Q    In what capacity did you have your

10   deposition taken?

11         A    I think this is probably my second time as

12   a fact witness and once -- and then I guess twice as

13   an expert.

14         Q    Okay.  Let me just give you a few

15   instructions at the beginning.  First, I need to

16   remember this as well, but we do have Mr. Dimler on --

17   Special Agent Dimler on the phone.  So both of us need

18   to keep our voices up as loud as possible so that he

19   can hear.  Okay?

20         A    That's fine.  I'm from a big family.  We

21   yell a lot.

22         Q    The other thing is that the court reporter

Page 12

1    is here taking down everything that we say.  And so

2    make sure that you respond orally with your answers.

3    Okay?

4          A    Yes.

5          Q    If I ask you anything that is confusing or

6    unclear, then feel free to ask me to repeat the

7    question or to clarify the question.

8          A    Okay.

9          Q    And one of the objections that

10   Mr. Mulholland stated was in terms of attorney --

11   excuse me -- opinion testimony.  And it is my

12   intention to only ask you the opinions that you formed

13   at the time of your engagement in the summer of 2005

14   and not any other opinions that you've formed since

15   that time.  Do you understand that?

16         A    Yes.

17         Q    And if I ask you any question that you

18   believe calls for speculation or is something you had

19   not formed an opinion about back in 2005, feel free to

20   tell me that you think that calls for speculation,

21   that you haven't had a chance to review that

22   thoroughly, and just inform me of that, if that's the

Page 13

1    case.

2          A    I will.

3              MR. MULHOLLAND:  Just to be clear, our

4    objection would apply to any opinions he had in 2005

5    as well as any subsequent to that.

6              MR. ACKER:  I understand your objection.

7    BY MR. ACKER:

8          Q    I will note for the record that you do not

9    have an attorney present with you; is that correct?

10         A    That's correct.

11         Q    And you understand, if you wanted to, you

12   could have an attorney with you?

13         A    Yes.

14         Q    All right.  Let's get started with your --

15   the other instruction is, if you need to take a break

16   at any time, please let us know.  We'll take a break

17   at any time that you need to.  And don't hesitate to

18   ask that.

19         A    I will.

20         Q    Let's start with your background.  Tell me

21   about your educational background starting with

22   college.

Page 14

1        A    I went to UNC, Chapel Hill, graduated in

2    January of 1971.  I went to -- I went to law school.

3    I graduated from Columbia Law School in New York City,

4    class of 1977.  And since then have practiced law.

5        Q    And tell me about your employment history

6    practicing law since '77.

7        A    Following law school I went to a -- I was

8    an associate in a firm, Kelley, Drye & Warren in New

9    York City, where I worked for several years -- three,

10   four years.  I then was assistant counsel to the

11   governor of New York, Hugh Carey, from about '81, '82.

12   I then came -- I then worked at, as an associate at

13   the law firm of Dewey, Ballantine & Warren in

14   Washington, DC.

15       Q    Approximately what years was that?

16       A    Well, I think I came down in -- well, I

17   came down in '82 or '83, and I worked there until

18   January '97, I think.  And then at some point in there

19   after about three years I was a partner, I became

20   partner.  Was a partner there for about, I don't know,

21   10, 11 years, I think.

22           I then, in 1997, I went to work at the Office

Page 15

1    of the Inspector General, counsel's office, and I

2    worked there for six years until May, I think, 2003.

3    I think it was May 2003.  And then since then I've

4    been in private practice, solo practice.

5         Q   Do you recall in the summer of 2005 being

6    employed by Tuomey Hospital and Palmetto Orthopaedics?

7         A   Well, I remember the engagement.  The time,

8    I'm not exactly sure what the time is without looking

9    at the papers, but, yes.

10        Q   Let me hand you what's been marked McAnaney

11   Deposition Exhibit 1.  And this consists of a number

12   of pages.  The page numbers -- there is a Bates number

13   at the bottom that starts with 006-1 through 006-194.

14   Is that what you have before you?

15        A   Yes.

16        Q   And does this appear to be the documents

17   that you provided to the United States in an interview

18   that you gave on or about November 1 of 2006?

19        A   Yes.

20        Q   And does this constitute documents that you

21   had in your file for this engagement?

22        A   Yes.

Kevin G. McAnaney, Esq.                                October 9, 2008
Washington, DC

Page 16

1          Q    All right.  Take a look at page 006-13.

2    What is this, the two pages, 006-13 and 14?  What is

3    this?

4          A    It's a copy of my engagement letter.

5          Q    Does this set out the terms of your

6    engagement?

7          A    Yes.

8          Q    And who is it addressed to?

9          A    Mr. Jay Cox at Tuomey Healthcare System and

10   Dr. Mike Drakeford at Palmetto Orthopaedics and

11   Sports.

12         Q    And this is dated May 6th, 2005?

13         A    Yes.

14         Q    Does that refresh your recollection as to

15   when your engagement was with this matter?

16         A    Yes.

17         Q    So have you reviewed this letter recently?

18   Take a minute to read it over.

19         A    Okay.  Yes.

20         Q    After reading that, tell me in your own

21   words your understanding of what you were hired to do.

22              MR. MULHOLLAND:  Again, we have not waived

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 17

1    the attorney-client privilege with respect to any

2    matters that Mr. McAnaney was engaged in.  I would

3    just instruct him of that fact.

4              MR. ACKER:  Well, let me, then, back off

5    that question for a moment that I asked you and ask

6    you --

7    BY MR. ACKER:

8         Q    Did there come a time when you had a

9    conversation with a Mr. Bart Daniel concerning this

10   matter?

11        A    Yes.

12        Q    And who was Bart Daniel?  Who is your

13   understanding of who Bart Daniel was?

14        A    He was -- I understood him to be counsel

15   representing Tuomey.

16        Q    And what did he indicate to you about any

17   waiver of attorney-client privilege in this matter?

18        A    He told me that Tuomey had waived the

19   privileges as to my -- to this matter, to my

20   representation, and that I could meet with you back in

21   2006.

22             MR. MULHOLLAND:  And, again, the retention

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                        Washington, DC

Page 18

1    letter talks about joint instructions relative to

2    Mr. McAnaney, both from Palmetto and from Tuomey.

3              MR. ACKER:  Okay.  Are you claiming the

4    privilege on behalf of Palmetto?

5              MR. MULHOLLAND:  No.  I'm just saying that

6    the joint retention of Mr. McAnaney referred to joint

7    instructions and required, as I understand it -- and

8    he can testify about his understanding obviously --

9    the agreement of the parties relative to any waiver of

10   privilege.

11   BY MR. ACKER:

12        Q    Was it your understanding before you spoke

13   to us in 2006 that Palmetto Orthopaedics had also

14   waived the privilege?

15        A    Yes.

16             MR. ACKER:  Mr. Mulholland, are you

17   instructing the witness not to answer or are you

18   simply preserving your objection for the record?

19             MR. MULHOLLAND:  We're preserving our

20   objection for the record, but I think the joint

21   instructions that were given to him at the time of his

22   retention are clear.  But, you know, we have not

Kevin G. McAnaney, Esq.
Washington, DC
October 9, 2008

```
                                              Page 19
 1   withdrawn any of the objections that I stated at the

 2   beginning of the deposition.

 3            MR. ACKER:  Okay.  So it's your --

 4            MR. MULHOLLAND:  So we would instruct him

 5   not to answer, but from his standpoint, you know, if

 6   he follows those instructions, fine.  If he doesn't

 7   follow the instructions, we'll take it up later.

 8            MR. ACKER:  Let's go off the record.

 9        (Discussion was had off the record.)

10        (Proceedings recessed at 10:28 a.m.)

11        (In session at 12:19 p.m.)

12        (Telephone call placed by counsel Tracy

13   Hilmer.)

14        (Exhibit No. 2 marked for identification and

15   attached hereto.)

16            MR. ACKER:  Just for the record we want to

17   say that we've, during the break, worked out a

18   stipulation regarding the testimony of Kevin McAnaney

19   and we've added to the deposition for the purpose of

20   this stipulation and one other matter Nick Lewis, who

21   is one of the attorneys representing the relator in

22   this matter, Dr. Michael Drakeford.
```

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 20

1      Are you there, Nick?

2          COUNSEL APPEARING BY TELEPHONE:  I am.  For

3  purposes of the record, this is Nick Lewis.  I'm with

4  Ballenger, Barth & Hoefer in Florence.  We're

5  attorneys for the relator.

6          MR. ACKER:  All right.  And what I'm going

7  to do is read the stipulation, which we have marked as

8  Deposition Exhibit 2.

9          Stipulation regarding testimony of Kevin

10  McAnaney.

11          The parties stipulate to the following:

12          1.  The mere acts of, (a), going forward with

13  the deposition of Kevin McAnaney and, (b), the

14  defendant's attorneys withdrawing their instruction to

15  Kevin McAnaney not to answer the questions do not

16  waive any of the following privileges or rights that

17  the defendant may have as of this date, October 9,

18  2008:

19          (i) attorney-client privilege;

20          (ii) work-product privilege;

21          (iii) any privilege or right which may have

22  been created by the May 6, 2005 engagement letter

1    among Kevin McAnaney, defendant and the relator; and

2           (iv) any privilege or right which may exist

3    pursuant to Federal Rules of Civil Procedure 408 --

4    that's what the stipulation says, but I think we

5    should stipulate it should be the Federal Rules of

6    Evidence, Rule 408.

7           COUNSEL APPEARING BY TELEPHONE:  Yes.

8           MR. MULHOLLAND:  That's correct.

9           MR. ACKER:  Do all the parties agree that

10   that should be corrected on this stipulation?

11          MR. MULHOLLAND:  Yes.

12          MR. LEWIS:  Yes.

13          COUNSEL APPEARING BY TELEPHONE:  Yes.

14          MR. ACKER:  No. 2.  The mere fact that the

15   government and the relator are entering into this

16   stipulation does not constitute an admission by the

17   government or the relator that any such privileges or

18   rights exist as of this date, October 9, 2008.

19          No. 3.  The mere fact that Mr. McAnaney answers

20   questions put to him in this deposition shall not be

21   grounds for any civil or administrative action,

22   complaint or proceeding, concerning:

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 22

1           (a) any violation of the applicable rules of

2    professional responsibility, or

3           (b) any obligation which may have been created

4    by the May 6, 2005 engagement letter.  None of the

5    parties to this stipulation or their attorneys or

6    agents will bring any such civil or administrative

7    action, complaint or proceeding against Mr. McAnaney

8    or assist anyone else in doing so.

9          That's the end of the stipulation.  I'd just

10   ask for each attorney one at a time to agree that, on

11   behalf of their clients and themselves, that -- to

12   this stipulation.

13         The government, Norman Acker on behalf of the

14   Government, agrees.

15             MR. MULHOLLAND:  Tuomey -- this is Dan

16   Mulholland -- also agrees subject to the understanding

17   that the objections we entered at the start of the

18   deposition are still in effect and continuing.

19             MR. ACKER:  We agree that those are

20   continuing objections.  And Nick?

21             COUNSEL APPEARING BY TELEPHONE:  This is

22   Nick Lewis, and I'd like to state for the record that

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 23

1    Palmetto Orthopaedics, Dr. Drakeford are waiving

2    privilege as to Kevin McAnaney.  We also agree to the

3    stipulation just read into the record regarding the

4    testimony of Kevin McAnaney.

5              MR. ACKER:  Is there anything else that we

6    need to put on the record as to this matter?

7              MR. LEWIS:  No.

8              MR. MULHOLLAND:  Don't believe so.

9              COUNSEL APPEARING BY TELEPHONE:  No.

10             MR. ACKER:  Nick, do you want to continue on

11   or do you want to be dropped out of the conference at

12   this point?

13             COUNSEL APPEARING BY TELEPHONE:  You can

14   drop me.  That will be fine.

15             MR. ACKER:  Okay.  Thank you.

16             COUNSEL APPEARING BY TELEPHONE:  Thank you.

17                   EXAMINATION (resumed)

18   BY MR. ACKER:

19        Q    Mr. McAnaney, I think the question before

20   you was, on Exhibit 1, page 006-13 and 14, you had

21   testified that this is your engagement letter to -- on

22   this matter; is that correct?

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 24

1          A    Yes.

2          Q    And I ask you to describe in your own words

3    what's your understanding of what you were hired to

4    do.

5          A    My understanding was that the two parties

6    would submit -- submit material to me about a proposed

7    arrangement or proposed arrangements that they were

8    discussing between themselves and to -- for me to not

9    to opine on their legality but to basically give them

10   an assessment -- let me exactly say what it was

11   because it was -- basically to review it.  I don't see

12   it quite here, but to review it and give them an

13   assessment as to what I thought of the arrangement in

14   terms of how it related to the federal anti-kickback

15   and Stark statute and possible compliance --

16         Q    Okay.

17         A    -- issues.

18         Q    Now, when you said you didn't see it here,

19   just for clarification, you're looking at the exhibit

20   that I just mentioned, pages 6-13 and 6-14?

21         A    Yes.

22         Q    Okay.

Kevin G. McAnaney, Esq.                                   October 9, 2008
                        Washington, DC

                                                        Page 25

 1            MR. ACKER:  One housekeeping matter we

 2     probably need to take care of is to add Mr. Dimler

 3     back on, Special Agent Dimler.  So can we do that?

 4            (Telephone call placed by Mr. O'Donnell.)

 5            MR. O'DONNELL:  Brian, are you there?

 6            APPEARING BY TELEPHONE:  Yes, I'm here.

 7     BY MR. ACKER:

 8        Q    All right.  Mr. McAnaney, if you'll look at

 9     the last sentence of the first paragraph, could you

10     read that?

11        A    Yes.  I will report orally my conclusions

12     as well as an evaluation of any potential compliance

13     issues.

14        Q    Is that what you were recalling earlier --

15        A    Yes.

16        Q    -- that you were going to report to them

17     your assessment?

18        A    Yes, it is.

19        Q    Okay.  And was it your understanding --

20     what capacity were you acting as in this?

21            MR. MULHOLLAND:  Object to the form of the

22     question.

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                          Washington, DC

                                                              Page 26

1    BY MR. ACKER:

2           Q    You may answer.

3           A    I'd say -- I mean, loosely speaking, sort

4    of a -- I don't know if it's a tie-breaker, but an

5    independent judgment.  I think the two parties were

6    assessing it separately and they were having trouble

7    coming to a consensus view.

8           Q    Were you acting as an attorney?

9           A    Yes.  Well, I --

10           MR. MULHOLLAND:  Excuse me.  I thought he

11   had some more to say.

12   BY MR. ACKER:

13          Q    Did you?

14          A    Yes, I thought so.

15          Q    And you indicated on this letter that it

16   was protected by the attorney-client work product and

17   subject to attorney-client privilege.

18          A    Yes.

19          Q    And this letter says in the first sentence

20   that you've been jointly retained to review and advise

21   the parties with respect to the proposed business

22   relationships?

Page 27

 1          A    Yes.

 2          Q    Was there ever any time when you were asked

 3     by the parties to serve as a mediator?

 4               MR. MULHOLLAND:   I'll object to the form of

 5     the question.

 6     BY MR. ACKER:

 7          Q    You can answer.

 8          A    Not that I recall beyond what I sort of

 9     described as --

10          Q    Okay.  If you'll look two pages before

11     that, to page 6-11 and 6-12, what is this document?

12          A    This looks to be apparently a fax document

13     of the retainer letter that's been signed by Tuomey.

14          Q    Okay.  So Jay Cox signed the engagement

15     letter on behalf of Tuomey?

16          A    Yes.

17          Q    And, other than that, page 6-11 to 12

18     appears to be the same engagement letter as page 6-13

19     and 14?

20          A    Yes.

21          Q    Okay.  And if you will, can you tell at the

22     top, is there a date that this was faxed on page 6-11?

Kevin G. McAnaney, Esq.                                 October 9, 2008

Washington, DC

Page 28

```
 1         A    Well, I see it.  I actually don't know

 2    whether that's mine or theirs, but, I mean, there is a

 3    date of May 9th, 2005.

 4         Q    Okay.

 5         A    Yeah.  And I don't know whether that's

 6    coming or going.

 7         Q    Okay.  Now, turn next to page 6-2 through

 8    6-4.  What is this?

 9         A    It's my bill.

10         Q    And what's the date of the bill?

11         A    July 5th, 2005.

12         Q    And on page 6-2, it says, statement of

13    account for your legal services; is that right?

14         A    Yes.

15         Q    And it says, in connection with advice

16    relating to the federal anti-kickback statute and

17    certain proposed business arrangements.

18         A    Yes.

19         Q    So is it your understanding that you gave

20    legal advice to the parties?

21         A    Yes, I think I'd call it that, I guess.

22         Q    On page 6-4, is this a breakdown of the
```

Kevin G. McAnaney, Esq.                                              October 9, 2008
Washington, DC

                                                                  Page 29

1    details of the time that you spent?

2         A    Yes.

3         Q    Some of the questions I'm going to ask you

4    deal with time frame, so I want to show you this to

5    try to help clarify in your mind the dates of some of

6    these things.

7         And so, if you could, just go through each one

8    of these starting with April 27th, 2005, and tell us

9    what you recall or what this indicates you did on that

10   date.

