# Witness: Kevin McAnaney

## Case: Michael Drakeford vs. Tuomey Health Care System

Date: 10/09/2008

Reference Number: 10128

McAnaney_001

# NEXSEN PRUET

**Tim L. Hewson**
Member

September 2, 2005

Kevin G. McAnaney, Esquire
Law Offices of Kevin G. McAnaney
1800 K Street, N.W., Suite 720
Washington, DC 20006-2202

Re:    Joint Engagement by Palmetto Orthopaedic and Sports Medicine Center and
Tuomey Health Care System

Dear Kevin:

Thank you for your prior work in reviewing two proposed business arrangements between Palmetto and Tuomey. Please be advised that a difference of opinion now exists between the parties. Because you have served as counsel for both parties in this matter, you are in an unfortunate conflict of interest situation. Accordingly, at this time, you are not authorized to do any further work in this matter, including preparing a written opinion. Please note that if, in the future, Tuomey and Palmetto decide to extend your engagement, you will be informed in writing, and the terms of the engagement will be agreed upon in advance by Palmetto and Tuomey. Until such time, please do not perform any additional work in this matter.

Thank you again for your assistance.

Very truly yours,

Tim L. Hewson

TLH/ll
cc:    Greg Smith

Charleston

Charlotte

**Columbia**

Greensboro

Greenville

Hilton Head

Myrtle Beach

1441 Main Street
Suite 1500 (29201)
PO Drawer 2426
Columbia, SC 29202
www.nexsenpruet.com

T 803.253.8204
F 803.253.8277
E THewson@nexsenpruet.com
Nexsen Pruet Adams Kleemeier, LLC
**Attorneys and Counselors at Law**



DEPOSITION EXHIBIT

NPCOL1:794225.1-LT-(TLH) 014245-00157
006-1

LAW OFFICES
OF
# KEVIN G. MCANANEY

1800 K STREET, N.W.
SUITE 720
WASHINGTON, D.C. 20006-2202

(202) 457-0494
FAX (202) 457-6636

MEMBER
D.C. AND NY BARS

July 5, 2005

Dr. Mike Drakeford
Palmetto Orthopaedic & Sports
595 W. Wesmark Boulevard
Sumter, SC  29150

RE:    Statement for June 2005 Legal Services

Dear Dr. Drakeford:

Enclosed is a Statement of Account for my legal services in June 2005 in connection with advice relating to the federal anti-kickback statute and certain proposed business arrangements with Tuomey Healthcare System.

I appreciate the opportunity to assist Palmetto Orthopaedic & Sports on these matters.

Best regards,

Kevin G. McAnaney

006-2

# LAW OFFICES OF KEVIN G. MCANANEY
1800 K STREET, N.W.
SUITE 720
WASHINGTON, D.C. 20006-2202

## STATEMENT OF ACCOUNT
FOR PROFESSIONAL SERVICES AND DISBURSEMENTS

(202) 457-0494
(202) 457- 6636 F

EIN 20-0044987

July 5, 2005

Palmetto Orthopaedic & Sports
595 W. Wesmark Boulevard
Sumter, SC  29150

For legal services rendered in June 2005
      (11.4 hrs @ $325/hr)       $ 3,705.00

50%                     $ 1,852.50

(Please see attached detailed description of services)

Payment due within 30 days of invoice date.  Thank you.

006-3

# TUOMEY HOSPITAL/PALMETTO ORTHOPAEDIC

| DATE | DESCRIPTION | TIME |
|------|-------------|------|
| April 27, 2005 | T/c Greg Smith (GS) re: background on Sumter ortho outpatient surgery center proposal | .5 |
| May 3, 2005 | T/c Tim Hewson (TH) re: background, process | .5 |
| May 27, 2005 | Review employment contracts and opinions | 1.5 |
| May 31, 2005 | Review contracts and opinions; t/c GS re: background info (.4) | 2.4 |
| June 21, 2005 | Review material | 1.0 |
| June 22, 2005 | Prep and conf call w/ GS and TH | 2.5 |
| June 23, 2005 | Prep and conf call w/ GS, TH, Hall Render re JV | 3.0 |
| | **TOTAL** | 11.4 hrs. |

006-4

LAW OFFICES
OF
# KEVIN G. MCANANEY

1800 K STREET, N.W.
SUITE 720
WASHINGTON, D.C. 20006-2202

(202) 457-0494
FAX (202) 457-6636

MEMBER
D.C. AND NY BARS

July 5, 2005

Mr. Jay Cox
President/CEO
Tuomey Healthcare System
129 N. Washington St.
Sumter, SC   29150

    RE:    Statement for June 2005 Legal Services

Dear Mr. Cox:

Enclosed is a Statement of Account for my legal services in June 2005 in connection with advice relating to the federal anti-kickback statute and certain proposed business arrangements with Palmetto Orthopaedic Group.

I appreciate the opportunity to assist Tuomey on these matters.

Best regards,

Kevin G. McAnaney

006-5

# LAW OFFICES OF KEVIN G. MCANANEY

1800 K STREET, N.W.
SUITE 720
WASHINGTON, D.C. 20006-2202

## STATEMENT OF ACCOUNT
### FOR PROFESSIONAL SERVICES AND DISBURSEMENTS

(202) 457-0494
(202) 457-6636 F

EIN 20-0044987

July 5, 2005

Tuomey Healthcare System
129 N. Washington St.
Sumter, SC   29150

For legal services rendered in June 2005
      (11.4 hrs @ $325/hr)          $ 3,705.00

    50%                                  $ 1,852.50

(Please see attached detailed description of services)

Payment due within 30 days of invoice date.  Thank you.

006-6

# TUOMEY HOSPITAL/PALMETTO ORTHOPAEDIC

| DATE | DESCRIPTION | TIME |
|------|-------------|------|
| April 27, 2005 | T/c Greg Smith (GS) re: background on Sumter ortho outpatient surgery center proposal | .5 |
| May 3, 2005 | T/c Tim Hewson (TH) re: background, process | .5 |
| May 27, 2005 | Review employment contracts and opinions | 1.5 |
| May 31, 2005 | Review contracts and opinions; t/c GS re: background info (.4) | 2.4 |
| June 21, 2005 | Review material | 1.0 |
| June 22, 2005 | Prep and conf call w/ GS and TH | 2.5 |
| June 23, 2005 | Prep and conf call w/ GS, TH, Hall Render re JV | 3.0 |

**TOTAL   11.4 hrs.**

Orthopedic Group in Sumter
— invest in ASC
— Tuomey Hospitals
— Drs. invest in ASC (in hospital
                    (or urologist

— outpatient surgery center
    — couldn't buy out
    — other alternatives

— employ d— w/
    → compensation formula
    →
        base salary + probably be
        % of drs. collect

            +

always
use
drs

drug

built at outpatient surgery center
    → economic credentialing
    → invest in some respects
        — provide these services
        — incentive if may any
            60/40 →
            netty 75,000

T/C Greg
Smith
wrinkle
4/27

006-8

Tim Housh    803-253-8204

The hospital through CON battle —
— if capacity applicat to setup
an ASC

— deny applicatn for capacity I mean
— (involvmt)

— gave hospital apprvl for 4 beds

— was appeald on access —
→ single specialty ASC to
urology

→ attract investors from other
multispecialty specialist —

Closed Staff / Non Competes /
part time employmt
→ Clinic will bottle off total divest
investmt in ASC —
{ → jeopardize manage care reimburst rate
{ → deepens loss if into ASC

→ can't offer the divest investmt
→ had to meet competitive threat
→ only option economic credintialg
Explore P/T time employmt — eng recomultr
→ small base / with total partial —
→ Chilton his P/V opiniots →



— CS
— Consultant svp head equity
West bank to outsource service center —
⇒ McClaren / World Center
— under arrangements

— NewCo reserve of service
— mgmt
— turnkey OPSC
— Private Isterd / under
arrangements —

⇒ ls & FMV ⇒

— Kb issues

⇒ Dick Kusserow's firm ⇒

There are other employment Ks authd
w/ same / similar methodology

05/12/00  12:00 FAX 000 200 0211       NFSF COLA 14B                    002
05/09/2005  09:21    2024575636           LAW OFFICES              PAGE  02

LAW OFFICES
OF

# KEVIN G. MCANANEY

1800 K STREET, N.W.
SUITE 720
WASHINGTON, D.C. 20006-2202

MEMBER
D.C. AND NY BARS

(202) 457-0494
FAX (202) 457-6656

**CONFIDENTIAL – ATTORNEY WORK PRODUCT
SUBJECT TO ATTORNEY/CLIENT PRIVILEGE**

May 6, 2005

Mr. Jay Cox
President/CEO
Tuomey Healthcare System
129 N. Washington St.
Sumter, SC  29150

Dr. Mike Drakeford
Palmetto Orthopaedic & Sports
595 W. Wesmark Boulevard
Sumter, SC  29150

RE:    Legal Services Engagement

Dear Mr. Cox and Dr. Drakeford:

This is to confirm that Tuomey Healthcare System ("Tuomey") and Palmetto Orthopaedic & Sports ("Palmetto") (together, "Clients") have jointly retained me to review and advise them with respect to a proposed business relationship between them. Specifically at this time, you have asked me to assist Tuomey and Palmetto in reviewing certain business arrangements relating to an outpatient surgery center in light of 42 U.S.C. §1320a-7b(b) (commonly known as the anti-kickback statute) and other federal fraud and abuse authorities. I will report orally my conclusions as well as an evaluation of any potential compliance issues.

I will be guided by your joint instructions in carrying out the representation. In particular, I understand that: (i) the representation is joint; (ii) my fees will be split equally between Clients; (iii) the attorney-client privilege extends to communications from both Clients and can only be waived if both Clients consent; and (iv) any materials or information provided me by either Client can be shared by me with the Client unless the Client providing the information or material expressly requests that it not be shared. The Clients will provide an index with a brief descriptive title of any materials or information provided me subject to restriction. Each Client's index will be made available to the other Client., if requested.

006-11

I bill for my services on an hourly basis plus disbursements.  My current hourly rate is $325.00 and is subject to periodic increases.  My practice is to bill on a monthly basis using a format that identifies the services provided and the costs of those services.  I request that clients pay upon receipt of the statement and, if payment is not made within 60 days, I reserve the right to terminate my representation.

If, in the course of my representation, I determine there is a conflict of interest or a potential conflict of interest caused by my representation of any other client, I will advise you accordingly so that you can make an informed decision whether you wish for me to continue my representation.

If the terms of this engagement are acceptable to you, please sign a copy of the letter below and return it for my files.  I look forward to working with you on behalf of Tuomey and Palmetto.

Best regards,

Sincerely,

Kevin G. McAnaney

Accepted on behalf of
Tuomey Healthcare System1

By: _____
        Jay Cox

Accepted on behalf of
Palmetto Orthopaedic & Sports

By: _____
        Mike Drakeford

LAW OFFICES
OF
## Kevin G. McAnaney

1800 K STREET, N.W.
SUITE 720
WASHINGTON, D.C. 20006-2202

MEMBER
D.C. AND NY BARS

(202) 457-0494
FAX (202) 457-6636

## CONFIDENTIAL – ATTORNEY WORK PRODUCT
## SUBJECT TO ATTORNEY/CLIENT PRIVILEGE

May 6, 2005

Mr. Jay Cox
President/CEO
Tuomey Healthcare System
129 N. Washington St.
Sumter, SC  29150

Dr. Mike Drakeford
Palmetto Orthopaedic & Sports
595 W. Wesmark Boulevard
Sumter, SC  29150

      RE:    Legal Services Engagement

Dear Mr. Cox and Dr. Drakeford:

      This is to confirm that Tuomey Healthcare System ("Tuomey") and Palmetto Orthopaedic & Sports ("Palmetto") (together, "Clients") have jointly retained me to review and advise them with respect to a proposed business relationship between them. Specifically at this time, you have asked me to assist Tuomey and Palmetto in reviewing certain business arrangements relating to an outpatient surgery center in light of 42 U.S.C. §1320a-7b(b) (commonly known as the anti-kickback statute) and other federal fraud and abuse authorities. I will report orally my conclusions as well as an evaluation of any potential compliance issues.

      I will be guided by your joint instructions in carrying out the representation.  In particular, I understand that: (i) the representation is joint; (ii) my fees will be split equally between Clients; (iii) the attorney-client privilege extends to communications from both Clients and can only be waived if both Clients consent; and (iv) any materials or information provided me by either Client can be shared by me with the Client unless the Client providing the information or material expressly requests that it not be shared. The Clients will provide an index with a brief descriptive title of any materials or information provided me subject to restriction.  Each Client's index will be made available to the other Client., if requested.

006-13

I bill for my services on an hourly basis plus disbursements. My current hourly rate is $325.00 and is subject to periodic increases. My practice is to bill on a monthly basis using a format that identifies the services provided and the costs of those services. I request that clients pay upon receipt of the statement and, if payment is not made within 60 days, I reserve the right to terminate my representation.

If, in the course of my representation, I determine there is a conflict of interest or a potential conflict of interest caused by my representation of any other client, I will advise you accordingly so that you can make an informed decision whether you wish for me to continue my representation.

If the terms of this engagement are acceptable to you, please sign a copy of the letter below and return it for my files. I look forward to working with you on behalf of Tuomey and Palmetto.

Best regards,

Sincerely,

Kevin G. McAnaney

Accepted on behalf of
Tuomey Healthcare Systeml

By: _____
     Jay Cox

Accepted on behalf of
Palmetto Orthopaedic & Sports

By: _____
     Mike Drakeford

006-14

1800 K Street, Suite 720
Washington, D.C. 2006
202-457-0494

**Law Offices of
Kevin G. McAnaney**



# Fax

| | | | |
|---|---|---|---|
| **To:** | Jay Cox | **From:** | Kevin McAnaney |
| **Fax:** | 803.778.9489 | **Pages:** | 3/ pgs (including cover) |
| **Phone:** | | **Date:** | May 9, 2005 |
| **Re:** | Engagement Letter | **CC:** | |

☐ **Urgent**    ☐ **For Review**    ☐ **Please Comment**    ☐ **Please Reply**    ☐ **Please Recycle**

● **Comments:** Per Tim Hewson's request.

1800 K Street, Suite 720
Washington, D.C. 2005
202-457-0494

**Law Offices of
Kevin G. McAnaney**

# Fax

| To: | Tim Hewson | From: | Kevin McAnaney |
|---|---|---|---|
| Fax: | (803) 253-8277 (fax) | Pages: | 3 pgs (including cover) |
| Phone: | | Date: | May 6, 2005 |
| Re: | Engagement letter | CC: | |

☐ **Urgent**     ☐ **For Review**     ☐ **Please Comment**     ☐ **Please Reply**     ☐ **Please Recycle**

● **Comments:** Tim – I thought it might be quicker if you just faxed this on to Jay Cox

1800 K Street, Suite 720
Washington, D.C. 2006
202-457-0494

**Law Offices of
Kevin G. McAnaney**



# Fax

| | | | |
|---|---|---|---|
| **To:** | Dr. Mike Drakeford | **From:** | Kevin McAnaney |
| **Fax:** | (803) 469-2663 | **Pages:** | 3 pgs (including cover) |
| **Phone:** | | **Date:** | May 6, 2005 |
| **Re:** | Engagement letter | **CC:** | |

☐ **Urgent**   ☐ **For Review**   ☐ **Please Comment**   ☐ **Please Reply**   ☐ **Please Recycle**

● **Comments:** Per Greg Smith's request.

# NEXSEN|PRUET

## FAX TRANSMISSION

| | | |
|---|---|---|
| **TO:** | **FAX NO.:** | **PHONE NO.:** |
| Greg Smith | 336-733-8353 | 336-721-3665 |
| Kevin McAnaney | 202-457-6636 | 202-457-0494 |

| | | |
|---|---|---|
| **FROM:** Tim L. Hewson | **PHONE:** | 803.253.8204 |
| **RE:** Tuomey Healthcare System and Palmetto Orthopaedic & Sports | **DATE:** | May 12, 2005 |

**NUMBER OF PAGES WITH COVER PAGE:** 3

**Message:**

ATTACHED IS THE ENGAGEMENT LETTER EXECUTED BY JAY COX ON BEHALF OF TUOMEY HEALTHCARE SYSTEM IN THE REFERENCED MATTER. HAVE EITHER OF YOU RECEIVED AN EXECUTED COPY FROM PALMETTO ORTHOPAEDIC?

USER NUMBER:                    278

NEXSEN PRUET ADAMS KLEEMEIER, LLC
ATTORNEYS AND COUNSELORS AT LAW
1441 MAIN STREET, SUITE 1500 (29201)
POST OFFICE DRAWER 2426
COLUMBIA, SC 29202
803.771.8900 • FAX: 803.253.8277

### CONFIDENTIALITY NOTE

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS LEGALLY PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THIS READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR DUPLICATION OF THIS TELECOPY IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS TELECOPY IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ADDRESS ABOVE VIA THE UNITED STATES POSTAL SERVICE. THANK YOU.

IF YOU DO NOT RECEIVE ALL OF THE PAGES, PLEASE CALL
Louise Lawson AT _____ AS SOON AS POSSIBLE.

NPCOL1:773292.1-FX-(TLH) 000278-00060

006-18



**HALL,
RENDER, KILLIAN,
HEATH & LYMAN**

Attorneys at Law

Professional Service Corporation

Suite 2000, Box 82064
One American Square, Indianapolis, IN 46282
(317) 633-4884  Fax: (317) 633-4878

Steven H. Pratt
spratt@HallRender.com

March 14, 2005

VIA E-MAIL
gregg.martin@tuomey.com

Gregg Martin
Senior Vice-President and COO
Tuomey Healthcare System
129 North Washington Street
Sumter, SC 29150

Re:     Under Arrangement Relationship with Palmetto Orthopedics

Dear Gregg:

After our recent conference call on February 28, 2005, Tim Hewson, Terry Heath, and I discussed the status of the efforts by Tuomey Healthcare System to create an "under arrangement" relationship with Palmetto Orthopedics, and perhaps other physicians. We thought that it would be helpful to reiterate why Tuomey has decided to pursue this relationship with the physicians.

There are many laudable and legal reasons to enter into an under arrangements relationship. During our discussion with Tuomey, we have identified several reasons that explain why Tuomey desires to more forward with this relationship. The primary reasons that we have identified are as follows:

1.  **Enhanced quality of services at the Outpatient Surgery Center ("OSC").** The physicians will bring a unique perspective to the management and operations of the OSC. Tuomey's expectation is that having the physicians actively participate in managing and operating the OSC will result in an improvement in the quality. Physicians and hospitals necessarily possess different skills. By combining their skills, Tuomey hopes to better serve the Sumter community.

2.  **Control costs and increase efficiencies.** Newco will be at risk to efficiently manage the OSC. Among other things, Newco will take genuine business risks relating to the cost of staff and supplies. The physician owners of Newco will have a genuine incentive to begin standardizing supplies and equipment, control the number of staff, improve scheduling, and take other actions that will increase the efficiency and reduce the costs of operating the OSC. Tuomey's expectation is that this will improve the services the OSC provides to the community and will lead to higher patient and physician satisfaction with the OSC.

006-19

Gregg Martin
Senior Vice President and COO
March 14, 2005
Page 2 of 2

3. **New services to the community.** The use of the under arrangement relationship with the physicians may allow for expansion of the current services that are offered at the OSC. The physicians will have an entrepreneurial interest to ensure that the OSC is efficient and profitable. Therefore, a benefit to the community is that Newco will bring greater innovation and introduce new ideas about how to deliver services, and what services to deliver, that should benefit the community.

4. **Support the recruitment of new physicians.** Palmetto has said that as they recruit additional surgeons, it would be helpful if the new surgeon would be provided the opportunity to invest in Newco. The physicians view Newco as a helpful tool for them to recruit new surgeons to the community. Newco will allow Palmetto, and perhaps other physician groups, to more effectively compete with recruitment offers that new physicians receive when they are recruited by other communities.

5. **Supervision and control over employees.** Managing the OSC through Newco will provide more direct physician participation in the managing of the staff that provide services in the OSC. Once the under arrangement relationship is in place, the staff that will provide services at the OSC will be direct or leased employees of Newco, and will therefore be subject to the control of Newco, including its physician owners. The expectation is that this will allow for better overall supervision, control and use of the staff.

An important result of the under arrangement relationship with Palmetto, and perhaps other surgeons (e.g. ENT; general surgeons), is that a new perspective will be offered in the operation and management of the OSC. This should result in improved quality and improved efficiency. It is important that the working group remain focused on why Tuomey is forming Newco, and why Tuomey in interested in hiring Newco to operate and manage the OSC on an under arrangement basis. The purpose of this joint venture cannot be, and based on our discussions with you is not, to secure or induce referrals, but rather is to change how the OSC operates thereby improving quality and efficiency.

Please feel free to contact me if you have any questions. We appreciate the opportunity to be of service to you.

Sincerely yours,

HALL, RENDER, KILLIAN, HEATH & LYMAN, P.S.C.

Steven H. Pratt

cc:    Tim Hewson
       Terry Heath

145369_1/SHP



**HALL, RENDER, KILLIAN, HEATH & LYMAN**

**Memorandum**

| | | | |
|---|---|---|---|
| **To:** | Timothy L. Hewson | **From:** | Steven H. Pratt, Esq. |
| **cc:** | Terry Heath, Esq. | | |
| **Date:** | May 26, 2005 | **Subject:** | Proposed Management Relationship Tuomey Healthcare System |

You requested that I prepare answers to the questions presented in an e-mail from Greg Smith dated 04/29/05 in connection with the proposed management relationship between Tuomey Healthcare Systems ("Hospital") and certain physicians ("Physicians"). The proposal is for the Hospital and Physicians to form a new legal entity ("Newco") that would manage the Hospital's Outpatient Surgery Center ("OSC").

1.0 **The Services to be provided by Newco to Hospital.** The services to be provided by Newco are not firmly determined. If the venture with the physicians is to be successful and achieve the goal of improving the quality and efficiency of the OSC, then the Hospital needs to listen to the physicians and learn what services Newco should provide in order to achieve the goals. Set forth below is a list of services that the Hospital would propose to the physicians, with the understanding that the list of services will change in response to the physicians' suggestions and comments.

  1.1. **Management of OSC.** Newco will provide administrative and management services to the OSC, and shall direct and coordinate the overall activities of the OSC. This shall include directing and coordinating the clinical activities of the OSC in accordance with recognized professional standards to ensure that quality and efficient care is given to patients. Newco shall ensure that the OSC adheres to all Hospital policies and procedures, and all laws, regulations, and accrediting body requirements. Newco shall arrange for and manage any of the services for the OSC that are provided through contractual arrangements.

  1.2 **Liaison With Medical Staff.** Newco shall promote high quality and efficient care, and shall serve as a liaison between the OSC and the Hospital Board, management and Medical Staff.

  1.3 **Scheduling of Patients.** Newco shall direct and coordinate the scheduling of procedures at the OSC.

  1.4 **Employees.** Newco will supervise and manage the non-physician personnel at the OSC. Newco will provide advice regarding the duties, compensation, in-service training, and job position qualifications with respect to all non-physicians

006-21

employees at the OSC. Newco will help recruit and retain qualified personnel that comply with accepted professional standards. The non-physician employees will either be employees of Newco, or leased employees from the Hospital.

1.5 **Equipment and Supplies.** Newco would provide, through a purchase and/or a lease arrangement, the equipment, supplies and services that are necessary for the operation of the OSC. Newco shall provide the supplies, services and equipment which are advisable for the efficient operation of the OSC, and as are necessary to ensure the provision of high quality care OSC services.

1.6 **Strategic, Financial and Operational Services.** Newco shall assist in the development of, and shall work to implement, the strategic, financial and operating plans for the OSC. This shall include, but not be limited to, assisting the Hospital to prepare the annual budget for the OSC.

1.7 **Quality of Services Performed.** Newco shall evaluate and advise Hospital regarding all quality control aspects of the OSC's operation. Newco shall cooperate with Hospital to develop and implement quality improvement programs and assist with utilization review and provider credentialing. Newco shall assist the OSC to prepare for surveys conducted by governmental authorities and accrediting bodies.

1.8 **Promotion of OSC.** Newco shall make recommendations regarding how to promote and grow the OSC, and shall use its best efforts to market the OSC. All expenses incurred in connection with efforts to market and promote the OSC shall be borne by the Hospital.

1.9 **Third Party Billing and Audits.** Newco shall assist in the preparation of the documentation that is necessary for Hospital to bill and collect for services provided in the OSC. Newco shall cooperate with Hospital to respond to third-party payor audits and government inquiries concerning the medical necessity or quality of care rendered in the OSC.

1.10 **Compliance Program.** A comprehensive corporate regulatory compliance program ("Program") will be developed and implemented that will include HIPAA privacy and security compliance, fraud and abuse compliance, state and local licensing and regulation, as well as all applicable state and federal laws and regulations. Newco shall operate the OSC in compliance with the Program.

1.11 **Miscellaneous Duties.** Newco shall perform such other duties as are mutually agreed upon by Newco and Hospital in order to effectuate the efficient, harmonious and economical operation of the OSC (e.g., support efforts to resolve patient concerns; recommend additions or revisions to OSC policies).

1.12 **Operating Expenses.** Newco will bear all expenses associated with the provision of services, personnel, supplies and equipment as described in paragraphs 1.1-1.11 above.

2

2.0    **Ownership Percentages.** Individual physician ownership will be limited to no more than six (6) units, for a total physician ownership of no more than eighty-four (84) units. The Hospital will remain the majority owner.

3.0    **FMV Support for Newco membership interest purchase and use of Newco capitalization funds.** The preliminary price proposed to the Physicians was Ten Thousand ($10,000) per unit and a maximum of six (6) units. This price was prepared by a CPA firm and is based upon the capital needed by Newco to acquire the equipment and supplies, and provide Newco with sufficient operating cash to meet its needs (e.g., payroll expenses). The final price will be supported by an evaluation from an independent third party that will verify that the Hospital has received FMV for the membership interests sold to the Physicians.

4.0    **Fees Payable by Hospital to Newco and FMV support for the payments.** The pro forma for Newco shows income per case of $1,260 in year one. This per case amount was proposed based upon the judgment of an independent third party advisor, Heaton & Eadie, as to what constitutes fair market value for the services, taking into account the projected expenses, the services to be provided by Newco, and assumptions as to what constitutes a reasonable return on investment. A copy of the Pro Forma Income Statement for Newco dated February 1, 2005 is attached.

5.0    **Newco Management Arrangements.** Newco will be governed by a Board of Managers that will be comprised of Hospital and Physician representatives in approximate proportion to ownership percentages. Certain decisions will be subject to a "super-majority vote" of the Board of Managers. The proposed "super majority vote" decisions are discussed in Section 3.2 of the Term Sheet. The decisions that are "super majority vote" will be subject to negotiation with the Physicians, and the list is not final. The list may expand or contract. Also, consistent with the desire to engage the Physician to improve the quality of care provided at the OSC, the Hospital is proposing that the approval of all clinically-based procedural decisions that affect patient care that is provided at the OSC will be subject to Physician control. It would be the responsibility of the Board to provide or obtain the necessary management services to allow for the efficient and high quality operation of the OSC.