11        A    Well, I think April 27th was the first date

12   I had this matter.  I think it was a -- I mean, it was

13   a telephone call from Greg Smith of the Womble Carlyle

14   firm.  And he was calling basically sort of to -- I

15   believe -- I can't recall -- I mean, to sort of begin

16   the engagement.  And I believe it was sort of general

17   background to tell me that they had discussed this

18   with Tuomey and they were going to be calling me.  So

19   I think -- I mean, that was basically --

20        Q    Okay.

21        A    -- it.  I'm not exactly sure what he told

22   me at the time about the arrangement, but --

Kevin G. McAnaney, Esq.                                                          October 9, 2008
                              Washington, DC

                                                                      Page 30

1          Q    Do you recall having the conversation,

2    phone call?

3          A    Not beyond a call.

4          Q    You don't recall the specifics of the call,

5    but you recall having the telephone conversation.

6          A    Yes.

7          Q    Okay.  What about May 3rd, 2005?

8          A    Yes, that was -- that was a telephone call

9    with Tim Hewson, which -- he was with the Nexsen Pruet

10   firm, I believe, who's counsel for Tuomey.  And I

11   think that call, again, was sort of background to sort

12   of -- the engagement and some of the basic facts, and

13   that they -- more, I think, logistics of how it was

14   going -- how it would work and what they were going to

15   send me and what they were looking for.

16         Q    Okay.  And did you say before who Greg

17   Smith represented?

18         A    Womble Carlyle -- I think he's with the

19   Womble Carlyle firm and I believe he represented

20   Palmetto Orthopaedic.

21         Q    Okay.  On May 27th what does that indicate

22   on your bill?

Kevin G. McAnaney, Esq.                                                October 9, 2008
                        Washington, DC

                                                              Page 31
     1          A    That -- it indicates that on that day I

     2    reviewed the materials that they had sent me, which

     3    were certain employment contracts and I believe some

     4    opinions.

     5          Q    How did you get the materials that you

     6    reviewed?

     7          A    I'm not sure.  I think there is some in

     8    here.  I believe they came from Tim Hewson.

     9          Q    Did the engagement letter indicate that

    10    both parties had the right to give you information?

    11          A    I have to --

    12          Q    Back on pages 13 and 14.

    13          A    Yes, I believe that -- I now recall that

    14    the way it worked was they could both send me things

    15    so long as I was free to share it with the other

    16    party.

    17          Q    And if the -- one of the parties

    18    specifically asked you to keep certain portions

    19    confidential, you could do that as well?

    20          A    Yes.

    21          Q    Did you get information from both sides?

    22          A    Well, I believe I got some -- well, I

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 32

1   believe most of the documents came from Nexsen Pruet

2   because they were the hospital's documents.  I had

3   some information orally from both sides as well, sort

4   of during the course of the telephone conferences.

5   And then -- and then there was information during the

6   telephone conferences between ourselves following up.

7        Q   Okay.  And according to the engagement

8   letter, was there anything wrong with you talking

9   independently with either side?

10       A   Not that I understood.

11       Q   Okay.  What about May 31st, 2005, what does

12   your bill show on page 006-4?

13       A   It, again, shows that I reviewed the

14   contracts and the opinions and I had a telephone call

15   with Greg Smith regarding some background information.

16       Q   And what is that .4 after that?

17       A   I was just breaking it out just myself.

18   That was the time.

19       Q   So .4 of the 2.4 hours was the telephone

20   call?

21       A   Yes.

22       Q   And on June 21st?

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 33

1          A    That was just additional time that I spent

2    reviewing material.

3          Q    Now, on June 22nd and 23rd, what happened

4    on June 22nd and June 23rd?

5          A    Well, at some point -- I mean, the first

6    thing was reviewing employment contracts.  I think

7    they may have sent additional material that was a

8    slightly different arrangement dealing with an

9    outpatient surgery center.  I can't recall.  There

10   were two different alternatives.  And then on the 22nd

11   and the 23rd, I think we basically -- on the 22nd

12   there was a long -- I had some preparation and then a

13   conference call extended with both Greg Smith and Tim

14   Hewson to go through those matters.  And, again, I'm

15   not exactly sure if it was one or both.

16         And then on the 23rd we had another long

17   conference call.  And this had Greg Smith, Tim Hewson,

18   and then I think two attorneys from the Hall Render

19   joint venture.  And now that I see, that says the

20   joint venture.  I think perhaps on the 22nd we talked

21   about the employment contracts.  And I think perhaps

22   on the 23rd we talked about the joint venture.

Kevin G. McAnaney, Esq.                                              October 9, 2008
                          Washington, DC

Page 34

```
 1          Q    Okay.  And do you recall if Steven Pratt

 2    was one of the people from Hall Render?

 3          A    Yes.

 4          Q    Do you know if there was anybody else from

 5    Hall Render on that?

 6          A    Maybe I'm wrong.  I thought there might

 7    have been two people with Hall Render.

 8          Q    Okay.  But Hall Render was not on the

 9    telephone call on June 22nd; is that correct?

10          A    That's correct, to the best of my

11    knowledge.

12          Q    Okay.  While we're talking about your

13    representation in general, did there come a time after

14    these telephone conversations on June 22nd and 23rd

15    when one of the parties asked you to put your opinion

16    in writing?

17          A    I believe so.

18          Q    Okay.  And did another party to your

19    engagement letter ask you not to put it in writing?

20          A    Yes.

21          Q    If you'll take a look at the first page of

22    this exhibit, 006-1, take your -- a chance to read
```

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 35

1      this letter to yourself.

2              Do you recall this letter?

3          A    Yes.

4          Q    What is this letter?

5          A    It is a letter from Tim Hewson at Nexsen

6      Pruet, and it basically instructed me that there had

7      been a difference of the parties and that I was not to

8      prepare anything in writing basically until I heard

9      further from them, I mean, that -- if there was a

10     change, the two of them would get back to me.

11             Q    Okay.  And what's the date of this letter?

12             A    September 2nd, 2005.

13             Q    Let's go through some of these exhibits in

14     No. 1.

15             Let me ask you, when do you want to take lunch?

16     It's twenty till 1:00.

17             A    I'm fine whenever anybody else wants to

18     take it.

19             Q    All right.  Let's go a little bit longer,

20     then.

21             If you'll look at page 8, 006-8, do you

22     recognize the handwriting on this page?

Kevin G. McAnaney, Esq.
Washington, DC
October 9, 2008

Page 36

1      A    Yes.

2      Q    Is it the same handwriting from page 8

3  through page 10?

4      A    Yes.

5      Q    Whose handwriting is it?

6      A    That's my handwriting.

7      Q    All right.  I'm going to ask you, because

8  it's difficult sometimes to read people's handwriting,

9  to read into the record as much as you can from this

10  page.

11      A    Okay.

12      Q    Or actually from all three pages.

13      A    Okay.  In the upper right-hand corner it

14  says, TC, Greg Smith, Womble, 4-27, which is a

15  notation, I mean, to myself just when this was made.

16      Q    What does TC mean?

17      A    Telephone call, telephone conference.

18      Q    Okay.

19      A    And it says, beginning at the top --

20      Q    Are these your notes from that telephone

21  call?

22      A    I believe --

Page 37

1          Q    If you look at the page before that, page

2     7 --

3          A    I believe the first page is, yes, April

4     27th.  The date seems to be the same, yes.

5          Q    So at least this first page are your notes

6     from the telephone call with Greg Smith.

7          A    Yes.

8          Q    All right.

9          A    And it basically says at the top,

10    orthopedic group in Sumter.  I think the next line is

11    invest in ASC Tuomey Hospital.  Then the next line,

12    doctors invested in ASC.  And then sort of a bracket

13    that says in hospital or urologists.  And then the

14    next line is, outpatient surgery center, with two

15    entries under that, couldn't buy something -- out -- I

16    think it might be out.  And then under it, other

17    alternatives.

18          Under that is, employ docs. with compensation

19    formula under it.  And then under that, base salary,

20    and productivity percent of doctors' collections.

21          And then on the side there is a notation,

22    always use doctors -- always lose doctors.  And then

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 38

1    underneath it always lose 20%.

2         Under that is built -- built out outpatient

3    surgery center.  Underneath that, I believe it's

4    economic credentialing.  And under that, it's not

5    quite -- invest in some respects, I think, provide

6    these services.  I'm not sure the next line.  And then

7    60/40.  And then under it, netting $75,000.

8    BY MR. ACKER:

9         Q    Let me go back up to the portion kind of in

10   the middle a little bit on the left that says, always

11   lose doctors, always lose 20%.  Do you know -- do you

12   recall what you meant by that?

13        A    Well, I believe this is my trying to take

14   notes on what Greg Smith was telling me.  And I

15   believe this was a concern with the employment

16   compensation formula that was being proposed.  And the

17   idea being that, under the arrangement that -- his

18   view was the compensation formula was such that the

19   hospital would always lose money.

20        Q    Okay.  Turn to the next page.

21        A    Yes.

22        Q    This is page 006-9.  Do you know if this is

Kevin G. McAnaney, Esq.                                      October 9, 2008
                          Washington, DC

Page 39

1    still from that same telephone conversation or from

2    something else?

3         A    I do not.  I can't tell if it's -- I don't

4    have a -- I can't say I have a firm practice of always

5    dating everything.

6         Q    Okay.  So if you could read this.

7         A    It says, Tim Hinson and his phone number,

8    803-253-8204.  And then the next line says, the

9    hospital through COM battle with competing application

10   to set up an ASC.  Under that, denied application

11   for -- for something.  I can't read the rest of it.

12   And then underneath that, urologists.

13        Underneath that, gave hospital approval for

14   four beds.  And underneath that, uro's appealed on

15   access.  Underneath that, single specialty ASC to

16   urology.  And underneath that, attract investors from

17   other multi-specialties.

18        Q    Let me ask you a question about the very

19   first line that you said.  You said Tim Hinson.  Is it

20   possible that that's Tim Hewson?

21        A    Yes.

22        Q    Okay.  Is he the attorney from Nexsen

Page 40

1    Pruet?

2         A    Yes.

3         Q    Okay.  All right.

4         A    Yes.

5         Q    Keep reading.

6         A    Then on the next line, it says, close

7    staff/noncompetes.  Under that, part-time employment.

8    Under that I can't quite -- client had lots of -- it's

9    sort of -- it looks like total direct investment in

10   ASC.

11           Underneath that, jeopardize managed care

12   reimbursement rates.  And under that, expenses loaded

13   into ASC.

14           The next line is, can't offer direct

15   investment.  Had to meet competitive threat.  Only

16   option, economic credentialing.  Explore part-time

17   employment/ -- I think it says compensation

18   reasonable.  Small -- I think it says small base with

19   something productivity.  I don't know if

20   it's client -- something has fair market value

21   opinions.  I think it might be client.  I mean, it

22   looks like the same word I have there.

Page 41

1        Q     The next page?

2        A     The next page, CS, whatever that means.

3   And then -- I can't quite read the next line, the

4   first words.  Something says SUP held equity.

5   Maybe -- I think the first word looks to be consultant

6   says something equity.  I think it's held equity or

7   something.

8        The next line, went back to Outpatient Surgery

9   Center.  I'm not sure what the first -- it's something

10  like McClutcheon/Hall Render under arrangements.

11  Under that, Newco -- and I can't quite read what's

12  next to it.  And then under that, management turnkey

13  OPSC, Outpatient Surgery Center.

14       Under that, provider based/under arrangements.

15       Q     Let me stop you there for just a minute.

16  This "under arrangements," is that the same thing as

17  the joint venture that you discussed earlier?

18       A     Yes, I think it is.

19       Q     And the Newco is part of that joint venture

20  under arrangements deal?

21       A     Yeah.  I think this is sort of describing

22  that.  That would be it.  Newco would be the entity.

Page 42

1    And it would provide services under -- it would be

2    provider-based and it would provide services under

3    arrangements, which are Medicare terms.

4        Q    Okay.  What is your understanding of what

5    "under arrangements" mean, an "under arrangements"

6    agreement?

7        A    Well, an under arrangements agreement is

8    when -- well, classically, it was when another entity,

9    frequently a physicians' group, had a particular piece

10   of equipment that -- and they used it in their own

11   private practice frequently and then had -- at least

12   historically this was it -- and it was a piece of

13   equipment that, if it was already there in the

14   community, rather than have a hospital invest in their

15   own, they would basically enter into an agreement

16   under Medicare law for that entity to provide those

17   services to hospital inpatients and outpatients under

18   an arrangement with the hospital that allowed the

19   hospital to bill for that as an inpatient hospital or

20   outpatient -- typically inpatient before, but, I mean,

21   that's -- that was sort of the idea.  The classic was

22   when a lot of expensive imaging equipment first came

Page 43

1    up, you frequently would have a group of radiologists

2    across the street who bought it and they would just

3    provide it for both sides.

4         Q    Okay.  What's the next line here?

5         A    Is it fair market value.  And then under

6    that, KB issues, meaning kickback issues.  Underneath

7    that, Dick Kusserow's firm.  And then under that there

8    are other employment contracts with the same or

9    similar methodology.

10        Q    Okay.  Tell me what you recall about why

11   you wrote Dick Kusserow's firm.

12        A    Well, I believe that whoever I was having

13   this conversation with -- and I don't -- mention as

14   part of the -- has as part of the development of this

15   proposal, they had had Dick Kusserow who has a firm --

16   he's a former Inspector General -- and he has a firm

17   that does a lot of consulting work in the healthcare

18   area -- look at the arrangement and do an assessment

19   of it, I guess.

20        Q    Why did you write down, is it fair market

21   value -- or you wrote, is it FMV, which I think you

22   said is fair market -- why did you write that?

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 44

1          A    Yeah.  Well, that's, I mean, in looking at

2     fraud and abuse issues, it's frequently the starting

3     point.  I mean, if something is not fair market value,

4     you're in trouble.  It doesn't necessarily insulate

5     it, but it certainly is the first inquiry.  If you

6     think about it as a -- in the terms of the kickback

7     world, if there is a transaction between two people

8     and it's fair market value, then one way to look at it

9     is there is no other excess value that could be the

10    kickback, that the exchange is the same.  There is not

11    extra money that would be classified as a kickback.

12         Q    And is fair market value also relevant to a

13    Stark Act inquiry?

14         A    Yes.  It's sort of -- it tends to be, when

15    you're looking at any kind of a compensation

16    relationship, it's the -- it's sort of the touchstone.

17    There are other requirements, but you sort of -- if

18    you don't have fair market value, you don't have to go

19    much -- I mean, that sort of knocks you out of the box

20    right away.

21              MR. MULHOLLAND:  Just to remind you,

22    continuing objection to you asking Mr. McAnaney for

Page 45

1  his opinions as an expert or otherwise still stands.

2          MR. ACKER:  And let me give you an

3  instruction, Mr. McAnaney, that I only want to ask any

4  information that you had as of the time of your

5  representation, which was the summer of -- late spring

6  and summer of 2005.  I'm not asking you to testify --

7  I would specifically ask you not to testify about any

8  information that you had after -- or any opinions that

9  you had after September 2nd, 2005, the date in which

10  you received -- or this letter was sent.

11          THE WITNESS:  Okay.

12          MR. MULHOLLAND:  And our objections are

13  still his opinions at that time as well.

14          MR. ACKER:  We understand your continuing

15  objections.

16          MR. MULHOLLAND:  Those are continuing.

17  Reiterate them again.  I just wanted to make sure the

18  witness understood the nature of our objection.

19          MR. ACKER:  Very good.

20  BY MR. ACKER:

21      Q   Your question that you answered just a

22  moment ago about fair market value, did you have that

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 46

1    information at the time of your engagement in the

2    summer of 2005 about the importance of fair market

3    value?

4           A    Well, yes.

5           Q    Okay.  I don't want to spend a lot of time

6    talking about the joint venture, but I will just draw

7    your attention so we can identify these documents.  If

8    you look at page 006-19 through 006-42, and could you

9    tell me if this information all relates to the joint

10   venture or under arrangements deal that was discussed?

11          A    Yes.

12          Q    Let's get back to, then, page 43, another

13   handwritten document that's from page 006-43 to

14   006-44, two pages.  Is this your handwriting again?

15          A    Yes, it is.

16          Q    And do you know when you wrote this?

17          A    No.  There is no date on it.

18          Q    Okay.  At the very top of page 43, what

19   does it say?

20          A    It says, Tuomey notes TC, telephone

21   conference, Greg Smith -- G. Smith.

22          Q    Okay.  So does that help you with

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 47

1    understanding when this page at least was taken, when

2    these notes were taken?

3         A    I mean, not -- not really.

4         Q    So you don't know whether this was the

5    notes you took during that telephone conversation with

6    Greg Smith or not?

7         A    I suspect it's -- I don't think it's the

8    first one.  I mean, the only -- having those notes, it

9    might have been the second one, but it's -- I don't

10   think it is the first.

11        Q    Okay.  If you would, again, just read this

12   into the record so that we can make sure we understand

13   your handwriting.

14        A    It says, Tuomey was going to do

15   ASC/urology.  Tuomey converted to outpatient hospital

16   reimbursement rate.  Urologists is the next line.

17        The next thing, first approach was compensation

18   contract.  Under that, pay amount in excess of

19   collections.

20        Q    Let me stop you there.  What was your

21   understanding of the proposed part-time employment

22   agreement in relation to the relationship between the

Kevin G. McAnaney, Esq.                                October 9, 2008
                          Washington, DC

Page 48

 1    payment to the doctor and collections?