6.0    **Proposed Minimum Participation Requirements.** The Term Sheet in Section 5 states that certain utilization minimums will be required for continued physician ownership. In part, the rationale for requiring these minimums is to ensure that the Physician owners' of Newco have the ability and continued interest to continuously improve the quality of outpatient surgery services at the OSC. The Hospital wants to ensure that the Physician owners have the skills, experience and knowledge to have a material impact on the quality of care rendered at the OSC. The goal is for the Physician owners to be working physicians who bring an understanding of the operations of the OSC and who, therefore, can make suggestions on how to improve the quality and efficiency of care. In addition, we are aware of the minimum case requirement in the Anti-Kickback Statute ASC safe harbors, and the rationale for requiring such, for the OSC follows the same rationale. The Hospital will not insist that there be utilization minimums for continued Physician ownership in Newco. The use of utilization minimums is a proposal on how to ensure

3

006-23

that the Physician owners are able to contribute to the operations of the OSC so as to achieve the Hospital's objectives of improving quality and efficiency.

**7.0   Newco Redemption Requirements.** Section 5 of the Term Sheet states that the owners of Newco will be restricted from selling or transferring their Newco ownership interests to third parties. In general, departing owners will be entitled to have their interests redeemed by Newco for an amount determined by a formula that does not include any value for goodwill, thus, protecting Newco's interests. Redemption of ownership interests will occur upon death, disability, voluntary withdrawal, involuntary withdrawal, and other events. The terms relating to redemption must be discussed and negotiated with the Physicians. An objective of the Hospital was to ensure that only working physicians will have ownership in Newco for the reasons stated in Section 6.0 of this letter. The Hospital is committed to ensuring that the Physicians who have ownership at the time of Newco's formation or thereafter, have the skills, experience and knowledge to have a material impact on the quality and efficiency of care rendered at the OSC. Again, the goal is for the Physician owners to be working physicians who bring an understanding of the operations of the OSC and who, therefore, can make effective suggestions on how to improve the scheduling of patients, the use and selection of equipment, the utilization and training of staff and so forth, to improve the quality and efficiency of care.

The redemption terms set forth in the Term Sheet are preliminary and presumably will change after further discussions with the Physicians.

**8.0   History of OSC.** The OSC opened as a department of the hospital on March 15, 2004. The center was developed in order to address the growth of surgical procedures and to relocate certain existing surgical procedures into a more efficient and appropriate setting. The center was constructed and equipped for four (4) operating rooms. Initially, only two of the operating rooms were opened. Over the past year a third room was opened. The fourth room will open as additional surgeries are moved over and as physician recruitment dictates.

**9.0   OSC Assets and Staff.** Regarding the assets of the OSC, please see the list of assets that is attached to the financial pro forma for Newco. Regarding staff, all staff members working within the OSC are employees of Tuomey. The staff possesses extensive experience in the provision of outpatient surgical services.

**10.0   Target Subscribers.** The Physicians targeted to invest in Newco include the following specialties: Orthopaedics, ENT, General Surgery, Ophthalmology, and Podiatry. These physicians were selected because of the belief that their skills, experience and knowledge would allow them to participate in managing the OSC and thereby have a significant, measurable effect on the quality and efficiency of care rendered at the OSC. Any subscriber that is employed part-time to provide outpatient surgery services at the OSC will be required to terminate their employment prior to investing in Newco.

I hope this is helpful. We appreciate the opportunity to be of service to you, and to Tuomey Healthcare System.

161758_1/SHP

Hall, Render, Killian, Heath & Lyman, P.S.C.

006-24

Exhibit 6.1.2
To
Proposed Management Services Relationship between
Tuomey Healthcare System
and
Physicians

Outpatient Surgery Center

## MEDICARE MANDATED HOSPITAL CONTROL

Medicare rules requires that the Hospital maintain certain controls over the inpatient and outpatient services provided to Hospital patients. Therefore, the Hospital will maintain control over the following.

1. The patients must be admitted for treatment in accordance with Hospital's admission policies.

2. The Physicians providing "provider-based" services must be properly credentialed by Hospital.

3. Medical records must be completed and maintained in accordance with Hospital's policies.

4. Newco must actively participate in Hospital's UR/QA programs.

5. Hospital should maintain the same monitoring and oversight of Newco as it does for any other Hospital department.

6. Hospital must maintain liaison with attending physicians regarding the progress of patients and the need for revised orders.

7. Hospital must maintain overall professional responsibility for the provision of services that are performed by Newco.

8. Professional staff pertaining to the services must have clinical privileges at Hospital.

9. Hospital must maintain the same monitoring and oversight of the Services as it does for any (other) Hospital services.

10. The medical director of the Services venture must maintain a reporting relationship with the chief medical officer or other similar official of Hospital that has the same frequency, intensity, and level of accountability that exists in the relationship between the medical director of a Hospital department and the chief medical officer or other similar official of Hospital, and is under the same type of supervision and accountability as any other

Draft 01/27/05

director, medical or otherwise, of Hospital.

11. Medical staff committees or similar professional committees at Hospital are responsible for medical activities, including quality assurance, utilization review, and the coordination and integration of services, to the extent practicable, between Newco and Hospital.

12. Medical records for patients must be integrated into a unified retrieval system (or cross reference) of Hospital.

13. The Services and Hospital must be integrated, and patients treated who require further care must have full access to all services of Hospital and be referred where appropriate to the corresponding inpatient or outpatient department or service of Hospital.

14. The Services must be held out to the public and payors as part of Hospital. Patients should be made aware that they are entering the main provider (Hospital) and will be billed accordingly.

138775_1.DOC/SHP

Draft 01/27/05

**Proposed Management Services Relationship between
Tuomey Healthcare System
and
Certain Physicians**

**Outpatient Surgery Center**

TERM SHEET
dated
January 27, 2005

Management Services Relationship

## 1. Summary of Proposal.

1.1.    Tuomey Healthcare System ("Hospital") and certain eligible physicians ("Physicians") will form a new legal entity ("Newco") to contract with the Hospital to operate and manage the Tuomey Healthcare System Outpatient Surgery Center ("OSC") so that Hospital is able to improve the quality and efficiency of care, and offer certain patient services at the OSC, some of which are not now offered in the community.

1.2.    The services to be provided by Newco ("Services") (which include management and other services) are set forth on Exhibit 1.2. Newco will provide the space, equipment, supplies, and staff necessary to provide the Services. The Services shall **not** include any professional physician services, which shall be provided and billed by private physicians.

1.3.    Hospital will compensate Newco at fair market value rates for the Services rendered to Hospital by Newco.

1.4.    The relationship between Newco and Hospital will satisfy the federal "under arrangements" rules and, upon request by Hospital, will be affirmatively approved by CMS as "provider-based."

1.5.    By offering the Services in this way, those benefits set forth on Exhibit 1.5 may best be achieved.

## 2. Newco Ownership.

2.1.    Hospital and Physicians will jointly form Newco as a pass-through entity (e.g., limited liability company).

2.2.    Hospital/Physician ownership percentages will be agreed upon.

2.3.    Newco capitalization and profit sharing will be in proportion to ownership.

3. **Governance**.

3.1.   Newco will be governed by a Board of Managers that will be comprised of Hospital and Physician representatives in approximate proportion to ownership percentages.  Generally, Newco will be governed so as to eliminate (or at least minimize) any adverse tax impact on Hospital.

3.2.   Certain decisions will be subject to a "super-majority vote" of the Board of Managers.  The following are proposed "super majority vote" decisions.  The Board actions that will require a "super majority vote" is subject to further discussion:

3.2.1.  Approval of transactions between Newco and any owner;

3.2.2.  Incurring expenses over an agreed upon limit (e.g., $100,000) and entering into leases having a term greater than 5 years or annual rent in excess of an agreed upon limit (e.g., $60,000);

3.2.3.  Any amendment to Newco's governing documents;

3.2.4.  Any merger or consolidation of Newco;

3.2.5.  The creation of any subsidiary organization or the affiliation of Newco with any other entity for the purpose of the joint conduct of business or other programs, whether in the form of participation in a corporation (either through the holding of stock or by membership), partnership, joint venture, co-tenancy or any other form of ownership or control;

3.2.6.  The dissolution or liquidation of Newco;

3.2.7.  The admission of new owners to Newco; or

3.2.8.  Any requirement for additional capital contributions.

3.3.   The approval of all clinically-based procedural decisions affecting care provided at Newco will be subject to Physician control.

4. **Capital Account; Distributions**.  Newco will maintain a Capital Account for each owner.  All cash distributions will be made upon the decision of the Board of Managers and in direct proportion to the owner's ownership interests.

5. **Transfer and Buy/Sell Arrangement**.  The owners will be restricted from selling or transferring their Newco ownership interests to third parties.  In general, departing owners will be entitled to have their interests redeemed by Newco for an amount determined by a formula that does not include any value for goodwill, thus protecting Newco's interests.

006-28

Redemption of ownership interests will occur upon death, disability, voluntary withdrawal, involuntary withdrawal, and other events. Within Hospital's discretion, it will be able to sell or transfer its interests to an entity affiliated with Hospital. Certain utilization minimums will be required for continued physician ownership. These minimums will ensure Newco of the physician owners' continued interest and participation in continuously improving the quality of outpatient surgery services in Sumter. These requirements will also be consistent with the spirit of the Anti-Kickback Statute ASC safe harbors.

6. **Key Terms of Arrangement.** The key terms of the arrangement are described below. Consistent with its goal of improving and expanding the availability of patient services provided to the community, the Hospital and Physicians will agree upon the following terms.

    6.1.    Subject to the approval of CMS, the Services will be provider-based hospital services, and will be provided consistent with the Medicare "under arrangements" rules. Therefore, the arrangement between Hospital and Newco will have the following terms:

        6.1.1.  Hospital will enter into a written contract to engage Newco to perform the Services on behalf of Hospital.

        6.1.2.  Hospital will maintain significant control over the Services, as delineated in Exhibit 6.1.2 attached hereto. For example, the Services will be subject to Hospital's utilization review, quality assurance, and peer review activities. All patients will be admitted as Hospital patients. (See Exhibit 6.1.2 for details.)

        6.1.3.  The Services will remain Hospital services that are offered by Hospital and operated under the Hospital's license. Hospital will bill and collect from all patients and third party payors for the Services.

    6.2.    Hospital will compensate Newco for the Services rendered by Newco at an agreed upon fair market rate, and Newco will look solely to Hospital for such payment. The compensation will be inspected by a qualified third party to ensure it constitutes "fair market value." The fee arrangement between Hospital and Newco will be reviewed annually. Changes to Newco's fees will be the result of negotiations and market factors. However, as is true with the original fee, the new fee arrangement will be inspected by a qualified third party to ensure it constitutes a "fair market value" arrangement.

    6.3.    If necessary, the term of this arrangement will comply with tax rules applicable to tax-exempt financed property (e.g., Rev Proc 97-13). Also, the arrangement will comply with state and federal laws, including the applicable Stark Law exceptions (e.g., space lease, equipment lease and personal services). Attempts will also be made to comply with (or come as close as possible to) the applicable Anti-Kickback Statute safe harbors (e.g., space lease, equipment lease and personal services).

    6.4.    For the duration of the agreement between Hospital and the Physicians, Hospital and Physicians will be subject to a covenant not to compete.

006-29

6.5.   Newco may obtain the space and equipment needed for the Services from third parties and/or from Hospital.  All purchases or leases involving Hospital will be at fair market value, verified by a qualified third party appraisal, and comply with applicable Stark Law exceptions.

138775_1.DOC/SHP

006-30

**Exhibit 1.2**
**To**
**Proposed Management Services Relationship between**
**Tuomey Healthcare System**
**and**
**Physicians**

**Outpatient Surgery Center**

**Description**
**of**
**SERVICES**
**To be Provided by Newco to Hospital**

Newco will operate the OSC on a turn-key basis. Newco will provide the space, equipment, supplies, and staff necessary to operate the OSC. The specific space, equipment, supplies, and staff to be provided will be determined at a later date.

Newco will be asked to provide certain other Services, such as:

1. Assist in development/implementation of strategic & financial plans for Services.

2. Designation of a Medical Director, to be approved by Hospital.

3. Assist in development of quality improvement initiative.

4. Assist in marketing and physician relations activities.

5. Provide ongoing review/input on mutually agreed upon performance indicators.

6. Develop patient care protocols for both patient services provided at the OSC.

Exhibit 1.5
To
Proposed Management Services Relationship between
Tuomey Healthcare System
and
Physicians

Outpatient Surgery Center

## BENEFITS OF ARRANGEMENT

1. **Enhanced Quality of Services.** The quality of those Services that currently exist will be enhanced through Hospital and Physicians working together to jointly provide them. Hospitals and Physicians necessarily possess different skills relating to the operation and management of surgical services that will compliment each other. By combining these skills, the community will be better served.

2. **New Services for the Community.** The proposed arrangement will allow Hospital to expand hospital surgical services currently offered in the community.

3. **Control Costs and Increase Efficiency.** With the Physicians financially "interested" in Hospital's operations, costs will be better contained. For example, standardization of supplies and control of the number of staff are more likely to become a reality. These cost reductions will be realized by the community through natural competition among community providers and through negotiations with payors.

4. **Allow for the Purchase of New Equipment.** Because of the capitalization provided by the Physicians, the joint ventured relationship will allow for the purchase of new equipment that would not have occurred but for the joint venture.

5. **Better Supervision and Control Over Staff.** More direct and interested physician involvement in the Services will allow for better overall supervision and control of the staff that supports the Services.

6. **Allow for Recruitment of New Physicians.** The existence of the joint ventured relationship will allow for the recruitment of needed physicians to the community that would not have occurred but for the joint venture. Those physicians may be offered the ability to participate on the technical side of medicine in other markets to which they are recruited. The joint venture will allow Hospital to compete with recruitment offers from other communities.

Draft 01/27/05

006-32

# NEWCO, LLC

## JOINT VENTURE:

## TOUMEY HEALTHCARE SYSTEM

## AND

## PHYSICIAN INVESTORS





Newco, LLC
List of Significant Assumptions

We have prepared the accompanying five-year projected statement of income and expense for Newco, LLC. The projection represents the potential joint venture between Tuomey Healthcare System and a group of physician investors. The joint venture will satisfy the federal "under arrangements" rules and will provide certain services to Tuomey Healthcare System's outpatient surgery center. The outpatient surgery center shall be operated as a "provider based" outpatient surgery center upon approval by CMS.

**Revenue Projections:**

Revenue is based on the estimated revenue to be paid to Newco, LLC by Tuomey Healthcare System for services rendered. The services to be provided by Newco, LLC to Tuomey Healthcare System are set forth on Exhibit 4. The information for revenue and case volume was provided by Tuomey Healthcare System administration. We have determined that the proposed four operating room facility should be sufficient in order to handle the estimated number of cases to be performed at the outpatient surgery center. It is important to note that for the subsequent four years of operations, revenue to Newco, LLC is assumed to grow by 5% per year.

**Expense Projections:**

Administrative and Medical Support Staff Costs – We applied average staffing levels utilized at outpatient surgery centers with similar case volumes to the average staffing costs provided by Tuomey Healthcare System. The administration of Tuomey Healthcare System reviewed the assumptions and has agreed that the staffing is sufficient for the expected case volume. Initially, personnel will be provided by Tuomey Healthcare System under contract. Administrative and medical support staff costs are expected to increase by 3% for each of the projected five years.

Medical and Surgical Supplies – Medical and surgical supply costs are estimate at $350 per case based on a combination of similarly situated outpatient surgery centers and estimates provided by Tuomey Healthcare System. This category includes pharmaceuticals, implants, and general medical supplies. Medical and surgical supplies costs are expected to increase by 3% for each of the projected five years.

Equipment Leases – This value is based on the estimated cost of equipment the outpatient surgery center will need to operate as provided by Tuomey Healthcare System. We estimated the operating lease value based on the cost that was provided to us by Tuomey, using a monthly payment at 6.5 percent interest over a 7 year lease term. A small number of minor operating leases are assumed to be transferred from the hospital to Newco, LLC.

We have included a detail list of the equipment that will be included in the lease which was provided by Tuomey Healthcare System.

Administrative Supplies and Services – This cost is based on an average supply costs per case experienced by similarly situated outpatient surgery centers. Administrative supplies and services costs are expected to increase by 3% for each of the projected five years.

Liability and Business Insurance – This costs is based on an average costs per case experienced by similarly situated outpatient surgery centers. Liability and business insurance costs are expected to increase by 3% for each of the projected five years.

Accounting/Legal/Consulting – This cost is based on an average costs per case experienced by similarly situated outpatient surgery centers. Accounting, legal and consulting costs are expected to increase by 3% for each of the projected five years.

Maintenance & Service Fees – Maintenance and service costs are based on estimates provided by Tuomey Healthcare System. Maintenance and service costs are expected to increase by 3% for each of the projected five years.

Miscellaneous Operating – This cost is based on an average costs per case experienced by similarly situated outpatient surgery centers. Miscellaneous operating costs are expected to increase by 3% for each of the projected five years.

Amortization of Start Up Costs – We have assumed that the total costs incurred to organize Newco, LLC will total $200,000. This cost will be amortized equally over five years.

# CONTENTS

**ACCOUNTANTS' COMPILATION REPORT**     EXHIBIT 1

**FIVE YEAR PROJECTED STATEMENT OF INCOME AND EXPENSES**

 PROJECTED INCOME STATEMENT    EXHIBIT 2
 INVESTMENT SCENARIOS      EXHIBIT 3
 DESCRIPTION OF SERVICES     EXHIBIT 4
 LISTING OF EQUIPMENT INCLUDED IN EQUIPMENT LEASE EXHIBIT 5

**LIST OF SIGNIFICANT ASSUMPTIONS**     PAGES 1-2

To the Board of Directors
Projected Income and Expenses
Sumter, SC

████████████████████████████████████ five-year statement of income and expense as well as supplementary information for Newco, LLC in accordance with attestation standards established by the American Institute of Certified Public Accountants. The accompanying projection was prepared for internal use only.

████████████████████████████████ ing in the form of a projection information that is the ████████████████████████████████████████████████████████████ underlying the projection. We have not audited or reviewed the projection and, accordingly, do not express an opinion or any other form of assurance on the accompanying statements or assumptions. Furthermore, even if the income levels displayed in the accompanying statement of income and expense and other supplementary information are realized, there will usually be differences between the projected and actual results because events and circumstances frequently do not occur as expected, and those differences may be material. We have no responsibility to update this report for events and circumstances occurring after the date of this report.

The accompanying projection and this report are intended solely for the information and use of management and are not intended to be and should not be used by anyone other than these specified parties.

March 1, 2005

Exhibit 1

006-37

**Newco, LLC**
**Pro Forma Income Statement**
**February, 2005**

| | Year 1 | | Year 2 | | Year 3 | | Year 4 | | Year 5 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Expected Cases: | | | | | | | | | | |
| Service Revenue Fee: | $ 8,133,300 | 100.00% | $ 8,539,965 | 100.00% | $ 8,966,963 | 100.00% | $ 9,415,311 | 100.00% | $ 9,886,077 | 100.00% |
| | | | | | | | | | | |
| Operating Expenses: | | | | | | | | | | |
| Administrative and Medical Support Staff Costs (1) | 2,315,238 | 28.47% | 2,384,716 | 27.92% | 2,456,257 | 27.39% | 2,529,945 | 26.87% | 2,605,843 | 26.36% |
| Medical and Surgical Supplies | 2,259,250 | 27.78% | 2,327,028 | 27.25% | 2,396,838 | 26.73% | 2,468,743 | 26.22% | 2,542,806 | 25.72% |
| Equipment Leases | 567,218 | 6.97% | 570,285 | 6.68% | 573,443 | 6.40% | 576,696 | 6.13% | 580,047 | 5.87% |
| Administrative Supplies and Services | 78,451 | 0.96% | 83,228 | 0.97% | 85,725 | 0.96% | 88,297 | 0.94% | 90,946 | 0.92% |
| Liability Insurance | 60,017 | 0.74% | 63,672 | 0.75% | 65,583 | 0.73% | 67,549 | 0.72% | 69,576 | 0.70% |
| Business Insurance | 25,892 | 0.32% | 27,469 | 0.32% | 28,293 | 0.32% | 29,142 | 0.31% | 30,016 | 0.30% |
| Accounting/Legal/Consulting | 77,460 | 0.95% | 83,177 | 0.96% | 84,643 | 0.94% | 87,182 | 0.93% | 89,797 | 0.91% |
| Maintenance & Service Fees | 431,600 | 5.31% | 445,578 | 5.22% | 458,945 | 5.12% | 472,714 | 5.02% | 486,895 | 4.93% |
| Miscellaneous Operating | 193,650 | 2.38% | 205,443 | 2.41% | 211,607 | 2.36% | 217,955 | 2.31% | 224,493 | 2.27% |
| Amortization - Start Up Costs | 40,000 | 0.49% | 40,000 | 0.47% | 40,000 | 0.45% | 40,000 | 0.42% | 40,000 | 0.40% |
| | | | | | | | | | | |
| Total Operating Expense | | | | | | | | | | |
| | | | | | | | | | | |
| Net Income | $ | | $ | | $ | | $ | | $ | |
| | | | | | | | | | | |
| Revenue Per Case | $ 1,250 | | $ 1,284 | | $ 1,309 | | $ 1,335 | | $ 1,361 | |
| Expense Per Case | $ 937 | | $ 937 | | $ 935 | | $ 933 | | $ 931 | |
| Net Income Per Case | $ 323 | | $ 347 | | $ 375 | | $ 402 | | $ 430 | |
| Net Cash Flow Per Case | $ 329 | | $ 354 | | $ 380 | | $ 408 | | $ 436 | |

(1) Note that CRNAs are not included in medical support staff. Trustey Healthcare System will provide 4 CRNAs to cover the outpatient surgery center. If additional CRNAs are required due to increased operating hours, Newco, LLC will be responsible for the additional cost. The CRNAs rate charged to Newco, LLC for additional CRNAs will not exceed $50 per hour.

Exhibit 2

HEATONHEALE

006-38

**Newco, LLC**
Investment Scenarios

Uses of Funds

| | | |
|---|---|---|
| Organizational Costs | $ | 200,000 |
| Capital Expenditures and Operating Contingency | | 500,000 |
| Initial Operating Expenses | | 1,000,000 |

Total Uses of Funds

Total Shares      170

**Ownership**
| | |
|---|---|
| Tuomey Healthcare System Shares (50.59%) | 86 |
| Physician Investor Shares (49.41%) | 84 |

| | | |
|---|---|---|
| Tuomey Healthcare System Revenue | $ | 1,054,006 |
| Physician Investor Revenue | $ | 1,029,494 |

| | | |
|---|---|---|
| **Individual Physician Investor Share - Maximum** | $ | 6 |
| Individual Physician Investor Revenue | | 73,535 |
| Number of Physician Investors | | 14 |

| | | |
|---|---|---|
| Individual Physician Investor Share | | 5 |
| Individual Physician Investor Revenue | $ | 61,279 |
| Number of Physician Investors | | 17 |

| | | |
|---|---|---|
| Individual Physician Investor Share | | 4 |
| Individual Physician Investor Revenue | $ | 49,024 |
| Number of Physician Investors | | 21 |

| | | |
|---|---|---|
| Individual Physician Investor Share | | 3 |
| Individual Physician Investor Revenue | $ | 36,768 |
| Number of Physician Investors | | 28 |

| | | |
|---|---|---|
| **Individual Physician Investor Share - Minimum** | | 2 |
| Individual Physician Investor Revenue | $ | 24,512 |
| Number of Physician Investors | | 42 |

| | | |
|---|---|---|
| Physician Investment Per Share | $ | 10,000 |
| Tuomey Healthcare Investment | $ | 860,000 |

*handwritten: 60,000; 60,000 mut*



HEATON‖EADIE
ACCOUNTANTS&CONSULTANTS

Newco, LLC
Description of Services to be provided by Newco, LLC
to Tuomey Healthcare System

Newco, LLC ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Newco, LLC will
provide the equipment, supplies, and staff necessary to operate and manage the outpatient
surgery center. The specific equipment, supplies, and staff to be provided will be determined at
a later date.

In addition to operation and management services, Newco, LLC will provide certain other
services, such as:

1. Assist in development/implementation of strategic & financial plans for the operation of the
   outpatient surgery center.