 2         A    Well, I mean, I had what he said, but

 3    further on in the documents there is more methodology.

 4    I mean, when you look at it, it appeared to be that.

 5         Q    Appeared to be what?

 6         A    Well, it -- well, the compensation seemed

 7    to be -- well, I need to go back and look at the

 8    documents.

 9         Q    Okay.  We'll look at that later.  What does

10    the rest of this say?    .

11         A    Let's see.  The next line is West Mart.

12    And then underneath that, lots of GPs.  I think that's

13    probably general practitioners complaining of costs

14    and scheduling.  And then under that, no commitment to

15    ASC.

16         Under that I think it says -- I actually can't

17    tell.  I think the second word on that one might be

18    contemplating.

19         Q    Is it possible the first word is while?

20         A    Well, that's what I thought it was, while

21    contemplating.

22         Q    Okay.

Kevin G. McAnaney, Esq.                                              October 9, 2008
                              Washington, DC

                                                                      Page 49

 1          A    Yes.   I think that's what it is.   Under

 2     that, evaluation of one group.   I think under that,

 3     GI.

 4          Q    What does GI stand for?

 5          A    Well, gastrointestinal.

 6          Q    Okay.

 7          A    A specialty, I believe.   Under that,

 8     confident of -- I think it's confident/of fair market

 9     value or confident of market value.   Under that, if

10     methodology is supportable.

11          Then under that is terms, ten years plus

12     three-year noncompete.   Under that, competitive

13     service with hospital.

14          Q    Okay.   Next page?

15          A    The next page, hesitated, Tuomey came back

16     with outpatient management contract to -- and that's

17     it.   And then under that, will make to all staff.   To

18     the side it says either/or.   If invest in one.   And

19     under that, employment -- I think that might be PT,

20     but I can't quite tell.   And then --

21          Q    Could it be AGT, agreement maybe?

22          A    It could be.

                         Alderson Reporting
                         1-800-FOR-DEPO

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 50

1          Q    What was your understanding of that

2     either/or on the side?

3          A    Well, as I -- my understanding was at least

4     at some point there was on the table this under

5     arrangements Outpatient Surgery Center investment and

6     also potentially an option for part-time employment,

7     but that physicians could only -- those physicians who

8     would be eligible for it could only do one or the

9     other.

10         Q    Okay.  What's it say next?

11         A    Next line says, can't pay both.

12         Q    Does that refer to what you were just

13    testifying, that they could choose one or the other

14    but they couldn't do both?

15         A    Actually I seem -- I believe I recall that

16    this referred to -- I was told that Tuomey couldn't

17    pay both.

18         Q    Tuomey couldn't pay what?

19         A    Well, they had to choose because they only

20    had -- I mean, they couldn't afford to have everybody

21    do both.  They couldn't --

22         Q    Okay.

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 51

1        A   The next line is doctor -- I can't recall.

2  I can't read that.

3        Q   Is it a name that starts with R?

4        A   Yes, it is a name that starts with R.

5        Q   Okay.  Continue.

6        A   If -- if -- it looks like if ED services

7  call pay medical office park.  The next line seems to

8  be, if doesn't -- I can't read the next word.  And

9  then, again, I think it seems to say medical park.

10       Under that, developer has approached entering

11  into buy office building at, and then it's attractive

12  project.

13       Q   Project?

14       A   Oh, attractive profit.  I'm sorry.

15  Attractive profit/and hire doctor's brother.

16       Q   Why do you laugh when you read that?

17       A   Well, it's just -- I thought it was

18  amusing.

19       Q   Why?

20       A   Well, just because, I mean, it's -- it gets

21  done in business.  I mean, you know, it gets done in

22  business sometimes.

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                              Washington, DC

                                                                    Page 52

1            Q    Okay.  What does it say next?

2            A    I don't see the line all the way over.

3    Seems to be adopted or something.  I mean, something

4    like adopted -- or adapted.  And then under it, I

5    think is -- I think it says conflicts credentialing.

6    Dr. -- and I can't read the name -- it looks like it

7    begins with an M -- and then under it there is another

8    word I can't read.  And it says, plus ASC/MRI.

9            Under that, all this pattern practice to -- I

10   think it might be to attend physician, but I can't --

11   I can't quite tell.

12            MR. ACKER:  Okay.  Maybe this would be a

13   good time to take a break for lunch.

14            (Proceedings recessed at 1:09 p.m.)

15            (Exhibit No. 3 marked for identification and

16   attached hereto.)

17            (Counsel agree to providing Bates-stamped

18   exhibits prior to scanning and attaching to

19   transcript.)

20            (In session at 2:07 p.m.)

21   BY MR. ACKER:

22            Q    Mr. McAnaney, the next document in the

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                              Washington, DC

Page 53

1    stack of documents we're looking at, which is part of

2    Exhibit 1, is page number 006-45.  Do you see that?

3          A    Yes.

4          Q    What is this document?

5          A    It's a printout of an e-mail.

6          Q    And from whom and to whom is it?

7          A    It is from Greg Smith to me and it's dated

8    June 19th, 2005.

9          Q    So this would have been shortly before your

10   conference call to discuss the part-time employment

11   agreements?

12         A    Yes, I think that was the 22nd and the

13   23rd.  Yes.

14         Q    Okay.  And part of this on this particular

15   exhibit is hard to read.  Do you know what might have

16   caused that?

17         A    Well, yeah.  I use a highlighter.  And so

18   it doesn't -- I tried to use one that's light enough,

19   but I guess I didn't.

20         Q    Okay.  So you think that was something you

21   highlighted.  Why would you have highlighted it?

22         A    I highlight a lot.  Sometimes it's

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                              Washington, DC

Page 54

1    important; sometimes it's not.  I mean, I don't

2    really -- I can't read it.

3         Q    All right.  Let me have you take a look at

4    what's been marked as Deposition Exhibit 3.  It is a

5    multi-page document.  Can you identify what this stack

6    of documents is?

7         A    Yes.  These are documents when I -- in

8    preparation for this deposition, I went through my

9    file to compare it to what had been produced before,

10   and then I looked for additional documents.  Most of

11   these were just e-mails that were stored on my

12   computer.  And I particularly did this one, printed

13   out the original message of this, because I noticed I

14   couldn't read it when I was reviewing the document.

15        Q    Okay.  So --

16        A    So it's in here somewhere.

17        Q    Just to clarify, Deposition Exhibit 1 is a

18   stack of documents that you delivered to me and to

19   Special Agent Sue Kim and Mr. Mulholland and Kelly

20   Bagby when we met in your office on November 1st of

21   2006?

22        A    Yes, that's correct.

Page 55

1        Q    And Exhibit 3 are additional documents that

2    you produced in response to the subpoena that we

3    issued to you for this deposition?

4        A    That is correct.

5        Q    And it consists mainly of e-mails?

6        A    Yes.

7        Q    All right.  Let me have you turn to what I

8    believe -- the pages aren't numbered, but if you'll

9    count the pages, I believe it's the eighth page of

10   Exhibit 3, and compare that, if you will, with page

11   number 006-45 of Exhibit 1.  Can you tell me if that

12   is the same e-mail?

13       A    Yes, it is.

14       Q    If you would read this first paragraph out

15   loud.  And, again, this is from Greg Smith, who

16   is Tuomey's attorney, to you in June --

17       A    No, he's Palmetto's.

18       Q    Excuse me.  Right, I'm sorry, Palmetto's

19   attorney, to you dated June 19th.

20       A    Yes.

21       Q    Read the first paragraph.

22       A    Okay.  Hey, Kevin.  I think I am one of the

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 56

1    few attorneys in our firm NC offices that came to work

2    over the last few days.  Most are at Pinehurst for the

3    U.S. Open.  Did you ever hear from Tim regarding times

4    to discuss the Tuomey employment arrangement and JV

5    arrangement?  As we have discussed, my primary concern

6    with the employment arrangement is that the

7    compensation methodology makes it a mathematically

8    certainty that the professional fees collected by the

9    hospital will be less than the salary and benefits

10   paid to the doctors.  The hospital must lose money.  I

11   spoke with Tim Cejka -- C-E-J-K-A, is the name --

12   appraisers last week and did not receive any comfort

13   to lessen my concerns.  Tim justified the arrangement

14   as being commercially reasonable by arguing the

15   hospital does not lose money because it makes money on

16   the facility fees and ancillary revenues (CTs, MRIs,

17   PT, and lab work) related to the physicians referrals.

18   Tim asked me to summarize in writing my compensation

19   methodology and appraisal concerns and attached is the

20   resulting memorandum I sent Tim.  (It was dictated

21   quickly, so excuse the roughness.)

22        Q    Okay.  Now, is the portion that is

Kevin G. McAnaney, Esq.
Washington, DC

October 9, 2008

Page 57

1    highlighted on page 006-45 of Exhibit 1 the portion

2    that says, my -- on the fourth line down of the eighth

3    page of Exhibit 3, my primary concern with the

4    employment arrangement is that the compensation

5    methodology makes it a mathematically certainty that

6    the professional fees collected by the hospital will

7    be less than the salary and benefits paid to the

8    doctors --

9         A    Yes.

10        Q    -- why did you highlight that?

11        A    Well, I think it's -- it was clearly one of

12   the -- I mean, a concern, so I just -- that was his

13   concern.  I highlighted it.  So just --

14        Q    So you would make sure you looked at that

15   issue?

16        A    Yeah.

17        Q    Okay.  Now, back to -- well, right after

18   that it says, the hospital must lose money.  Did you

19   take a look at the documents to determine whether or

20   not that statement was true?

21        A    Well, I'm not sure I took -- I mean, I

22   certainly have taken a look at the documents.  I don't

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 58

1    think I trusted my math enough to say that it was a

2    mathematical certainty.  I certainly review in here, I

3    think there is a report from the appraisal fair market

4    value company.

5         Q    I believe they pronounce it Cejka.

6         A    Okay.

7         Q    It's a very unusual name.

8         A    So I looked at that.  I did not

9    necessarily -- I did not do computations to find out

10   if it was -- I mean, I just don't trust my math that

11   well.  That's what evaluators are for.

12        Q    Back to page 006-45, you also -- is that

13   your handwriting at the top?

14        A    Yes.

15        Q    What does that say?

16        A    Well, I was trying to -- I think it says,

17   this is the lab.  I can't quite -- I was trying to

18   figure out.  It sort of looks like lab, but I'm not

19   sure that's what it is.

20        Q    Okay.  Do you know why you wrote that?

21        A    Well, it comes off a portion of this that I

22   underlined that says, arguing the hospital does not

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                              Washington, DC

Page 59

1    lose money because it makes money on the facility fees

2    and ancillary revenues (CTs, MRIs, PT and lab work)

3    related to the physicians referrals.

4         Q    Do you know if, during the conversation

5    that you had with Tim Hewson and Greg Smith on June

6    22nd, did Greg Smith make this argument, that the

7    hospital does not lose money because it makes money on

8    the facility fees and ancillary revenues?

9         A    I don't recall.

10        Q    Okay.  At the top when you said the

11   handwriting said, this is the lab, could that be KB

12   instead of lab?

13        A    I mean, it could be, but I don't -- I don't

14   think so.

15        Q    Okay.

16        A    Because I --

17        Q    Was there a KB earlier in something we

18   looked at?

19        A    Yes.  No, I use KB normally for kickback.

20        Q    Okay.

21        A    And, I mean, this could be, but when I look

22   at this, this doesn't seem to me anything I would have

Kevin G. McAnaney, Esq.    Washington, DC    October 9, 2008

Page 60

```
 1    said this is the kickback --

 2         Q    So --

 3         A    -- for.

 4         Q    Okay.  So is this relating -- "this"

 5    relating to the underlined portion --

 6         A    I believe so.

 7         Q    Okay.  And Greg Smith was saying that Tim

 8    Smith (sic) was arguing that the hospital makes money

 9    in facility fees and, therefore --

10         A    Right.

11         Q    -- is reasonable to pay this compensation

12    to the doctors?

13              MR. MULHOLLAND:  Objection.  The document

14    speaks for itself and asking him what Greg Smith was

15    saying or intending to say would call for speculation.

16              MR. ACKER:  Okay.

17    BY MR. ACKER:

18         Q    What is this?  What was your understanding

19    of what was being argued -- what Greg Smith said Tim

20    Hewson was arguing?

21         A    Well, it's a fairly common --

22              MR. MULHOLLAND:  Same objection.
```

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 61

```
 1              THE WITNESS:  I mean, the argument is one

 2     that recurs in hospital and physician employment, that

 3     they can afford to overpay them or pay them more than

 4     they would make in private practice because they will

 5     make up for it with, whether it's labs or ancillary

 6     revenues, or just from inpatient admissions.  And

 7     that's sort of a -- I mean, that's -- it's a standard

 8     allegation in a lot of these suits where it's alleged

 9     that a hospital pays physicians -- over compensates

10     physicians.

11     BY MR. ACKER:

12         Q   And at the time, in June of 2005, what was

13     your understanding of the validity of that argument?

14         A   Well, I know the Justice Department bought

15     into it.  I mean, I know that they -- they liked that

16     argument.  There have been a number of cases that had

17     been brought and settled, so --

18         Q   Brought and settled.

19         A   I mean, False Claims Act cases on those

20     kinds of hospital-physician relationships.

21         Q   Okay.  Where the hospitals had paid to

22     settle the case?
```

Kevin G. McAnaney, Esq.                                                   October 9, 2008
                        Washington, DC

                                                                    Page 62

    1          A    Yes.

    2          Q    Okay.  If you would turn over to -- we're

    3    going to continue looking at Exhibit 1 and we'll put

    4    Exhibit 3 to the side for now.  Page 006-47.  Actually

    5    let me refer you back to -- the last sentence that you

    6    read in the first paragraph on page 006-45 says,

    7    attached is the resulting memorandum I sent Tim.  Do

    8    you see that?

    9          A    Yes.

   10          Q    Is this document starting on page 47 that

   11    memorandum?

   12          A    Yes.

   13          Q    Okay.  Let me direct your attention to the

   14    second paragraph of this memorandum that starts under

   15    the heading, material compliance standard.

   16          A    Yes.

   17          Q    Could you just read that paragraph aloud?

   18          A    The employment agreement compensation

   19    arrangement must provide for payments at fair market

   20    value which cannot be determined in a manner that

   21    takes into account (directly or indirectly) the value

   22    or volume of referrals by the referring physician or

Page 63

1    other business generated between the parties.  The

2    employment agreement must also be commercially

3    reasonable if no referrals were made by the employee.

4         Q    In June of 2005 was that an accurate

5    statement of your understanding of the law at the

6    time?

7         A    Well, I don't have it in front of me, but

8    it seems to be a fairly accurate summary of the

9    employment exception under the physician's

10   self-referral law.

11        Q    Okay.  And in the next section, issues

12   raised by compensation methodology, there is a quote

13   in the fourth line that says, while good-faith

14   reliance on a proper valuation may be relevant to a

15   party's intent, it does not establish the ultimate

16   issue of the accuracy of the valuation figure itself,

17   end quote.  There are numerous examples of the OIG and

18   judge's finding that financial arrangements supported

19   by an appraisal was not in fact commercially

20   reasonable or fair value.

21        Did I read that correctly?

22        A    Yes.

Kevin G. McAnaney, Esq.                                                October 9, 2008
                          Washington, DC

Page 64

1          Q    Now, over to the side, is that your

2     handwriting?

3          A    Yes, it is.

4          Q    What does it say?

5          A    HCA and Tenant.

6          Q    And then there is a solid line next to the

7     last couple of lines of that paragraph?

8          A    Yes.

9          Q    Did you write that, too?

10         A    Yes.

11         Q    Why did you write those?

12         A    Well, I believe this is just sort of as I

13    was going through -- when they say numerous examples

14    of the OIG and judge's finding, I think those are

15    references to two cases, two settlements, I think,

16    that involved that kind of an allegation.

17         Q    Okay.  And --

18         A    Basically that Justice had brought a case

19    that had been settled notwithstanding valuations or --

20         Q    By you making that notation, what, if any,

21    significance were you drawing to that sentence?

22         A    Well, just that I think it's -- I think

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 65

1    it's correct that a valuation is -- is definitive.

2          Q    That is, a valuation letter from an

3    appraiser isn't definitive on the question of whether

4    or not the compensation is fair market value.

5          A    That's correct.  At least from the -- from

6    the position of insulating you from a False Claims Act

7    suit or allegation.  I mean, that's --

8          Q    Okay.  And then the next sentence, at the

9    bottom of that page, 006-47, says, based on the Cejka

10   computations for Dr. Drakeford, $287,829 cash

11   compensation would be paid on $295,361 collections.

12   The hospital would also pay additional -- continuing

13   on to the next page -- additional benefits of medical

14   malpractice insurance, FICA, and billing and

15   collections services totaling $72,469.  The Cejka

16   PowerPoint presentation illustrates that $360,298 in

17   total cash compensation and benefits compared to

18   $295,361 in collections results in $64,937 net gain to

19   physician and loss to hospital.

20         Did I read that correctly?

21         A    Yes.

22         Q    On page 006-47 at the very bottom there is

Page 66

1    another solid line on the left and what appears to be

2    a star.