2. Designation of a Medical Director, to be approved by Hospital.

3. Assist in development of quality improvement initiative.

4. Assist in marketing and physician relations activities.

5. Provide ongoing review/input on mutually agreed upon performance indicators.

6. Develop patient care protocols for patient services provided at the outpatient surgery center.

Exhibit 4

Feb. 23. 2005  6:50AM                                No. 2197   P. 7

RUN DATE: 12/10/04
RUN TIME: 1142
RUN USER: ACPM

LOONEY REGIONAL MEDICAL CENTER FA *LIVE*
CURRENT VALUE REPORT

PAGE 4

DEPARTMENT: 01 668        TN OUTPATIENT SURGERY CENTER

| Asset | Description | Status | Date | Value |
|---|---|---|---|---|
| 17710 | DEFIBRILLATOR - LIFEPAK 12 BIPHASIC 01.668 PO-2 | ACTIVE | 02/11/04 03/15/04 | 20025.40 |
| 17774 | COMPUTER, MONITORS, SOFTWARE 19/EA 01.668 PO-25 | ACTIVE | 04/06/04 03/15/04 | 35670.96 |
| 17775 | PRINTER - HP JET DIRECT 2EA 01.668 PO-258693 | ACTIVE | 04/06/04 03/15/04 | 969.90 |
| 17776 | PRINTER - HP 4200DTN 3EA 01.668 PO-258693 | ACTIVE | 04/06/04 03/15/04 | 6318.66 |
| 17777 | PRINTER - HP LASERJET 4200 2YEA 01.668 PO-258693 | ACTIVE | 04/06/04 03/15/04 | 3310.89 |
| 17778 | FURNITURE - LOBBY VISTION CHAIRS 01.668 PO-252 | ACTIVE | 04/06/04 03/15/04 | 40833.24 |
| 17779 | CABLE, SWITCHES, POWER SUPPLY RACK MOUNT 01.668 | ACTIVE | 04/06/04 03/15/04 | 35014.81 |
| 17780 | CARTS - LINEN, UTILITY 11/EA 01.668 PO-240223 | ACTIVE | 04/06/04 03/15/04 | 4245.43 |
| 17781 | SHELVING - PORTABLE STEEL 01.668 PO-240221 | ACTIVE | 04/06/04 03/15/04 | 19703.90 |
| 17782 | TABLE WORK SS 01.668 PO-240221 | ACTIVE | 04/06/04 03/15/04 | 1705.23 |
| 17783 | BLANKET WARMER HEA 01.668 PO-240221 | ACTIVE | 04/06/04 03/15/04 | 17007.27 |
| 17784 | DEFIBRILLATOR LIFEPAK 12 BIPHASIC 01.668 PO-253 | ACTIVE | 04/06/04 03/15/04 | 15916.10 |
| 17785 | DRYSTAR 3000 FILM PROCESSOR 01.668 PO-256845 | ACTIVE | 04/06/04 03/15/04 | 15900.00 |
| 17796 | WASHER - ULTRASONIC W/BASKET 01.668 PO-256892 | ACTIVE | 04/06/04 03/15/04 | 9640.97 |
| 17806 | MONITOR PATIENT PASSPORT 01.668 PO-247087 W/XX | ACTIVE | 05/11/04 04/01/04 | 198215.35 |
| 17811 | AODOSE - RX CABINETS 01.668 PO-253051 A PO-261 | ACTIVE | 05/11/04 04/01/04 | 61140.65 |
| 17812 | SURGICAL LIGHT - 2T (4/EA) 01.668 PO-232677 | ACTIVE | 05/11/04 04/01/04 | 83321.12 |
| 17813 | SURGICAL LIGHT - 2T (4/EA) 01.668 PO-232677 | ACTIVE | 05/11/04 04/01/04 | 76736.77 |
| 17814 | SURGICAL LIGHT - FOR MIRROR IN PROCEDURE ROOM ( | ACTIVE | 05/11/04 04/01/04 | 12996.69 |
| 17815 | LIGHT SET CORD (4/EA) 01.668 PO-232677 | ACTIVE | 05/13/04 04/01/04 | 2005.39 |
| 17816 | POWER BOOM TELECOM 322 14/EA 01.668 PO-23267 | ACTIVE | 05/11/04 04/01/04 | 106029.00 |
| 17817 | SURGICAL TABLES W/ACCESSORY PKG (5/EA) 01.668 P | ACTIVE | 05/11/04 04/01/04 | 162578.22 |
| 17819 | ANESTHESIA UNIT 01.668 (4/EA) 01.668 PO-252471 | ACTIVE | 05/11/04 04/01/04 | 207342.58 |
| 17820 | ENDOSCOPY 908 CAMERA - (4/EA) W/LIGHT SOURCE 01 | ACTIVE | 05/12/04 04/01/04 | 41409.35 |
| 17821 | TELEMEDICINE SYSTEM - INTERACTIVE CAMPUS ROUTER | ACTIVE | 05/11/04 04/01/04 | 10870.90 |
| 17822 | WASHER, PASS THRU WINDOW CONVEYOR 01.668 PO-24 | ACTIVE | 05/11/04 04/01/04 | 94928.75 |
| 17826 | X RAY UNIT, ANGIOGRAPHIC SYSTEM 01.668 PO-75508 | ACTIVE | 05/11/04 04/01/04 | 42982.73 |
| 17857 | X RAY MOBILE UNIT | ACTIVE | 06/11/04 19/22/03 | 4181.70 |
| 18012 | SYOOL PHYSICIAN PEDICO 14/EA PO-256960 01.668 | ACTIVE | 09/03/04 04/06/04 | 29165.86 |
| 18013 | CART UTILITY (LINE 15) PO-256572 01.668 | ACTIVE | 09/09/04 04/06/04 | 34014.24 |
| 18014 | SCALPEL - HARMONIC ULTRASONIC CUTTING & COAGULA | ACTIVE | 09/09/04 04/06/04 | 20022.91 |
| 18015 | CRIB - MIDMARK PEDIATRIC 4/EA 01.668 PO-258067 | ACTIVE | 09/09/04 04/06/04 | 27378.05 |
| 18016 | LAPAROSCOPE 14/EA 01.668 PO-256064 SET EQUIPMNT | ACTIVE | 09/08/04 04/06/04 | 40256.93 |
| 18017 | TABLE & UTILITY INSPECTOR 01.668 PO-281010 01.6 | ACTIVE | 09/08/04 04/06/04 | 12666.82 |
| 18018 | MONITOR ADC COMPUTER FOR PACS PO-257010 01.668 | ACTIVE | 09/08/04 04/06/04 | 120889.33 |
| 18020 | STRETCHER KIT TRANSTAR 12000 22/EA 01.668 PO-25 | ACTIVE | 09/04/04 04/06/04 | 68770.68 |
| 18021 | FURNITURE - TABLE OVERHEAD/CHAIR VISTION 01.668 | ACTIVE | 09/08/04 04/06/04 | 16281.60 |
| 18022 | TELESCOPE HOPKINS 17 6/EA SET COMKIT FOR DETAI | ACTIVE | 09/08/04 06/23/04 | 26436.66 |
| 18023 | VIDEO PLATE SYSTEM - W/MONITOR SAGITTAL,DECI | ACTIVE | 09/08/04 05/20/04 | 40863.39 |
| 18024 | ELECTROSURGICAL UNIT 4/EA PO-259688 01.668 | ACTIVE | 09/08/04 04/06/04 | 48666.41 |
| 18025 | MICROSCOPE - OPMI VISTEHA PO-263069 01.668 | ACTIVE | 09/03/04 05/23/04 | 54176.47 |
| 18026 | IMPAX - SOFTWARE TO BE USED WITH THE PACS SYSTE | ACTIVE | 09/08/04 04/06/04 | 15125.91 |
| 18027 | CARTS - LAUNDRY W/PANELS, COVERS & SHELVES 11/E | ACTIVE | 09/08/04 04/06/04 | 23359.14 |
| 18028 | STAND - HAND-WASHING 36/A/Y/EA 17/A TABLE MISTER | ACTIVE | 09/08/04 04/06/04 | 10029.60 |
| 18029 | SCOPE - ARTHROSCOPE (PEDIATRIC) 7/A LAP-SET 01 | ACTIVE | 09/08/04 04/06/04 | 16584.68 |
| 18058 | SCANER - SURGICAL SKULLS 2000 01.668 PO-256044 | ACTIVE | 09/08/04 05/23/04 | 11441.72 |

```
RUN DATE: 12/10/04                                                          PAGE 5
RUN TIME: 1142
RUN USER: ACPA
                        TUDNEY REGIONAL MEDICAL CENTER FA *LIVE*
                                CURRENT VALUE REPORT

CLASS:

NUMBER    DESCRIPTION                                      STATUS  ...            VALUE

10001  CAMERA - MIDLIVE 3CD ROMO MFSE D1 668 PO-2817       ACTIVE  09/08/04 06/30/04    18697.66
10002  CHAIR - ARMLESS,GENERIC & CONFIXION/FURNILINE       ACTIVE  09/08/04 04/05/04     6202.07
10003  DESK - 2/6A, RETURN 2/6A, PEDESTAL STORAGE 2/6A     ACTIVE  09/08/04 04/06/04     3328.56
10004  FILE - MOBILE PEDESTAL 0/6A, FILE - LATERAL 3/E     ACTIVE  09/08/04 04/06/04     2490.15

                                                                                     25431G0.70

                                                          TOTAL FOR CLASS:           25431G8.70
```

006-42

Tommy   Notes T/C Co Smith

Toumey

Keong ~ was pay to do ASC

— urolog

— Tomy converted to outpatient
— hospital resident rate

— urologists =>

First Approach was compensation contract —
→ pay amount in excess of collections

→ investment
— lots of GP's complain of cost +
schedule =
→ No commitment to ASC

Whole contingency —
→ evaluation of one group —
— GI
→ Conflict / of FMV
→ if methodology is supportable —

Terms → 10 yr + 3 yr non-compete —
→ competition issue w/ hospital —

006-43

When hesitate / Tony came back of

Outpatient might Could to

- will make that all staff
- if unit in one
- employment get

Can't pay both

Dr. Raynula ⟹ if ED service all
pay / indunt offer perks ⟹
if doesn't unit / indunt pule-

- developer has approached
retail unit - by offer bldg @
attractive profit / + have
drs better
Caflut evaluating ⟹ Dr. Moon
- availing + ASC / MRI -

All this pattern / practice / to restrict physicians
⟹

006-44

Kevin McAnaney

From:           Smith, Greg [GSmith@wcsr.com]
Sent:           Sunday, June 19, 2005 5:43 PM
To:             Kevin G McAnaney , Esq. (E-mail)
Subject:        Tuomey Hospital Compensation Arrangement

*This is the best!*

Compliance
Standard (Palmetto).
                Please see Confidentiality Notice before reading email.
*******************************************************************

Hey Kevin

I think I am one of the few attorneys in our firm NC offices that came to work over the
last few days....most are at Pinehurst for the US Open.  Did you ever hear from Tim
regarding times to discuss the Tuomey employment arrangement and JV arrangement?  As we
have discussed, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ the professional fees
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
doctors.....the Hospital must lose money.  I spoke with Tim and the Cejka appraisers last
week, and did not receive any comfort to lessen my concerns.  Tim justified the
arrangement as being commercially reasonable by arguing the Hospital does not lose money
because it makes money on the facility fees and ancillary revenues (CTs, MRIs, PT, and
labwork) related to the physicians' referrals.  Tim asked me to summarize in writing my
compensation methodology and appraisal concerns, and attached is the resulting memorandum
I sent Tim (it was dictated quickly, so excuse the roughness).

Another odd thing about the employment arrangement is its relationship to the JV
arrangement.  The doctors have been told that they must choose one or the other, but can
have both.  Doctors already employed by the hospital have been told they must terminate
the employment arrangement if they want to invest in the JV.  Tim explained that the
hospital can't afford to allow the docs to participate in both.  That doesn't make sense
if both arrangements are commercially reasonable.  If a doc terminates the employment
agreement to invest in the JV, then the hospital will lose the doc professional fee
revenues that they should be profiting from.  The hospital can't afford both programs for
each doc only if the hospital is losing money on each program.  Each program is based on
totally different physician services and hospital benefits......outpatient surgery
professional services versus outpatient dept management services.  Both arrangements tie
patient referrals to the Hospital through noncompetes, and by not allowing the docs to
invest in both unrelated programs, the Hospital seems to acknowlege that it cannot afford
to overcompensate the docs twice for the same referral restrictions.

Looking forward to our call with Tim.

Regards.  Greg


    <<Compliance Standard (Palmetto)(v1).DOC>>

*******************************************************************
CONFIDENTIALITY NOTICE: This electronic mail transmission has been
sent by a lawyer. It may contain information that is confidential,
privileged, proprietary, or otherwise legally exempt from
disclosure. If you are not the intended recipient, you are hereby
notified that you are not authorized to read, print, retain, copy
or disseminate this message, any part of it, or any attachments.
If you have received this message in error, please delete this

                                  1

006-45

message and any attachments from your system without reading the content and notify the sender immediately of the inadvertent transmission. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Thank you for your cooperation.

006-46



WOMBLE
CARLYLE
SANDRIDGE
& RICE

A PROFESSIONAL LIMITED
LIABILITY COMPANY

One West Fourth Street
Winston-Salem, NC 27101

Telephone: (336) 721-3600
Fax: (336) 721-3660
Web Site: www.wcsr.com

Greg Smith
Direct Dial: (336) 721-3665
Direct Fax: (336) 733-8353
E-mail: gsmith@wcsr.com

## MEMORANDUM

**TO:**        Timothy Hewson

**FROM:**    Greg Smith

**DATE:**     June 18, 2005

**RE:**        Tuomey Hospital Part-Time Employment Agreement

Tuomey Healthcare System has offered the orthopaedists of Palmetto Orthopaedic and Sports Medicine Center an employment opportunity to provide part-time outpatient surgery services at the Hospital. As discussed, I have reviewed the proposed Employment Agreement, Cejka Consulting Powerpoint presentation and Cejka Appraisal, and the only compliance reservation I have turns on the fair market value and commercial reasonableness of the compensation paid the physicians. In a conference call last week we discussed with principals of Cejka some of my concerns, and others were not addressed due to time limitations. Below is a quick dictated summary of some of the concerns I have about the commercial reasonableness and fair value of the proposed part-time employment arrangements.

### Material Compliance Standard

The Employment Agreement compensation arrangement must provide for payments at fair market value which cannot be determined in a manner that takes into account (directly or indirectly) the value or volume of referrals by the referring physician or other business generated between the parties. The Employment Agreement must also be commercially reasonable if no referrals were made by the employee.

### Issues Raised by Compensation Methodology

1. In our conference call last week it was suggested that the Cejka Appraisal was conclusive on the issue of the fair market value and commercial reasonableness of the compensation amount. As I referenced at that time, the Phase II Regulation Commentary provides that "While good faith reliance on a proper valuation may be relevant to a party's intent, it does not establish the ultimate issue of the accuracy of the valuation figure itself." There are numerous examples of the OIG and Judges finding that a financial arrangement supported by an appraisal was in fact not commercially reasonable or fair value.

2. Based upon the Cejka computations for Dr. Drakeford, $287,829 cash compensation would be paid on $295,361 of collections. The Hospital would also pay additional

HCA +
Tenet

006-47

benefits of medical malpractice insurance, FICA and billing and collections services totaling $72,469. The Cejka Powerpoint presentation illustrates that $360,298 in total cash compensation and benefits, compared to $295,361 in collections, results in $64,937 net gain to physician and loss to Hospital.

a. How can this compensation arrangement be fair market value or commercially reasonable? Total compensation and benefits is 122% of collections.

b. The base salary, mandatory productivity incentive, and quality incentive in the aggregate total 97.45% of physician collections. Each of he additional guaranteed benefits paid by the Hospital reflect the following percentage of physician fee collections: medical malpractice insurance 11.28%, billing and collections 10% and FICA 3.25%. Consequently, the payment by the Hospital of any <u>one</u> of these benefits, in addition to the cash compensation, results in the Hospital losing money.

c. The compensation methodology makes it a mathematical certainty that the Hospital will lose money. It is mathematically impossible for the Hospital to make money on the physician fees generated from the employment arrangement. On $295,361 of physician collections, the compensation formula guarantees a cost to the Hospital of $343,758 made up of base compensation of $35,000, a mandatory productivity incentive of $236,289 (80% of collections), liability coverage of $33,310, an employer FICA payment of $9,623 and a billing and collection cost of $29,536. At a minimum, the Hospital is guaranteed to lose $48,397 ($295,361 of physician collections less $343,758 in minimum guaranteed costs). The Hospital will lose up to an additional $16,540 if the 7% discretionary quality incentive bonus is paid. We understand the 7% quality incentive bonus has always been paid in the Hospital's other part-time physician employment arrangements. Since it is impossible for the Hospital to profit from the physician collections, the compensation formula cannot be commercially reasonable unless the value of the physician's referrals or other business generated for the Hospital is considered. The fact the compensation formula insures a windfall to the physician and a loss to the Hospital is my biggest compliance concern.

d. It was pointed out in our call with Cejka that hospitals often lose money on physician compensation, and the recruitment of physicians to underserved areas was given as an example. The Stark Statute and Antikickback regulations recognize that hospitals may pay physician expenses and pay above market compensation to insure they have the specialized professionals necessary to provide the full spectrum of medical care and maintain their accreditation. The risks inherent in the payment of physician's expenses and higher compensation is offset by the greater need to incentivize doctors to practice in underserved areas. These factors are not present in our circumstances. The three orthopaedists are currently on the Tuomey staff, as are all the other physicians that entered into similar employment arrangements. The orthopaedists are entrenched in the community and remain dedicated to provide care to all Hospital patients, regardless of their ability to pay, and to meet all orthopaedic specialty coverage

requirements. There are no exigent factors present to justify paying above fair market value to the orthopaedists (or to any of the other hospital physicians that have similar compensation arrangements).

e.  It was also pointed out in our call with Cejka that many hospitals all over the country lose money on their employment arrangements with doctors . . . . a safety in numbers argument.  The difference in most other physician employment arrangements and Tuomey's lies in the methodologies used to set compensation, and the certainties or uncertainties of profit or loss to the hospitals.  A common fact pattern is a hospital's employment of a physician that historically worked 2,400 hours annually, made up of 1,800 hours of productive patient care and 600 hours of unproductive administrative work.  In this example, assume the physician generally gets paid $200/hour so he collects $360,000 on his 1,800 hours of patient work.  The hospital employs the physician, takes over the 600 annual hours of administrative work, and reasonably expects the physician to increase his productive patient work from 1,800 hours to 2,100 hours annually, thereby generating $60,000 more in professional revenues annually.  The hospital pays the doctor $370,000 annually (a $10,000 increase).  Although the doctor spends 600 hours less on administrative work, the doctor does not increase his productive patient work and only works 1,800 patient hours annually, so the hospital loses money.  The hospital's assumptions and expectations of profit based on administrative efficiencies and historical hours were commercially reasonable when the compensation was initially determined, but in practice were not realized.  The Medicare fraud rules don't require the hospital to make a profit, but only requires commercial reasonableness in initially setting compensation.  The Tuomey compensation methodology is not based upon any operating efficiency assumptions whereby both parties can actually realize a greater profit.  If the physician works more or less, the guaranteed salary payments and other benefits guarantees the hospital will always lose money.  If the incentive bonus is paid as well (and we understand it has always been paid), the loss to the hospital is even greater.  Unlike the above example where the hospital had reasonable expectation of profit, there is no expectation or possibility of profit to Tuomey under the Cejka compensation methodology . . . . it is a mathematical certainty that Tuomey will lose money.  You indicated that Tuomey actually doesn't lose money on its physician part-time employment arrangements, and that the arrangements are commercially reasonable, because Tuomey makes money on its facility charges and ancillary services (e.g., lab work, CTs, MRIs, etc.) related to the physicians referrals.  The compensation to the physicians must be commercially reasonable without taking into account the value of the physician referrals or other business generated between the parties.

3.  Why isn't the targeted physicians existing remuneration and profit for providing the exact same outpatient surgery services at Tuomey the best comparable in determining fair market value?  Why look to national compensation surveys that may not account for regional differences and other unique circumstances when you have actual comparable data for the same doctors, the same services and at the same hospital.  The orthopaedists

are not new recruits to the area with no historical collections and operating expense data . . . . we have actual comparable data.

    a. Based on the Cejka compensation presentation, Dr. Drakeford generated $295,361 in professional collections last year at Tuomey. In generating those collections, Dr. Drakeford incurred $33,310 in medical malpractice insurance costs and billing and collection costs of $29,536. Offsetting these costs against collections, Dr. Drakeford would net $232,515 as compensation for his services. Tuomey proposes to pay Dr. Drakeford cash compensation of $287,829, plus pay billing and collection costs and medical malpractice insurance costs. The Cejka compensation formula pays Dr. Drakeford $55,314 more than what he would actually make if there were no Tuomey compensation arrangement.

4. The Cejka appraisal is based upon the 2004 MGMA National Market Survey for the National Market.

    a. The Phase II Stark II final regulations recognized potential distortions from any one compensation survey in setting fair market value and required averaging data from four of six named surveys. MGMA produces one of the six recognized surveys.

    b. The Phase II commentary recognizes regional differences should be taken into account if it is necessary to avoid distortion of results. National versus rural southeastern comparables can differ by greater than 40%.

    c. Is the MGMA survey data based upon hospital employed orthopaedist or does it include private practice compensation data as well? If the latter is included, private practices would always pay their own benefits and operating costs.

    d. Is the data pool statistically significant and reliable given the unusual nature of the arrangement; i.e., hospital employed part-time outpatient orthopaedic surgeons? Aren't most of these arrangements in underserved areas where compensation is often above fair market value?

    e. Does the survey data address any compensation variances between new recruits versus physicians already in the market with existing goodwill and patient following?

5. The Cejka appraisal provides that the approximately $72,469 in non-cash benefits "are typical of what is offered to physicians in the market."

    a. What support can be given for the above statement?

    b. Many of the six compensation surveys referenced in the Stark II Phase II regulations (including MGMA) specifically provide non-cash compensation information (e.g., benefits, expense recoupment, etc.).

**006-50**

c.  Due to minimum participation/minimum coverage requirements, most hospital employee benefit plans exclude part-time employees.

d.  The compensation analysis schedule at page 3 of the Cejka Appraisal supports the conclusion that non-cash benefits are typical in full-time employment, but not in part-time employment. Collections far exceed compensation in the schedule for full-time employment, thereby giving the employer profits from which to pay benefits. That is not the case for the part-time employees in the schedule; i.e., there are little to no profits in the schedule to pay non-cash benefits to part-time employees.

6.  Exclusivity/Noncompete Provision

a.  The Commentary to the Stark II Phase II Regulations recognizes that exclusivity and noncompete provisions may be reasonable for institutional physicians (radiologists, pathologists, etc.) employed by a hospital "if reasonably necessary to effectuate legitimate purposes of the compensation relationship." Query, would the Tuomey noncompete/exclusivity provision be viewed as tying compensation to the value or volume of referrals since the physician is in a position to refer, compensation is based on production, and the physician is already in the market with a significant patient base and goodwill.

b.  How can the three-year tail on the Tuomey noncompete be viewed as effectuating legitimate purposes of the compensation relationship. Upon termination of employment, the physician would be required to either renew the 10-year contract, move out of the service area, or cease his surgical practice at the end of the Agreement term. No legitimate hospital interest is served by the three-year noncompete tail. The hospital did not build the patient base for the physician as the physician already had an active local practice when he was employed. The noncompete trail forces continued employment and referral loyalty.

006-51

① Compensation                    Palmetto
② Investments

→ Some other employment agreements to put two –
    → draft [?] –
    → hospital due diligence
    ⨂        → Kusserow
              → other materials

Invitely to access two proposals
    → talk thru using
    → + what gives comfort
    → am I comfort –

Ultimately – my evaluation on the level of
    confidence risk w/ arrangement
    especially the AKS issue
    – w/ can we the →
    – Given structure of deal / Business consideration
        → Evaluation – 100% risk  006-52
        → what done + could do to manage risk –



— is it defensible

Bournes

In terms of "under arrangmts" —
— team chat +/ pro formas —

— mgmt K
— involuntary surge of reqmt

Joint repredtr

① client ↑ Tuomey / Palmetto Orthopaedic – bts

② fees / split

③ AC prvlge / no waive unless
all consent —

④ Dis damne still ear share unless
supp vs sharing —

complin issues / hospital

→ fees   letter of reqmt

→ oral   pnlty   20/40 hrs

006-53

Govt does not like these = { Not what statute intends! }

① Arrangement is Very Aggressive

→ especially given the actual background

→ Can't be ignored b/c it will be the background to anything —

→ ~~Is not required~~

→ Obvious issue under AKS
    — no Safe Harbor
    — no ASC

→ Even State ( clearly seen as an end run )
    → once selecting offering so it falls into a net referral

→ their 1 switch in ~~that~~ AKS
    → to eliminate bias
        → ours f chn

low risk / high reward

②



006-55

Greg Smith /
Tim Hewson
Steve Pratt

# N E X S E N | P R U E T

**Tim L. Hewson**
Member

May 12, 2005

**VIA OVERNIGHT DELIVERY**

Kevin G. McAnaney, Esquire
Law Offices of Kevin G. McAnaney
1800 K Street, N.W., Suite 720
Washington, DC 20006-2202

Re:    Tuomey Surgical Professionals, LLC

Dear Kevin:

In connection with the referenced review, I am enclosing two documents, which Tuomey Administration gave the Board of Trustees at Tuomey Health System regarding part-time employment agreements with the gastroenterologists. Please keep this information confidential. Specifically, do not share this information with Greg Smith or his clients since it involves another group of specialists at Tuomey. Nevertheless, the compliance review process description in these memoranda has equal application to the proposed part-time arrangement between Tuomey and Greg Smith's clients. Please call me if you have any questions.

Very truly yours,

Tim L. Hewson

TLH/ll
Enclosures

Charleston

Charlotte

**Columbia**

Greensboro

Greenville

Hilton Head

Myrtle Beach

1441 Main Street
Suite 1500 (29201)
PO Drawer 2426
Columbia, SC 29202
www.nexsenpruet.com

T 803.253.8204
F 803.253.8277
E THewson@nexsenpruet.com
Nexsen Pruet Adams Kleemeier, LLC
**Attorneys and Counselors at Law**

NPCOL1:773384.1-LT-(TLH) 006-57

# NEXSEN|PRUET

Tim L. Hewson
Member

May 12, 2005

**VIA OVERNIGHT DELIVERY**

Kevin G. McAnaney, Esquire
Law Offices of Kevin G. McAnaney
1800 K Street, N.W., Suite 720
Washington, DC 20006-2202

Re:     Tuomey Surgical Professionals, LLC

Dear Kevin:

Enclosed please find copies of the proposed part-time employment arrangements with Drs. Drakeford, Ford, and Stroebel in the referenced matter. Also enclosed for your review is a copy of Cejka Consulting's August 31, 2004 presentation.

Charleston

Charlotte

**Columbia**

Greensboro

Greenville

Hilton Head

Myrtle Beach

Very truly yours,

Tim L. Hewson

TLH/ll
Enclosures

cc:     Greg Smith (w/encs.)

1441 Main Street
Suite 1500 (29201)
PO Drawer 2426
Columbia, SC 29202
www.nexsenpruet.com

T 803.253.8204
F 803.253.8277
E THewson@nexsenpruet.com
Nexsen Pruet Adams Kleemeier, LLC
**Attorneys and Counselors at Law**

NPCOL1:773369.1-LT-(TLH) 006-58

## Kevin McAnaney

| | |
|---|---|
| **From:** | Smith, Greg [GSmith@wcsr.com] |
| **Sent:** | Monday, May 16, 2005 2:49 PM |
| **To:** | Timothy Hewson |
| **Subject:** | RE: FW: Tuomey Surgical Professionals, LLC |

Please see Confidentiality Notice before reading email.
*****************************************************************

Tim

The initial submission to Kevin regarding the employment arrangement covers all the
documents we discussed.  I assume Cejka will be doing the valuation.  Can you clarify
Cejka's engagement arrangements with Tuomey?  If they were engaged to design a physician
employment strategy for which they received a fee, their valuation will not be
"independent" since their appraisal will be of their own work product.  The Cejka
appraisal will still be of value based upon the merits of its reasoning and underlying
assumptions.  Has an independent appraiser looked at any of the employment arrangements?
At the time of the employment arrangement appraisal, was Cejka aware that physicians will
be required to abandon their employment arrangement in order to invest in the
underarrangements OSC venture; ie, physicians will not be allowed to have both an
employment arrangement for outpatient surgery services and an investment interest in the
OSC management/consulting LLC?

I look forward to receiving the underarrangements documentation.

Regards.   Greg

-----Original Message-----
From: Timothy Hewson [mailto:THewson@nexsenpruet.com]
Sent: Monday, May 16, 2005 2:27 PM
To: Smith, Greg
Subject: Re: FW: Tuomey Surgical Professionals, LLC


Greg,

Of course to both of your requests.  As for the initial submission to Kevin of the draft
employment agreements and Cejka's power point presentation, I hope you were OK with my
submission of those documents to Kevin, as it was my belief that we had agreed that they
would be submitted to Kevin.