3         A    Yes.

4         Q    Is that your handwriting?

5         A    Yes, it is.

6         Q    Why did you put that notation?

7         A    Well, again, I mean, these are the issues

8    that were being raised by Greg Smith.  So I was just

9    sort of noting that that's one to be paid attention

10   to, I think, I mean --

11        Q    Okay.  On page 006-48 at the bottom there

12   is a paragraph (D) that has two solid lines beside it.

13   Why did -- is that your handwriting?

14        A    Yes.

15        Q    And why did you note that?

16        A    Well, again, it seemed -- I mean --

17        Q    What does that paragraph deal with?  Start

18   off with that.

19        A    The paragraph deals with -- apparently what

20   it recounts is that Cejka in a conversation between --

21   between -- with Tim, Greg and Cejka -- that one of

22   the -- that one of the explanations for the

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 67

1    compensation was that hospitals often lose money on

2    physician compensation and they gave as an example the

3    recruitment of physicians.  And then it goes on and

4    says the kickback -- Stark and kickback recognize that

5    they may pay physician expenses and pay above-market

6    compensation to ensure they have specialized

7    professionals necessary to provide services in the

8    community.

9         Q    And so why did you make a notation of that?

10        A    Well, just because that's -- this is one of

11   the counter-arguments to Greg's concern, just sort of

12   to note it.

13        Q    Okay.  And this document that we're looking

14   at is a memo from Greg Smith to Tim Hewson?

15        A    Yes.

16        Q    On the next page, 006-49, at the bottom of

17   the long paragraph (E), seven lines up from the

18   bottom, the sentence starting with "you indicated."

19        A    Yes.

20        Q    Let me read that.  You indicated that

21   Tuomey actually doesn't lose -- and this is, again --

22   I'm sorry.  I'm going to start that sentence over.

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 68

```
 1    But this is from Greg Smith to Tim Hewson --

 2         A    Yes.

 3         Q    -- saying you indicated that Tuomey

 4    actually doesn't lose money on its physician part-time

 5    employment arrangements and that the arrangements are

 6    commercially reasonable because Tuomey makes its money

 7    on its facility charges and ancillary services, e.g.,

 8    lab work, CTs, MRIs, etcetera, related to the

 9    physicians referrals.  The compensation to the

10    physicians must be commercially reasonable without

11    taking into account the value of the physician

12    referrals or other business generated between the

13    parties.

14         Now, that first sentence that I read where Greg

15    Smith is saying to Tim Hewson, you indicated that

16    Tuomey doesn't actually lose money because of the

17    reasons given, in any of your conversations with Tim

18    Hewson, did he deny that he had said that to Greg

19    Smith?

20              MR. MULHOLLAND:  Objection to the form of

21    the question.

22              THE WITNESS:  I don't recall, but I also
```

Page 69

1    don't -- I mean, I don't recall one way or another.  I

2    don't recall him actually saying that in any

3    conversation.

4    BY MR. ACKER:

5         Q    Nor do you recall Tim Hewson denying that.

6         A    Right.

7              MR. MULHOLLAND:  Objection to form.

8    BY MR. ACKER:

9         Q    Let's move on to page 006-52.  And there

10   are pages from page 52 to page 56 that are handwritten

11   notes.  Is all that on all those pages your

12   handwriting?

13        A    Yes.

14        Q    And if you'll look at the bottom of page

15   55, there is something that appears to be maybe in a

16   different pen.  Is that still your handwriting?

17        A    Yes.

18        Q    Okay.  Well, if I could, again, just ask

19   you to read, to the extent that you can, read this

20   into the record.

21        A    Okay.

22        Q    Starting with page 52.

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 70

1          A    Okay.  Page 52 says at the top, it's got

2     Palmetto underscored, and then it has the number 1

3     next to compensation, number 2 next, and then

4     investments.

5          Q    Now, let me just ask you the significance

6     of that number 1 and number 2.

7          A    Well, I -- I assume it's referring to there

8     were two possible arrangements that were being

9     discussed.  One was compensation and employment

10    contract and one was the investment in the under

11    arrangements, Newco.

12         Q    So this would be the same, the compensation

13    would be the part-time employment?

14         A    Yes.

15         Q    And the investments would be the under

16    arrangements or joint venture Newco deal?

17         A    Yes.

18         Q    All right.  Continue reading.

19         A    Okay.  The first note is, some other

20    employment agreements to part-time.  Draft opinion.

21    Hospital due diligence.  And then underneath that,

22    Kusserow, other materials.  Then under that, initially

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 71

1    to assess two proposals, talk through issues and what

2    gives comfort.  And am I -- I think comfortable, but

3    it's -- that's -- that's what I think it meant.

4          Q    Okay.

5          A    Under that, ultimately my evaluation as to

6    the level of compliance risk with the arrangements,

7    especially the anti-kickback statute issue.  And then,

8    if we can fix.  I think that's a reference to possible

9    fixes if there were problems.  And then give -- given

10   structure of deal, business considerations, valuation,

11   next to it, 100% something.  And then what done and

12   could do to manage risk.

13         Q    The next page?

14         A    At the top it says, is it defensible.  And

15   then over on the side it says, 30 minutes, which makes

16   me think this is a -- makes me think these are notes

17   of a call and that was actually writing my time.

18         In terms of, quote, under arrangement, term

19   sheet and pro formas, underneath that, management

20   contract.  Underneath that, understanding scope of --

21   I'm not sure what the last word is there.

22         Q    Okay.

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 72

1          A    Underneath that, client -- joint

2    representation Tuomey, Palmetto Orthopaedic, both.

3    Fees split.  Attorney-client privilege.  No waiver

4    unless all consent.  Disclaimer -- no -- disclosure

5    can share unless says no sharing.  And then underneath

6    that, compliance issues, hospital, fees, letter of

7    representation oral.  And then I'm not quite sure what

8    it was.  And then 20/40 hours.

9          Q    Okay.  Next page.

10         A    Begins at the top, says, government does

11   not like these.  Not what -- I'm not quite sure what

12   it says there.  Not what -- I think it's probably

13   Stark.  I can't see what -- oh, Stark -- not what

14   Stark intended.  But then it says, arrangement is very

15   aggressive especially given the factual background.

16   Can't be ignored because it would -- will be the

17   background to anything.  Obvious issues under AKS.  No

18   safe harbor, no ASC.  Even Stark, and then in

19   parentheses, something seen as an end run, parens.

20   And then under it, one selectively offered so it takes

21   into account referrals.  Other switch in regs. to

22   eliminate -- it looks like this type of something.

Kevin G. McAnaney, Esq.                                          October 9, 2008
                          Washington, DC

                                                              Page 73

1          Q    And then there is one note that's circled

2     on the left-hand side about halfway up?

3          A    Oh.  Yeah, I'm sorry.  It's circled and

4     says, low risk/high reward.

5          Q    Do you know what you meant by that?

6          A    No, actually -- I mean, I -- no.

7          Q    What did you mean by the first sentence

8     there, government does not like these, not what Stark

9     intended?  And is that an exclamation point after

10    that?

11         A    Yes.  Well, I think -- I mean, this -- I

12    believe this seems to me to be referring to the under

13    arrangements proposal.  So I think what it says is,

14    not what Stark intended is, in fact, I think these

15    things can be structured to fit in the Stark, I mean

16    to comply with Stark, but so they don't -- I mean, the

17    fact is, even though they can't get it under that, I

18    think that they don't like them is sort of the point

19    and it's not really the intent.

20         Q    Now, you say here, especially given the

21    factual background.  What was the factual background

22    that you were referring to?

Page 74

1           A    I think the factual background here was the

2    background, as I understood it, as to there had been

3    some kind of a -- an ASC proposal and a competing ASC,

4    and -- I can't quite recall now, but it seemed to be

5    that a lot of this was in response to a free-standing

6    ASC that had been built in the area and that was now

7    expanding to include other specialties.  I believe it

8    had been a urology owned, if I recall, and that that

9    was now expanding and that this was basically -- so it

10   would be seen in that background, that that was

11   what -- it gave context to sort of what -- why the

12   offers were being made, etcetera.

13           Q    Explain the significance of that.  When you

14   say it would be seen in that context, who would see it

15   in that context?

16               MR. MULHOLLAND:  Objection to the form.

17               THE WITNESS:  The government, if it came up.

18   I mean, it would be again the context of the response

19   to sort of a competitive threat that referrals might

20   go there that they could purchase over there and that

21   this was a way to offer them something.

22   BY MR. ACKER:

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 75

1          Q    Offer them something --

2          A    Instead of going to the ASC.

3          Q    And what, if anything, would the hospital

4    get in exchange for offering them this?

5               MR. MULHOLLAND:  Objection to the form.

6               THE WITNESS:  Admissions.

7    BY MR. ACKER:

8          Q    Admissions -- business referrals?

9          A    Yeah.  Yeah.

10              MR. MULHOLLAND:  Objection to form.

11   BY MR. ACKER:

12         Q    Okay.  If you go to the next page, 006-55.

13         A    Yes.

14         Q    Can you read the top?

15         A    Yeah.  It's number 2 in a circle.

16   Obviously I can't -- well, it says, I can -- I think

17   it meant I can't opine on fair market value of

18   service.  I put in -- and then it says below that, I

19   note that the pro forma is a, quote, compilation,

20   which means nothing but management views.

21              Over to the left of that I've circled FMV

22   inside with -- underscored.

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 76

1       Q    Which means?

2       A    Fair market value.  And then underneath the

3    compilation, I say, but it's something ironclad,

4    underscored.  And I can't -- right now I'm having

5    difficulty reading what it is.  Okay.

6            And then there is the number 3.  And it says,

7    several -- several -- it looks like several groups --

8    group out.  Underneath that, buyouts without goodwill.

9    Under that, participation requirements -- oh, it says

10   several jump out.  Is that --

11      Q    Instead of "several group out," it says

12   "several jump out"?

13      A    Yeah.  Buyouts without goodwill.

14   Participation requirements.  Not in my terms sheet but

15   in -- and I don't know what -- but it was in

16   something.  And then 4, ongoing risk if docs. don't

17   actively participate.

18      Q    And then at the bottom are some telephone

19   numbers.

20      A    Yes.  Those are --

21      Q    Can you say the names of the people -- I'm

22   not interested in the numbers, but --

Kevin G. McAnaney, Esq.                    October 9, 2008
                        Washington, DC

```
                                                      Page 77
 1          A    Tellis, Tom Bullet, and Lisa Ohren.

 2          Q    And who are they?

 3          A    Well, Tellis is my dentist; Tom Bullet is a

 4     lawyer; and Lisa Ohren is a -- actually I'm not sure

 5     that's --

 6          Q    Let me just ask --

 7          A    -- Lisa Ohren because the phone number

 8     doesn't seem right.

 9          Q    Do these notes have anything to do with

10     this case?

11          A    No.

12          Q    And the next page?

13          A    I checked my voicemail.

14          Q    The next page 006-56.

15          A    Yes.  It says, Greg Smith/Tim Hewson, Steve

16     Pratt.

17          Q    Okay.  Now, if you look at page 006-57, and

18     simultaneously look at 006-58, are these both letters

19     dated May 25th, 2005 via overnight delivery both from

20     Tim Hewson to you?

21          A    May 12th.

22          Q    I'm sorry.  May 12th, 2005.
```

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 78

1        A    Yes.

2        Q    And page 006-57 does not have an indication

3    that it was copied to anyone --

4        A    That's correct.

5        Q    -- other than you.  And on the 006-58, it

6    shows that it was copied to Greg Smith with

7    enclosures.

8        A    That's correct.

9        Q    Look at page 57 and just read that.  It's a

10    short letter.

11        A    Dear Kevin.  In connection with the

12    referenced review, I am enclosing two documents which

13    Tuomey Administration gave the board of trustees at

14    Tuomey Health System regarding part-time employment

15    agreements with the gastroenterologists.  Please keep

16    this information confidential.

17        Q    All right.  That's all I need you to read.

18    Does that -- "please keep this information

19    confidential," what significance does that have to

20    you?

21        A    Well, under the retainer, the agreement was

22    I could share any information provided me by one party

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 79

1    with the other party unless the party providing it

2    expressly said not to share.

3        Q    Okay.  And so in the one that he's asked

4    you to keep confidential, he didn't copy to Greg

5    Smith; on the other one he did.

6        A    Yes.

7        Q    And both of them are letters that say that

8    there are documents attached or enclosed?

9        A    Yes.

10        Q    And in the one that he did ask you to keep

11    confidential on page 57, he said it's two documents,

12    which Tuomey Administration gave the board of trustees

13    at Tuomey Health System regarding the part-time

14    employment agreements with gastroenterologists; is

15    that correct?

16        A    That's correct.

17        Q    What I want to do is try to identify which

18    pages following this go with which letters.  And I

19    think I've figured it out, but I want you to confirm

20    whether this is correct or not.

21            If you will set aside for the moment pages 59

22    and 60, because I think that may be something else --

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                          Washington, DC

                                                                        Page 80

1    let's not lose them.

2          I'm looking for the two documents that Tuomey

3    Administration gave the board of trustees.  If you

4    look at page 123 to 127 --

5          A    Yes.

6          Q    -- does that appear to be one of the

7    documents that was attached to the letter on page 57

8    that he asked you to keep confidential?

9          A    Yes.

10         Q    Okay.  And if you'll look at pages 128

11   through 1 -- through the end, through 194 -- does that

12   appear to be the second document delivered to the

13   board of trustees with a number of attachments?

14         A    Yes.

15         Q    Okay.  And just to kind of complete the

16   identification of the documents, in the letter on page

17   58 it says, enclosed please find copies of the

18   proposed part-time employment agreements with Drs.

19   Drakeford, Ford and Stroble in the referenced matter.

20   Also enclosed for your review is a copy of the Cejka

21   Consulting's August 31 presentation.

22         Does it appear that pages 61 -- well, on pages

Kevin G. McAnaney, Esq.                                                                October 9, 2008
                              Washington, DC

                                                                         Page 81

1    61 through 72 there are Cejka opinion letters for the

2    three doctors mentioned -- Dr. Ford, Stroble and

3    Drakeford.  Do you know if those were sent to you by

4    Tim Hewson?  This would be pages 61 --

5             A    Well, I am sure they were sent to me by Tim

6    Hewson.  When, I'm not sure.

7             Q    So it could have been part of this letter

8    or some other time, but pages 61 through 72, is it

9    correct those are the opinion letters from Cejka for

10   Drs. Ford, Stroble and Drakeford?

11            A    Yes.

12            Q    Okay.  And you did receive those and you

13   did review those?

14            A    Yes.

15            Q    And if you'll look at pages 76 through 86,

16   is this the Cejka Consulting's August 31, 2004

17   presentation?

18            MR. MULHOLLAND:  Objection to the form.  If

19   you're asking him if it was a document referred to in

20   one of those letters, I think that's a different

21   question.

22   BY MR. ACKER:

Page 82

1         Q   Okay.  Is this the document that Tim Hewson

2   referred to in his letter on page 58, which he

3   identified as a copy of Cejka Consulting's August 31,

4   2004 presentation?

5         A   Yes.

6             MR. MULHOLLAND:  I'll just object to the

7   extent your questions are asking him to actually

8   authenticate the underlying documents as opposed to

9   simply say whether he knows they were sent to him or

10  not.

11  BY MR. ACKER:

12        Q   Right.  This was, just to clarify, it's

13  your testimony that this presentation was the

14  documents sent to you with the letter on page 58.

15        A   Yes.

16        Q   And if you look at pages -- and I hope we

17  can keep these in order -- take as much time as you

18  need to keep them in order -- pages 87 through 122.

19        A   Yes.

20        Q   Are these the documents that Tim Hewson

21  identified in his letter on page 58 as the proposed

22  part-time employment arrangements with Drs. Drakeford,

Page 83

1    Ford and Stroble?

2         A    Yes, they are.

3         Q    And those were sent to you by Tim Hewson?

4         A    Yes.

5         Q    And you reviewed them?

6         A    Yes.

7         Q    Okay.  Let's go through these a little bit

8    more.  In fact, why don't you put pages 59 and 60 back

9    in order.  We're going to come back to them.

10        Let's turn to the document which we identified

11   as -- it's on page 006-76, which was the Cejka

12   Consulting presentation sent to you by Tim Hewson; is

13   that correct?

14        A    Yes.

15        Q    What was your understanding of who Cejka

16   was and -- of who Cejka was, Cejka Consulting?

17        A    I think they were a consulting company that

18   had done the valuations for these part-time employment

19   compensation arrangements.

20        Q    And what was your understanding of this

21   PowerPoint presentation or this presentation?

22        A    Well, I'm not sure I had an understanding

Page 84

1    besides what it says.  I mean, I think it's a

2    presentation that they did that sort of laid out their

3    methodology and how they were reaching their

4    valuation --

5         Q    Okay.

6         A    -- or reviewing the proposal.

7         Q    If you look on the second page of this

8    presentation -- and it's hard to read the numbers

9    because they are obliterated a little bit by the dark

10   black thing -- but it would be the second page of this

11   presentation, which is, in fact, page 77.

12        At the bottom, the very bottom, it says, on

13   average approximately 93% of a physician's outpatient

14   compensation is a result of incentives.

15        What was your understanding of that statement

16   in Cejka's presentation?