As to the under arrangements submission, Steve Pratt is working on the executive summary
you requested, I will make sure you get it as soon as it is complete.  That summary plus
the most recent term sheet and financial projections are the documents that I anticipate
we should submit to Kevin.

Tim

******************************************
Tim Hewson
Member
Nexsen Pruet Adams Kleemeier, LLC
1441 Main Street, Suite 1500
Columbia, SC 29201
thewson@nexsenpruet.com
803-253-8204 (voice)
803-253-8277 (fax)

ww.NexsenPruet.com
******************************************
The information contained in this e-mail message is intended only for the personal and
confidential use of the recipient(s) named above. This message may be an attorney-client

1

006059

communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or an agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

>> "Smith, Greg" <GSmith@wcsr.com> 05/16/05 10:48AM >>>
Please see Confidentiality Notice before reading email.
*******************************************************

Tim

Can I see the underarrangements package before submission to Kevin?  Also, can I get a copy of the fmv opinion on the part-time employment arrangement when you send it to Kevin?

Thanks.  Greg

-----Original Message-----
From: Louise Lawson [mailto:LLawson@nexsenpruet.com]
Sent: Monday, May 16, 2005 10:16 AM
To: kevin@mcananeylaw.com
Cc: gregg.martin@tuomey.com; sheri.watkins@tuomey.com; Smith, Greg
Subject: Tuomey Surgical Professionals, LLC

Kevin:

    Please confirm that you have received most of the information regarding the part-time employment arrangements in the referenced matter.  I anticipate that we will receive the fair market value opinion by the middle of this week.  As to the under arrangement materials, we are shooting to get you a package by Wednesday or Thursday.  Given this time frame for delivery of documents for review, when might we schedule a telephone conference?

                                        Tim

******************************************
   NEXSEN PRUET ADAMS KLEEMEIER, LLC
       1441 Main Street, Suite 1500
            Columbia, SC 29201
               803-771-8900

             www.NPJP.com
******************************************


***************************************************************
CONFIDENTIALITY NOTICE: This electronic mail transmission has been sent by a lawyer. It may contain information that is confidential, privileged, proprietary, or otherwise legally exempt from disclosure. If you are not the intended recipient, you are hereby notified that you are not authorized to read, print, retain, copy or disseminate this message, any part of it, or any attachments. If you have received this message in error, please delete this message and any attachments from your system without reading the content and notify the sender immediately of the inadvertent transmission. There is no intent on the part of the sender to waive any privilege, including the attorney-client privilege, that may attach to this communication. Thank you for your cooperation.

006-60

**Privileged and Confidential**

**Attorney - Client Communications**

May 10, 2005

Tim Hewson
Member
Nexsen Pruet Adams Kleemeier, LLC
1441 Main Street, Suite 1500
Columbia, SC 29201

**Subject:**   **Opinion for Tuomey Outpatient Orthopedic Surgery Compensation for Dr. Danny Ford**

Dear Mr. Hewson:

Nexsen Pruet Adams Kleemeier, LLC has requested that Cejka provide our opinion about the reasonableness and fair market value of the financial terms of the part-time Employment Agreement between Danny H. Ford, M.D. and Tuomey Surgical Professionals, LLC (TSP). TSP is a subsidiary of Tuomey Healthcare System (THS). The Agreement allows Dr. Ford, an orthopedic surgeon on staff at THS, to provide outpatient orthopedic services on a part-time basis at THS.

Cejka Consulting has assisted over 1000 healthcare client organizations in evaluating physician pay-related trends and is generally known for its expertise in physician compensation evaluation. Our approach to market analysis includes a mix of consulting expertise, financial modeling based on physician productivity and market databases to provide analysis for a variety of compensation applications. Based on our experience in the area of compensation analysis for both for profit and not for profit healthcare organizations:

1. Cejka Consulting holds itself out to the public as a recognized compensation consultant;
2. We perform market evaluations such as this on a regular basis, and;
3. We are qualified to evaluate the fair market value of the services being performed in this situation.

Our analysis is based on objective compensation and production data from the Medical Group Management Association Physician Compensation and Production Survey, 2004.

For purposes of our opinion, the term fair market value is defined as follows (this definition is long-standing and is most recently cited in the Federal Register March 26, 2004 (69 FR 59)):

006-61

*...the value in arms length transactions, consistent with the general market value. "General market value" means the price that an asset would bring, as the result of bona fide bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party; or the compensation that would be included in a service agreement, as the result of bona fide bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party.... or the compensation that has been included in bona fide services agreements with comparable terms at the time of the agreement.*

*Contract Terms*

The Employment Agreement provides for the part-time employment of Dr. Ford for purposes of providing outpatient orthopedic procedures at Tuomey Medical Center. The initial length of the contract is for ten years. Pursuant to his professional services, Dr. Ford will receive compensation and other benefits as follows:

Compensation
➤ Base Salary:
  o Each year the base salary will be set according to the previous year's net collections for outpatient orthopedic services. Since Dr. Ford had collections last year of less than $185,000, he will receive an initial annual base salary of $5,000. The base salary ranges are summarized in the following table:

| Range Number | Collections Range Minimum | Collections Range Maximum | Base Salary |
|---|---|---|---|
| 1 | $0 | $185,000 | $5,000 |
| 2 | $185,001 | $205,000 | $10,000 |
| 3 | $205,001 | $225,000 | $15,000 |
| 4 | $225,001 | $245,000 | $20,000 |
| 5 | $245,001 | $265,000 | $25,000 |
| 6 | $265,001 | $285,000 | $30,000 |
| 7 | $285,001 | $305,000 | $35,000 |
| 8 | $305,001 | $325,000 | $40,000 |
| 9 | $325,001 | $345,000 | $45,000 |
| 10 | $345,001 | $365,000 | $50,000 |
| 11 | $365,001 | $385,000 | $55,000 |
| 12 | $385,001 | $405,000 | $60,000 |
| 13 | $405,001 | $425,000 | $65,000 |
| 14 | $425,001 | $445,000 | $70,000 |
| 15 | $445,001 | $465,000 | $75,000 |

  o The base salary amounts in each range are for the initial year and may increase in any given year based on system-wide base salary increases.

006-62

➢ Productivity Incentive:
  o Dr. Ford will receive a productivity incentive of 80% of individual Net Collections.
➢ Incentive Bonus:
  o This is a "qualitative" incentive to ensure high quality of patient care and physician relationships with THS. The qualitative measures are determined by TSP and are summarized in Exhibit A of the Employment Agreement.
  o The incentive bonus is calculated as 7% of the Productivity Incentive.

Benefits
➢ Insurance
  o Health, Dental and Vision Insurance equivalent to THS's.
  o Supplemental Insurance available for purchase through THS plan
  o Malpractice Liability Insurance
➢ Miscellaneous
  o THS's Healthcare Flexible Spending Account program
  o THS's Dependent Care Flexible Spending Account program
  o THS's Employee Discount Program
  o Employer's share of all payroll taxes paid

*Compensation Analysis*

The market data below represent full-time and part-time compensation and net collections data for orthopedic surgeons nationwide in the 2004 MGMA survey:

**2004 MGMA - National Market - Ortho Surgery**

|  | 25th %ile | 50th %ile | 75th %ile | 90th %ile |
|---|---|---|---|---|
| Full-Time Compensation | $290,566 | $385,000 | $515,037 | $731,151 |
| Full-Time Net Collections | $612,700 | $756,581 | $982,890 | $1,217,645 |
| Part-Time Compensation | $186,237 | $293,022 | $426,161 | $581,903 |
| Part-Time Net Collections | $245,080 | $302,632 | $393,156 | $487,058 |

TSP submitted to Cejka Consulting Dr. Ford's most recent annual outpatient collections. His productivity and resulting compensation are summarized as follows:
➢ Dr. Ford had annual net collections of approximately $113,700. This level of productivity is less than the 25th percentile of the part-time orthopedic market.
➢ According the terms of the compensation plan with current levels of productivity, Dr. Ford's total cash compensation (before benefits) would be approximately

$102,300. This level of compensation is also less than the 25th percentile of the part-time orthopedic market.

➤ The additional benefit amounts for flexible spending accounts, health insurance, malpractice insurance, etc. are typical of what is offered to physicians in the market.

*Conclusion*

Based on the above analyses and considerations, it is Cejka's opinion that the compensation and benefit terms of the Employment Agreement between TSP and Dr. Ford are individually and collectively within fair market value. His compensation is directly reflective of his productivity and it is well within the range of typical compensation seen for part-time physicians nationwide.

It has been our pleasure to assist Nexsen Pruet Adams Kleemeier, LLC and Tuomey Healthcare System in assuring that the compensation programs for their physicians are reasonable and reward the physicians at levels that are consistent with fair market value. Should you have any questions please do not hesitate to contact us at (770) 446-5977.

Sincerely,

Kim Saccone
Senior Consultant
Cejka Consulting

Cc:    Doug Cardinal

006-64

**Privileged and Confidential**

**Attorney - Client Communications**

May 10, 2005

Tim Hewson
Member
Nexsen Pruet Adams Kleemeier, LLC
1441 Main Street, Suite 1500
Columbia, SC 29201

**Subject:   Opinion for Tuomey Outpatient Orthopedic Surgery
Compensation for Dr. Kurt Stroebel**

Dear Mr. Hewson:

Nexsen Pruet Adams Kleemeier, LLC has requested that Cejka provide our opinion
about the reasonableness and fair market value of the financial terms of the part-time
Employment Agreement between Kurt T. Stroebel, M.D. and Tuomey Surgical
Professionals, LLC (TSP). TSP is a subsidiary of Tuomey Healthcare System (THS).
The Agreement allows Dr. Stroebel, an orthopedic surgeon on staff at THS, to provide
outpatient orthopedic services on a part-time basis at THS.

Cejka Consulting has assisted over 1000 healthcare client organizations in evaluating
physician pay-related trends and is generally known for its expertise in physician
compensation evaluation. Our approach to market analysis includes a mix of
consulting expertise, financial modeling based on physician productivity and market
databases to provide analysis for a variety of compensation applications. Based on our
experience in the area of compensation analysis for both for profit and not for profit
healthcare organizations:

1. Cejka Consulting holds itself out to the public as a recognized compensation
   consultant;
2. We perform market evaluations such as this on a regular basis, and;
3. We are qualified to evaluate the fair market value of the services being performed
   in this situation.

Our analysis is based on objective compensation and production data from the Medical
Group Management Association Physician Compensation and Production Survey,
2004.

For purposes of our opinion, the term fair market value is defined as follows (this
definition is long-standing and is most recently cited in the Federal Register March 26,
2004 (69 FR 59)):

006-65

*...the value in arms length transactions, consistent with the general market value. "General market value" means the price that an asset would bring, as the result of bona fide bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party; or the compensation that would be included in a service agreement, as the result of bona fide bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party.... or the compensation that has been included in bona fide services agreements with comparable terms at the time of the agreement.*

*Contract Terms*

The Employment Agreement provides for the part-time employment of Dr. Stroebel for purposes of providing outpatient orthopedic procedures at Tuomey Medical Center. The initial length of the contract is for ten years. Pursuant to his professional services, Dr. Stroebel will receive compensation and other benefits as follows:

Compensation
➢ Base Salary:
  o Each year the base salary will be set according to the previous year's net collections for outpatient orthopedic services. Since Dr. Stroebel had collections last year of less than $185,000, he will receive an initial annual base salary of $5,000. The base salary ranges are summarized in the following table:

| Range Number | Collections Range Minimum | Collections Range Maximum | Base Salary |
|---|---|---|---|
| 1 | $0 | $185,000 | $5,000 |
| 2 | $185,001 | $205,000 | $10,000 |
| 3 | $205,001 | $225,000 | $15,000 |
| 4 | $225,001 | $245,000 | $20,000 |
| 5 | $245,001 | $265,000 | $25,000 |
| 6 | $265,001 | $285,000 | $30,000 |
| 7 | $285,001 | $305,000 | $35,000 |
| 8 | $305,001 | $325,000 | $40,000 |
| 9 | $325,001 | $345,000 | $45,000 |
| 10 | $345,001 | $365,000 | $50,000 |
| 11 | $365,001 | $385,000 | $55,000 |
| 12 | $385,001 | $405,000 | $60,000 |
| 13 | $405,001 | $425,000 | $65,000 |
| 14 | $425,001 | $445,000 | $70,000 |
| 15 | $445,001 | $465,000 | $75,000 |

  o The base salary amounts in each range are for the initial year and may increase in any given year based on system-wide base salary increases.

006-66

- ➤ Productivity Incentive:
  - o Dr. Stroebel will receive a productivity incentive of 80% of individual Net Collections.
- ➤ Incentive Bonus:
  - o This is a "qualitative" incentive to ensure high quality of patient care and physician relationships with THS. The qualitative measures are determined by TSP and are summarized in Exhibit A of the Employment Agreement.
  - o The incentive bonus is calculated as 7% of the Productivity Incentive.

Benefits
- ➤ Insurance
  - o Health, Dental and Vision Insurance equivalent to THS's.
  - o Supplemental Insurance available for purchase through THS plan
  - o Malpractice Liability Insurance
- ➤ Miscellaneous
  - o THS's Healthcare Flexible Spending Account program
  - o THS's Dependent Care Flexible Spending Account program
  - o THS's Employee Discount Program
  - o Employer's share of all payroll taxes paid

*Compensation Analysis*

The market data below represent full-time and part-time compensation and net collections data for orthopedic surgeons nationwide in the 2004 MGMA survey:

**2004 MGMA - National Market - Ortho Surgery**

|  | 25th %tile | 50th %tile | 75th %tile | 90th %tile |
|---|---|---|---|---|
| Full-Time Compensation | $290,566 | $385,000 | $515,037 | $731,151 |
| Full-Time Net Collections | $612,700 | $756,581 | $982,890 | $1,217,645 |
| Part-Time Compensation | $186,237 | $293,022 | $426,161 | $581,903 |
| Part-Time Net Collections | $245,080 | $302,632 | $393,156 | $487,058 |

TSP submitted to Cejka Consulting Dr. Stroebel's most recent annual outpatient collections. His productivity and resulting compensation are summarized as follows:
- ➤ Dr. Stroebel had annual net collections of approximately $85,200. This level of productivity is less than the 25th percentile of the part-time orthopedic market.
- ➤ According the terms of the compensation plan with current levels of productivity, Dr. Stroebel's total cash compensation (before benefits) would be approximately

$78,000. This level of compensation is also less than the 25th percentile of the part-time orthopedic market.

➢ The additional benefit amounts for flexible spending accounts, health insurance, malpractice insurance, etc. are typical of what is offered to physicians in the market.

*Conclusion*

Based on the above analyses and considerations, it is Cejka's opinion that the compensation and benefit terms of the Employment Agreement between TSP and Dr. Stroebel are individually and collectively within fair market value. His compensation is directly reflective of his productivity and it is well within the range of typical compensation seen for part-time physicians nationwide.

It has been our pleasure to assist Nexsen Pruet Adams Kleemeier, LLC and Tuomey Healthcare System in assuring that the compensation programs for their physicians are reasonable and reward the physicians at levels that are consistent with fair market value. Should you have any questions please do not hesitate to contact us at (770) 446-5977.

Sincerely,

Kim Saccone
Senior Consultant
Cejka Consulting

Cc:     Doug Cardinal

**Privileged and Confidential**

**Attorney - Client Communications**

May 10, 2005

Tim Hewson
Member
Nexsen Pruet Adams Kleemeier, LLC
1441 Main Street, Suite 1500
Columbia, SC 29201

**Subject:    Opinion for Tuomey Outpatient Orthopedic Surgery Compensation for Dr. Michael Drakeford**

Dear Mr. Hewson:

Nexsen Pruet Adams Kleemeier, LLC has requested that Cejka provide our opinion about the reasonableness and fair market value of the financial terms of the part-time Employment Agreement between Michael K. Drakeford, M.D. and Tuomey Surgical Professionals, LLC (TSP). TSP is a subsidiary of Tuomey Healthcare System (THS). The Agreement allows Dr. Drakeford, an orthopedic surgeon on staff at THS, to provide outpatient orthopedic services on a part-time basis at THS.

Cejka Consulting has assisted over 1000 healthcare client organizations in evaluating physician pay-related trends and is generally known for its expertise in physician compensation evaluation. Our approach to market analysis includes a mix of consulting expertise, financial modeling based on physician productivity and market databases to provide analysis for a variety of compensation applications. Based on our experience in the area of compensation analysis for both for profit and not for profit healthcare organizations:

1. Cejka Consulting holds itself out to the public as a recognized compensation consultant;
2. We perform market evaluations such as this on a regular basis, and;
3. We are qualified to evaluate the fair market value of the services being performed in this situation.

Our analysis is based on objective compensation and production data from the Medical Group Management Association Physician Compensation and Production Survey, 2004.

For purposes of our opinion, the term fair market value is defined as follows (this definition is long-standing and is most recently cited in the Federal Register March 26, 2004 (69 FR 59)):

006-69

*...the value in arms length transactions, consistent with the general market value. "General market value" means the price that an asset would bring, as the result of bona fide bargaining between well-informed buyers and sellers who are not otherwise in a position to generate business for the other party; or the compensation that would be included in a service agreement, as the result of bona fide bargaining between well-informed parties to the agreement who are not otherwise in a position to generate business for the other party.... or the compensation that has been included in bona fide services agreements with comparable terms at the time of the agreement.*

*Contract Terms*

The Employment Agreement provides for the part-time employment of Dr. Drakeford for purposes of providing outpatient orthopedic procedures at Tuomey Medical Center. The initial length of the contract is for ten years. Pursuant to his professional services, Dr. Drakeford will receive compensation and other benefits as follows:

Compensation
- Base Salary:
  - Each year the base salary will be set according to the previous year's net collections for outpatient orthopedic services. Since Dr. Drakeford had collections last year between $285,001 and $305,000, he will receive an initial annual base salary of $35,000. The base salary ranges are summarized in the following table:

| Range Number | Collections Range Minimum | Collections Range Maximum | Base Salary |
|---|---|---|---|
| 1 | $0 | $185,000 | $5,000 |
| 2 | $185,001 | $205,000 | $10,000 |
| 3 | $205,001 | $225,000 | $15,000 |
| 4 | $225,001 | $245,000 | $20,000 |
| 5 | $245,001 | $265,000 | $25,000 |
| 6 | $265,001 | $285,000 | $30,000 |
| 7 | $285,001 | $305,000 | $35,000 |
| 8 | $305,001 | $325,000 | $40,000 |
| 9 | $325,001 | $345,000 | $45,000 |
| 10 | $345,001 | $365,000 | $50,000 |
| 11 | $365,001 | $385,000 | $55,000 |
| 12 | $385,001 | $405,000 | $60,000 |
| 13 | $405,001 | $425,000 | $65,000 |
| 14 | $425,001 | $445,000 | $70,000 |
| 15 | $445,001 | $465,000 | $75,000 |

  - The base salary amounts in each range are for the initial year and may increase in any given year based on system-wide base salary increases.

006-70

> Productivity Incentive:
>    o   Dr. Drakeford will receive a productivity incentive of 80% of individual Net Collections.
> Incentive Bonus:
>    o   This is a "qualitative" incentive to ensure high quality of patient care and physician relationships with THS. The qualitative measures are determined by TSP and are summarized in Exhibit A of the Employment Agreement.
>    o   The incentive bonus is calculated as 7% of the Productivity Incentive.

Benefits
> . Insurance
>    o   Health, Dental and Vision Insurance equivalent to THS's.
>    o   Supplemental Insurance available for purchase through THS plan
>    o   Malpractice Liability Insurance
> Miscellaneous
>    o   THS's Healthcare Flexible Spending Account program
>    o   THS's Dependent Care Flexible Spending Account program
>    o   THS's Employee Discount Program
>    o   Employer's share of all payroll taxes paid


*Compensation Analysis*

The market data below represent full-time and part-time compensation and net collections data for orthopedic surgeons nationwide in the 2004 MGMA survey:

**2004 MGMA - National Market - Ortho Surgery**

|  | 25th %tile | 50th %tile | 75th %tile | 90th %tile |
|---|---|---|---|---|
| Full-Time Compensation | $290,566 | $385,000 | $515,037 | $731,151 |
| Full-Time Net Collections | $612,700 | $756,581 | $982,890 | $1,217,645 |
| Part-Time Compensation | $186,237 | $293,022 | $426,161 | $581,903 |
| Part-Time Net Collections | $245,080 | $302,632 | $393,156 | $487,058 |

TSP submitted to Cejka Consulting Dr. Drakeford's most recent annual outpatient collections. His productivity and resulting compensation are summarized as follows:
> Dr. Drakeford had annual net collections of approximately $295,400. This level of productivity approximates the 25th -50th percentile of the part-time orthopedic market, or roughly 61% of the part-time P90.
> According the terms of the compensation plan with current levels of productivity, Dr. Drakeford's total cash compensation (before benefits) would be approximately

$287,800. This level of compensation approximates the 25th - 50th percentile of the part-time orthopedic market, or roughly 49% of the part-time P90.

➤ The additional benefit amounts for flexible spending accounts, health insurance, malpractice insurance, etc. are typical of what is offered to physicians in the market.

*Conclusion*

Based on the above analyses and considerations, it is Cejka's opinion that the compensation and benefit terms of the Employment Agreement between TSP and Dr. Drakeford are individually and collectively within fair market value. Dr. Drakeford's collections represent only approximately 30% of his personal total workload; however his productivity is reflective of physicians working at approximately 50% of a full-load (i.e. when he is compared to part-time or .5 FTE orthopedic surgeons). His compensation is directly reflective of his productivity, and it is well within the range of typical compensation seen for both part-time and full-time physicians nationwide.

It has been our pleasure to assist Nexsen Pruet Adams Kleemeier, LLC and Tuomey Healthcare System in assuring that the compensation programs for their physicians are reasonable and reward the physicians at levels that are consistent with fair market value. Should you have any questions please do not hesitate to contact us at (770) 446-5977.

Sincerely,


Kim Saccone
Senior Consultant
Cejka Consulting


Cc:    Doug Cardinal

not go to be couples of south.

① FMV is b simply not creditable

- Papi does more than even is red flag + relative easy Smile — Nothing / Tant
  — Mc Leod
- It makes no sense when totly aut referrals + can't to tied

② AKS = very broad but govt does say

"for employment with the furnish ofany item or service for which pyment my be made" does not include referrals

See: MacThotn IRS title

③ Smile made very dubtty + will throw on bits

Very risky → Non-compete // effectiv preclude term practing (of cant practe styled)

⇒ Term (how reasonable)?

→ history ⇒ (but rates)

006-73

① Employment PMV does not pass the
   red face test ⇒

② Can't pay does more than they
   earn raises huge red flags

   → McLeod was exactly as such
   → They had FMV / opinion

③ Can't justify w/ refusal of annuity
   → that is what North city
        in Dérail
   → PMV / excludes consideration of
        annuity refusals

④ Both AKS / State ⇒
   AKS ⇒ employ

006-74

Review

① Consultants Chart shows bottom line

→ Does make 31% more of what

→ but actually much greater

some 31% compares

new package w/ old not revenue

may of new benefits are actual
subtraction from true
{ — benefits
{ — billing

② Best idea of comparables in adding MVA
is from prior #

— not national averages —

③ Kriskow memo id'd causes of productivity
mixture —

④ for ACS ⇒ terms — layoff of [?]
— non comp [?]

→ background of ASL

006-75



GEJKA CONSULTING

# Tuomey Healthcare System

## Part-time Employee Compensation Plan for Outpatient Orthopedic Surgery

August 31, 2004

Prepared by Kim Saccone, Senior Consultant

Confidential

ETKA
CONSULTING

## Plan Philosophy and Assumptions

- The plan applies to each physician equally...variations between the group's individual physicians are directly related to personal productivity.

- MGMA 2004 market data for Orthopedic Surgeons nationwide have been adjusted to account for part-time productivity and compensation levels.

- Because the plan emphasizes and rewards productivity as the compensation driver:

  – The base salaries to allow for fair market value total compensation once productivity incentives are paid

    ❖ collections for the group are at the adjusted 25th percentile, and total compensation under this plan is at the adjusted 75th percentile

  – On average, approximately 93% of a physician's outpatient compensation is a result of incentives

00

## Plan Details

**CEJKA CONSULTING**

- Three components of total compensation:

  - Base Salary: Base salary each year will be reset according to the previous year's outpatient net collections. Base salary ranges provide incremental base salary increases/decreases for incremental increases/decreases in productivity.

  - Productivity Incentive: 80% of personal net collections

  - Quality Incentive:

    - 7% of personal productivity incentive

    - Ensures quality remains at higher productivity levels

Confidential

## Plan Details

**CEJKA CONSULTING**

- In addition to total compensation, Tuomey is also providing these additional benefits:

  – 100% malpractice insurance coverage

  – 100% FICA

  – 100% coverage for billing & collecting costs

  – Full participation in Tuomey health insurance plan

Confidential

## CEJKA CONSULTING

## Plan Details

- The additional benefit provided to physicians (excluding health insurance) amounts to an average of 43% additional monetary benefit above compensation.

- On average, each physician receives a "net gain" (excluding health insurance benefit) of 31% over individual outpatient collections.

Confide



# Plan Payouts using 2003 collections data

CEJKA CONSULTING



| Physician Name | Annual Operation Net Collections | Est Comp Adj % | Base Range# | Base | Threshold (penalty at 150% of collections) | Health Incentive Compensation | Total Cash Compensation | Liability Coverage | Billing & Collections (10% of collections) | FICA | Total Benefit (excluding health insurance) | Net Gain over collections |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Drakeford | $295,361 | 30% | 7 | $35,000 | $236,289 | $16,540 | $287,829 | $33,310 | $29,536 | $9,623 | $360,288 | $64,937 |

Base plus incentives

Total Compensation plus additional benefits (excluding health insurance)

| Range Number | Minimum | Maximum | Base Salary |
|---|---|---|---|
| | Collections Range | | |
| 1 | $0 | $185,000 | $5,000 |
| 2 | $185,001 | $205,000 | $10,000 |
| 3 | $205,001 | $225,000 | $15,000 |
| 4 | $225,001 | $245,000 | $20,000 |
| 5 | $245,001 | $265,000 | $25,000 |
| 6 | $265,001 | $285,000 | $30,000 |
| 7 | $285,001 | $305,000 | $35,000 |
| 8 | $305,001 | $325,000 | $40,000 |
| 9 | $325,001 | $345,000 | $45,000 |
| 10 | $345,001 | $365,000 | $50,000 |
| 11 | $365,001 | $385,000 | $55,000 |
| 12 | $385,001 | $405,000 | $60,000 |
| 13 | $405,001 | $425,000 | $65,000 |
| 14 | $425,001 | $445,000 | $70,000 |
| 15 | $445,001 | $465,000 | $75,000 |

| | |
|---|---|
| Minimum to exceed $5K Base | $185,001 |
| Collections increments after minimum | $20,000 |
| Base Salary increments after minimum | $5,000 |

Salary ranges for Orthopedic Surgery:

Threshold collections to receive a base salary higher than the $5,000 minimum was established using the MGMA P25 adjusted to 30% (the Outpatient Load %).