17        A    Well, I just understood it to be what it

18   says, which is that there was probably a base

19   component and then -- but it was expected that 93% of

20   it would be -- would come in incentive payments.

21        Q    What is it an incentive for?

22             MR. MULHOLLAND:  Objection, calls for

Page 85

1    speculation.

2    BY MR. ACKER:

3        Q    To the extent you understand, what was your

4    understanding of what those incentives were for?

5        A    Well, it says productivity incentives.

6        Q    And what does a productivity incentive mean

7    or what was your understanding of productivity

8    inventive?

9        A    Well, they are pretty common, physician

10   compensation.  They can do -- I mean, every physician

11   service can have RVU units and you figure out how many

12   RVUs someone performs in a year and there are surveys

13   that sort of give you -- I mean, some convert it to

14   salary; some convert it to RVU units.  So it's a

15   fairly standard method of incentivizing physicians for

16   their physician performance.

17       Q    Okay.  And in this particular proposed

18   arrangement, was it based on RVU or something else?

19       A    I would need to --

20       Q    Look on the next page.

21       A    It says productivity incentives is 80% of

22   personal net collections.

Kevin G. McAnaney, Esq.                                                     October 9, 2008
                        Washington, DC

Page 86

1          Q    Okay.  So this page talks about three

2    components of total compensation.  Describe to us what

3    your understanding was at the time of how this

4    compensation arrangement would work.

5          A    Well, I really have to go back -- as I

6    recall, it was fairly complicated.  The idea was there

7    was a base salary and then there is productivity

8    incentive.  Here it appears to be on personal net

9    collections.  I mean, that's another way people do it.

10   If it's a physician service, you -- it's pretty common

11   in physician practices that you base it based on some

12   percent of collections and supposed to basically

13   represent some part of your profit after you take off

14   all your overhead and the cost of producing.

15         Q    Okay.

16         A    And then they have a quality incentive

17   here, which I'm not exactly sure since it goes off

18   personal productivity.  But frequently you have

19   quality incentives and programs for patient

20   satisfaction and the quality of your work.

21         Q    You said that it's fairly common to have

22   some portion of compensation based on productivity.

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                                    Washington, DC

```
                                                          Page 87
 1   Was there something unusual about this contract in

 2   that respect?

 3             MR. MULHOLLAND:  Objection to form.

 4   BY MR. ACKER:

 5        Q    What, if anything, was unusual about this

 6   proposed compensation arrangement in respect to the

 7   issue of productivity bonus?

 8             MR. MULHOLLAND:  Same objection.

 9             THE WITNESS:  I mean, I would say to me it

10   was unusual just because of the nature of sort of a

11   part-time arrangement I hadn't actually seen before.

12   BY MR. ACKER:

13        Q    Okay.

14        A    But aside from that, there are lots of ways

15   to structure compensation arrangements.

16        Q    Okay.  On the next page it says, in

17   addition to total compensation, Tuomey is also

18   providing these additional benefits.  100% malpractice

19   insurance coverage.

20             At the time you were engaged by Tuomey and

21   Palmetto, had you seen other part-time agreements that

22   paid 100% of malpractice insurance coverage?
```

Kevin G. McAnaney, Esq.                                    October 9, 2008
Washington, DC

Page 88

1            A    I don't recall, but I haven't reviewed a

2      whole lot.  I mean, I'm not -- I don't review the

3      physician compensation arrangements regularly.

4            Q    Okay.  Also on this page it says 100%

5      coverage for billing and collecting costs.  Were you

6      aware of any additional contracts between Tuomey and

7      the physicians' group practice for billing and

8      collecting?

9            A    I have no present recollection.

10           Q    Okay.  All right.  Let me go to the next

11     page, then.  The second bullet point on this page

12     says, on average, each physician receives a net gain,

13     excluding health insurance benefit, of 31% over

14     individual outpatient collections.

15           What was your understanding of that statement?

16           A    Well, as I understood it, it means he's

17     receiving 31% more than he's collecting.

18           Q    And --

19           A    I mean, his total compensation package was

20     worth 31% more than what they were collecting for the

21     services being provided.

22           Q    What, if any, questions did that raise in

Page 89

1   your mind?

2              MR. MULHOLLAND:  Objection.

3              THE WITNESS:  It certainly raised questions

4   as to the commercial reasonability of the arrangement.

5   BY MR. ACKER:

6       Q   Okay.  On the next page you mentioned a

7   complex formula.  Is this part of what you were

8   talking about?

9       A   Yes.

10      Q   This page is for Dr. Drakeford; is that

11  correct?

12      A   Yes.

13      Q   It's a little bit hard on this copy to read

14  the columns, but let's try to go through it.

15      At the very top does it say, plan payouts using

16  2003 collections data?

17      A   Yes.

18      Q   All right.  And the first column is

19  Dr. Drakeford.  The second column, does that say

20  annual outpatient net collections --

21      A   Yes.

22      Q   -- $295,361?

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 90

1     A    Yes.

2          Q    And then there is a series of computations

3   dealing with base pay, productivity incentive, quality

4   incentive, total cash compensation, liability

5   coverage.  Do you see that coverage, liability

6   coverage?

7          A    Yes.

8          Q    And then there is a column, billing and

9   collection, 10% of the collections, $29,536.  Does

10  that refresh your recollection about whether or not

11  the hospital was going to pay a fee to the doctors or

12  the doctors' group practice for actually performing

13  the collections functions?

14          MR. MULHOLLAND:  Objection to the form.

15  Also assumes facts that are not in the record.

16          THE WITNESS:  Not particularly.

17  BY MR. ACKER:

18          Q    Okay.  Let's concentrate on the next to the

19  last column that says, total benefit except health

20  insurance, $360,298, and then there is a block below

21  that that says total compensation plus additional

22  benefits excluding health insurance.

1         Comparing that to the first or actually the

2    second column, the first financial column that says,

3    $295,361 of annual outpatient net collections, what,

4    if anything, strikes you about those two numbers?

5              MR. MULHOLLAND:  Objection to the form.

6              THE WITNESS:  Well, what strikes one is that

7    he -- he's getting compensation and it appears it's

8    substantially above the amount he's even collecting.

9    So --

10   BY MR. ACKER:

11        Q    And the last column, does that give a

12   dollar amount of the difference between those two

13   numbers?

14        A    Yes.

15        Q    And what's that dollar amount?

16        A    $64,937.

17        Q    And, again, did that -- what, if

18   anything -- what, if any, concerns did you have based

19   on that net gain above collections?

20             MR. MULHOLLAND:  Objection to the form.

21             THE WITNESS:  Well, my concern was that

22   it -- going back to the -- some of the prior cases, I

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                              Washington, DC

                                                                    Page 92

1    was familiar with, I mean, it seemed payments in

2    excess of what someone makes would raise concerns to

3    the government.  I mean, I think that that's --

4    BY MR. ACKER:

5         Q    And if --

6         A    That was my concern.

7         Q    If you look at the next two pages, is the

8    next page for Dr. Ford?

9         A    Yes.

10        Q    And does it have a positive number for net

11   gain above collections?

12        A    Yes.

13        Q    Would the same concerns apply here to

14   Dr. Ford as to Dr. Drakeford?

15        A    Yes.

16        Q    If you look at the next page --

17        A    And --

18        Q    Yes.  Go ahead.

19        A    Another thing that was troubling was --

20   and, again, this was only a partial part of their

21   practice -- but even the net collection number -- I

22   mean, typically, collections, I mean, it wasn't clear

Kevin G. McAnaney, Esq.                                    October 9, 2008
                        Washington, DC

Page 93

1    that the net -- well, it wasn't clear what that number

2    was and whether that would have included billing and

3    liability if you were in private practice, which would

4    be subtracted from that number.

5         Now, I assumed it was net, but it wasn't clear,

6    I mean, from this document.

7              MR. MULHOLLAND:  Move to strike as not

8    responsive to any question on the record.

9    BY MR. ACKER:

10        Q    Let me make sure I understand what you just

11   said.  Normally a doctor would get his total

12   collections and he would have to subtract from that --

13   he would have to pay out of what he collected his

14   malpractice insurance and his FICA --

15        A    Yes.

16        Q    -- and other office expenses --

17        A    Yes.

18             MR. MULHOLLAND:  Object.

19   BY MR. ACKER:

20        Q    He would have to pay somebody to --

21             MR. MULHOLLAND:  I'm sorry.  Objection to

22   the form.

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                              Washington, DC

                                                                    Page 94

1    BY MR. ACKER:

2         Q    He would have to pay somebody to collect --

3    some billing person in his office?

4         A    Yes.  And it may be that's what they meant

5    by net collections.  Typically I think of net

6    collections as meaning what you get after contractual

7    discounts and no-pays and things like that.  I mean,

8    what sort of cash coming in.

9         Q    Okay.  But normally somebody would have --

10   a doctor would have -- just want to make sure I

11   understand what you said a minute ago.  A doctor would

12   have to take out of his collections his malpractice

13   insurance and other costs.

14             MR. MULHOLLAND:  Objection to form.  Also

15   calls for speculation.

16   BY MR. ACKER:

17        Q    That was your understanding at the time?

18        A    Yes, that's how --

19        Q    And that raised additional concerns to you

20   at the time?

21        A    Well --

22             MR. MULHOLLAND:  Objection to the form.

Kevin G. McAnaney, Esq.                                           October 9, 2008
                        Washington, DC

Page 95

1              THE WITNESS:  It just underscored my concern

2      that that number was -- was -- that number was of

3      concern, the difference at the end.

4      BY MR. ACKER:

5          Q   Okay.  And on the next page, this is for

6      Dr. Stroble, is that correct, the next page?

7          A   Yes.

8          Q   And, again, it had a net gain above

9      collections more than $40,000?

10         A   Yes.

11         Q   The next page is for Dr. Tate.  Do you know

12     who Dr. Tate is?

13         A   No.

14         Q   Okay.  If you'll turn to the document that

15     starts on page 006-87, it's after the Cejka Consulting

16     documents.  Is this the proposed physician employment

17     agreement for Dr. Drakeford?

18             MR. MULHOLLAND:  Objection, calls for

19     speculation.

20     BY MR. ACKER:

21         Q   Look at the bottom left corner.

22         A   Oh, yes.  Okay.  Yes.

Page 96

1          Q    And is this the document that was sent to

2     you by Tim Hewson --

3          A    Yes.

4          Q    -- that he represented to you was the

5     proposed part-time employment arrangement with

6     Dr. Drakeford?

7          A    Yes.

8          Q    If you'll turn to page 93, which is a later

9     page of this same document, do you see in the bottom

10    left-hand corner it says, page 7 of 18 of the Michael

11    K. Drakeford, M.D. physician employment agreement?

12         A    Yes.

13         Q    If you could read the top paragraph, it's

14    paragraph number 6.

15         A    It says, exclusivity, the parties

16    acknowledge that the physician shall perform

17    exclusively for the practice all surgical procedures

18    other than inpatient surgical procedures and those

19    listed on Exhibit O at the practice.

20         Q    Is that your handwriting?

21         A    Yes, it is.

22         Q    What does that say?

Page 97

1          A    Well, I have a mark on the side in the

2     margin on the right-hand side.  And I have a circle

3     around where it says, Exhibit C at the practice, and

4     then I have another circle with the word "what."

5          Q    What's the significance of your handwritten

6     comments there?

7          A    Well, I was probably just -- I believe I

8     was just making notes to myself to say what's in

9     Exhibit C.

10         Q    Okay.  If you'll look at 006-100, and does

11    that appear to be Exhibit A to this proposed

12    agreement?

13         A    Yes.

14         Q    And if you'll look at page 102, does that

15    appear to be Exhibit B to this agreement?

16         A    Yes.

17         Q    And if you'll look at page number 104, does

18    that appear to be Exhibit C?

19         A    Yes.

20         Q    And it says, Surgical Procedures Excepted

21    from the Exclusivity Provisions Set Forth in Section

22    6.  Is there anything of substance in Exhibit C?

Page 98

1               MR. MULHOLLAND:  Objection to the form.

2               THE WITNESS:  No, besides -- other than the

3    title and Dr. Drakeford's name down in the corner, it

4    appears to be blank.

5    BY MR. ACKER:

6         Q    So going back to page 93, 006-93, the

7    exclusivity provision that you read, what was your

8    understanding of that provision?

9               MR. MULHOLLAND:  Objection.

10              THE WITNESS:  Well, what I understand, the

11   provision appears to require him to perform all

12   outpatient surgical procedures -- and I forget, I have

13   to go back -- but I think at the practice.  And I

14   think the practice is at the hospital outpatient

15   center, but --

16   BY MR. ACKER:

17        Q    And what, if any, concerns did that

18   provision raise in your mind?

19        A    Well, I mean, I think it's -- I mean, it

20   clearly required him to perform all procedures there,

21   and so it's -- it's worth noting.  I mean, it's --

22   there are employment -- I mean, the Stark Law allows

Page 99

1    you in certain cases to mandate -- although it

2    usually -- I mean, it has exceptions in the Stark Law

3    that you have to provide for the patient's insurance,

4    patient's coverage, things like that.  So it's just

5    clearly you want to know.

6          Q    Okay.  If you'll turn to page 182 and look

7    at pages 182 through 193.

8          A    Yes.

9          Q    Can you identify that document?

10         A    Yes.  This appears to be an attachment that

11   was a letter from Strategic Management Systems, Inc.,

12   which was Dick Kusserow's consulting firm.

13         Q    Is Dick Kusserow a lawyer?

14         A    No.  Actually I don't know.  I don't

15   believe so.

16         Q    Okay.  If you look on page 006-184, it's

17   the second page of the letter, if you'll notice in the

18   fourth line from the bottom of the top paragraph, in

19   the middle of that line, it says, and, as you know --

20   do you see that?

21         A    Yes.

22         Q    And, as you know, we are not in a position

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 100

```
 1    to render legal opinions on these laws; is that

 2    correct?

 3         A    Yes, that's correct.

 4         Q    And this document was given to you before

 5    you had the conversation on June 22nd?

 6         A    Yes.

 7         Q    And you reviewed it?

 8         A    Yes.

 9         Q    So was it your understanding that this

10    letter was a legal opinion?

11              MR. MULHOLLAND:  Objection.

12              THE WITNESS:  No.

13    BY MR. ACKER:

14         Q    It was your understanding this was not a

15    legal opinion.

16              MR. MULHOLLAND:  Objection.

17              THE WITNESS:  Well, I didn't consider it a

18    legal opinion.

19    BY MR. ACKER:

20         Q    Okay.  And in fact he says, we're limited

21    to assisting you in reviewing these arrangements from

22    our previous positions in enforcement and regulatory
```

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 101

1    agencies; is that correct?

2           A    Yes.

3           Q    And if you look on page 006-184, that same

4    page, is he describing the same basic type of

5    compensation arrangement that you reviewed for

6    Dr. Drakeford?

7           A    I'm not sure I can tell from this.  I may

8    need to go back.  I didn't --

9           Q    Well, let's go back to the --

10          A    Didn't look like -- the hundred thousand

11   annual salary appears higher than --

12          Q    Okay.  But it includes an annual salary, a

13   productivity bonus of 80% of cash collections, and an

14   incentive bonus.

15          A    Yes.

16          Q    And if you look on page 006-185, the

17   first -- the paragraph that says, overview, could you

18   read that paragraph out loud?

19          A    The Office of the Inspector General (OIG)

20   at the Department of Health and Human Services (DHHS)

21   has been focusing attention to these types of

22   arrangements due to enhanced opportunity for abuse in

Page 102

1   this area.  The OIG has noted that a number of, quote,

2   sham directorships and administrative service

3   contracts with physicians have been established in

4   order to circumvent the anti-kickback statute.  The

5   concern of the OIG is that there may be a flow of

6   benefits in excess of the value of services provided,

7   which suggests disguised kickbacks for referrals from

8   the physician or to ensure physician loyalty to the

9   hospital.  The OIG has taken note that many referring

10  physicians were serving as medical directors,

11  advisors, or had contracts to perform administrative

12  services on behalf of the hospitals.  In a number of

13  cases the OIG discovered referring physicians were

14  either paid well beyond the, quote, fair market value,

15  quote, of the services provided or they provided

16  minimal services relative to payments received.

17  Therefore, the OIG is critically reviewing the

18  activities of hospitals in this area.

19        Q    What, if anything, did you at the time in

20  June of 2005 agree or disagree with that paragraph

21  that you just read?

22              MR. MULHOLLAND:  Objection to the form.  And

Page 103

 1    I'll just reiterate our prior objection about his

 2    giving opinions.

 3    BY MR. ACKER:

 4         Q    Just asking for your thoughts at the time

 5    of your -- as of June of 2005.

 6              MR. MULHOLLAND:  Same objections.

 7              THE WITNESS:  I mean, I thought it was

 8    reasonably accurate.

 9    BY MR. ACKER:

10         Q    Is there anything that you see in here that

11    you disagree with or that you disagreed with at the

12    time?

13              MR. MULHOLLAND:  Same objections.

14              THE WITNESS:  No.

15    BY MR. ACKER:

16         Q    What, if anything -- what, if any, concerns

17    did you have in June of 2005 as to whether or not the

18    proposed contract with Dr. Drakeford would have been a

19    disguised kickback for referrals from the physician or

20    to ensure physician loyalty to the hospital?