Confidential

00



# Plan Payouts using 2003 collections data



| Physician Name | Annual Collections Not Including CR | Split % (Collections Over Base Range) | Base Range | Base | Productivity Incentive (70% of Collections) | Quality Incentive Productivity Incentive | Total Cash Compensation | Liability Coverage | Billing & Collections (10% of Collections) | Total Benefit (except health insurance) | Net claim above Collections |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Ford | $113,684 | 30% | 1 | $5,000 | $30,947 | $6,366 | $102,313 | $33,310 | $11,368 | $6,933 | $153,925 | $40,241 |

**Base plus incentives**

**Total Compensation plus additional benefits (excluding health insurance)**

| Range Number | Collections Range | | Base Salary |
|---|---|---|---|
| | Minimum | Maximum | |
| 1 | $0 | $185,000 | $5,000 |
| 2 | $185,001 | $205,000 | $10,000 |
| 3 | $205,001 | $225,000 | $15,000 |
| 4 | $225,001 | $245,000 | $20,000 |
| 5 | $245,001 | $265,000 | $25,000 |
| 6 | $265,001 | $285,000 | $30,000 |
| 6 | $285,001 | $305,000 | $35,000 |
| 7 | $288,001 | $305,000 | $35,000 |
| 8 | $305,001 | $325,000 | $40,000 |
| 9 | $325,001 | $345,000 | $45,000 |
| 10 | $345,001 | $365,000 | $50,000 |
| 11 | $365,001 | $385,000 | $55,000 |
| 12 | $385,001 | $405,000 | $60,000 |
| 13 | $405,001 | $425,000 | $65,000 |
| 14 | $425,001 | $445,000 | $70,000 |
| 15 | $445,001 | $465,000 | $75,000 |

| | |
|---|---|
| Minimum to exceed $5K Base | $185,001 |
| Collections Increments after minimum | $20,000 |
| Base Salary Increments after minimum | $5,000 |

Salary ranges for Orthopedic Surgery:

Threshold collections to receive a base salary higher than the $5,000 minimum was established using the MGMA P25 adjusted to 30% (the Outpatient Load %).

Confidential

00



# Plan Payouts using 2003 collections data



| Physician Name | Annual Outpatient Net Collections | Adjusted Net Coll % | Base Threshold | Base | Productivity Incentive (80% of Collections) | Quality Incentive (2% of Phlebotomy Compensation) | Total Cash Compensation | Liability Coverage | Billing & Collections (10% of collections) | FICA | Total Benefit (excluding above) | Total Cash + Benefit (excluding health insurance) Compensation |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Stroebel | $85,208 | 30% | 1 | $5,000 | $68,167 | $4,772 | $77,938 | $33,310 | $8,521 | $5,662 | $125,732 | $40,523 |

| Range Number | Collections Range Minimum | Collections Range Maximum | Base Salary |
|---|---|---|---|
| 1 | $0 | $185,000 | $5,000 |
| 2 | $185,001 | $205,000 | $10,000 |
| 3 | $205,001 | $225,000 | $15,000 |
| 4 | $225,001 | $245,000 | $20,000 |
| 5 | $245,001 | $265,000 | $25,000 |
| 6 | $265,001 | $285,000 | $30,000 |
| 7 | $285,001 | $305,000 | $35,000 |
| 8 | $305,001 | $325,000 | $40,000 |
| 9 | $325,001 | $345,000 | $45,000 |
| 10 | $345,001 | $365,000 | $50,000 |
| 11 | $365,001 | $385,000 | $55,000 |
| 12 | $385,001 | $405,000 | $60,000 |
| 13 | $405,001 | $425,000 | $65,000 |
| 14 | $425,001 | $445,000 | $70,000 |
| 15 | $445,001 | $465,000 | $75,000 |
| Minimum to exceed $5K Base | | | $185,001 |
| Collections Increments after minimum | | | $20,000 |
| Base Salary Increments after minimum | | | $5,000 |

Base plus incentives

Total Compensation plus additional benefits (excluding health insurance)

Salary ranges for Orthopedic Surgery:

Threshold collections to receive a base salary higher than the $5,000 minimum was established using the MGMA P25 adjusted to 30% (the Outpatient Load %).

Confidential

00



# GETKA CONSULTING

# Plan Payouts using 2003 collections data

| Physician Name | Annual Collections | Est. Object. level % | Base Range | Base collections | Productivity Incentive (X% of collections) | Quality Incentive (X% of collections) | Total Cash Compensation | Liability Coverage | Fulfills Coverage (X% of collections) | HSA | Total Benefit Personal Benefits | Max Gain above Collections |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Tate | $181,103 | 30% | 1 | $5,000 | $144,883 | $10,142 | $160,024 | $33,310 | $18,110 | $7,770 | $219,215 | $38,112 |

Base plus incentives

Total Compensation plus additional benefits (excluding health insurance)

| Collections Range | | | |
|---|---|---|---|
| Range Number | Minimum | Maximum | Base Salary |
| 1 | $0 | $185,000 | $5,000 |
| 2 | $185,001 | $205,000 | $10,000 |
| 3 | $205,001 | $225,000 | $15,000 |
| 4 | $225,001 | $245,000 | $20,000 |
| 5 | $245,001 | $265,000 | $25,000 |
| 6 | $265,001 | $285,000 | $30,000 |
| 7 | $285,001 | $305,000 | $35,000 |
| 8 | $305,001 | $325,000 | $40,000 |
| 9 | $325,001 | $345,000 | $45,000 |
| 10 | $345,001 | $365,000 | $50,000 |
| 11 | $365,001 | $385,000 | $55,000 |
| 12 | $385,001 | $405,000 | $60,000 |
| 13 | $405,001 | $425,000 | $65,000 |
| 14 | $425,001 | $445,000 | $70,000 |
| 15 | $445,001 | $465,000 | $75,000 |

| Minimum to exceed $5K Base | $185,001 |
|---|---|
| Collections Increments after minimum | $20,000 |
| Base Salary Increments after minimum | $5,000 |

Salary ranges for Orthopedic Surgery:

Threshold collections to receive a base salary higher than the $5,000 minimum was established using the MGMA P25 adjusted to 30% (the Outpatient Load %).

Confidential



# CEJKA CONSULTING

# Plan Payouts using 2003 collections data

| Physician Name | Annual Outpatient Net Collections | Pct. Over Award?% | Base Raise? | Base | Private-Pay Incentive (20% of Collections) | Quality Insurance (1% of Incentive) | Total Base plus Incentives | Flexibility Coverage | Billing & Collections (18% a collections) | HSA | Total Benefit excludes health insurance | Net Outp. above Collections |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Dr. Drakeford | $295,361 | 30% | 7 | $35,000 | $236,289 | $16,540 | $287,829 | $33,310 | $29,536 | $9,623 | $360,298 | $64,937 |
| Dr. Ford | $113,684 | 30% | 1 | $5,000 | $90,947 | $6,366 | $102,313 | $33,310 | $11,368 | $6,933 | $153,925 | $40,241 |
| Dr. Stroebel | $85,208 | 30% | 1 | $5,000 | $68,167 | $4,772 | $77,938 | $33,310 | $8,521 | $5,962 | $125,732 | $40,523 |
| Dr. Tate | $181,103 | 30% | 1 | $5,000 | $144,883 | $10,142 | $160,024 | $33,310 | $18,110 | $7,770 | $219,215 | $38,112 |

Base plus incentives

Total Compensation plus additional benefits (excluding health insurance)



| Range Number | Collections Range | | Base Salary |
|---|---|---|---|
| | Minimum | Maximum | |
| 1 | $0 | $185,000 | $5,000 |
| 2 | $185,001 | $205,000 | $10,000 |
| 3 | $205,001 | $225,000 | $15,000 |
| 4 | $225,001 | $245,000 | $20,000 |
| 5 | $245,001 | $265,000 | $25,000 |
| 6 | $265,001 | $285,000 | $30,000 |
| 7 | $285,001 | $305,000 | $35,000 |
| 8 | $305,001 | $325,000 | $40,000 |
| 9 | $325,001 | $345,000 | $45,000 |
| 10 | $345,001 | $365,000 | $50,000 |
| 11 | $365,001 | $385,000 | $55,000 |
| 12 | $385,001 | $405,000 | $60,000 |
| 13 | $405,001 | $425,000 | $65,000 |
| 14 | $425,001 | $445,000 | $70,000 |
| 15 | $445,001 | $465,000 | $75,000 |

| | |
|---|---|
| Minimum to exceed $5K Base | $185,001 |
| Collections Increments after minimum | $20,000 |
| Base Salary Increments after minimum | $5,000 |

Salary ranges for Orthopedic Surgery:

Threshold collections to receive a base salary higher than the $5,000 minimum was established using the MGMA P25 adjusted to 30% (the Outpatient Load %).



# Plan Payouts using 2003 collections data

| Physician Name | Annual Collections (Net) | Est. Owed % (Coll Paid %) | Base (Range) | Base Salary | Productivity Incentive (30% of Collections) | Quality Incentive (7% of Base Salary) | Total Cash Compensation | Benefits Coverage | Benefits (10% of Collections excl FICA) | FICA | Total Payouts (excl Health Insurance) | % Gain above Collections |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | $295,361 | 30% | 7 | $35,000 | $236,289 | $16,540 | $287,829 | $33,310 | $29,536 | $9,623 | $360,298 | $64,937 |
| B | $113,684 | 30% | 1 | $5,000 | $90,947 | $6,366 | $102,313 | $33,310 | $11,368 | $8,933 | $153,925 | $40,241 |
| C | $85,208 | 30% | 1 | $5,000 | $68,167 | $4,772 | $77,938 | $33,310 | $8,521 | $5,962 | $125,732 | $40,523 |
| D | $181,103 | 30% | 1 | $5,000 | $144,883 | $10,142 | $160,024 | $33,310 | $18,110 | $7,770 | $219,215 | $38,112 |

Base plus incentives

Total Compensation plus additional benefits (excluding health insurance)

| Range Number | Collections Range Minimum | Collections Range Maximum | Base Salary |
|---|---|---|---|
| 1 | $0 | $185,000 | $5,000 |
| 2 | $185,001 | $205,000 | $10,000 |
| 3 | $205,001 | $225,000 | $15,000 |
| 4 | $225,001 | $245,000 | $20,000 |
| 5 | $245,001 | $265,000 | $25,000 |
| 6 | $265,001 | $285,000 | $30,000 |
| 7 | $285,001 | $305,000 | $35,000 |
| 8 | $305,001 | $325,000 | $40,000 |
| 9 | $325,001 | $345,000 | $45,000 |
| 10 | $345,001 | $365,000 | $50,000 |
| 11 | $365,001 | $385,000 | $55,000 |
| 12 | $385,001 | $405,000 | $60,000 |
| 13 | $405,001 | $425,000 | $65,000 |
| 14 | $425,001 | $445,000 | $70,000 |
| 15 | $445,001 | $465,000 | $75,000 |

| | |
|---|---|
| Minimum to exceed $5K Base | $185,001 |
| Collections Increments after minimum | $20,000 |
| Base Salary Increments after minimum | $5,000 |

Salary ranges for Orthopedic Surgery:

Threshold collections to receive a base salary higher than the $5,000 minimum was established using the MGMA P25 adjusted to 30% (the Outpatient Load %).

Confidential

<u>THIS AGREEMENT IS SUBJECT TO ARBITRATION</u>
<u>PURSUANT TO SC CODE §15-48-10 ET SEQ. AS MODIFIED HEREIN</u>

**PHYSICIAN EMPLOYMENT AGREEMENT**

This Physician Employment Agreement (the "Agreement") is made and entered into by and between Tuomey Surgical Professionals, LLC (the "Practice") and the undersigned physician ("Physician") to be effective as of the date set forth on the signature page of this Agreement (the "Effective Date").

<u>Introduction</u>.  Physician is qualified to practice as a doctor of medicine and holds an unrestricted license to practice medicine in South Carolina.  Physician desires to provide services as an employee of the Practice upon the terms and conditions set forth in this Agreement.

The Practice is a wholly owned subsidiary of Tuomey d/b/a Tuomey Healthcare System (the "Hospital").  The Hospital is a tax exempt, non-profit entity that provides health care services in Sumter, South Carolina and the surrounding region.  The Hospital formed the Practice to employ physicians to provide healthcare and related services at the Hospital.  The Practice desires to obtain the services of the Physician as an employee upon the terms and conditions set forth in this Agreement.

For purposes of this Agreement, "Hospital" shall include Tuomey d/b/a Tuomey Healthcare System and all healthcare facilities owned, operated, or affiliated with Tuomey Healthcare System.

<u>Agreement</u>.  In consideration of the premises and the mutual promises and covenants stated below, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do covenant, stipulate, and agree as follows:

1.    <u>Employment of Physician</u>.  The Practice shall employ Physician to provide professional, administrative and supervisory services in accordance with the terms of this Agreement.

    1.1    <u>Professional Duties</u>.  Physician shall provide outpatient surgery services and other related services (the "Services") on a part-time basis at the Hospital.  The Services shall be provided to outpatients at the Hospital or at facilities owned or operated by the Hospital, as may be designated by the Practice from time to time (collectively, "Hospital Site").  By entering into this Agreement, Physician agrees and understands that he shall at all times be subject to the rules governing the Practice physicians, as may be amended from time to time (the "Practice Rules"), provided that such rules are reasonable and do not unduly interfere with Physician's professional responsibilities.

1.2    Availability. Physician agrees to provide the Services at the Hospital on a mutually agreed upon basis. Physician acknowledges that as a professional providing the Services, he is an "exempt" employee for purposes of the Fair Labor Standards Act. Physician shall also comply with additional guidelines regarding Practice coverage requirements to be developed by the Physician and the Practice.

1.3    Staff Privileges and Hospital Rules. Physician shall at all times during the term of this Agreement be and remain a member in good standing of the active medical staff of the Hospital, with all the privileges of and subject to all the responsibilities of the Hospital medical staff bylaws, rules, and regulations, all as may be amended and in effect from time to time.

1.4    Best Efforts. Physician will actively and industriously pursue his profession in the best interest of the Practice and its patients. Physician will actively assist in the development and improvement of the Practice's services and reasonably participate in any advisory committee created by the Practice or the Hospital. Physician will carefully avoid any and all personal acts, habits and usages which might injure in any way, directly or indirectly, his professional reputation or that of the Practice or any employee of the Practice, or which might otherwise be detrimental to any interest of the Practice.

1.5    Application of Standards. Physician shall perform his duties under this Agreement in conformity with and shall comply with: (i) all applicable standards, rulings, regulations and requirements of the United States Department of Health and Human Services, the South Carolina Department of Health and Environmental Control, the Joint Commission on Accreditation of Healthcare Organizations (the "JCAHO") and any federal, state, or local government agency, third party payer or accrediting body having jurisdiction over or providing reimbursement for the services provided by Physician and any programs and services offered by the Hospital; (ii) the bylaws, policies, rules and regulations of the Hospital (including those of any department, section or division thereof), the Hospital's medical staff and of managed care programs in which the Practice participates, as the same may be amended and in effect from time to time; (iii) the Principles of Medical Ethics of the American Medical Association; and (iv) the standard of care required of physicians practicing in the state of South Carolina.

1.6    Administrative Duties. Physician shall perform such administrative duties on behalf of the Practice as are determined by the Practice to be reasonable and necessary to ensure the proper and efficient operation of the Practice, provided such duties are within the scope of the Physician's training and expertise.

1.7    Training of Non-Physician Personnel. As requested, Physician shall participate in training non-physician personnel performing services at the Hospital.

1.8     Physician Charting.  Physician shall be responsible for charting services provided to patients in accordance with Medicare and other applicable guidelines, and the Practice shall be responsible for billing and collecting for such services.

1.9     Health Status.  The parties acknowledge that, during the term and any renewal terms of this Agreement, Physician must be able to appropriately and safely perform his duties hereunder.  Physician is responsible for informing the Practice of health factors that may affect performance of his professional and/or administrative duties, including health factors potentially affecting the health, safety or welfare of Physician or others.  The Practice, in accordance with applicable laws, shall from time to time be entitled to make reasonable inquiries and require appropriate health screenings, both mental and physical, and testing concerning Physician's ability to perform his duties.  Such screenings and testing include, but are not limited to, testing for substance abuse; testing for communicable or infectious diseases, including sexually transmitted diseases; and requesting and receiving such other information necessary to assure the Practice that Physician is capable of performing his duties and does not pose a health or safety risk to others.

The results of any testing, screening or examination as required herein will be maintained as confidential and will be disclosed within the sole discretion of the Practice to its administration and management only on a need to know basis in accordance with applicable laws. Provided however, any positive test result will be reported to appropriate authorities as required or allowed by law. Furthermore, if Physician is or becomes infected with Human Immunodeficiency Virus (HIV) or Hepatitis B Virus (HBV), then the Practice has the sole discretion to report Physician's condition to an expert review panel, established pursuant to the "S.C Health Care Professional Compliance Act," S.C. Code Ann. Section 44-30-10, et. seq. (Law. Co-op. Supp. 1995) (or the corresponding section of any future law) and any subsequent amendments as may occur, to determine Physician's appropriate scope of Practice and resolve any other relevant issues.

2.     Physician's Representations and Warranties.  Physician represents and warrants that:

2.1     Physician has never had his license to practice in the State of South Carolina, District of Columbia or any state revoked or suspended.

2.2     Physician is not now a defendant in any malpractice litigation.

2.3     The execution, delivery and performance of this Agreement is neither prohibited by nor constitutes a default under any statute, law, judgment, order, decree, writ, injunction, deed, instrument, contract, lease, license or permit to which Physician is a party or by which Physician is bound.

2.4     There is no litigation, proceeding or governmental investigation, including, but not limited to, any bankruptcy proceeding, pending or threatened, against Physician.

Michael K. Drakeford, M.D.
Physician Employment Agreement
Page 3 of 18

2.5    Physician has not relied upon any representation or statement by any representative of the Practice or the Hospital which is not set forth in this Agreement.

2.6    Physician has, in full force and effect, extended reporting endorsement coverage or is otherwise protected by valid medical malpractice insurance for any incidents occurring prior to employment by the Practice hereunder.

2.7    Physician is duly licensed to practice medicine in the State of South Carolina, has obtained all required narcotics and controlled substances numbers, and has secured privileges at the Hospital.

2.8    Physician agrees to execute any agreements necessary for the Practice's and Physician's participation in and reimbursement from public or private third party payers including, but not limited to, Medicaid, Medicare, and private managed care programs approved by the Hospital or with whom the Practice otherwise contracts as a participant or a provider. Physician agrees to maintain such practice patterns, including abiding by specialty consultation and other referral restrictions, as may be required under such public or private managed care programs. The Practice shall consult with and receive input from Physician regarding such programs and practice patterns.

3.    Billing and Compensation.

3.1    Professional Charges. Physician's professional fees and charges shall be determined by the Practice.

3.2    Billing. Practice shall be solely responsible for billing and collections from the patient and third party payors for the Services. The Physician is not authorized to make any billing adjustments. Physician hereby expressly reassigns to the Practice all benefits payable to the Physician for the Services by third party payors, including without limitation Medicare, Medicaid, Champus, and any other governmental reimbursement programs.

3.3    Compensation of Physician. Physician shall be compensated for providing the Services pursuant to the provisions set forth in the attached Exhibit A.

3.4    The Practice will provide Physician the benefits outlined in the attached Exhibit B.

4.    The Practice's Duties. The Practice or its designee shall perform the following services:

4.1    The Practice shall in cooperation with Physician establish administrative and business practices for the efficient and effective processing of patient inquiries, handling and scheduling appointments and arranging for the disposition of insurance filings and collection procedures involving the patient and patient's insurance company.

Michael K. Drakeford, M.D.
Physician Employment Agreement
Page 4 of 18

The Practice shall bill for professional services rendered to patients in accordance with all pertinent legal and ethical guidelines. It is the Practice's current intent that charges shall be comparable to charges for the same services made by physicians operating practices in South Carolina within the same medical specialty. The Practice intends to use billing and collection techniques that are comparable to the operating norms of physician office practices in the community.

4.2    The Practice shall be responsible for assuring its compliance with all laws and regulations, and shall provide technical support and advice to Physician to assist Physician in complying with all applicable governmental laws and regulations related to his provision of services hereunder.

5.    Term and Termination of the Agreement.

5.1    Commencement.  This Agreement shall commence on the Effective Date and shall be in effect thereafter for a term of ten (10) years (the "Initial Term").  This Agreement shall then be renewed automatically for successive one (1) year term(s) (a "Renewal Term").

5.2    Automatic Termination.  The Practice may terminate this Agreement for "cause" effective immediately upon written notice to Physician.  For purposes of this Agreement, "cause" shall be defined as any of the following:

5.2.1  If Physician's license to practice medicine in the State of South Carolina is suspended, revoked or otherwise terminated;

5.2.2  If Physician ceases to be a member in good standing of the active Medical Staff of the Hospital;

5.2.3  If the clinical privileges or medical staff membership of Physician at any hospital where Physician maintains staff membership is suspended or terminated for a period in excess of thirty (30) days for reasons related to quality of care or professional misconduct of Physician;

5.2.4  If Physician is formally charged with a felony or any other crime or misdemeanor involving fraud or dishonesty, or any act of misconduct which relates directly or indirectly to the rendering of ethical, professional medical services by Physician; provided, however, the Practice may, in its sole reasonable discretion, grant Physician an unpaid leave of absence during the pendency of such charges and reinstate Physician if Physician is cleared of all charges;

5.2.5  Physician's death;

5.2.6  Physician's "disability" (as that term is defined in Section 3.2.1) for a period of ninety (90) consecutive days if such disability is determined to be permanent

Michael K. Drakeford, M.D.
Physician Employment Agreement
Page 5 of 18

NPCOL1:708074.1-AGR-(PKP) 024500158

by the Hospital's Chief of Medicine. The Practice may, in its sole reasonable discretion, grant Physician an unpaid leave of absence;

5.2.7 The imposition of any restrictions or limitations by any governmental authority having jurisdiction over Physician which prevents Physician from providing the services contemplated by this Agreement, including, but not limited to, suspension or revocation of Physician's right to prescribe controlled substances;

5.2.8 Physician's being found guilty of unprofessional, unethical, immoral or fraudulent conduct by any board, institution, organization or professional society having any privilege or right to pass upon the conduct of Physician or the Physician's resignation from any such organization under threat of disciplinary action for professional misconduct; or

5.2.9 Physician's stealing or embezzling from the Practice or being intoxicated while on the job or abusing drugs or violation of the Hospital's disruptive physician policy as may be amended from time to time.

5.3     Termination Subject to Opportunity to Cure. In addition to termination of this Agreement under Sections 5.2, in the event of a breach by Physician of any of the material terms or conditions of this Agreement, or Physician's willful neglect of duty or violation of the Practice policies, rules or regulations, and the failure of Physician, as determined by the Practice in its reasonable judgment, to correct such breach or neglect of duty or violation within thirty (30) days after written notice from the Practice describing the breach, neglect of duty or violation, then the Practice may terminate this Agreement in its sole discretion at or after the end of such thirty (30) day period by delivering to Physician written notice of termination specifying the effective date of termination.

5.4     In the event of a breach by the Practice of any of the material terms or conditions of this Agreement and the failure of the Practice, as determined by Physician in his reasonable judgment, to correct such breach within thirty (30) days after written notice from the Physician describing the breach, then the Physician may terminate this Agreement in his sole discretion at or after the end of such thirty (30) day period by delivering to the Practice written notice of termination specifying the effective date of termination.

5.5     The Practice may but is not required to terminate this Agreement if the Hospital's margin for its operations falls below 2% as reflected in the Hospital's fiscal year end financial statements which are prepared in accordance with generally accepted accounting principles ("Annual Financials"). The Practice must exercise its right to terminate pursuant to this Section 5.5 within sixty (60) days of the issuance of the Annual Financials by giving notice of termination to the Physician. The effective date of termination shall be six (6) months after Physician receives such notice of termination.

Michael K. Drakeford, M.D.
Physician Employment Agreement
Page 6 of 18

6.    Exclusivity. The parties acknowledge that the Physician shall perform exclusively for the Practice all surgical procedures other than inpatient surgical procedures and those listed on Exhibit C at the Practice.

7.    Ownership. In addition to (but not in limitation of) the restrictions of Section 6, during the term of this Agreement plus three (3) years following its termination or expiration, Physician shall not own an equity interest (other than as the holder for investment purposes only of up to 2% of the outstanding capital stock of any corporation which is publicly traded on a national stock exchange or the NASDAQ National Market System, so long as Physician is not a controlling person of, or a member of a group that controls, such corporation and Physician is not otherwise affiliated in any capacity with such corporation) in any entity or enterprise conducting operations in the territory which is competitive with the business activities being engaged in by the Practice on the date hereof.

8.    Employees. In addition to (but not in limitation of) the restrictions of Section 6 and Section 7, during any Term, except upon the Practice's prior written consent, Physician shall not, directly or indirectly, solicit or in any manner attempt to solicit or induce any person employed by, or an agent of, the Practice to terminate such person's association or contract of employment or agency, as the case may be, with the Practice.

9.    Agreement Not to Compete. Physician agrees not to compete with the Practice or the Practice or the Hospital during any term of this Agreement and for a period of three (3) years following expiration or termination of this Agreement for any reason, directly or indirectly, by practicing surgery within 30 miles of any office or facility operated by the Practice or the Hospital. If it shall be determined that the duration or geographical limit of any restriction contained in this Section 9 is unenforceable, it is the intention of the parties that such restrictive covenant set forth herein shall not thereby be terminated or void, but shall be deemed amended to the extent required to render it valid and enforceable to the greatest extent permissible by the applicable law and public policy, such amendment shall apply only with respect to the operation of this Section 9. Physician acknowledges that the restrictions contained in this Section 9 are a reasonable and necessary protection of the legitimate business interests of the Practice and the Practice or the Hospital. In the event of any violation of these restrictions, Practice shall be entitled to preliminary and permanent injunctive relief, in addition to any other remedy, and shall be entitled to be reimbursed by Physician for any attorneys' fees and costs, at all pre-trial and appellate levels, incurred as a result thereof. Nothing herein contained shall be construed as prohibiting Practice from pursuing any other legal or equitable remedies available to Practice due to a violation of the restrictions set forth in this Section 9.