21              MR. MULHOLLAND:  Same objections.

22              THE WITNESS:  Well, my concern with respect

Page 104

1    to the kickback statute was -- primarily turned on

2    whether or not it would be considered a bona fide

3    employment arrangement.

4    BY MR. ACKER:

5        Q    What about the Stark statute?

6        A    Well, the Stark -- the Stark statute has

7    more stringent standards because it has to be fair

8    market value, you have to -- I don't have the

9    regulations -- but I believe the formulation is, to

10   the extent it has to be fair market value, not taking

11   into account the volume in value of referrals or other

12   business generated between the parties --

13       Q    And what, if any --

14       A    -- commercial, reasonable -- it has a

15   laundry list, but that's the main -- the two main

16   standards.

17       Q    What, if any, concerns were raised in your

18   mind about those standards that you just raised as it

19   resulted -- as it related to the proposed employment

20   agreement with Dr. Drakeford?

21            MR. MULHOLLAND:  Same objections.

22            THE WITNESS:  Well, my concern was the

Page 105

1    numbers -- the mere fact that the physicians appeared

2    to be, based on Cejka, the total compensation seemed

3    to be significantly above their collections, that -- I

4    mean, that would be a red flag for enforcement, not

5    that it was necessarily -- ended the matter, but it

6    would -- if it came to their attention, it would jump

7    out at them.

8    BY MR. ACKER:

9         Q    Tell me what you recall about the June 22nd

10   conference call between you, Tim Hewson, and Greg

11   Smith.

12        A    I'm not sure I have a real recollection of

13   the call, exactly what it was.  I mean, I think I

14   expressed those -- those concerns.  My recollection is

15   that, A, I thought the employment -- to the extent you

16   could do an employment arrangement, I thought it was

17   the best.  I thought, given what I had seen of the

18   context and things like that, that -- and these other

19   proposals, that I thought you wanted to be in the safe

20   harbor under the anti-kickback statute.  Because if

21   you're in the safe harbor, intent doesn't matter,

22   you're safe.  And so, therefore, I said -- I think we

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 106

1  discussed at some point I think that's the way to go

2  if you can possibly do it.

3      Q   And under the kickback --

4          MR. LEWIS:  Did he finish?

5  BY MR. ACKER:

6      Q   Oh.

7      A   And that was -- again, the only concern --

8  I mean, the concern with respect to that, I think, is

9  whether or not you have a bona fide employment

10  relationship.

11     Q   Okay.  And what did you all discuss about

12  that anti-kickback safe harbor?

13     A   Well, I'm not sure -- I mean, I think, if

14  we would have discussed anything, it would be whether

15  this kind of arrangement would be a bona fide

16  employment, which, again, I think -- I was not an

17  employment lawyer.  The test is IRS test.  But,

18  clearly, if you fit in that, under the kickback

19  statute, my view is you're immunized.

20     Q   What, if anything, did you discuss in that

21  June 22nd meeting concerning the Stark Law?

22     A   The Stark Law has -- unlike the kickback

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 107

1    statute, which has no fair market value test, you can

2    pay them anything you want, there is some -- at least

3    the Inspector General, there is a letter out, which is

4    just a letter, but in which they have taken the

5    position that there is language in the kickback safe

6    harbor that says it has to be payment for -- I forget

7    exactly -- but they have taken the position that, for

8    example, you couldn't just hire a physician and pay

9    him for his referral.  He's got to perform services or

10   something.  I think you can read the statute and argue

11   with whether or not that's a correct interpretation,

12   if it's not broader.

13           Q    Is what you're talking about --

14                MR. MULHOLLAND:  Excuse me.  He has more to

15   say.

16                MR. ACKER:  Well, I wanted to clarify.

17   BY MR. ACKER:

18           Q    You're talking about the kickback statute?

19           A    Yes, that's the kickback statute.

20           Q    My question to you was the Stark Law.

21           A    The Stark Law, by contrast, you have to

22   have fair market value and it can't take into account

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 108

1    the value or volume of referrals.

2         So this is -- I mean, in employment, the Stark

3    Law's usually the one that you -- I mean, that's the

4    smaller wicket to get through.

5         Q    What do you mean by "smaller wicket to get

6    through"?

7         A    Well, typically the Stark exceptions are

8    broader and the anti -- to the extent there might be

9    an analog in the anti-kickback safe harbors, they are

10   much narrower.  Employment is -- I mean, I think

11   it's -- it's certainly the biggest.  There may be

12   another, but in employment it's exactly -- as I said,

13   the kickback safe harbor for employment is -- well,

14   kickback law, it's a statutory exception.  It's not a

15   regulation.  In the Stark Law, you have to fit in the

16   safe harbor.

17        Q    And you discussed those issues during the

18   June 22nd meeting?

19        A    Yes.

20        Q    And what, if any, concerns did you raise

21   with Tuomey about the fair market value issue under

22   Stark?

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 109

1          A    Well, just -- I mean, basically looking at

2    those figures, it raised a red flag based on what -- I

3    mean, the cases that had been -- right at this time in

4    the immediate -- I would need to go back and look --

5    but there had been a series of cases that the

6    government was beginning to bring that we talked

7    about, fair market cases, which had settled on --

8    basically that was the crux of the government's case,

9    was the physicians were being employed -- physicians

10   previously in private practice in the communities were

11   being employed by the hospitals for amounts that were

12   substantially in excess of what they had been getting

13   in the private -- in their private practice, that they

14   were really being overcompensated.  It wasn't fair

15   market value.  That's basically it.

16          Q    And so --

17          A    And, in particular, one of the concerns

18   which I brought up was there had been a case right in

19   South Carolina.

20          Q    What was that case?

21          A    I thought you'd say that.  I was afraid

22   you'd say that.

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 110

1            MR. LEWIS:  McLeod Hospital versus --

2            THE WITNESS:  McLeod.  It was called McLeod,

3  I think.  Is there a McLeod Hospital System?

4  BY MR. ACKER:

5        Q    And did you discuss that case during the

6  conversation?

7        A    Yes.  Yes.

8        Q    And what did you say about the comparison

9  to this case to McLeod?

10       A    Well, I said -- I mean, I said it was

11  basically the same kind of allegations, as I

12  understand it.  So my point was, from a risk matter,

13  it was not a kind of case that was unfamiliar to the

14  U.S. Attorney in South Carolina.

15       Q    And you mentioned risk.  What level of

16  risk, if any, did you see in this arrangement?

17            MR. MULHOLLAND:  Objection.

18  BY MR. ACKER:

19       Q    Or what -- let me change the question.

20  What level of risk did you communicate to Tim Hewson

21  in that meeting?

22            MR. MULHOLLAND:  Objection.

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 111

1              THE WITNESS:  I communicated I thought that

2    this had a substantial risk.

3    BY MR. ACKER:

4         Q   Do you recall any -- do you recall using

5    the term that this would set off bells and whistles?

6              MR. MULHOLLAND:  Objection.

7              THE WITNESS:  I don't recall it

8    specifically, but it's an expression I use.

9    BY MR. ACKER:

10        Q   And when you use that expression, what do

11   you mean by it?

12             MR. MULHOLLAND:  Objection.

13             THE WITNESS:  Well, I just mean that, if it

14   came to -- I mean, if -- in my experience, if an OI

15   agent or if Justice -- if that came to their

16   attention, they would -- they would think of it as --

17   I mean, it would be a good case.  It would be

18   something they are familiar with, they have seen, they

19   know how to deal with, and they have gotten

20   settlements in the past.

21   BY MR. ACKER:

22        Q   Do you recall if you used the term "red

Page 112

1    flag" in that meeting?

2           A    Well, again, that might very well.  It's a

3    term I use, the same.

4           Q    What does that mean?

5           A    Well, it's the same thing, bells and

6    whistles.  It's --

7           Q    Do you recall whether you told Tim Hewson

8    that this would be a relatively straightforward case

9    for the government to prosecute?

10          A    Well, I think I said, from their

11   standpoint, the allegations would be very

12   straightforward.  Basically the same as what I had

13   understood had been in the Tuomey and these other

14   cases, which was simply they were being paid above

15   fair market value.

16          Q    Could you repeat the last part of your

17   answer?

18          (Record read.)

19   BY MR. ACKER:

20          Q    When you said Tuomey --

21          A    I meant McLeod.

22          Q    You meant McLeod.  Thank you.  In other

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 113

1    words, this was similar to the McLeod case.

2              MR. MULHOLLAND:  Objection.

3              THE WITNESS:  Well, to the government's eyes

4    it would be -- or at least, if they saw this at first

5    glance, that's what they would think.

6    BY MR. ACKER:

7         Q    Do you recall whether you said during that

8    meeting to Tim Hewson that the key to fair market

9    value was what the doctors were making before?

10        A    Well, I'm not sure I said "the key."  I

11   think that the government's position -- they would

12   start with that, yes.

13        Q    Do you recall saying that Exhibit 1 of the

14   government case would be the Cejka presentation?

15        A    I think I recall that.

16        Q    And what did you mean by that?

17        A    Well, just those pages that we went through

18   where it had collections and then all the things and

19   then the figures and the net gain above collections.

20   I just --

21        Q    Do you recall Tim Hewson asking you if the

22   hospital losing money was the test?

Page 114

1              MR. MULHOLLAND:  Objection.

2              THE WITNESS:  I don't recall that.

3    BY MR. ACKER:

4         Q    Okay.  Do you recall saying that the test

5    for fair market value was what another employer would

6    pay, not a hospital -- not how much a hospital getting

7    referrals would pay?

8         A    I do not recall saying that exactly, but --

9         Q    What do you recall --

10        A    But I may have -- I think that is a

11   benchmark.  It is certainly not the test.  Fair market

12   value is -- the government's acknowledged again and

13   again -- is a range and there is a range of values,

14   but one of the benchmarks I have always used and I

15   think that is what -- what another physician would pay

16   for that practice so that -- he's someone who is not

17   in a position -- who is in a position to benefit from

18   that practice as a physician practice but not -- not

19   with the inpatient revenue that they might generate.

20   So I've always thought that -- I mean, that's sort of

21   a -- it strikes me that fair market value is what

22   someone else would pay in the market.  And the

Page 115

1    hospital can pay that.

2    BY MR. ACKER:

3        Q    When you say you've always used that, that

4    included the time during June of 2005?

5        A    Yes.

6            MR. MULHOLLAND:  Objection.

7    BY MR. ACKER:

8        Q    And why -- why does it make a difference

9    what another physician would pay as opposed to what

10   the hospital might pay?

11           MR. MULHOLLAND:  Objection.

12           THE WITNESS:  Well, I mean, my view is it's

13   a relatively straightforward test of that is what

14   someone who is basically paying for the physician's

15   practice -- for his services and the value of that

16   practice as a practice without generating -- that's --

17   that's contrary to the OIG position as laid out in the

18   letter I referred to before -- it's a Mac Thornton

19   letter to the IRS -- is that a hospital can't even do

20   that because to the extent a physician -- another

21   physician might pay for a physician and get ancillary

22   services or something, that the official OIG position

Kevin G. McAnaney, Esq.                                    October 9, 2008
                          Washington, DC

Page 116

1   is they can't even pay that, they have to back that

2   out, which, I think, is a silly position and doesn't

3   make sense particularly.

4   BY MR. ACKER:

5        Q   What is different between what a hospital

6   might be willing to pay and what a physician might be

7   willing to pay for the services from a doctor?

8              MR. MULHOLLAND:  Objection to the form.

9              THE WITNESS:  Well, in the government fraud

10  and abuse world, it's because that a hospital, to the

11  extent they can capture inpatient business, ancillary

12  services, they can actually -- I mean, they can make a

13  lot more money off a physician.  So they could afford

14  to pay him more than he would make in private practice

15  in some cases and still have a substantial profit off

16  the other services generated.  I mean, physicians are

17  gatekeepers to the healthcare system and they make

18  decisions as to where patients go, what services that

19  they get, many of which they actually don't provide

20  themselves.  I mean, that's the -- that's sort of the

21  basis of the -- of the kickbacks.  I mean -- not of

22  the kickbacks, but one of the main concerns is that

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 117

1    they be paid to influence those decisions, so --

2         Q    So the hospital might get referrals from

3    the physician and they might be willing to pay, is

4    that --

5              MR. MULHOLLAND:  Objection.

6              THE WITNESS:  Yes.

7              MR. MULHOLLAND:  Objection.

8              THE WITNESS:  They would make revenue --

9    they would make revenue from inpatient admissions,

10   outpatient testing that's -- I mean, that basically

11   generates substantially more revenue than physician

12   services, physician fees.

13   BY MR. ACKER:

14        Q    Do you recall in that meeting discussions

15   about why the physicians were not allowed to do both

16   the joint venture under arrangements deal and the

17   part-time employment agreement?

18             MR. MULHOLLAND:  Objection to form of the

19   question.

20             THE WITNESS:  I don't recall specific

21   discussion of that.

22   BY MR. ACKER:

Page 118

1          Q    Do you recall at any time Tim Hewson giving

2     you rationale as to why physicians couldn't do both?

3               MR. MULHOLLAND:  Objection to the form of

4     the question.

5               THE WITNESS:  No, I don't recall.

6     BY MR. ACKER:

7          Q    Do you recall during that meeting telling

8     Tim Hewson that you thought the proposed employment

9     agreements were problematic?

10         A    Again, I don't have a specific

11    recollection, but it's a phrase I use a lot.

12         Q    And when you use that phrase or when you

13    used that phrase in 2005, what would you have meant by

14    that?

15              MR. MULHOLLAND:  Objection.

16              THE WITNESS:  That it would raise concerns,

17    that there were -- that I thought -- that they raise

18    several problems or potential problems would be

19    accurate.

20    BY MR. ACKER:

21         Q    If you'll turn to page 006-73 of Deposition

22    Exhibit 1.  Let me ask you to identify pages 73

Kevin G. McAnaney, Esq.

October 9, 2008

Washington, DC

Page 119

1    through 75.  It's three pages of handwritten

2    information?

3         A    Yes.

4         Q    And is it your handwriting?

5         A    Yes.

6         Q    If you could start reading on page 73 at

7    the top.

8         A    It says, 1, fair market value is -- and

9    then it's got inserted, not going to be accepted by

10   government.

11        Q    You had something else that looks like

12   you've crossed it out?

13        A    Yeah.  Simply not credible.

14        Q    Is this something that you told Tim Hewson

15   during the meeting on June 22nd?

16        A    I don't think I told him -- I believe these

17   are notes I made to myself in preparation for that

18   conference call.

19        Q    Okay.

20        A    And I think I crossed that out and I

21   probably said is not going to be accepted by the

22   government.

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 120

1      Q   So you did tell Tim Hewson that during your

2  meeting?

3      A   I believe -- I believe so.  I mean, that's

4  my practice.

5      Q   Okay.

6      A   Or, if not the exact words, something very

7  similar.

8      Q   Do you recall why you crossed out "simply

9  not credible" and replaced it with "not going to be

10  accepted by government"?

11      MR. MULHOLLAND:  Objection.  I think it's

12  asked and answered.

13      THE WITNESS:  I mean, I think it was -- I

14  think it was a misstatement.  I decided on reflection

15  that wasn't right.

16  BY MR. ACKER:

17      Q   Okay.  If you could read the next portion.

18      A   Paying docs. more than earned is red flag

19  and relatively easy -- I don't know if it's Stark --

20  and then I have next to it Northridge Tenant, and then

21  McLeod, names of cases.

22      Q   And you've already mentioned McLeod.  What

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 121

1    was your understanding of Northridge Tenant?

2            A    Well, the Northridge case was -- was a

3    tenant-owned hospital in Florida, which they -- the

4    allegation was they had sort of bought this hospital

5    and then gone and employed a number of physicians from

6    the local community that were high refers and paid

7    them a lot of money, and they had just -- I can't

8    remember -- they settled the case for about -- for a

9    substantial sum of money.  And I think Northridge was

10   the first case.  And then McLeod came afterwards or

11   they came just about the same time.

12           Q    And you discussed those cases with Tim

13   Hewson during your conference call on the 22nd of

14   June?

15           A    Well, yes.  At least I mentioned them.

16   Underneath that --

17               MR. MULHOLLAND:  He was starting to respond.

18               MR. ACKER:  I think he was going to continue

19   reading.

20               THE WITNESS:  Yeah.

21               MR. ACKER:  I wanted to ask him one more

22   question about that comment of paying docs. more

Kevin G. McAnaney, Esq.                                          October 9, 2008
                              Washington, DC

Page 122

1    than --

2    BY MR. ACKER:

3         Q    What did you say --

4         A    More than they earn.

5         Q    -- is red flag and relatively easy Stark.

6    You said something along those lines to Tim Hewson

7    during that meeting?

8         A    I believe I did.

9         Q    Okay.  What's the next comment?

10        A    It makes no sense unless taking account of

11   referrals and you can't do -- well, and can't do that.

12        Q    What does that mean?

13        A    Well, it goes back to the Stark -- the

14   Stark exception, which says you have to pay fair

15   market value, not taking into account the volume and

16   value of referrals or other business generated.

17        Q    And when you say it makes no sense, what

18   are you referring to by it?

19        A    I think it's paying docs. more than they

20   earn.

21        Q    So paying docs. more than they earn makes

22   no sense unless they what?

Page 123

1              MR. MULHOLLAND:  You're asking him what that

2    says as opposed to asking him to agree with the

3    statement?