10.    Set Off. In the event of any breach by Physician of the covenants set forth in this Agreement, in addition to the other rights, remedies, or damages to which the Practice may be entitled, the Practice shall be entitled to set off the amounts to which the

Practice may become entitled hereunder against payments, if any, becoming due to Physician as a result of any employment or similar relationship between Physician and the Practice.

11.    Practice of Medicine.  A fundamental understanding between the parties is that Physician shall be solely and exclusively responsible for all medical care of patients and discharge of medical practice matters and related business decisions which are required by law to be made or performed by a medical doctor.

12.    Confidential Business Information and Protected Health Information.  Physician acknowledges that business information developed, acquired or retained by the Practice is of substantial value and that its value may be destroyed by the disclosure thereof to anyone outside the employ of the Practice.  Accordingly, Physician hereby agrees that he will not, without the express written consent of a duly authorized officer of the Practice, disclose directly or indirectly any confidential information for the benefit of anyone other than the Practice. The term "confidential information" as used herein means all information of the Practice of a business or technical nature, including but not limited to, patient and client lists, information relating to processes, plans, methods of doing business and special needs of referring doctors, clients and patients, disclosed to, learned or developed by Physician in the course of performance of his obligations hereunder or any such information previously known which relates to the operations of the Practice. The term "confidential information" shall also include all information of any type which directly or indirectly relates to peer review, utilization review, quality assurance and risk management activities.  Nothing in this Section 12 shall be construed to deny to any patient his or her medical records contrary to applicable law or ethical guidelines. In addition, notwithstanding the above, the confidentiality provisions contained in this Agreement shall not apply to any information that (i) becomes generally available to the public other than as a result of disclosure by the Physician, (ii) the Physician is required to disclose to a governmental entity, (iii) is required by Physician to treat a patient electing continued treatment by Physician after termination of this Agreement; or (iv) information Physician obtained prior to this relationship that is reflected to the treatment of patients. All disclosures by Physician of "protected health information," as defined by the Health Insurance Portability and Accountability Act ("HIPAA"), shall only be disclosed in conformance with HIPAA and its implementing regulations.

13.    Arbitration.  In the event of any controversy or claim arising out of or relating to this Agreement, or the breach, termination or validity thereof, the parties will attempt in good faith to resolve such controversy or claim.  If the matter has not been resolved within sixty (60) days of the commencement of such discussions (which period may be extended by mutual agreement), then the parties hereby agree to immediately submit the controversy to binding arbitration.  The arbitration shall be conducted by a single arbitrator in accordance with the American Health Lawyers Association Alternative Dispute Resolution Rules of Procedure for Arbitration.   Judgment upon the award

rendered by the arbitrator may be entered by any court having jurisdiction thereof. Each party shall bear its own expenses and attorneys' fees incurred in the arbitration, except that all expenses and attorneys' fees incurred in any appeal shall be borne by the party not prevailing on such appeal. The place of arbitration shall be Sumter, South Carolina.

14.   Miscellaneous.

14.1   Strict Compliance.   No failure by a party to this Agreement to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other existing or subsequent breach thereof.

14.2   Notice.   All notices, requests, demands, or other communications authorized or required to be given by any party pursuant to this Agreement shall be given in writing and either (a) delivered personally; (b) sent by overnight express delivery (for which written confirmation of delivery can be obtained from the carrier); (c) sent by registered or certified U.S. mail, return receipt requested; or (d) sent by telefax, addressed as follows:

> If to Physician:
>
> > As shown on the signature page hereto.
>
> If to the Practice:
>
> Tuomey Surgical Professionals, LLC
> 129 North Washington Street
> Sumter, SC 29150
> Attn: _____
>
> With a copy to:
>
> Tim Hewson, Esquire
> Nexsen Pruet, LLC
> 1441 Main Street, Suite 1500
> Columbia, SC 29201
>
> Telefax: (803) 253-8277

The parties shall be responsible for notifying each other promptly in writing of any change of address.

Michael K. Drakeford, M.D.
Physician Employment Agreement
Page 9 of 18

14.3   Severability.   Any provision of this Agreement which is unenforceable, invalid or contrary to law, shall be of no effect and in such case all the remaining terms and provisions of this Agreement shall subsist and be fully effective according to the terms of this Agreement, the same as though any such invalid portion had never been included.  To this end, the provisions of this Agreement are deemed severable.

14.4   Assignment.  The services provided by Physician under the terms of this Agreement are personal and Physician may not assign nor delegate any of his rights or obligations hereunder without first obtaining the written consent of the Practice.   In addition, the Practice may assign or transfer its rights or obligations hereunder to any entity, controlling, controlled by, or under the common control of, the Practice, or any entity operating all or substantially all of the assets of the Practice's facilities; provided that in that event, this Agreement shall, subject to the provisions hereof, be binding upon and inure to the benefit of such entity and such entity shall discharge and perform all of the obligations of the Practice hereunder.

14.5   Amendments.   This Agreement may be amended, waived, changed, modified or discharged only by an instrument in writing signed by both parties.

14.6   Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the parties hereof, and their respective heirs, executors, administrators, successors and permitted assigns.

14.7   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of South Carolina.

14.8   Entire Agreement.   This Agreement constitutes the entire Agreement between the parties with respect to this subject matter.

14.9   Confidentiality.  Neither party shall disclose the contents of this Agreement or any other agreement simultaneously executed to any person, firm or entity, except the agents or representatives of the parties, except as required by law.

14.10  Word Forms.  Whenever used herein, the singular includes the plural and the plural includes the singular.  The use of any gender, tense or conjugation includes both genders and all tenses and conjugations.

14.11  Headings.  The section or subsection headings have been included for convenience only and are not to be taken as an interpretation of any provision hereof.

14.12  Notice of Breach.  Physicians shall advise the Practice forthwith in writing if any representation contained in this Agreement shall become untrue or inaccurate, or upon the occurrence of any event that might result in termination of this Agreement pursuant to Section 5.

14.13 <u>Rights in Property</u>. All title to supplies, fiscal records, charts, equipment and furnishings of the Practice that are owned by the Practice shall remain the sole property of the Practice.

14.14 Purposes of Agreement. Both parties agree that it is in the best interest of high quality patient care and for the efficient delivery of health care at the Hospital at a reasonable cost, that a contract of this type be entered into by the Physician to provide for the Services at the Hospital. Such arrangement will: (a) facilitate the administration of the Hospital's surgery services; (b) facilitate the training of personnel involved in provided Services at the Hospital; (c) afford effective selection, maintenance and utilization of the Hospital's equipment; (d) assure consistency of service, quality control and the needs of the patients; (e) provide for prompt availability of Services; (f) allow the needs of the patients to be met effectively and efficiently at a reasonable and fair cost; (g) provide continuous availability of Services for consultation with attending physicians; and (h) provide consistency with  customary patterns for the administration of the Services and promote the ability of the Hospital to deliver high quality care efficiently, effectively and at a fair and reasonable cost.

14.15 <u>Operation of Law</u>.  In the event that the Agreement or any part of the Agreement is deemed to be contrary to local, state or federal law by counsel for the Practice or, in the opinion of counsel, presents substantial legal risk to either party or to the Practice, the parties agree to use their best efforts to make changes to the Agreement to the minimum extent necessary to make the Agreement consistent with applicable laws, and to try to retain as closely as possible the original terms reflected in this Agreement. After the parties have used their best efforts, if the Agreement cannot be modified or amended to comply with applicable law or mitigate the legal risk to both parties in the Practice in a way that is mutually agreeable to the parties, then either party may terminate the Agreement.

The parties expressly acknowledge that it has been and continues to be their intent to comply with all federal, state, and local laws and regulations. It is not the purpose, nor is it a requirement of this Agreement or of any other agreement between the parties, to offer or receive any remuneration or inducement to encourage the referral of any patient.

14.16 <u>Survivability</u>. All rights and obligations of a party which reasonably extend beyond the termination or expiration of this Agreement shall survive termination or expiration of this Agreement.

SIGNATURE PAGE ATTACHED

Michael K. Drakeford, M.D.
Physician Employment Agreement
Page 12 of 18

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of _____, 2004 (the "Effective Date").

Practice:

By:_____
           (Signature)

_____
       (Type or Print Name)

Its: President

PHYSICIAN:

_____
        (Signature)
MICHAEL K. DRAKEFORD, M.D.
    (Type or Print Name)

PHYSICIAN'S ADDRESS

_____

_____

_____

Telefax: _____

Michael K. Drakeford, M.D.
Physician Employment Agreement
Page 13 of 18

EXHIBIT A
Compensation

In exchange for the Services, covenants and promises of Physician pursuant to this Agreement, the Practice shall compensate Physician as set forth in this Exhibit A.

1.    For purposes of this Exhibit A, the following terms shall be defined as follows:

"Contract Year" shall mean a full year of the Agreement beginning initially on the Effective Date and thereafter beginning on each anniversary of the Effective Date.

"Physician's Collections" means the Practice's cash collections (net of refunds) for the Services.

2.    Practice shall pay Physician an annual salary ("Base Salary"), subject to applicable income and employment taxes and other withholdings, to be paid in accordance with the Practice's payroll policies, as amended from time to time. The initial Base Salary shall be $35,000. Each Contract Year, the Base Salary will be adjusted in accordance with the following table based upon the Physician's Collections for the prior Contract Year:

| Specialty | Range Number | Collections Range | | Base Salary |
|---|---|---|---|---|
| | | Minimum | Maximum | |
| Ortho | 1 | $0 | $185,000 | $5,000 |
| | 2 | $185,001 | $205,000 | $10,000 |
| | 3 | $205,001 | $225,000 | $15,000 |
| | 4 | $225,001 | $245,000 | $20,000 |
| | 5 | $245,001 | $265,000 | $25,000 |
| | 6 | $265,001 | $285,000 | $30,000 |
| | 7 | $285,001 | $305,000 | $35,000 |
| | 8 | $305,001 | $325,000 | $40,000 |
| | 9 | $325,001 | $345,000 | $45,000 |
| | 10 | $345,001 | $365,000 | $50,000 |
| | 11 | $365,001 | $385,000 | $55,000 |
| | 12 | $385,001 | $405,000 | $60,000 |
| | 13 | $405,001 | $425,000 | $65,000 |
| | 14 | $425,001 | $445,000 | $70,000 |
| | 15 | $445,001 | $465,000 | $75,000 |

Minimum Base for Base: $5,000
Collections increments after minimum: $20,000
Base Salary increments after minimum: $5,000

Michael K. Drakeford, M.D.
Physician Employment Agreement
Page 14 of 18

3.      In addition to payment of the Base Salary, Practice shall pay Physician a productivity bonus ("Productivity Bonus") in the amount of 30% of the Physician's Collections. The Productivity Bonus shall be paid in accordance with the Practice's payroll policies, as amended from time to time.

4.      In addition to the Base Salary and Productivity Bonus, Physician shall be entitled to participate in the following incentive compensation program ("Incentive Bonus"):

        i.      Physician's maximum annual Incentive Bonus is 7% of the Productivity Bonus earned by Physician in each Contract Year (the "Maximum Annual Incentive").

        ii.     Physician shall earn the bonus percentage points set forth below upon satisfaction, as determined by the Practice in its sole and absolute discretion, of the following standards:

                a.      Patient Satisfaction Standard (0-25 bonus percentage points);

                b.      Turnaround Times (0-25 bonus percentage points);

                c.      Compliance with Scheduled Start Times (0-25 bonus percentage points);

                d.      Positive Relationships with employees, administration and other members of the Practice Medical Staff (0-25 bonus percentage points).

        iii.    Following each Contract Year, Physician shall be paid a bonus equal to total bonus percentage points, multiplied by the Maximum Annual Incentive. The Incentive Bonus shall be paid in accordance with the Practice's payroll policies, as amended from time to time.

5.      The compensation set forth in this Exhibit A is for all services rendered by Physician, and Physician shall not be entitled to additional compensation for overtime work because he is an exempt professional employee pursuant to the Federal Fair Labor Standards Act.

<u>EXHIBIT B</u>
Benefits

<u>Benefits shall be subject to change from time to time</u>. As of the Effective Date, the benefits shall be as follows:

1.    <u>Employee Welfare Benefits</u>:  Subject to the terms and conditions of the applicable plans, Physician shall be eligible to participate in the Hospital's flexible benefit plan and the benefits provided thereunder, all as may be amended or deleted from time to time.  As of the Effective Date, the flexible benefit plan permits eligible employees to elect to pay for any of the following benefits through payroll deduction:

a.    **Health Insurance**.  In order to provide for the payment or reimbursement for eligible medical expenses, Hospital provides eligible employees with the opportunity to elect single health insurance coverage or health insurance coverage for the employee and one or more eligible dependents.  The premiums for health insurance coverage are reasonable and paid on a pre-tax basis through payroll deduction.

b.    **Dental Insurance**. In order to provide for the payment or reimbursement for eligible dental expenses, Hospital provides eligible employees with the opportunity to elect single dental insurance coverage or dental insurance coverage for the employee and one or more eligible dependents.  The premiums for dental insurance coverage are reasonable and paid on a pre-tax basis through payroll deduction.

c.    **Vision Insurance**. In order to provide for the payment or reimbursement for eligible vision expenses, Hospital provides eligible employees with the opportunity to elect single vision insurance coverage or vision insurance coverage for the employee and one or more eligible dependents. The premiums for vision insurance coverage are reasonable and paid on a pre-tax basis through payroll deduction.

d.    **Supplemental Insurance**.  Hospital offers eligible employees the opportunity to purchase individual supplemental insurance policies, the premiums for which are paid on a pre-tax basis through payroll deduction.

e.    **Health Care Flexible Spending Account**.  The health care flexible spending account ("health care FSA") allows eligible employees to set aside a specified amount of compensation to pay for certain medical expenses incurred during the plan year on a pre-tax basis.  Participating employees must submit proof of the claims incurred in order to receive reimbursement from the health care FSA.

f.    **Dependent Care Flexible Spending Accounts**.  The dependent care flexible spending account ("dependent care FSA") allows eligible employees to set

aside a specified amount of compensation to pay for certain dependent care expenses incurred during the plan year on a pre-tax basis. Participating employees must submit proof of the claims incurred in order to receive reimbursement from the dependent care FSA.

For more detailed information about the available employee welfare benefits, Physician should consult the applicable summary plan description, which will be distributed by the Hospital's Human Resources Department.

2. Employee Discount Program: Physician shall be eligible to participate in the Hospital's employee discount program.

3. Malpractice Liability Insurance: Practice will pay for Physician's malpractice liability insurance.

4. Payroll Taxes: Practice will pay the employer's share of FICA and FUTA and any other applicable payroll taxes imposed upon employers.

EXHIBIT C
Surgical Procedures Excepted from Exclusivity Provisions
Set Forth in Section 6

## THIS AGREEMENT IS SUBJECT TO ARBITRATION
## PURSUANT TO SC CODE §15-48-10 ET SEQ. AS MODIFIED HEREIN

### PHYSICIAN EMPLOYMENT AGREEMENT

This Physician Employment Agreement (the "Agreement") is made and entered into by and between Tuomey Surgical Professionals, LLC (the "Practice") and the undersigned physician ("Physician") to be effective as of the date set forth on the signature page of this Agreement (the "Effective Date").

**Introduction**. Physician is qualified to practice as a doctor of medicine and holds an unrestricted license to practice medicine in South Carolina. Physician desires to provide services as an employee of the Practice upon the terms and conditions set forth in this Agreement.

The Practice is a wholly owned subsidiary of Tuomey d/b/a Tuomey Healthcare System (the "Hospital"). The Hospital is a tax exempt, non-profit entity that provides health care services in Sumter, South Carolina and the surrounding region. The Hospital formed the Practice to employ physicians to provide healthcare and related services at the Hospital. The Practice desires to obtain the services of the Physician as an employee upon the terms and conditions set forth in this Agreement.

For purposes of this Agreement, "Hospital" shall include Tuomey d/b/a Tuomey Healthcare System and all healthcare facilities owned, operated, or affiliated with Tuomey Healthcare System.

**Agreement**. In consideration of the premises and the mutual promises and covenants stated below, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do covenant, stipulate, and agree as follows:

1. **Employment of Physician**. The Practice shall employ Physician to provide professional, administrative and supervisory services in accordance with the terms of this Agreement.

    1.1 **Professional Duties**. Physician shall provide outpatient surgery services and other related services (the "Services") on a part-time basis at the Hospital. The Services shall be provided to outpatients at the Hospital or of facilities owned or operated by the Hospital, as may be designated by the Practice from time to time (collectively "Hospital Site"). By entering into this Agreement, Physician agrees and understands that he shall at all times be subject to the rules governing the Practice physicians, as may be amended from time to time (the "Practice Rules"), provided that such rules are reasonable and do not unduly interfere with Physician's professional responsibilities.

1.2     Availability.  Physician agrees to provide the Services at the Hospital on a mutually agreed upon basis.  Physician acknowledges that as a professional providing the Services, he is an "exempt" employee for purposes of the Fair Labor Standards Act. Physician shall also comply with additional guidelines regarding Practice coverage requirements to be developed by the Physician and the Practice.

1.3     Staff Privileges and Hospital Rules.  Physician shall at all times during the term of this Agreement be and remain a member in good standing of the active medical staff of the Hospital, with all the privileges of and subject to all the responsibilities of the Hospital medical staff bylaws, rules, and regulations, all as may be amended and in effect from time to time.

1.4     Best Efforts.   Physician will actively and industriously pursue his profession in the best interest of the Practice and its patients.  Physician will actively assist in the development and improvement of the Practice's services and reasonably participate in any advisory committee created by the Practice or the Hospital. Physician will carefully avoid any and all personal acts, habits and usages which might injure in any way, directly or indirectly, his professional reputation or that of the Practice or any employee of the Practice, or which might otherwise be detrimental to any interest of the Practice.

1.5     Application of Standards.  Physician shall perform his duties under this Agreement in conformity with and shall comply with: (i) all applicable standards, rulings, regulations and requirements of the United States Department of Health and Human Services, the South Carolina Department of Health and Environmental Control, the Joint Commission on Accreditation of Healthcare Organizations (the "JCAHO") and any federal, state, or local government agency, third party payer or accrediting body having jurisdiction over or providing reimbursement for the services provided by Physician and any programs and services offered by the Hospital; (ii) the bylaws, policies, rules and regulations of the Hospital (including those of any department, section or division thereof), the Hospital's medical staff and of managed care programs in which the Practice participates, as the same may be amended and in effect from time to time; (iii) the Principles of Medical Ethics of the American Medical Association; and (iv) the standard of care required of physicians practicing in the state of South Carolina.

1.6     Administrative Duties.  Physician shall perform such administrative duties on behalf of the Practice as are determined by the Practice to be reasonable and necessary to ensure the proper and efficient operation of the Practice, provided such duties are within the scope of the Physician's training and expertise.

1.7     Training of Non-Physician Personnel.  As requested, Physician shall participate in training non-physician personnel performing services at the Hospital.

1.8    Physician Charting.  Physician shall be responsible for charting services provided to patients in accordance with Medicare and other applicable guidelines, and the Practice shall be responsible for billing and collecting for such services.

1.9    Health Status.  The parties acknowledge that, during the term and any renewal terms of this Agreement, Physician must be able to appropriately and safely perform his duties hereunder.  Physician is responsible for informing the Practice of health factors that may affect performance of his professional and/or administrative duties, including health factors potentially affecting the health, safety or welfare of Physician or others.  The Practice, in accordance with applicable laws, shall from time to time be entitled to make reasonable inquiries and require appropriate health screenings, both mental and physical, and testing concerning Physician's ability to perform his duties.  Such screenings and testing include, but are not limited to, testing for substance abuse; testing for communicable or infectious diseases, including sexually transmitted diseases; and requesting and receiving such other information necessary to assure the Practice that Physician is capable of performing his duties and does not pose a health or safety risk to others.

The results of any testing, screening or examination as required herein will be maintained as confidential and will be disclosed within the sole discretion of the Practice to its administration and management only on a need to know basis in accordance with applicable laws.  Provided however, any positive test result will be reported to appropriate authorities as required or allowed by law.  Furthermore, if Physician is or becomes infected with Human Immunodeficiency Virus (HIV) or Hepatitis B Virus (HBV), then the Practice has the sole discretion to report Physician's condition to an expert review panel, established pursuant to the "S.C Health Care Professional Compliance Act," S.C. Code Ann. Section 44-30-10, et. seq. (Law. Co-op. Supp. 1995) (or the corresponding section of any future law) and any subsequent amendments as may occur, to determine Physician's appropriate scope of Practice and resolve any other relevant issues.

2.    Physician's Representations and Warranties.  Physician represents and warrants that:

2.1    Physician has never had his license to practice in the State of South Carolina, District of Columbia or any state revoked or suspended.

2.2    Physician is not now a defendant in any malpractice litigation.

2.3    The execution, delivery and performance of this Agreement is neither prohibited by nor constitutes a default under any statute, law, judgment, order, decree, writ, injunction, deed, instrument, contract, lease, license or permit to which Physician is a party or by which Physician is bound.

2.4    There is no litigation, proceeding or governmental investigation, including, but not limited to, any bankruptcy proceeding, pending or threatened, against Physician.

Danny H. Ford, M.D.
Physician Employment Agreement
Page 3 of 18

2.5    Physician has not relied upon any representation or statement by any representative of the Practice or the Hospital which is not set forth in this Agreement.

2.6    Physician has, in full force and effect, extended reporting endorsement coverage or is otherwise protected by valid medical malpractice insurance for any incidents occurring prior to employment by the Practice hereunder.

2.7    Physician is duly licensed to practice medicine in the State of South Carolina, has obtained all required narcotics and controlled substances numbers, and has secured privileges at the Hospital.

2.8    Physician agrees to execute any agreements necessary for the Practice's and Physician's participation in and reimbursement from public or private third party payers including, but not limited to, Medicaid, Medicare, and private managed care programs approved by the Hospital or with whom the Practice otherwise contracts as a participant or a provider. Physician agrees to maintain such practice patterns, including abiding by specialty consultation and other referral restrictions, as may be required under such public or private managed care programs. The Practice shall consult with and receive input from Physician regarding such programs and practice patterns.

3.    Billing and Compensation.

3.1    Professional Charges. Physician's professional fees and charges shall be determined by the Practice.

3.2    Billing. Practice shall be solely responsible for billing and collections from the patient and third party payors for the Services. The Physician is not authorized to make any billing adjustments. Physician hereby expressly reassigns to the Practice all benefits payable to the Physician for the Services by third party payors, including without limitation Medicare, Medicaid, Champus, and any other governmental reimbursement programs.

3.3    Compensation of Physician. Physician shall be compensated for providing the Services pursuant to the provisions set forth in the attached Exhibit A.

3.4    The Practice will provide Physician the benefits outlined in the attached Exhibit B.

4.    The Practice's Duties. The Practice or its designee shall perform the following services:

4.1    The Practice shall, in cooperation with Physician, establish administrative and business practices for the efficient and effective processing of patient inquiries, handling and scheduling appointments, and arranging for the disposition of insurance filings and collection procedures, involving the patient and patient's insurance company.

The Practice shall bill for professional services rendered to patients in accordance with all pertinent legal and ethical guidelines. It is the Practice's current intent that charges shall be comparable to charges for the same services made by physicians operating practices in South Carolina within the same medical specialty. The Practice intends to use billing and collection techniques that are comparable to the operating norms of physician office practices in the community.

4.2   The Practice shall be responsible for assuring its compliance with all laws and regulations, and shall provide technical support and advice to Physician to assist Physician in complying with all applicable governmental laws and regulations related to his provision of services hereunder.

5.   Term and Termination of the Agreement.

5.1   Commencement. This Agreement shall commence on the Effective Date and shall be in effect thereafter for a term of ten (10) years (the "Initial Term"). This Agreement shall then be renewed automatically for successive one (1) year term(s) (a "Renewal Term").

5.2   Automatic Termination. The Practice may terminate this Agreement for "cause" effective immediately upon written notice to Physician. For purposes of this Agreement, "cause" shall be defined as any of the following:

5.2.1  If Physician's license to practice medicine in the State of South Carolina is suspended, revoked or otherwise terminated;

5.2.2  If Physician ceases to be a member in good standing of the active Medical Staff of the Hospital;

5.2.3  If the clinical privileges or medical staff membership of Physician at any hospital where Physician maintains staff membership is suspended or terminated for a period in excess of thirty (30) days for reasons related to quality of care or professional misconduct of Physician;

5.2.4  If Physician is formally charged with a felony or any other crime or misdemeanor involving fraud or dishonesty, or any act of misconduct which relates directly or indirectly to the rendering of ethical, professional medical services by Physician; provided, however, the Practice may, in its sole reasonable discretion, grant Physician an unpaid leave of absence during the pendency of such charges and reinstate Physician if Physician is cleared of all charges;

5.2.5  Physician's death;

5.2.6  Physician's "disability" (as that term is defined in Section 3.2.1) for a period of ninety (90) consecutive days if such disability is determined to be permanent

by the Hospital's Chief of Medicine. The Practice may, in its sole reasonable discretion, grant Physician an unpaid leave of absence;

5.2.7 The imposition of any restrictions or limitations by any governmental authority having jurisdiction over Physician which prevents Physician from providing the services contemplated by this Agreement, including, but not limited to, suspension or revocation of Physician's right to prescribe controlled substances;

5.2.8 Physician's being found guilty of unprofessional, unethical, immoral or fraudulent conduct by any board, institution, organization or professional society having any privilege or right to pass upon the conduct of Physician or the Physician's resignation from any such organization under threat of disciplinary action for professional misconduct; or

5.2.9 Physician's stealing or embezzling from the Practice or being intoxicated while on the job or abusing drugs or violation of the Hospital's disruptive physician policy as may be amended from time to time.

5.3 Termination Subject to Opportunity to Cure. In addition to termination of this Agreement under Sections 5.2, in the event of a breach by Physician of any of the material terms or conditions of this Agreement, or Physician's willful neglect of duty or violation of the Practice policies, rules or regulations, and the failure of Physician, as determined by the Practice in its reasonable judgment, to correct such breach or neglect of duty or violation within thirty (30) days after written notice from the Practice describing the breach, neglect of duty or violation, then the Practice may terminate this Agreement in its sole discretion at or after the end of such thirty (30) day period by delivering to Physician written notice of termination specifying the effective date of termination.

5.4 In the event of a breach by the Practice of any of the material terms or conditions of this Agreement and the failure of the Practice, as determined by Physician in his reasonable judgment, to correct such breach within thirty (30) days after written notice from the Physician describing the breach, then the Physician may terminate this Agreement in his sole discretion at or after the end of such thirty (30) day period by delivering to the Practice written notice of termination specifying the effective date of termination.