4              MR. ACKER:  I want him to --

5              THE WITNESS:  Unless the payments take into

6    account the referrals.

7    BY MR. ACKER:

8         Q    Okay.  So was it your understanding that

9    this -- or was it your concern -- that this contract

10   would be viewed as paying for referrals?

11             MR. MULHOLLAND:  Objection.

12             THE WITNESS:  Well, my concern was that it

13   would be considered that the compensation was taking

14   into account referrals.

15   BY MR. ACKER:

16        Q    Okay.  And when you say "can't do that,"

17   what does that mean?

18        A    Well, it's just the Stark -- I mean, you

19   can't do that and fit in the Stark exception.

20        Q    Okay.  If you'll read the next section.

21        A    It says, AKS, which stands for

22   anti-kickback statute, very broad but government does

Page 124

1    say -- and this is a quote -- for employment in the

2    furnishing of any item or service for which payment

3    may be made in whole or in part.  And that does not

4    include referrals.  That's a -- that's a reference to

5    the Mac Thornton letter that I spoke of earlier.

6        Q    And when you read that, you said, or in

7    whole or in part, but that's not actually on this

8    document; is that correct?

9        A    Oh.  Oh, yeah.  No, it's -- yeah, right.

10   Yes, that is not -- it stops at "payment may be made,"

11   quote, and does not include referrals.

12       Q    And then it says --

13       A    Oh, see Mac Thornton IRS letter.

14       Q    Okay.  And then what's the next, section 3?

15       A    It says, Stark -- Stark very doubtful, I

16   think, and will throw in both.  I think that's what --

17   yeah.

18       Q    What did you mean by "Stark very doubtful"?

19       A    Well, given -- given the first part, if

20   it's not fair market value, or it takes into account

21   the volume or values, then it will fail under Stark,

22   and in a False Claims Act they will throw the kickback

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 125

1    allegation in as well.

2            Q    And when you say "very doubtful," did you

3    mean it would be very doubtful that this proposed

4    agreement would fit within a Stark exception?

5            A    Well, I probably -- I'm -- I may have

6    said -- what I think is it certainly is questionable

7    if it's in Stark.

8            Q    Okay.

9            A    So --

10           Q    And did you tell that to Tim Hewson during

11   this meeting?

12           A    Yes.  I -- yes.

13           Q    Can you read --

14           A    I mean, I didn't say it didn't.  I just

15   said it certainly has a lot of flags about it that

16   they will question.

17           Q    Can you read the next section?

18           A    Very risky, underscored, and then I have

19   the next -- noncompete effectively precludes from

20   practicing because you can't -- if you can't perform

21   outpatient.  And term, question mark, how reasonable.

22           And then under that, history.

Page 126

1          Q    When you said "term, how reasonable," what

2    were you -- what was in your mind at the time you

3    wrote that?

4          A    Well, the term of these employment

5    contracts were ten-year terms, and then I think it was

6    a three-year noncompete, which I, again, one of the

7    tests, I believe, under Stark -- I'd have to go

8    back -- is sort of commercially reasonable.  And I

9    just -- it seemed like a long time for an employment

10   contract.

11         Q    Okay.  And when you say here "very risky,"

12   did you communicate that to Tim Hewson during the June

13   22nd meeting?

14         A    That would have been my practice having

15   written this out.

16         Q    Okay.  If you'll turn to page 74 and read

17   what it says under No. 1 there.

18         A    Employment fair market value does not pass

19   the red face test.

20         Q    Let's stop there.  What do you mean by the

21   "red face test"?

22         A    Well, it's just -- it's hard to say with a

Page 127

1    straight face.  I mean, it just doesn't -- it

2    doesn't -- it's pretty hard to believe.

3         Q    Hard to believe that the compensation

4    arrangement outlined for Dr. Drakeford, hard to say

5    that with a straight face that it meets fair market

6    value test?

7         A    Well, a compensation arrangement that

8    appears to pay someone significantly above what they

9    are actually earning or revenue generating from their

10   fees for you.  I mean, it's just hard to believe

11   anyone would employ someone for that, that's all.

12        Q    Okay.  Read No. 2.

13        A    "Can't" seems to be crossed out -- pay

14   docs. more than -- oh, pay docs. more than they earn

15   raises huge red flags.  McLeod was exactly about this.

16   They had fair market value opinion.

17        Q    So under "huge red flags," what do you have

18   under those words?

19        A    They are just underscored.

20        Q    And why did you underscore those?

21        A    Well, I just thought that -- I mean, I had

22   been asked to review what the compliance risks were.

Page 128

1    And, basically, given the fact that there were these

2    cases that the government was bringing on what seemed

3    to be pretty similar facts, that that was -- that was

4    a huge red flag.  And, again, specifically McLeod,

5    because it was in the same state.

6         Q    And when you say "they had fair market

7    value opinions," who is "they"?

8         A    McLeod, was my understanding that they had

9    had --

10        Q    And so what's the significance of that?

11             MR. MULHOLLAND:  Objection.

12             THE WITNESS:  Just having a valuation wasn't

13   necessarily going to -- wasn't going to protect the

14   arrangement necessarily.

15   BY MR. ACKER:

16        Q    Okay.  And this No. 1 where you say

17   employment doesn't -- FMV doesn't pass the red face

18   test, and, No. 2, about the huge red flags and McLeod

19   and that McLeod had fair market value opinions, did

20   you discuss all of that with Tim Hewson during the

21   June 22nd meeting?

22        A    Well, I'm sure -- I mean, it's basically

Kevin G. McAnaney, Esq.                                          October 9, 2008
                              Washington, DC

                                                                Page 129

1    the same -- I am not sure whether this may be a

2    further refinement of this.

3              Q    Okay.

4              A    I mean, they may have both been pre-meeting

5    talking points.

6              Q    My question is, did you discuss those?

7              A    Yes, the same -- yes.

8              Q    Okay.  Can you read No. 3?

9              A    Can't justify with referrals of

10   ancillaries.  That is what -- that is what Northridge

11   and Tenant and fair market value excludes

12   consideration of ancillary referrals.

13             Q    What was the purpose for writing this No. 3

14   about can't justify with referral of ancillary?

15             A    Well, I -- I mean, it was certainly, I

16   believe, it was in advance in case that came up

17   because of the -- what Greg Smith had sent in his

18   concerns.  And so I was just prepared -- I mean,

19   prepared for that, if that came up, if that was the

20   justification.

21             Q    And under the Stark Law, did you have

22   concerns that that would not be a valid justification?

Page 130

1         A    Yes, under the Stark Law, I'm sure -- I

2    mean, it's -- let me clarify exactly.

3         I think you can actually take ancillary incomes

4    in a physician's -- I believe, to go back -- if you

5    were to employ physicians and say you were to employ

6    two cardiologists and cardiologists in private

7    practice get ancillary income, and so their earnings

8    the year before you employ them, their earnings take

9    into account that ancillary income, if you employ

10   them, you can pay them that amount.  I think you can

11   take into account -- because that's fair market --

12   they are not -- two people, he's not going to come

13   work for you unless he makes at least what he's making

14   there.  That, I think you can do, if you're setting an

15   employment rate.

16        Q    Just to clarify --

17             MR. LEWIS:  Let him finish.

18   BY MR. ACKER:

19        Q    When you clarify ancillary --

20        A    That's my view.

21             MR. LEWIS:  Let him finish.

22   BY MR. ACKER:

Page 131

1          Q    When you clarify ancillary --

2               MR. LEWIS:  Excuse me.  Let him finish.

3               MR. ACKER:  I'm asking him a question.

4               MR. LEWIS:  No, sir.  He didn't finish his

5    last one.  You interrupted him.  He was hurting you

6    and you interrupted him and I don't appreciate it.

7               MR. ACKER:  He wasn't hurting me.  I was

8    trying to clarify what he was saying.

9               MR. LEWIS:  Let him finish.

10   BY MR. ACKER:

11         Q    Did you finish?

12         A    Yes, I finished.

13         Q    When you say ancillary services by a

14   cardiologist, you're talking about the ancillary

15   services that would normally be provided in the

16   cardiologist's office.

17         A    Yes.  Yes.

18              MR. MULHOLLAND:  Objection to the form.

19              THE WITNESS:  Yes.

20   BY MR. ACKER:

21         Q    And what's the distinction between that and

22   ancillary services at a hospital?

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                              Washington, DC

Page 132

1              MR. MULHOLLAND:  Objection to the form.

2              THE WITNESS:  Well, I think, for example --

3    well, to go to the Northridge case, the Northridge

4    case -- they actually, when they were in that case,

5    the documents that were produced where they were doing

6    the contract, the employment contract, and they

7    actually gave them this amount of money and then they

8    projected what his ancillary income -- the ancillaries

9    the hospital was going to make off of them.  And so

10   that was then used as -- used in the calculation of

11   their employment.  That -- that's -- that you cannot

12   do.

13   BY MR. ACKER:

14        Q   Okay.  If you could go to the next page,

15   page 006-75, and if you could read --

16        Well, do you know what this document was?

17        A   I think, again, these are notes to myself

18   based upon -- I mean, during my review of the --

19   probably summarizing for myself.

20        Q   Okay.  If you could read No. 1.

21        A   Consultant's chart shows bottom line.  Next

22   sentence says, doctors make 31% more with the

1    contract.  Underneath it, but actually much greater

2    since 31% compares new package with old net revenues.

3    Many of new benefits are actually subtracted from -- I

4    can't read the last word.  For example, benefits and

5    billing.

6        Then, 2 says, best idea of comparable in

7    addressing M.D.s is their prior income, not national

8    averages.

9        Q    Let me ask you:  Did you discuss these

10   issues that you have just read from No. 1 and No. 2 on

11   this sheet with Tim Hewson during the June 22nd

12   meeting?

13       A    I can't recall if we discussed them all.

14       Q    Okay.  If you'll read No. 3.

15       A    3.  Kusserow memo I.D.'d concerns with

16   productivity and incentives.  I think that's what that

17   is.

18       And then, 4.  For AKS terms, length of

19   contract, noncompete, and then background of ASC.

20       Q    Okay.  Thank you.  Let me draw your

21   attention to Exhibit 3 again.  And, again, this is the

22   set of documents that you brought in today responsive

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                              Washington, DC

Page 134

1    to our subpoena; is that correct?

2            A    Yes.

3            Q    Consists mostly of e-mails?

4            A    Yes.

5            Q    You have to count these pages because they

6    are not numbered, but if you look at the fifth page of

7    the exhibit.  And let me draw your attention -- well,

8    let me just identify the page.  At the very top of the

9    page it says, from Kevin McAnaney sent Friday, May

10   12th, 2006, 11:51 a.m.

11           A    Yes.

12           Q    Look below that.  Do you see another e-mail

13   from Dan Mulholland sent Friday, May 12th, 2006 at

14   11:36 a.m.?

15           A    Yes.

16           Q    So would it appear that this one at the

17   bottom is the first message and the one at the top is

18   a response to that?

19           A    Yes.

20           Q    This was after the termination of your

21   engagement with Tuomey and Palmetto; is that correct?

22           A    Yes, that's correct.

Page 135

     1          Q    Mr. Mulholland, in the e-mail at the

     2     bottom, requests to meet with you; is that right?

     3          A    Yes.

     4          Q    And then the e-mail at the top at 11:51

     5     a.m., says, you have no objection to meeting with you

     6     and Jim provided that I get a waiver from Palmetto

     7     Orthopaedic Group.  I was retained by both and

     8     wouldn't want to get crosswise with either group.

     9          A    Yes.

    10          Q    Is that what that says?

    11          A    Yes.

    12          Q    Did you in fact meet with Mr. Mulholland as

    13     a result of this e-mail?

    14          A    No.

    15          Q    Okay.  You later met with Mr. Mulholland

    16     and me and others in approximately November of 2006?

    17          A    Yes.

    18          Q    But you did not meet with Mr. Mulholland --

    19     let me ask you this.  Did you meet with any

    20     representatives of Tuomey between the time your

    21     engagement was terminated in September of 2005 and

    22     when you met with me and Mr. Mulholland in November of

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 136

1    2006?

2        A    No.

3        Q    And did you meet with anyone from the

4    government during that time, again, until the November

5    1st meeting?

6        A    No.

7        Q    Did you have e-mails with us, that is, with

8    the government, to coordinate the logistics of the

9    November 1st meeting?

10       A    Yes.

11       Q    But in those -- did we have any substantive

12   discussions until the November meeting?

13       A    No.

14       Q    Going to have to count a lot of pages here.

15   You're on --

16       A    I think I'm on 5.

17       Q    That says 5.  So if you'll count to page

18   30.

19       A    Okay.

20       Q    And it may be page 29.  It's the page that

21   at the very top says, Kevin McAnaney in bold, and then

22   under that, from Kevin McAnaney dated Saturday, June

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 137

1    18th, 2005 at 9:04 a.m.

2         A    Yes.  I see --

3              MR. ACKER:  Has counsel found that?

4              MR. MULHOLLAND:  Not yet.

5              MR. ACKER:  E-mail at the top from Kevin

6    McAnaney dated Saturday, June 18, 2005 at 9:04 a.m.

7              MR. MULHOLLAND:  June 18?

8              MR. ACKER:  June 18, 9:04.

9              MR. MULHOLLAND:  Let me just show it to you

10   to make sure I'm looking at the same one.

11             MR. ACKER:  Yes.

12   BY MR. ACKER:

13        Q    All right.  Actually, again, oftentimes the

14   way e-mails show up when you print them out is the

15   latest message in a string is at the top and the

16   earlier messages are behind it; is that correct?

17        A    Yes.

18        Q    Let me have you look at the next page.  And

19   at the bottom do you see -- or halfway down do you

20   see, it says, original message from Greg Smith, Greg,

21   sent Friday, June 17th, 2005 at 9:12 a.m.?

22        A    Yes.

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 138

1          Q    And that says, Kevin and Tim, given that

2    the Indiana attorneys that worked on the JV were not

3    involved in the compensation arrangement, it would be

4    best to talk about the compensation arrangement and JV

5    separately.  To discuss the compensation arrangement I

6    would be available late Tuesday, 3:00 p.m. or later,

7    and my day is more open on Wednesday.  Maybe we could

8    schedule to talk about the JV next Thursday or early

9    Friday.  I assume the Indiana attorneys will be on

10   that call.  Tim, as discussed, I will e-mail you

11   shortly a summary of the Cejka compensation

12   arrangement appraisal issues we covered last week with

13   Cejka as well as the issues we did not get to address.

14   Greg.

15          Did I read that correctly?

16          A    Yes.

17          Q    So Greg Smith is asking that they have --

18   that you all have separate discussions about the

19   compensation arrangement and the joint venture

20   arrangement?

21          A    Yes.

22               MR. MULHOLLAND:  Objection, asks for

Kevin G. McAnaney, Esq.                                           October 9, 2008

Washington, DC

Page 139

1    speculation.

2    BY MR. ACKER:

3         Q    And if you'll look, then, on the previous

4    page, again, in the middle of the page, from Timothy

5    Hewson sent Friday, June 17th, 2005, at 4:20 p.m., he

6    says, let's plan on Wednesday at 11:00 a.m. for the

7    employment discussion.  I will originate the call.  I

8    have e-mailed Spratt and Heath about their

9    availability on Thursday.

10        Does this confirm your earlier statements that

11   there were separate discussions on the employment

12   issue and the joint venture issue?

13        A    Yes.

14        Q    And is it your recollection that the

15   joint -- excuse me -- the employment discussion for

16   the part-time employments was on the 22nd of June?

17        A    Yes.

18        Q    And the joint venture discussion was on the

19   23rd of June?

20        A    Yes.

21        Q    And that the representatives from

22   Hall Render law firm only participated on the second

```
                                                      Page 140
 1    call?

 2           A    Yes.

 3           Q    Okay.  If you'll look two pages -- excuse

 4    me -- let me count here -- about 12 pages further.

 5    And the top says, "recovered re Tuomey hospital matter

 6    from Kevin Barth."  Are we on the same page?

 7           A    Yep.

 8           Q    Monday, October 16, 2006, 11:51.

 9           A    This must be it.  Okay.  Yeah.

10                MR. ACKER:  Are you all on the same page?

11    The one that at the top says 11:51 a.m.

12                MR. MULHOLLAND:  Yes, we have it.

13    BY MR. ACKER:

14           Q    Okay.  And, again, this appears to be a

15    response from an earlier e-mail.  If you'll turn to

16    the next page, the next page there is an e-mail from

17    Kevin McAnaney sent Friday, October 13, 2006 at 3:18

18    p.m.?

19           A    Yes.

20           Q    Addressed to Mr. Acker.  That's me.

21           A    Yes.

22           Q    Read the first sentence of that.
```

Page 141

1          A    Mr. Acker, I received confirmation from

2     Mr. Daniel regarding Tuomey's waiver of the privilege

3     but have not yet heard back from Kevin Barth for

4     Palmetto Orthopaedic.

5          Q    Tell me again what your recollection is of

6     the confirmation you received from Mr. Daniel

7     regarding Tuomey's waiver of the privilege.

8          A    Well, I recall we had a back-and-forth for

9     a while.  We were playing tag.  And then I find -- I

10    mean, I left a message explaining what it was about.

11    And then at some point, which is probably right

12    before -- I think I e-mailed you probably right after.