5.5 The Practice may, but is not required to, terminate this Agreement if the Hospital's margin from its operations falls below 4%, as reflected in the Hospital's fiscal year end financial statements which are prepared in accordance with generally accepted accounting principles ("Annual Financials"). The Practice must exercise its right to terminate pursuant to this Section 5.5 within sixty (60) days of the issuance of the Annual Financials by giving notice of termination to the Physician. The effective date of termination shall be six (6) months after Physician receives such notice of termination.

Danny H. Ford, M.D.
Physician Employment Agreement
Page 6 of 18

6.     Exclusivity. The parties acknowledge that the Physician shall perform exclusively for the Practice all surgical procedures other than inpatient surgical procedures and those listed on Exhibit C at the Practice.

7.     Ownership. In addition to (but not in limitation of) the restrictions of Section 6, during the term of this Agreement plus three (3) years following its termination of expiration, Physician shall not own an equity interest (other than as the holder for investment purposes only of up to 2% of the outstanding capital stock of any corporation which is publicly traded on a national stock exchange or the NASDAQ National Market System, so long as Physician is not a controlling person of, or a member of a group that controls, such corporation and Physician is not otherwise affiliated in any capacity with such corporation) in any entity or enterprise conducting operations in the territory which is competitive with the business activities being engaged in by the Practice on the date hereof.

8.     Employees. In addition to (but not in limitation of) the restrictions of Section 6 and Section 7, during any Term, except upon the Practice's prior written consent, Physician shall not, directly or indirectly, solicit or in any manner attempt to solicit or induce any person employed by, or an agent of, the Practice to terminate such person's association or contract of employment or agency, as the case may be, with the Practice.

9.     Agreement Not to Compete. Physician agrees not to compete with the Practice or the Practice or the Hospital during any term of this Agreement and for a period of three (3) years following expiration or termination of this Agreement for any reason, directly or indirectly, by practicing surgery within 30 miles of any office or facility operated by the Practice or the Hospital. If it shall be determined that the duration or geographical limit of any restriction contained in this Section 9 is unenforceable, it is the intention of the parties that such restrictive covenant set forth herein shall not thereby be terminated or void, but shall be deemed amended to the extent required to render it valid and enforceable to the greatest extent permissible by the applicable law and public policy, such amendment shall apply only with respect to the operation of this Section 9. Physician acknowledges that the restrictions contained in this Section 9 are a reasonable and necessary protection of the legitimate business interests of the Practice and the Practice or the Hospital. In the event of any violation of these restrictions, Practice shall be entitled to preliminary and permanent injunctive relief, in addition to any other remedy, and shall be entitled to be reimbursed by Physician for any attorneys' fees and costs, at all pre-trial and appellate levels, incurred as a result thereof. Nothing herein contained shall be construed as prohibiting Practice from pursuing any other legal or equitable remedies available to Practice due to a violation of the restrictions set forth in this Section 9.

10.     Set Off. In the event of any breach by Physician of the covenants set forth in this Agreement, in addition to the other rights, remedies, or damages to which the Practice may be entitled, the Practice shall be entitled to set off the amounts to which the

Practice may become entitled hereunder against payments, if any, becoming due to Physician as a result of any employment or similar relationship between Physician and the Practice.

11.  Practice of Medicine.  A fundamental understanding between the parties is that Physician shall be solely and exclusively responsible for all medical care of patients and discharge of medical practice matters and related business decisions which are required by law to be made or performed by a medical doctor.

12.  Confidential Business Information and Protected Health Information.  Physician acknowledges that business information developed, acquired or retained by the Practice is of substantial value and that its value may be destroyed by the disclosure thereof to anyone outside the employ of the Practice. Accordingly, Physician hereby agrees that he will not, without the express written consent of a duly authorized officer of the Practice, disclose directly or indirectly any confidential information for the benefit of anyone other than the Practice. The term "confidential information" as used herein means all information of the Practice of a business or technical nature, including but not limited to, patient and client lists, information relating to processes, plans, methods of doing business and special needs of referring doctors, clients and patients, disclosed to, learned or developed by Physician in the course of performance of his obligations hereunder or any such information previously known which relates to the operations of the Practice. The term "confidential information" shall also include all information of any type which directly or indirectly relates to peer review, utilization review, quality assurance and risk management activities.   Nothing in this Section 12 shall be construed to deny to any patient his or her medical records contrary to applicable law or ethical guidelines. In addition, notwithstanding the above, the confidentiality provisions contained in this Agreement shall not apply to any information that (i) becomes generally available to the public other than as a result of disclosure by the Physician, (ii) the Physician is required to disclose to a governmental entity, (iii) is required by Physician to treat a patient electing continued treatment by Physician after termination of this Agreement; or (iv) information Physician obtained prior to this relationship that is reflected to the treatment of patients. All disclosures by Physician of "protected health information," as defined by the Health Insurance Portability and Accountability Act ("HIPAA"), shall only be disclosed in conformance with HIPAA and its implementing regulations.

13.  Arbitration.  In the event of any controversy or claim arising out of or relating to this Agreement, or the breach, termination or validity thereof, the parties will attempt in good faith to resolve such controversy or claim.  If the matter has not been resolved within sixty (60) days of the commencement of such discussions (which period may be extended by mutual agreement), then the parties hereby agree to immediately submit the controversy to binding arbitration.  The arbitration shall be conducted by a single arbitrator in accordance with the American Health Lawyers Association Alternative Dispute Resolution Rules of Procedure for Arbitration.  Judgment upon the award

rendered by the arbitrator may be entered by any court having jurisdiction thereof. Each party shall bear its own expenses and attorneys' fees incurred in the arbitration, except that all expenses and attorneys' fees incurred in any appeal shall be borne by the party not prevailing on such appeal. The place of arbitration shall be Sumter, South Carolina.

14.    Miscellaneous.

14.1    Strict Compliance. No failure by a party to this Agreement to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy consequent upon a breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other existing or subsequent breach thereof.

14.2    Notice. All notices, requests, demands, or other communications authorized or required to be given by any party pursuant to this Agreement shall be given in writing and either (a) delivered personally; (b) sent by overnight express delivery (for which written confirmation of delivery can be obtained from the carrier); (c) sent by registered or certified U.S. mail, return receipt requested; or (d) sent by telefax, addressed as follows:

If to Physician:

As shown on the signature page hereto.

If to the Practice:

Tuomey Surgical Professionals, LLC
129 North Washington Street
Sumter, SC 29150
Attn: _____

With a copy to:

Tim Hewson, Esquire
Nexsen Pruet, LLC
1441 Main Street, Suite 1500
Columbia, SC 29201

Telefax: (803) 253-8277

The parties shall be responsible for notifying each other promptly in writing of any change of address.

Danny H. Ford, M.D.
Physician Employment Agreement
Page 9 of 18

NPCOL1:708077.1-AGR-(PFS)142450068    006-113

14.3   Severability.   Any provision of this Agreement which is unenforceable, invalid or contrary to law, shall be of no effect and in such case all the remaining terms and provisions of this Agreement shall subsist and be fully effective according to the terms of this Agreement, the same as though any such invalid portion had never been included. To this end, the provisions of this Agreement are deemed severable.

14.4   Assignment.  The services provided by Physician under the terms of this Agreement are personal and Physician may not assign nor delegate any of his rights or obligations hereunder without first obtaining the written consent of the Practice.   In addition, the Practice may assign or transfer its rights or obligations hereunder to any entity, controlling, controlled by, or under the common control of, the Practice, or any entity operating all or substantially all of the assets of the Practice's facilities; provided that in that event, this Agreement shall, subject to the provisions hereof, be binding upon and inure to the benefit of such entity and such entity shall discharge and perform all of the obligations of the Practice hereunder.

14.5   Amendments.   This Agreement may be amended, waived, changed, modified or discharged only by an instrument in writing signed by both parties.

14.6   Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the parties hereof, and their respective heirs, executors, administrators, successors and permitted assigns.

14.7   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of South Carolina.

14.8   Entire Agreement.   This Agreement constitutes the entire Agreement between the parties with respect to this subject matter.

14.9   Confidentiality.  Neither party shall disclose the contents of this Agreement or any other agreement simultaneously executed to any person, firm or entity, except the agents or representatives of the parties, except as required by law.

14.10  Word Forms.  Whenever used herein, the singular includes the plural and the plural includes the singular.  The use of any gender, tense or conjugation includes both genders and all tenses and conjugations.

14.11  Headings.  The section or subsection headings have been included for convenience only and are not to be taken as an interpretation of any provision hereof.

14.12  Notice of Breach.  Physicians shall advise the Practice forthwith in writing if any representation contained in this Agreement shall become untrue or inaccurate, or upon the occurrence of any event that might result in termination of this Agreement pursuant to Section 5.

14.13 Rights in Property. All title to supplies, fiscal records, charts, equipment and furnishings of the Practice that are owned by the Practice shall remain the sole property of the Practice.

14.14 Purposes of Agreement. Both parties agree that it is in the best interest of high quality patient care and for the efficient delivery of health care at the Hospital at a reasonable cost, that a contract of this type be entered into by the Physician to provide for the Services at the Hospital. Such arrangement will: (a) facilitate the administration of the Hospital's surgery services; (b) facilitate the training of personnel involved in provided Services at the Hospital; (c) afford effective selection, maintenance and utilization of the Hospital's equipment; (d) assure consistency of service, quality control and the needs of the patients; (e) provide for prompt availability of Services; (f) allow the needs of the patients to be met effectively and efficiently at a reasonable and fair cost; (g) provide continuous availability of Services for consultation with attending physicians; and (h) provide consistency with  customary patterns for the administration of the Services and promote the ability of the Hospital to deliver high quality care efficiently, effectively and at a fair and reasonable cost.

14.15 Operation of Law.  In the event that the Agreement or any part of the Agreement is deemed to be contrary to local, state or federal law by counsel for the Practice or, in the opinion of counsel, presents substantial legal risk to either party or to the Practice, the parties agree to use their best efforts to make changes to the Agreement to the minimum extent necessary to make the Agreement consistent with applicable laws, and to try to retain as closely as possible the original terms reflected in this Agreement.  After the parties have used their best efforts, if the Agreement cannot be modified or amended to comply with applicable law or mitigate the legal risk to both parties in the Practice in a way that is mutually agreeable to the parties, then either party may terminate the Agreement.

The parties expressly acknowledge that it has been and continues to be their intent to comply with all federal, state, and local laws and regulations.  It is not the purpose, nor is it a requirement of this Agreement or of any other agreement between the parties, to offer or receive any remuneration or inducement to encourage the referral of any patient.

14.16 Survivability.  All rights and obligations of a party which reasonably extend beyond the termination or expiration of this Agreement shall survive termination or expiration of this Agreement.

**SIGNATURE PAGE ATTACHED**

Danny H. Ford, M.D.
Physician Employment Agreement
Page 12 of 18

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of _____, 2004 (the "Effective Date").

Practice:

By:_____
          (Signature)

_____
          (Type or Print Name)
Its: President

PHYSICIAN:

_____
          (Signature)
DANNY H. FORD, M.D._____
          (Type or Print Name)

PHYSICIAN'S ADDRESS

_____

_____

_____

Telefax: _____

Danny H. Ford, M.D.
Physician Employment Agreement
Page 13 of 18

<u>EXHIBIT A</u>
Compensation

In exchange for the Services, covenants and promises of Physician pursuant to this Agreement, the Practice shall compensate Physician as set forth in this <u>Exhibit A</u>.

1.     For purposes of this <u>Exhibit A</u>, the following terms shall be defined as follows:

"Contract Year" shall mean a full year of the Agreement beginning initially on the Effective Date and thereafter beginning on each anniversary of the Effective Date.

"Physician's Collections" means the Practice's cash collections (net of refunds) for the Services.

2.     Practice shall pay Physician an annual salary ("Base Salary"), subject to applicable income and employment taxes and other withholdings, to be paid in accordance with the Practice's payroll policies, as amended from time to time. The initial Base Salary shall be $5,000. Each Contract Year, the Base Salary will be adjusted in accordance with the following the following table based upon the Physician's Collections for the prior Contract Year:

| Specialty | Range Number | Collections Range | | Base Salary |
| --- | --- | --- | --- | --- |
| | | Minimum | Maximum | |
| Ortho | 1 | $0 | $185,000 | $5,000 |
| | 2 | $185,001 | $205,000 | $10,000 |
| | 3 | $205,001 | $225,000 | $15,000 |
| | 4 | $225,001 | $245,000 | $20,000 |
| | 5 | $245,001 | $265,000 | $25,000 |
| | 6 | $265,001 | $285,000 | $30,000 |
| | 7 | $285,001 | $305,000 | $35,000 |
| | 8 | $305,001 | $325,000 | $40,000 |
| | 9 | $325,001 | $345,000 | $45,000 |
| | 10 | $345,001 | $365,000 | $50,000 |
| | 11 | $365,001 | $385,000 | $55,000 |
| | 12 | $385,001 | $405,000 | $60,000 |
| | 13 | $405,001 | $425,000 | $65,000 |
| | 14 | $425,001 | $445,000 | $70,000 |
| | 15 | $445,001 | $465,000 | $75,000 |

| | |
| --- | --- |
| Minimum to exceed $5K Base | $185,001 |
| Collections Increments after minimum | $20,000 |
| Base Salary Increments after minimum | $5,000 |

Danny H. Ford, M.D.
Physician Employment Agreement
Page 14 of 18

006-118

3.    In addition to payment of the Base Salary, Practice shall pay Physician a productivity bonus ("Productivity Bonus") in the amount of 80% of the Physician's Collections. The Productivity Bonus shall be paid in accordance with the Practice's payroll policies, as amended from time to time.

4.    In addition to the Base Salary and Productivity Bonus, Physician shall be entitled to participate in the following incentive compensation program ("Incentive Bonus"):

i.    Physician's maximum annual Incentive Bonus is 7% of the Productivity Bonus earned by Physician in each Contract Year (the "Maximum Annual Incentive").

ii.    Physician shall earn the bonus percentage points set forth below upon satisfaction, as determined by the Practice in its sole and absolute discretion, of the following standards:

    a.    Patient Satisfaction Standard (0-25 bonus percentage points);

    b.    Turnaround Times (0-25 bonus percentage points);

    c.    Compliance with Scheduled Start Times (0-25 bonus percentage points);

    d.    Positive Relationships with employees, administration and other members of the Practice Medical Staff (0-25 bonus percentage points).

iii.    Following each Contract Year, Physician shall be paid a bonus equal to total bonus percentage points, multiplied by the Maximum Annual Incentive. The Incentive Bonus shall be paid in accordance with the Practice's payroll policies, as amended from time to time.

5.    The compensation set forth in this Exhibit A is for all services rendered by Physician, and Physician shall not be entitled to additional compensation for overtime work because he is an exempt professional employee pursuant to the Federal Fair Labor Standards Act.

EXHIBIT B
Benefits

Benefits shall be subject to change from time to time. As of the Effective Date, the benefits shall be as follows:

1.     Employee Welfare Benefits:  Subject to the terms and conditions of the applicable plans, Physician shall be eligible to participate in the Hospital's flexible benefit plan and the benefits provided thereunder, all as may be amended or deleted from time to time. As of the Effective Date, the flexible benefit plan permits eligible employees to elect to pay for any of the following benefits through payroll deduction:

a.     **Health Insurance.**  In order to provide for the payment or reimbursement for eligible medical expenses, Hospital provides eligible employees with the opportunity to elect single health insurance coverage or health insurance coverage for the employee and one or more eligible dependents.  The premiums for health insurance coverage are reasonable and paid on a pre-tax basis through payroll deduction.

b.     **Dental Insurance.**  In order to provide for the payment or reimbursement for eligible dental expenses, Hospital provides eligible employees with the opportunity to elect single dental insurance coverage or dental insurance coverage for the employee and one or more eligible dependents.  The premiums for dental insurance coverage are reasonable and paid on a pre-tax basis through payroll deduction.

c.     **Vision Insurance.**  In order to provide for the payment or reimbursement for eligible vision expenses, Hospital provides eligible employees with the opportunity to elect single vision insurance coverage or vision insurance coverage for the employee and one or more eligible dependents.  The premiums for vision insurance coverage are reasonable and paid on a pre-tax basis through payroll deduction.

d.     **Supplemental Insurance.**  Hospital offers eligible employees the opportunity to purchase individual supplemental insurance policies, the premiums for which are paid on a pre-tax basis through payroll deduction.

e.     **Health Care Flexible Spending Account.**  The health care flexible spending account ("health care FSA") allows eligible employees to set aside a specified amount of compensation to pay for certain medical expenses incurred during the plan year on a pre-tax basis.  Participating employees must submit proof of the claims incurred in order to receive reimbursement from the health care FSA.

f.     **Dependent Care Flexible Spending Accounts.**  The dependent care flexible spending account ("dependent care FSA") allows eligible employees to set

aside a specified amount of compensation to pay for certain dependent care expenses incurred during the plan year on a pre-tax basis. Participating employees must submit proof of the claims incurred in order to receive reimbursement from the dependent care FSA.

For more detailed information about the available employee welfare benefits, Physician should consult the applicable summary plan description, which will be distributed by the Hospital's Human Resources Department.

2.    <u>Employee Discount Program</u>: Physician shall be eligible to participate in the Hospital's employee discount program.

3.    <u>Malpractice Liability Insurance</u>:    Practice will pay for Physician's malpractice liability insurance.

4.    <u>Payroll Taxes</u>:  Practice will pay the employer's share of FICA and FUTA and any other applicable payroll taxes imposed upon employers.

<u>EXHIBIT C</u>
Surgical Procedures Excepted from Exclusivity Provisions
Set Forth in <u>Section 6</u>

## MEMORANDUM

TO:      Board of Trustees-Tuomey Healthcare System

FROM:   Tuomey Administration

DATE:    December 6, 2004

RE:      Executive Summary of Development of Tuomey Professional Services, LLC, Tuomey Gastroenterology Services, LLC & Arrangements With Gastroenterologists

---

This memorandum ("Executive Summary") is an executive summary of the January, 28, 2004 (updated November 22, 2004) memorandum, which outlines in detail the legal issues concerning the development of Tuomey Professional Services, LLC, Tuomey Gastroenterology Services, LLC and the arrangements with gastroenterologists (the "Memorandum"). Please refer to the Memorandum for additional information not contained in this Executive Summary.

I.    **Development of Tuomey Professional Services, LLC, Tuomey Gastroenterology Services, LLC**

A.      Tuomey will form a South Carolina limited liability company, Tuomey Professional Services, LLC ("TPS"), which will serve as a holding company for six separate limited liability companies ("SubLLCs"). The SubLLCs will be formed by TPS and will employ subspecialty physicians who are currently active members of Tuomey's medical staff. TPS will elect to be taxed as a corporation, so Tuomey will not be required to report TPS's operations (salaries, etc.) on its Form 990.

B.      One of the SubLLCs will be Tuomey Gastroenterology Services, LLC ("TGS"), which will own and operate a gastroenterology practice (the "Practice"). TGS will enter into employment agreements ("Employment Agreements") with qualified gastroenterologists (the "Physicians") for the performance of certain outpatient gastroenterology services. TGS will be a disregarded entity.

II.   **Employment of Gastroenterologists**

A.      Pursuant to the Employment Agreement, the Physicians will be required to exclusively provide the Services at Tuomey, or other facilities Tuomey may designate, for 10 years. Further, during the 10-year term and for a Restricted Period, which is a period of time ranging from zero months to two years depending on the date of termination, the Physicians will agree not to compete with Tuomey or the Practice in regarding the services within a 30-mile radius of any office or facility operated by Tuomey or the Practice.

B.      Compensation under the Employment Agreement is based on three components:

1.      Base Salary-This is a guaranteed portion of the salary that is in consideration for performance of the various duties and obligations and as partial consideration for the covenant not to compete. The initial Base Salary is $120,000. The Base Salary is subject to adjustments at the end of each contract year: a Tier 1 Adjustment and a Tier 2 Adjustment.

**006-123**

The Tier 1 Adjustment is based on the number of outpatient endoscopy procedures performed by the Physician (if the Physician performs fewer than 615 procedures in the prior contract year; the Base Salary is reduced to $60,000; if the Physician performs 615 or more, the Base Salary remains $120,000). The Tier 2 Adjustment is based on Tuomey's approved annual increase for its employees. The Physician's Base Salary would be increased accordingly.

2.    Productivity Component- This portion is based solely on the Physician's individual personal productivity. Under this component, the Physician is entitled to 80% of their personal collections derived from providing the services. This portion is also in partial consideration for the covenant not to compete.

3.    Subjective Component- This portion is based on a subjective evaluation of the Physician's compliance with multiple criteria including patient satisfaction, quality assurance, maintenance of good working relationships with Tuomey's medical staff and administration, reaching certain efficiency goals, and improved scheduling and turnaround times for performance of the Services. All of these concepts are designed to further and enhance the Hospital's tax-exempt purpose.

III.    **Services Agreement With Gastroenterologists Practice**

A.    Under the Services Agreement, Sumter Medical Consultants will provide billing and collections services, as well as other practice support services, such as payor pre-certification, patient registration and scheduling, phone support and counseling, and procedure documentation, to the Practice.

B.    The compensation under the Services Agreement will be set at twelve percent (12%) of the net collections, as defined under the Services Agreement.

IV.    **Stark Law**

A.    The Employment Agreements and Services Agreement will be structured to comply with applicable Stark exceptions.

B.    There is an exception for bona fide employment relationships, under which the Employment Agreements will be structured, which has the following requirements:

1.    The employment is for identifiable services,

2.    The amount of the remuneration under the employment--

(i)    is consistent with the fair market value of the services, and

(ii)    is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician,

3.    The remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer, and

006-124

4.     The employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

C.     There is an exception for personal services arrangements, under which the Services Agreement will be structured, which has the following requirements:

1.     The arrangement is set out in writing, is signed by the parties and specifies the services covered by the arrangement.

2.     The arrangement covers all of the services to be furnished by the physician group to the hospital. This requirements will be met if all separate arrangements between the entity and the physician group incorporate each other by reference of it they cross-reference a master list of agreements that is maintained and updated centrally and is available for review by the Secretary upon request.

3.     The aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the arrangement.

4.     The term of each arrangement is for at least 1 year.   To meet this requirement, if an arrangement is terminated during the term with or without cause, the parties may not enter into the same or substantially the same arrangement during the first year of the original term of the arrangement.

5.     The compensation to be paid over the term of the arrangement is set in advance, does not exceed fair market value, and except in the case of a physician incentive plan, is not determined in a manner that takes into account the value or volume of any referrals or other business generated between the parties.

6.     The services to be furnished under each arrangement do not involve the counseling or promotion of a business arrangement or other activity that violates any state or federal law.

V.     **Antikickback Law.**

A.     The Employment Agreements will be structured to comply with an applicable Antikickback safe harbor.

B.     There is a safe harbor for employees under Antikickback, which requires that the employees meet the tax law definition of an employee (i.e., any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee).

NPCHLT1:122997.1-MM-(MFS) 014245-00157

C.   The Services Agreement will be structured for the most part under the safe harbor for personal services, which has the following requirements:

1.   The agreement is set out in writing and signed by the parties.

2.   The agreement covers all of the services the physician group provides to the entity for the term of the agreement and specifies the services to be provided by the physician group.

3.   If the agreement is intended to provide for the services for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

4.   The term of the agreement is for not less than one year.

5.   The aggregate compensation paid to the physician group over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

6.   The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any state or federal law.

7.   The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

D.   Because the fee structure will not be "aggregate" as required under the safe harbor (number 5 above), the Services Agreement will not fully comply with the safe harbor. However, outsourcing support services, like those under the Services Agreement, is typical. Tuomey Administration believes that in this instance it is reasonable for TPS to outsource the support services for the SubLLCs rather than incurring the expense of paying for in-house staff, supplies and equipment. Tuomey Administration believes that based upon the services provided under the Services Agreement, the payment structure is fair and its reasonableness is supported by a report by Cejka Consulting.

VI.   **Federal Tax Law**

A.   For tax-exempt law purposes, if the compensation paid to the Physicians under the Employment Agreement and paid to Sumter Medical Consultants under the Services Agreement were paid by Tuomey, a tax-exempt organization, it must be reasonable so that it does not constitute an "excess benefit," which could lead to the imposition of taxes on the

physicians and hospital managers, or private inurement, which could lead to the revocation of Tuomey's tax-exempt status. However, because TPS, LLC will elect to be taxed as a corporation, separate from Tuomey, and will not seek tax-exempt status, it is a taxable entity and therefore not subject to the tax-exempt laws.

B.    Nevertheless, Tuomey Administration decided that the Board or a committee of the Board authorized by the Board, such as the Finance Committee, should take the following steps, which are outlined under the Internal Revenue Code and provide tax-exempt organizations a "rebuttable presumption" that compensation paid to certain individuals is reasonable:

1.    Approve in advance the compensation arrangement. The authorized approving body must be composed entirely of individuals who do not have a conflict of interest with respect to the compensation arrangement;

2.    The authorized approving body should obtain and rely upon appropriate data as to comparability prior to making its determination; and

3.    The authorized approving body should adequately document the basis for its determination concurrently with making its determination.

## VII.    Fair Market Value Opinion

At the advice of legal counsel, Tuomey Administration has obtained a fair market report from Cejka Consulting for the compensation paid under the Employment Agreement and the Services Agreement. This fair market value and commercial reasonableness analysis was necessary to document compliance with the Stark and Anti-kickback as discussed above. Additionally, the fair market report will satisfy the requirement under the rebuttable presumption that the Board rely on appropriate data as to comparability in making its decision. Further, the Board's consideration of the memoranda and all accompanying documentation, and subsequent approval of the proposed transaction should satisfy the other requirements for the rebuttable presumption.

## VIII.    Conclusion

In summary, the Tuomey Administration carefully reviewed various options and applicable legal and business issues raised by the proposed transaction with the Physicians. We believe that the proposed transaction, including the Practice's employment of the Physicians under the terms of the Employment Agreement and the Practice contracting with Sumter Medical Consultants under the terms of the Services Agreement, is in the best interest of Tuomey and will improve the quality and efficiency of the Services and will further Tuomey's tax-exempt purpose.

NPCHLT1:122997.1-MM-(MFS) 014245-00157

# MEMORANDUM

**TO:**  Board of Trustees-Tuomey Healthcare System
**FROM:**  Tuomey Administration
**DATE:**  January 29, 2004
  **Updated:** November 22, 2004
**RE:**  Development of Tuomey Professional Services, LLC, Tuomey
  Gastroenterology Services, LLC & Employment of Gastroenterologists

## I.  INTRODUCTION

This memorandum summarizes the process employed by the Tuomey Administration to analyze the formation of a subsidiary limited liability company ("LLC"), which will form six separate limited liability companies ("SubLLCs") to employ subspecialty physicians who are currently active members of Tuomey's medical staff. One of the subspecialties is gastroenterology. The SubLLC for gastroenterology services will employ qualified gastroenterologists (the "Physicians") for the performance of certain outpatient gastroenterology services. This long and deliberate process included the following steps:

- Retention of Nexsen Pruet, LLC to provide legal advice regarding multiple options related to contracting with the Physicians
- Analysis of the federal fraud and abuse laws implicated by the proposed transaction
- Retention of an independent appraisal company to conduct a fair market value and commercial reasonableness analysis of the proposed compensation for the Physicians
- Retention of Richard Kusserow of Strategic Management Systems, Inc., former Inspector General for United States Department of Health & Human Services, to conduct a review of the proposed transaction from a compliance perspective
- Review of the potential financial impact on Tuomey
- Review of the potential impact on Tuomey's strategic position

After completing this process, Tuomey Administration recommends to the Board that it approve the development of entities that will be owned and controlled, directly and indirectly, by Tuomey for the purposes of employing the Physicians. This employment relationship is more fully described below.