13    We did speak.  And he agreed that they waived the

14    privilege for me to meet with you and Dan in my

15    offices.

16         Q    Okay.  And what was your understanding of

17    what privilege was waived?

18         A    Well, I -- I thought it was the privilege

19    as to the discussions that we had had with Tuomey and

20    Palmetto.

21         Q    Would that include the attorney-client

22    privilege?

Kevin G. McAnaney, Esq.                                    October 9, 2008
                        Washington, DC

                                                        Page 142

1        A    Oh, yeah, specifically the attorney-client

2    privilege.  I mean, that's why I was calling.  I

3    wasn't -- I mean, that is the privilege that I was

4    aware of.  I actually -- I mean, I won't say waived

5    something else.  That's all I was concerned with.

6    That's all my question was to.

7        Q    Okay.  And then in this e-mail you say you

8    haven't yet heard from Kevin Barth; is that correct?

9        A    Yes.

10        Q    Look on the previous page at the top, there

11    is an e-mail from Kevin Barth.

12        A    Yes.

13        Q    Is this just a few days later after the

14    Friday, October 13th e-mail?

15        A    Yes.

16        Q    This is the following Monday.

17        A    (Nodding head up and down.)

18        Q    Read what Mr. Barth wrote to you.

19        A    Thank you for the e-mails.  I do have the

20    authority to waive the privilege on behalf of

21    Dr. Drakeford and his practice and I do hereby waive

22    the attorney-client privilege on their behalf so that

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 143

1    you guys may speak with Mr. McAnaney.  If you need

2    anything else, please let me know.

3          Q    Can you just read the next two lines?

4          A    With best regards, Kevin M. Barth.

5          Q    Okay.

6                MR. ACKER:  Let's take a break for a little

7    while.

8                (Proceedings recessed at 4:11 p.m.)

9                (In session at 4:50 p.m.)

10   BY MR. ACKER:

11         Q    Mr. McAnaney, did anyone ever tell you why

12   you were chosen by Tuomey and Palmetto to give your

13   opinion on these contracts?

14         A    Not that I recall.

15         Q    Okay.  When you were talking earlier at the

16   very beginning of your deposition about your jobs that

17   you've held, can you go into a little bit more detail

18   about what your role was at the Office of Counsel for

19   the Inspector General?

20         A    Well, I was brought in to start following

21   the passage of the HIPAA, Health Insurance Portability

22   and -- Portability, Accountability and something Act.

Page 144

1            Anyway, Congress mandated that the secretary

2    issue advisory opinions on the -- on various issues

3    under the anti-kickback statute and other at least OIG

4    authorities.  And I was brought in to run that group,

5    to start it, called the Industry Guidance Branch.  And

6    so I founded it and did that.  And in that capacity I

7    basically supervised that office.  And we basically

8    did advisory opinions, special bulletins dealing with

9    the kickback statute and different authorities, and

10   also safe harbor regulations.

11           In addition, while I was -- well, that was

12   my -- those were my job responsibilities.

13       Q    And what was your title there?

14       A    Chief of the Industry Guidance Branch of

15   the Office of Counsel to the Inspector General.

16       Q    And you started to say in addition you did

17   something else.  What were you going to say?

18       A    Well, I also worked on the Stark II

19   regulations.  I basically was the principal drafter of

20   the Stark II, Phase I and Phase II regulations.

21   Although those were actually CMS regulations, not OIG

22   regulations.

Kevin G. McAnaney, Esq.                                                    October 9, 2008
                              Washington, DC

                                                                Page 145

 1          Q    And are those the regulations that are --

 2    that apply to the analysis of whether there is a Stark

 3    problem with these contracts?

 4               MR. MULHOLLAND:   Objection to the form of

 5    the question.

 6               THE WITNESS:   Well, yeah.   I mean, they are

 7    the regulations that implement the physician

 8    self-referral law, the Stark Law, and so the

 9    employment exception that we were talking about is in

10    the Stark -- it's in the Stark Law and then it's

11    further implemented in the Stark regulations.

12    BY MR. ACKER:

13          Q    And is that the Stark regulations that you

14    helped to draft?

15          A    Yes.

16          Q    We skipped a page in here that I said we

17    would come back to, page 59 in Exhibit 1.   And I just

18    wanted to touch base on that very quickly.   This is an

19    e-mail from Greg Smith to Timothy Hewson dated May 16,

20    2005.   Was this in your file that you produced to us?

21          A    Yes.

22          Q    And if you look at the third -- let me just

1    read the first few sentences of this e-mail.

2         Tim, the initial submission to Kevin regarding

3    the employment arrangement covers all the documents we

4    discussed.  I assume Cejka will be doing the

5    valuation.  Can you clarify Cejka's engagement

6    arrangements with Tuomey?  If they were engaged to

7    design a physician employment strategy for which they

8    received a fee, their valuation will not be

9    independent since their appraisal will be of their own

10   work product.

11        That last sentence there is what I want to ask

12   you about.  If they, that is, Cejka, were engaged to

13   design a physician employment strategy for which they

14   received a fee, their valuation will not be

15   independent since their appraisal will be of their own

16   work product.  Did that issue come up in your

17   analysis?

18        A    Not that I recall.

19        Q    Did that issue come up in the discussions

20   that you had with Mr. Hewson?

21        A    Not that I recall actually.

22        Q    Okay.  Did Mr. Hewson ever tell you that he

Kevin G. McAnaney, Esq.                                                        October 9, 2008

Washington, DC

Page 147

1    believed you didn't have all the facts necessary for

2    you to advise them?

3         A    No.

4         Q    Did Mr. Hewson ever tell you that he

5    believed your opinion had been poisoned by your

6    discussions with Greg Smith?

7              MR. MULHOLLAND:  Objection.

8              THE WITNESS:  No.

9    BY MR. ACKER:

10        Q    Did Mr. Hewson ever tell you that he

11   thought that you had improperly spoken to Greg Smith

12   before the June 22nd meeting?

13             MR. MULHOLLAND:  Objection.

14             THE WITNESS:  No.

15   BY MR. ACKER:

16        Q    And do you believe that your opinions that

17   you formed as of June 22nd, 2005 were poisoned by your

18   communications with Greg Smith?

19             MR. MULHOLLAND:  Objection.

20             THE WITNESS:  No.

21   BY MR. ACKER:

22        Q    Did Mr. Hewson ever tell you -- I'm going

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 148

1    to withdraw that question.

2            During the time that you were working for

3    Tuomey and Palmetto in the summer of 2005, did you

4    form an opinion as to whether the Stark statute

5    applied to these proposed compensation arrangements?

6            MR. MULHOLLAND:  Same objections as

7    previously put on the record regarding any opinions he

8    may have had.

9            THE WITNESS:  I mean, yes.

10   BY MR. ACKER:

11       Q   And what was that opinion?

12           MR. MULHOLLAND:  Same objection.

13           THE WITNESS:  That I think the Stark Law --

14   I mean, the Stark Law certainly implicated by the

15   arrangement.

16   BY MR. ACKER:

17       Q   Why?

18           MR. MULHOLLAND:  Same objection.

19           THE WITNESS:  Well, because, as it was

20   described, it was an employment relationship that the

21   system was employing physicians who would be referring

22   to the hospital.

Kevin G. McAnaney, Esq.                                                      October 9, 2008
                              Washington, DC

Page 149

1    BY MR. ACKER:

2         Q    Did Tim Hewson ever tell you that he

3    thought Stark didn't apply?

4         A    No.

5         Q    Did Tim Hewson ever tell you that there was

6    no financial relationship between Tuomey and the

7    doctors?

8         A    No.

9         Q    Did Tim Hewson ever raise that as an issue

10   at all?

11             MR. MULHOLLAND:  Objection.

12             THE WITNESS:  Not that I recall.

13   BY MR. ACKER:

14        Q    What, if anything, did Mr. Hewson say about

15   the application of the Stark Law to these proposed

16   contracts?

17        A    I don't recall specifically.  I think he

18   thought they complied.

19        Q    Okay.  Did he say what exception he

20   believed it fit in?

21             MR. MULHOLLAND:  Objection.

22             THE WITNESS:  Not that I recall.

Kevin G. McAnaney, Esq.                                              October 9, 2008
                          Washington, DC

                                                               Page 150

 1    BY MR. ACKER:

 2          Q    Do you recall the interview that took place

 3    on or about November 1 of 2006 where Mr. Mulholland

 4    and I came to your office?

 5          A    Yes.

 6          Q    And was there any question in your mind as

 7    of that date that both of your clients had waived the

 8    attorney-client privilege?

 9               MR. MULHOLLAND:  Objection.

10               THE WITNESS:  I was -- I was clear they had

11    both waived the privilege.

12    BY MR. ACKER:

13          Q    And that was -- when you say they waived

14    the privilege, they waived the privilege as it related

15    to your joint representation of those two clients?

16          A    Yes.

17               MR. MULHOLLAND:  Objection to the form of

18    the question.

19    BY MR. ACKER:

20          Q    Your answer was yes?

21          A    Yes.

22          Q    Let me draw your attention to page 73 of

Page 151

1    Exhibit 1.  I want to draw your attention to the very

2    bottom section.  You see there is a double line, and

3    below that it says, very risky, noncompete.  And, I'm

4    sorry, I know you read this into the record before,

5    but could you just read that bottom section into the

6    record again?

7          A    Okay.  I think it says, very risky,

8    noncompete, effectively precludes from practicing, if

9    can't perform outpatient surgery -- I mean outpatient.

10   And underneath it, term (how reasonable)?  And

11   underneath that, history.

12         Q    What portion of the Stark Law, if any, did

13   you consider this noncompete and the term and the

14   history to be applicable to?

15              MR. MULHOLLAND:  Objection to the form of

16   the question.

17              THE WITNESS:  Well, I think the term -- I

18   would need to have the reg. in front of me.  I'm not

19   necessarily sure they were particularly geared towards

20   the Stark.  Although I think it may have been -- I

21   mean, to the extent there is a commercially

22   reasonable, not taking into account that it would

Kevin G. McAnaney, Esq.                                              October 9, 2008

Washington, DC

Page 152

1    be -- even if there were no referrals between them --

2    but I can't recall exactly.  I believe it's just --

3    the general commercial reasonableness of the

4    arrangement.

5    BY MR. ACKER:

6         Q    And that commercial reasonableness is an

7    element of some of the exceptions to the Stark Law?

8         A    Some of them.

9              MR. MULHOLLAND:  Objection.

10   BY MR. ACKER:

11        Q    And I believe your testimony earlier was

12   that the ten-year term of the agreement and the

13   three-year noncompete seemed long to you.  Is that

14   your recollection of what you testified to earlier?

15             MR. MULHOLLAND:  Objection.

16             THE WITNESS:  Yes.

17   BY MR. ACKER:

18        Q    And what was the relevance of your

19   statement that that seemed long to you?

20             MR. MULHOLLAND:  Objection to the form of

21   the question.

22             THE WITNESS:  Well, it's just -- I mean, the

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 153

1   longer it is, the longer you're locking up a referral

2   stream.

3   BY MR. ACKER:

4       Q    And did you tell that to Mr. Hewson in your

5   meeting on June 22nd, that you were concerned about

6   locking up referrals?

7            MR. MULHOLLAND:  Objection.

8            THE WITNESS:  I don't recall that.  I think

9   I probably mentioned I thought the term seemed long

10  compared to most employment contracts.

11  BY MR. ACKER:

12      Q    And do you know if you mentioned whether

13  the locking up of referrals was a concern?

14      A    No, I don't recall if I said -- I mean, I'm

15  not sure I would have said that beyond just the term

16  made it look like it was -- potentially would be --

17  would raise a question.

18      Q    And going back to page 73, you talk about

19  the noncompete, you talk about the term, but then you

20  also mentioned history.  What's the relevance of the

21  history to the noncompete and the term, if any?

22      A    Well, it's not so much that.  It's to the

Page 154

 1    evaluation of the entire arrangement, someone coming

 2    in cold.  The government, certainly if you're looking

 3    at the kickback statute as an intent-based statute,

 4    and in determining what the intent is, they are going

 5    to look at the history and the background to an

 6    arrangement.

 7         Q    What part of the history did you think was

 8    relevant to that question?

 9         A    Well, I thought the whole, beginning with,

10    as I said, this background about the ASC that was

11    there and how it's developed, and then having this

12    alternative -- I mean, so that's the background.  And

13    then you have this alternative of perhaps this

14    outpatient surgery center or the employment contract

15    that, in general, looked like you were trying to find

16    a way to induce -- I mean, to get the physicians'

17    referrals.

18         Q    Let me draw your attention to page 1 of

19    Exhibit A, page 006-1 of Exhibit 1, the very first

20    page.  We talked about this earlier.  "This" being the

21    letter essentially terminating your engagement; is

22    that correct?

Page 155

    1         A    Yes.

    2              MR. MULHOLLAND:  Objection.

    3    BY MR. ACKER:

    4         Q    Between the conference call that you had on

    5    June 23rd and this date, what did you do concerning

    6    the engagement?  Did you do any work --

    7         A    I don't think I did any work.  I think -- I

    8    mean, yeah.  If I had done, I would have billed them.

    9         Q    So your recollection is that you had the

   10    conference call on the 22nd of June, the conference

   11    call on the 23rd of June, then you received a request

   12    to put the -- your opinion in writing, and then you

   13    received this letter saying don't put it in writing.

   14              MR. MULHOLLAND:  Object to the form.

   15              THE WITNESS:  I'm not -- I don't think I

   16    actually received a call to put it in writing.  It was

   17    that it was being -- it was being considered.

   18    BY MR. ACKER:

   19         Q    Okay.  But you -- you don't recall any more

   20    work that you did between the 23rd and September 22nd.

   21         A    Right.  My recollection was that the end of

   22    those two calls was sort of -- I basically delivered

Page 156

1  orally my assessment, and they said, well, they might

2  get back to me or something along that line --

3      Q   Okay.

4      A   -- if something further would be done.

5      Q   Going back to page 73, the notes that we

6  made -- that you made at the bottom, the testimony

7  that you gave just a few moments ago about what you

8  meant by that and what you were concerned about that,

9  did you discuss those issues with Tim Hewson on June

10  22nd?

11          MR. MULHOLLAND:  Objection.  His testimony

12  speaks for itself.

13          THE WITNESS:  Yes, I believe I did.

14          MR. ACKER:  That's all the questions we

15  have.

16          MR. MULHOLLAND:  Can we go off the record?

17          (Discussion was had off the record.)

18          (Proceedings recessed at 5:08 p.m.)

19          (In session at 5:15 p.m. )

20          MR. ACKER:  The parties have discussed off

21  the record the possibility of continuing this

22  deposition for the cross-examination to a later date.

10

Kevin G. McAnaney, Esq.

Washington, DC

October 9, 2008

Page 157

1    The witness has said that that is his preference.  And

2    the parties have agreed that that will be done with

3    the -- the government would ask that -- has said that

4    its agreement is contingent upon the fact that there

5    will be no additional exhibits introduced other than

6    what's already been introduced, unless one of two

7    things happens:  either some attachment, for the rule

8    of completeness, something needs to be included from

9    one of the exhibits or documents that's already been

10   introduced or if Tuomey's counsel notifies us within

11   the next week of a request for additional exhibits,

12   and, if they are reasonable, we will give reasonable

13   consent to that.

14            MR. MULHOLLAND:  Those conditions are

15   acceptable to Tuomey.  I just thought we might want to

16   get on the record that this is all right with the

17   witness.

18        Is that okay, Mr. McAnaney, the postponement of

19   your deposition or rather the continuance of your

20   deposition?

21            THE WITNESS:  Yes.

22        (Proceedings recessed at 5:16 p.m.)

Page 158

1        (Signature having not been waived, the

2   deposition of KEVIN MCANANEY, ESQUIRE recessed at 5:16

3   p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 159

1                    ACKNOWLEDGMENT OF DEPONENT

2

3              I, KEVIN MCANANEY, ESQUIRE, do hereby

4     acknowledge that I have read and examined the

5     foregoing testimony, and the same is a true, correct

6     and complete transcription of the testimony given by

7     me and any corrections appear on the attached errata

8     sheet signed by me.

9

10

11

12     _____   _____

13        (Date)                    (Signature)

14

15

16     SUBSCRIBED AND SWORN TO before me this _____ of

17     _____, 2008.

18

19     _____

20          (Notary Public)

21     My Commission Expires:

22

```
 1        CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

 2

 3            I, Linda S. Kinkade, Registered Professional

 4   Reporter, Registered Merit Reporter, Certified

 5   Shorthand Reporter, Certified Realtime Reporter, and

 6   Registered Diplomate Reporter, the notarial officer

 7   before whom the foregoing proceedings were taken, do

 8   hereby certify that the foregoing transcript is a true

 9   and correct record of the proceedings; that said

10   proceedings were taken by me stenographically, to the

11   best of my ability, and thereafter reduced to

12   typewriting; and that I am neither counsel for or

13   related to, nor employed by any of the parties to this

14   case and have no interest, financial or otherwise, in

15   its outcome.

16            IN WITNESS WHEREOF, I have hereunto set my hand

17   and affixed my notarial seal this 12th day of MARCH

18   2010.

19            My commission expires:   July 14, 2012

20

21   NOTARY PUBLIC IN AND FOR

22   THE DISTRICT OF COLUMBIA
```