## II.  ANALYSIS OF STRUCTURE

Over the years, Tuomey has enjoyed a very close and cooperative relationship with the Physicians. Tuomey and the Physicians desired to formalize that relationship with some type of formal contractual relationship. Originally, Tuomey's legal counsel presented and Tuomey considered several different structure options that would allow Tuomey to develop a more formal contractual relationship with the Physicians. The options considered by Tuomey included an exclusive professional services agreement

006-128

between Tuomey and the Physicians, participation in various forms of joint ventures in a freestanding surgery center, and direct employment of the Physicians by Tuomey. As the Tuomey Administration considered each option, legal counsel presented the applicable advantages and disadvantages regarding the various legal and compliance issues associated with each potential structure. A memorandum, dated August 19, 2003, from legal counsel that addresses these issues is attached as Exhibit 1.

After much analysis and discussion of the legal and business implications of the various structure options, the Tuomey Administration ultimately decided to recommend the structure that involved a limited employment agreement ("Employment Agreement"), covering only outpatient gastroenterology services (the "Services"). Originally, legal counsel for the Hospital recommended that Tuomey employ the Physicians for all gastroenterology services but the Physicians were reluctant to sever ties with their private medical practice, Sumter Medical Consultants, because of their desire to continue funding of their retirement plan and other business concerns. This Employment Agreement would be between the Physicians and a separate entity owned and controlled by Tuomey. In addition to the Employment Agreement, the Practice will also enter into a services agreement with Sumter Medical Consultants to provide billing and collections and other administrative services. Attached, as Exhibit 2, is a copy of the form Employment Agreement. Attached, as Exhibit 3, is legal counsel's analysis of the Employment Agreement. Attached, as Exhibit 4, is a copy of the form Services Agreement.

Accordingly, Tuomey will form a South Carolina limited liability company, Tuomey Professional Services, LLC ("TPS, LLC"), which serve as a holding company for the SubLLCs. One of the SubLLCs will be Tuomey Gastroenterology Services, LLC, which will own and operate a gastroenterology practice (the "Practice"). TPS, LLC will elect to be taxed as a corporation; however Tuomey Gastroenterology Services, LLC will be a disregarded entity. *See* Nexsen Pruet Memorandum Regarding Election of Corporate Tax Treatment, attached as Exhibit 5. The Practice will enter into employment agreements with the Physicians and non-physician personnel to provide the Services.

Pursuant to the Employment Agreement, the Physicians will be required to exclusively provide the Services at Tuomey or other facilities Tuomey may designate, for 10 years. *See* Sections 5.1, 6 of the form Employment Agreement. Further, during the 10-year term and for a Restricted Period, which is a period of time ranging from zero months to two years depending on the date of termination, the Physicians will agree not to compete with Tuomey or the Practice in regarding the services within a 30-mile radius of any office or facility operated by Tuomey or the Practice. *See* Section 9 of the form Employment Agreement. The Employment Agreement will also include standard provisions and requirements found in other physician employment agreements.

Compensation under the Employment Agreement is based on three components:

a. **Base Salary**-This is a guaranteed portion of the salary that is in consideration for performance of the various duties and obligations and as partial consideration for the covenant not to compete. The initial Base

2

006-129

Salary is $120,000. The Base Salary is subject to adjustments at the end of each contract year: a Tier 1 Adjustment and a Tier 2 Adjustment. The Tier 1 Adjustment is based on the number of outpatient endoscopy procedures performed by the Physician (if the Physician performs fewer than 615 procedures in the prior contract year, the Base Salary is reduced to $60,000; if the Physician performs 615 or more, the Base Salary remains $120,000). The Tier 2 Adjustment is based on Tuomey's approved annual increase for its employees. The Physician's Base Salary would be increased accordingly.

b.   **Productivity Component-** This portion is based solely on the Physician's individual personal productivity. Under this component, the Physician is entitled to 80% of their personal collections derived from providing the services. This portion is also in partial consideration for the covenant not to compete.

c.   **Subjective Component-** This portion is based on a subjective evaluation of the Physician's compliance with multiple criteria including patient satisfaction, quality assurance, maintenance of good working relationships with Tuomey's medical staff and administration, reaching certain efficiency goals, and improved scheduling and turnaround times for performance of the Services. All of these concepts are designed to further and enhance the Hospital's tax -exempt purpose.

Under the Services Agreement, Sumter Medical Consultants will provide billing and collections services, as well as other practice support services, such as payor pre-certification, patient registration and scheduling, phone support and counseling, and procedure documentation, to the Practice.

The compensation under the Services Agreement will be set at twelve percent (12%) of the net collections, as defined under the Services Agreement.

III.   **JUSTIFICATIONS FOR STRUCTURE**

The Tuomey Administration has determined that the limited employment of the Physicians is in the best interest of high quality patient care and for the efficient delivery of health care at Tuomey at a reasonable cost.

The employment of the Physicians will: (a) facilitate the administration of the Services at Tuomey; (b) facilitate the training of personnel involved in provided Services at Tuomey; (c) afford effective selection, maintenance and utilization of Tuomey's equipment; (d) assure consistency and quality of the Services, and the needs of the patients; (e) provide for prompt availability of the Services; (f) allow the needs of the patients to be met effectively and efficiently at a reasonable and fair cost; (g) provide continuous availability of the Services for consultation with attending physicians; and (h) provide consistency with customary patterns for the administration of the Services and promote the ability of Tuomey to deliver high quality care efficiently, effectively and at a

006-130

fair and reasonable cost. By addressing these concepts in the Employment Agreement, Tuomey has created additional control over its ability to offer the services to all members of the community.

Further, the Physicians' compensation is linked in part to compliance with certain standards based on patient satisfaction; turnaround times; compliance with scheduled start times; and positive relationships with employees, administration and other members of Tuomey's medical staff.

If Tuomey can ensure these standards are achieved, then Tuomey will be improving the quality of care and furthering its tax-exempt purpose. Please review the total compensation, as described in Exhibit A to the form employment agreement contained in Exhibit 2 of this Memorandum. The non-financial standards of the incentive bonus directly advance Tuomey's ability to provide for prompt availability of the services and meet the needs of the patients effectively and efficiently.

## IV.   COMPLIANCE ISSUES

The proposed transaction involves the payment of compensation to physicians who make referrals of patients, both Medicare and private, to Tuomey. Consequently, the Tuomey Administration, with assistance from legal counsel, reviewed various compliance issues raised by the proposed relationship. These included the Federal Stark law, the federal Anti-kickback law and analysis of tax-exempt issues.

### A.   Federal Stark Law

The federal Stark law states that if a physician has a financial relationship with an entity that provides designated health services, then such physician shall not make referrals of Medicare/Medicaid patients to the entity unless that financial relationship fits within a certain exception. Failure to comply with this law can result in significant civil penalties and exclusion from the Medicare Program.

The applicable Stark exception to the financial relationship created by the Employment Agreement in the proposed transaction is the bona fide employee exception. Under the Stark exception for bona fide employment relationship, any amount paid by an employer to a physician who has a bona fide employment relationship with the employer for the provision of services is not considered a prohibited compensation arrangement, if:

1.    The employment is for identifiable services,

2.    The amount of the remuneration under the employment--

(a)    is consistent with the fair market value of the services, and

(b)    is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician,

006-131

3.    The remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer, and

4.    The employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

Under the Stark law, each element of an exception must be met in order for the relationship to be legal. In addition, the Stark bona fide employment exception does not prohibit the payment of remuneration in the form of a productivity bonus based on services performed personally by the physician.

The applicable Stark exception to the financial relationship between the Practice and Sumter Medical Consultants created by the Services Agreement in the proposed transaction is the personal services exception. An arrangement under which remuneration is paid by an entity to a physician group for specific physician services (of which non-professional, administrative services should be "physician" services), will meet this exception if the following are met:

1.    The arrangement is set out in writing, is signed by the parties and specifies the services covered by the arrangement.

2.    The arrangement covers all of the services to be furnished by the physician group to the hospital. This requirements will be met if all separate arrangements between the entity and the physician group incorporate each other by reference of it they cross-reference a master list of agreements that is maintained and updated centrally and is available for review by the Secretary upon request.

3.    The aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the arrangement.

4.    The term of each arrangement is for at least 1 year. To meet this requirement, if an arrangement is terminated during the term with or without cause, the parties may not enter into the same or substantially the same arrangement during the first year of the original term of the arrangement.

5.    The compensation to be paid over the term of the arrangement is set in advance, does not exceed fair market value, and except in the case of a physician incentive plan, is not determined in a manner that takes into account the value or volume of any referrals or other business generated between the parties.

006-132

6.    The services to be furnished under each arrangement do not involve the counseling or promotion of a business arrangement or other activity that violates any state or federal law.

B.    **Federal Anti-kickback Law.**

Under the federal Anti-kickback law, it is a crime for a person to offer, solicit or receive any type of remuneration in exchange for the referral of Medicare patients.

Under the federal Anti-kickback law, "remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs. Thus, as long as this is a "bona fide" employment relationship, there can be no violation of the Anti-kickback statute.

For purposes of the Anti-kickback statutory employment exception, the term "employee" has the same meaning as it does for purposes of tax law (i.e., any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee).

We believe that the Employment Agreement terms, such as the non-financial standards for the incentive bonus, do not result in over-utilization and unnecessary procedures for Medicare, Medicaid and other governmental programs. Further, the compensation under the Employment Agreement does not take into account the volume or value of referrals (but does take into account the Physicians' personal productivity as well as non-production based measures of work and compensation). When comparing this Employment arrangement to the Physicians' current relationship with Tuomey, we believe that there is no economic incentive to make referrals and generate business specific to Tuomey or to make referrals that limit patient choice or reduce competition based on quality of care and cost.

The Services Agreement will be structured to meet the requirements of a safe harbor for personal services under which prohibited remuneration does not include any payment by an entity to a physician group as compensation as long as the following are met:

1.    The agreement is set out in writing and signed by the parties.

2.    The agreement covers all of the services the physician group provides to the entity for the term of the agreement and specifies the services to be provided by the physician group.

3.    If the agreement is intended to provide for the services for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

6

006-133

4.   The term of the agreement is for not less than one year.

5.   The aggregate compensation paid to the physician group over the term of the agreement is set in advance, is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

6.   The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any state or federal law.

7.   The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the commercially reasonable business purpose of the services.

Under the Services Agreement, the compensation is based on a percentage of net collections, which would not satisfy the requirement that the "aggregate" compensation paid to the physician group over the term of the agreement is "set in advance." However, failure to meet all of the requirements of a safe harbor does not equate to a per se violation of the federal Anti-kickback statute.

Outsourcing support services, like those under the Services Agreement, is typical. In this instance, it is reasonable for the LLC to outsource the support services for the SubLLCs rather than incurring the expense of paying for in-house staff, supplies and equipment. Tuomey Administration believes that based upon the services provided, the payment structure is fair and its reasonableness is supported by a report by Cejka Consulting.

In essence, the risk of violating the "Anti-kickback law comes down to the government proving that the Practice and Physicians do not have a real employment relationship, or that Sumter Medical Consultants do not provide legitimate personal services to the Practice under the Services Agreement, but is instead these arrangements are shams, the purpose of which is to pay the Physicians for their referrals. We are convinced that nothing is further from the truth. Tuomey's intent is to control the availability, efficiency and quality of the outpatient gastroenterology procedures at Tuomey. We believe obligating these four highly qualified Physicians to Tuomey for ten years and monitoring their work to require that each perform his significant obligations under the Employment Agreements will accomplish this intent. Additionally, the non-professional, administrative services provided by Sumter Medical Consultants to the Practice under the Personal Services Agreement are legitimate services for which Sumter Medical Consultants receives fair market value compensation.

In addition to seeking advice from legal counsel, the Tuomey Administration also contacted former Inspector General, Richard Kusserow, now with Strategic Management

7

006-134

Systems, Inc., with regard to the analysis of the compliance issues raised by the proposed transaction. Mr. Kusserow has identified the factors that could initiate government reviews of the employment of the gastroenterologists and the risk levels identified by the Office of Inspector General ("OIG") regarding to various aspects of physician/hospital relationships. Attached as <u>Exhibit 6</u> is a copy of this analysis.

C.    **Tax-Exempt Rules**.

In addition to complying with the applicable fraud and abuse laws previously addressed, the Tuomey Administration also reviewed the applicable tax-exempt law implicated by the proposed transaction.

For tax-exempt law purposes, if the compensation paid to the Physicians under the Employment Agreement and paid to Sumter Medical Consultants under the Services Agreement were paid by Tuomey, a tax-exempt organization, it must be reasonable so that it does not constitute an "excess benefit," which could lead to the imposition of taxes on the physicians and hospital managers, or private inurement, which could lead to the revocation of Tuomey's tax-exempt status.

However, because TPS, LLC will elect to be taxed as a corporation, separate from Tuomey, and will not seek tax-exempt status, it is a taxable entity and therefore not subject to the tax-exempt laws.

Nevertheless, Tuomey Administration decided that the Board or a committee of the Board authorized by the Board, such as the Finance Committee, should take the following steps, which are outlined under the Internal Revenue Code and provide tax-exempt organizations a "rebuttable presumption" that compensation paid to certain individuals is reasonable:

1.    Approve in advance the compensation arrangement. The authorized approving body must be composed entirely of individuals who do not have a conflict of interest with respect to the compensation arrangement;[1]

---

[1] Individuals <u>do not</u> have a conflict of interest if the individual (a) is not a disqualified person participating in or economically benefiting from the compensation arrangement or property transfer, nor a member of the family of such disqualified person; (b) is not in an employment relationship subject to the direction or control of any disqualified person; (c) does not receive compensation or other payments subject to approval by any disqualified person; (d) has no material financial interest affected by the compensation arrangement or property transfer; and (e) does not approve a transaction providing economic benefit to any disqualified person who in turn has approved or will approve a transaction providing economic benefit to the individual.

006-135

2.  The authorized approving body should obtain and rely upon appropriate data as to comparability prior to making its determination;[2] and

3.  The authorized approving body should adequately document the basis for its determination concurrently with making its determination.[3]

At the advice of legal counsel, we have obtained the fair market report, attached as Exhibit 7, from Cejka Consulting, which should satisfy the requirement for appropriate data as to comparability. This fair market value and commercial reasonableness analysis was also necessary to document compliance with the Stark and Anti-kickback employment exceptions previously discussed. Additionally, the Board's consideration of this memorandum and all accompanying documentation, and subsequent approval of the proposed transaction should satisfy the other requirements for the rebuttable presumption.

## V.   CONCLUSION

In summary, the Tuomey Administration carefully reviewed various options and applicable legal and business issues raised by the proposed transaction with the Physicians. We believe that the proposed transaction, including the Practice's employment of the Physicians under the terms of the Employment Agreement and the Practice contracting with Sumter Medical Consultants under the terms of the Services Agreement, is in the best interest of Tuomey and will improve the quality and efficiency of the Services and will further Tuomey's tax-exempt purpose.

---

[2] "Appropriate data" means information sufficient to determine whether the compensation arrangement in its entirety is reasonable or the property transfer is at fair market value. Such information would include (a) compensation levels paid by similarly situated organizations for functionally comparable positions; (b) the availability of similar services in the geographic area of the organization; (c) current compensation surveys compiled by independent firms; and (d) actual written offers from similar institutions competing or the services of the disqualified persons.

[3] To be considered "adequately documented," the records must note: (a) the terms of the transaction that was approved and the date that it was approved; (b) the members of the authorized body who were present during the debate on the transaction that was approved and those who voted on it; (c) the comparability data obtained and relied upon by the authorized body and how the data was obtained; and (d) any actions taken with respect to consideration of the transaction by anyone who is otherwise a member of the authorized body but who had a conflict of interest with respect to the transaction.

006-136

# EXHIBIT 1

August 19, 2003 Nexsen Pruet Memorandum

**CONFIDENTIAL ATTORNEY-CLIENT PRIVILEGED**
**MEMORANDUM**

**TO:**     Tuomey Healthcare System      **CLIENT-MATTER NO.:**   014245.146

**FROM:**   Nexsen Pruet Jacobs & Pollard, LLC

**DATE:**    August 19, 2003

**RE:**      Potential Arrangements with Gastroenterologists

## I. Introduction.

This memorandum outlines the advantages and disadvantages of entering into employment agreements with the gastroenterologists and entering into an exclusive services contract with the gastroenterologists.

## II. Recommendation.

We recommend that the hospital enter into employment agreements with the gastroenterologists. As discussed below and summarized in the attached one-page chart, the advantages of the employment agreement outweigh the advantages of the exclusive services agreement.

## III. Employment Agreement.

**A. Terms.** The employment agreement would be an exclusive employment agreement where all of the gastroenterologists' efforts were devoted to the hospital. If the gastroenterologists kept their private practice and were only employed by the hospital for the services provided at the hospital, the operational and billing problems of tracking the services for both the hospital and their practice would be too burdensome.

The exclusive employment agreement would contain a covenant not to compete for the period of employment plus two to three years after the termination or expiration of the contract. The compensation under the employment agreement would be a $60,000 base salary with a productivity bonus.

**B. Advantages/Disadvantages.** An advantage of the employment agreement is the comfort that the arrangement does not violate Stark or Antikickback because there are an applicable Stark exception and Antikickback safe harbor for an employment relationship.

    **1. Stark.** Under the Stark exception for bona fide employment relationship, any amount paid by an employer to a physician who has a bona fide employment relationship with the employer for the provision of services is not considered a prohibited compensation arrangement, if:

       1. The employment is for identifiable services,

       2. The amount of the remuneration under the employment--

(a) is consistent with the **fair market value** of the services, and

(b) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician,

3. The remuneration is provided pursuant to an agreement which would be **commercially reasonable** even if no referrals were made to the employer, and

4. The employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse. 42 USCA § 1395nn.

Subparagraph 2(b) above does not prohibit the payment of remuneration in the form of a productivity bonus based on services performed personally by the physician. *Id.*

**2. Antikickback.** Under Antikickback, "remuneration" does not include any amount paid by an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs. 42 CFR § 1001.952. For purposes of Antikickback, the term "employee" has the same meaning as it does for purposes of 26 U.S.C. 3121(d)(2) (i.e., any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee). *Id.*

For purposes of Stark and Antikickback, it is important that the compensation be fair market value and commercially reasonable, and that the hospital have documentation to support it. We do not opine on whether compensation is fair market value or commercially reasonable. We recommend that an independent appraisal be done.

3. **Tax-Exempt Rules.** Additionally, for tax-exempt law purposes, the compensation must be reasonable so that it does not constitute an "excess benefit," which could lead to the imposition of taxes on the physicians and hospital managers, or private inurement, which could lead to the revocation of the hospital's tax-exempt status. There is a procedure that the hospital can follow to create a "rebuttable presumption" that the compensation is reasonable.

A compensation arrangement is presumed to be reasonable if the following conditions are satisfied:

a. The compensation arrangement or the terms of the property transfer are approved in advance by an authorized body of the applicable tax-exempt organization composed entirely of individuals who do not have a conflict of interest with respect to the compensation arrangement or property transfer;

➢ "Authorized body" may include board of trustees or equivalent controlling body, a committee of the controlling body as permitted by state law, or other parties authorized by the controlling body as permitted by state law.

2

006-139

> Individuals <u>do not</u> have a conflict of interest if the individual (a) is not a disqualified person participating in or economically benefiting from the compensation arrangement or property transfer, nor a member of the family of such disqualified person; (b) is not in an employment relationship subject to the direction or control of any disqualified person; (c) does not receive compensation or other payments subject to approval by any disqualified person; (d) has no material financial interest affected by the compensation arrangement or property transfer; and (e) does not approve a transaction providing economic benefit to any disqualified person who in turn has approved or will approve a transaction providing economic benefit to the individual.

b. The authorized body obtained and relied upon appropriate data as to comparability prior to making its determination; and

> "Appropriate data" means information sufficient to determine whether the compensation arrangement in its entirety is reasonable or the property transfer is at fair market value. Such information would include (a) compensation levels paid by similarly situated organizations for functionally comparable positions; (b) the availability of similar services in the geographic area of the organization; (c) current compensation surveys compiled by independent firms; and (d) actual written offers from similar institutions competing or the services of the disqualified persons.

c. The authorized body adequately documented the basis for its determination concurrently with making that determination.

> To be considered "adequately documented," the records must note: (a) the terms of the transaction that was approved and the date that it was approved; (b) the members of the authorized body who were present during the debate on the transaction that was approved and those who voted on it; (c) the comparability data obtained and relied upon by the authorized body and how the data was obtained; and (d) any actions taken with respect to consideration of the transaction by anyone who is otherwise a member of the authorized body but who had a conflict of interest with respect to the transaction.

If a rebuttable presumption arises because the hospital follows the above procedure, then the IRS may only rebut the presumption that arises if it develops sufficient contrary evidence to discredit the probative value of the comparability data relied upon by the authorized body in determining that the compensation was reasonable.

**4. Other.** Another advantage to the employment agreement is that it would be self-executing and would not require the type of evaluation process and approval of the Board, as would the exclusive services agreement, as discussed below.

006-140

## IV. Exclusive Services Agreement.

**A. Terms.** Under an exclusive services agreement, the gastroenterologist group (the "Group") would continue to bill and collect for its services and the hospital would pay the Group $300,000 per year.

The gastroenterologists would not do additional administrative or have any medical director duties.

The Group would exclusively provide services to the hospital and would be the exclusive group to provide their services at the hospital.

The agreement would contain a covenant not to compete for the term of the agreement plus two to three years after the termination or expiration of the agreement. The covenant not to compete would prevent the gastroenterologists from opening up an ambulatory surgery center or providing medical office endoscopic surgery.

The $300,000 per year compensation would be in exchange for the exclusivity and the covenant not to compete.

**B. Advantages/Disadvantages.** The potentially applicable Stark exception and Antikickback safe harbor are discussed below. Because the compensation is not for the actual services, but rather for the exclusivity and covenant not to compete, there is some question as to whether the arrangement would fall within a Stark exception or Antikickback safe harbor. Additionally even if it did, as mentioned below, the fair market and commercial reasonableness analysis may be problematic.

**C. Stark.** Under the Stark personal service arrangement exception, the following conditions must be met:

1.    The arrangement is set out in writing, signed by the parties, and specifies the services covered by the arrangement.

2.    The arrangement covers all of the services to be furnished by the physician to the entity.

3.    The aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes for the arrangement.

4.    The term of the arrangement is for at least 1 year.

5.    The compensation to be paid over the term of the arrangement is set in advance, does not exceed **fair market value**, and does not take into account the volume or value of any referrals or other business generated between the parties.

6.    The services to be furnished under the arrangement do not involve counseling or promotion of a business arrangement or other activity that violates any state or federal law.

4

006-141

**D. Antikickback.** Under the personal services and management contracts safe harbor to the Antikickback law, the following requirements must be met:

1.    The agreement is set out in writing and signed by the parties.

2.    The agreement covers all of the services the agent (the physician) provides to the principal (the hospital) for the term of the agreement and specifies the services to be provided by the agent.

3.    If the agreement is intended to provide for the services of the agent on a periodic, sporadic or part-time basis, rather than on a full-time basis for the term of the agreement, the agreement specifies exactly the schedule of such intervals, their precise length, and the exact charge for such intervals.

4.    The term of the agreement is for not less than one year.

5.    The aggregate compensation paid to the agent over the term of the agreement is set in advance, is consistent with **fair market value** in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between the parties for which payment may be made in whole or in part under Medicare, Medicaid or other Federal health care programs.

6.    The services performed under the agreement do not involve the counseling or promotion of a business arrangement or other activity that violates any State or Federal law.

7.    The aggregate services contracted for do not exceed those which are reasonably necessary to accomplish the **commercially reasonable** business purpose of the services.

Although we do not opine on fair market value or commercial reasonableness, it would appear to be more difficult to come up with a reliable opinion in the context of the exclusive service agreement. The compensation paid by the hospital is in return for the exclusivity and the covenant not to compete under the agreement, which are harder to value than services, so there is a strong appearance that the payment, all or part of it, is actually for referrals.

Furthermore, exclusive agreements for gastroenterology that include subsidies are not common. This could bring into question whether the agreement is commercially reasonable.

**E. Tax Exempt Rules.** Under tax-exempt law, if the compensation is not reasonable, it could be determined to be an "excess benefit" to the extent it exceeds fair market value and the physicians and hospital managers that knew of and approved the compensation could be taxed. Additionally, it could be private inurement and the IRS could revoke the hospital's tax-exempt status.

006-142

Additionally, the exclusive services agreement could be a "management agreement" under the private use restriction rules for tax-exempt bond financed property. An analysis of the safe harbors under Rev. Proc. 97-13 would be required to assure compliance with these private use restriction rules.

**F. Other.** Another disadvantage to the exclusive services agreement is that the Board would have to evaluate, through a study committee of the medical staff, whether the agreement for the services was cost-effective, efficient, consistent with the hospital's purpose, etc. Thus, entering into the agreement would take more time and be more labor intensive for the administration, medical staff and Board. Although the outcome may be the same for the employment agreement (i.e., that the agreement is entered into), the process is more involved.

006-143

## SUMMARY OF ARRANGEMENTS

### Employment Agreement

Terms:

> $60,000 Base Salary with Productivity Bonus
> Covenant Not to Compete
> Exclusive

Advantages:

> Can fit within Stark exception and Antikickback safe harbor
> Can obtain rebuttable presumption under tax law that compensation is reasonable
> Self-executing; immediate

### Exclusive Services Agreement

Terms:

> $300,000 Annual Compensation
> Covenant Not to Compete
> Exclusive

Disadvantages:

> May not fit within Stark exception and Antikickback safe harbor
> Some question whether payment for restrictive covenant is disguised payment for referrals in violation of Antikickback
> Requires Medical Staff evaluation and Board approval; time and labor intensive
> May be difficult to obtain reliable fair market value and commercial reasonableness opinion
> If compensation is not reasonable, then could have private inurement/excess benefit issues under tax law, and problems under Stark and Antikickback
> Could be a "management agreement" under tax-exempt bond private use restrictions; analysis under these rules would be needed

006-144