**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | |
|---|---|
| United States of America, *ex rel.*,   ) | |
| Michael K. Drakeford, M.D.,     ) | |
| )      | C.A. No. 3:05-cv-2858-MBS |
| Plaintiff,   ) | |
| ) | |
| v.     ) | |
| ) | |
| Tuomey, d/b/a Tuomey Healthcare   ) | |
| System, Inc.,   ) | |
| ) | |
| Defendant.   ) | |
| ) | |

**DEFENDANT'S RESPONSE TO THE GOVERNMENT'S MOTION FOR ENTRY OF**
**JUDGMENT UNDER THE FALSE CLAIMS ACT**

**INTRODUCTION**

Defendant Tuomey Healthcare System, Inc. ("Tuomey"), by its undersigned attorneys, submits the following Response to the Government's Motion for Entry of Judgment under the False Claims Act (Dkt. 818).[1]

The jury found that Tuomey violated the Stark Law and the False Claims Act ("FCA"). In special interrogatories, the jury also found that the total number of claims submitted in violation of the FCA was 21,730 and the total value of those claims was $39,313,065. The jury was not requested to determine and therefore did not decide whether or to what extent the Government suffered actual damage or loss as a result of the payment of claims submitted by Tuomey. Furthermore, there was no evidence presented that the services were not medically

---

[1] Tuomey is also filing a Renewed Motion for Judgment as a Matter of Law and/or for a New Trial ("Rule 50/59 Motion"), a Renewed Motion for Summary Judgment and/or Judgment as a Matter of Law on the Government's Equitable Claims and a Motion to Require the Government to Elect Remedies contemporaneously with this Response. Tuomey incorporates herein all of the arguments offered in support of those Motions to the extent relevant to this Response. Nothing in this Response should be construed to waive any arguments offered now or later in support of those Motions.

necessary, that the medical services for which claims were submitted were not performed, or that Tuomey overcharged for the medical services provided. In fact, there was not a legally sufficient evidentiary basis presented that would prove the Government suffered any damages as a result of anything Tuomey did.  Nor was there any evidence that the claims submitted were the result of Stark-prohibited referrals.

Nevertheless, the Government wants this Court to enter judgment in its favor under the FCA in an amount three times the dollar value stated by the jury in its answer to the verdict form interrogatories, and to impose a civil penalty of $5,500 for each of the 21,730 claims that the jury said were submitted in violation of the FCA, for a total of $237,454,195.  Such an award would destroy the only hospital in Sumter County.  This would be catastrophic for the Sumter community, as evidenced by the attached resolution from the Sumter County Legislative Delegation and letters from the Sumter Smart Growth Initiative and Sumter Economic Development.

For the reasons stated in Tuomey's Rule 50/59 Motion, the Government is not entitled to judgment under the FCA. Therefore, judgment should be entered in favor of Tuomey. But apart from the Rule 50 and Rule 59 considerations, the Government is not entitled to treble damages totaling $117,939,195.  The Government failed to present evidence at trial sufficient to prove that Tuomey presented claims for Stark-prohibited referrals.  For that reason and others, it failed to present evidence of any false claims.  In addition, the FCA only permits the trebling of net losses that the Government suffered as a result of a violation of the FCA. Here, the Government failed to prove that it suffered any financial loss as a result of the presentment of the allegedly false claims. Therefore, the Government is not entitled to an award of treble damages.

The Government also is not entitled to judgment for civil penalties in the amount of $5,500 per claim for 21,730 claims. Again, the Government failed to prove the existence of any Stark-prohibited referrals or the presentment of any false claims. Even if the Court finds the Government did adequately prove Tuomey submitted claims for Stark-prohibited referrals, however, imposing the requested total civil penalties of $119,515,000 would violate the Eighth Amendment's Excessive Fines Clause as well as the Fifth Amendment's Due Process protections. Under these circumstances, when the Government requests penalties that are excessive and unconstitutional, the FCA does not afford the Court discretion to fashion an alternative penalty that would not violate the Constitution. Therefore, the Court should refuse to award *any* civil penalties to the Government.

In the alternative, the Court can properly determine based on the facts of the case that the number of claims for penalty calculation purposes should be based on the number of Medicare cost reports submitted by Tuomey during the period in question, which in this case is four. As more fully explained below, the cost reports, not the Medicare claims forms, are the only things that could be considered as false claims for the purpose of the FCA.[2]

### ARGUMENT

**I.    THE GOVERNMENT IS NOT ENTITLED TO THREE TIMES THE VALUE OF THE CLAIMS IDENTIFIED BY THE JURY**

#### A.    The Government Failed to Prove the Submission of Any False Claims

As a threshold matter, the Government's claims for treble damages and statutory penalties are barred by the fact that the Government failed to present evidence of any Stark-prohibited referrals or of any claims or services provided by Tuomey that resulted from any Stark-prohibited referrals. As explained more fully in Tuomey's Rule 50/59 Motion, the number

---

[2]    Tuomey of course denies that anything in those cost reports was false.

of alleged claims and dollar amounts presented to the jury by the Government was based on inaccurate and unreliable testimony by Thomas MaCurdy and Ruben Steck that among other things did not comply with the requirements of FRE 1006 governing summary testimony.[3] *See U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*, 2011 WL 5005313, at *6-9 (E.D. Va. Oct. 19, 2011) ("*Bunk I*") and analysis set forth in the Rule 50/59 memorandum. There was also a complete failure of proof at trial of any Stark-prohibited referrals to Tuomey hospital made by any of the part-time employed physicians. The only evidence offered by the Government in support of its contention that referrals were made was allegedly derived from the Medicare UB-92 and UB-04 claims forms. As the testimony at trial indicated (and as more fully explained in Tuomey's Rule 50/59 memorandum), these forms were not designed to capture and do not identify "the request or establishment of a plan of care by a physician which includes the provision of the designation of a designated health service" which, according to the Stark Law, "constitutes a 'referral' by a 'referring physician.'" 42 U.S.C. §1395nn(h)(5)(B); *see also* 42 C.F.R. §411.351. As the Court correctly observed at the January 15, 2013 motions hearing "the plain wording of the [Stark] statute...prohibits payment if those claims are a result of referrals from physicians with whom the hospital has a financial relationship." Dkt. 737a 41:4-6.

The Government utterly failed to prove the existence of any referrals by these physicians, or the existence of any claims that resulted from any prohibited referrals. Therefore, there were no false claims for which damages could be trebled or any penalty assessed.

---

[3]     Steck was also not qualified as an expert by the Court because his work was not the product of reliable principles and methods as required by FRE 702. This makes the Government's claims evidence even more suspect.

**B.    The Government Failed to Prove or Provide Any Evidence of Any Damages and Therefore Cannot Obtain an Award of Treble Damages**

There was no evidence presented that the Government suffered any financial loss or damages resulting from any claims submitted by Tuomey to Medicare.  The FCA, which was the sole claim tried to the jury, imposes liability for the amount of *damages* that the Government sustains.  31 U.S.C. §3729(a).  The Government did not attempt to prove (because it could not) that unnecessary services were provided or that Tuomey overcharged for the services.  Before the Government can obtain a treble damages award, the Government must first prove a financial loss for which it is entitled to compensatory damages. In *United States v. Bornstein*, the Supreme Court explained:

> We think the chief purpose of the (Act's civil penalties) was to provide for restitution to the government of money taken from it by fraud, and that the device of double damages plus a specific sum was chosen to make sure that the government would be made completely whole.  *United States ex rel. Marcus v. Hess*, 317 U.S., at 551-552, 63 S.Ct., at 387-388, 87 L.Ed. 443. For several different reasons, this make-whole purpose of the Act is best served by doubling the Government's damages before any compensatory payments are deducted.

423 U.S. 303, 314-15 (1976).[4]

Court decisions following *Bornstein* have overwhelmingly concluded that the FCA only permits the trebling of the net losses suffered by the Government, subtracting the value of the goods or services provided from the gross payments.  *See, e.g.*, *United States ex rel. Feldman v. Gorp,* 697 F.3d 78, 87-88 (2d Cir. 2012)[5]; *United States v. United Technologies Corp., 626 F.3d*

---

[4]    As explained below, subsequent Supreme Court decisions have also held that the FCA has a punitive purpose as well.

[5]    *Feldman* involved research grant awards and the Court determined that the United States did not receive any value as a result of the grants and therefore did not deduct anything from the gross payments made to the Defendant. Nevertheless, the Second Circuit employed a net trebling approach. *See United States v. Anchor Mtg. Co.*, 711 F.3d 745, 750 (7th Cir. 2013).

313, 321-22 (6th Cir. 2010); *United States v. Science Applications International Corp.,* 626 F.3d

1257, 1279 (D.C. Cir. 2010) (*SAIC*); *Commercial Contractors, Inc. v. United States,* 154 F.3d

1357, 1372 (Fed. Cir. 1998).

Most recently, the Seventh Circuit Court of Appeals in *United States v. Anchor Mortgage*

*Co.* ruled that only net losses may be trebled under the FCA. The Court explains:

> The False Claims Act does not specify either a gross or a net
> trebling approach. Neither does it signal a departure from the
> norm – and the norm is net trebling. The Clayton Act, which
> created the first treble-damages action in federal law, 15 U.S.C.
> §15, has long been understood to use net trebling. The court finds
> the monopoly overcharge – the difference between the product's
> actual price and the price that would have prevailed in competition
> – and trebles that difference. *See, e.g., Illinois Brick Co. v. Illinois,*
> 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977). A gross
> trebling approach, parallel to the one the district court used in this
> suit, would be to treble the monopolist's price, then subtract the
> price that would have prevailed in competition. If there is a reason
> why the courts should use net trebling in antitrust suits and gross
> trebling in False Claims Act cases, it can't be found in §3729 – nor
> does the United States articulate one.

711 F.3d 745, 749 (7th Cir. 2013).

Accordingly, the Fourth Circuit in *U.S. ex rel. Harrison v. Westinghouse Savannah River*

*Co.* defined the measure of damages under the FCA as follows:

> We suggested this measure of damages in *Harrison I* when we
> noted that the plaintiff had sufficiently alleged that the false
> statements made by Westinghouse "caused the government to pay
> 'claims' at a higher cost than it would have paid absent the fraud."
> 176 F.3d at 794. This view is consistent with the text of the FCA,
> which provides for recovery of "damages which the Government
> sustains because of the act of" the defendant. 31 U.S.C. §3729(a).
> This approach also furthers an important purpose of the FCA,
> which is to make the government completely whole. *United States
> ex rel. Marcus v. Hess,* 317 U.S. 537, 551-52, 63 S.Ct. 379, 87
> L.Ed. 443 (1943).

352 F.3d 908, 922-23 (4th Cir. 2003).

The D.C. Circuit clearly articulated this point in *U.S. ex rel. Davis v. Dist. of Columbia*, 679 F.3d 832 (D.C. Cir. 2012), in which the court recognized the principle that FCA "damages are meant to put[] the government in the same position as it would have been if the defendant's claims had not been false." *Id.* at 839 (quotation omitted). In *Davis*, an agency of the District of Columbia's Medicaid program was sued under the FCA for paperwork deficiencies related to its program of transporting special education students. *Id.* at 834 (outlining factual background). Remanding the case to the district court, the court of appeals set out the Government's two-part burden in a case like Tuomey's where the Government is not damaged: "[1] [t]o establish damages, the government must show not only that the defendant's false claims caused the government to make payments that it would have otherwise withheld, [2] but also that the performance the government received was worth less than what it believed it had purchased." *Id.* (quotation omitted).

Just as in *Davis*, "the government [is] not entitled to recover all of its payments," and is, at most, entitled to "the difference in value between 'services tainted by potential conflict' and the untainted services promised." *Id.* at 839-40 (quoting *SAIC*, 626 F.3d 1257, 1280 (D.C. Cir. 2010)). The answer in this case is zero. Also like *Davis*, the Government "does not allege that any services paid for were not provided." *Id.* In fact, Tuomey's patients at issue in this case received excellent medical care; care for which the Government was obligated to pay anyway. Thus, "[u]nlike the contractor's undisclosed conflicts in [*SAIC*], the defect in this case in no way calls into question the value of the medical care provided by" Tuomey. *Id.* Because the Government got exactly what it paid for "[t]his is the rare case in which there is no allegation that what the 'government received was worth less than what it believed it had purchased,'" and instead "[t]he government got what it paid for and there are no damages." *Id.*

Also, a district court in the Fourth Circuit recently stated that "the amount the government paid over and above what the government would have paid if not for the fraudulent activity" is "precisely the type of evidence needed to establish and calculate damages under the FCA." *U.S. ex rel. Bunk v. Birkart Globistics GmbH & Co.*, 2012 WL 488256 (E.D. Va. Feb. 14, 2012) ("*Bunk II*"). The defendants in *Bunk* falsely certified that their bids to the military for contracts to move service members' belongings were not the product of collusion. As the *Bunk II* opinion explained: "The *Marcus* Court used a 'but for' test in its analysis of FCA damages. In other words, a court should ask the question of, 'How much would the government have paid for the item at issue 'but for' the fraudulent actions of the defendant?'" *Id.* at *5 (quoting *United States ex rel. Roby v. Boeing Co.*, 79 F.Supp.2d 877, 884 (S.D. Ohio 1999), citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551-52 (1943)). In order to prove an FCA violation, the Government must show not only that Tuomey's Medicare claims caused the Government to make payments that it would have otherwise withheld, but also that the performance the Government received was worth less than what it believed it had purchased. *Davis*, 679 F.3d at 839.

Here, there was no evidence that the Government paid for medical services that were not delivered to the Medicare beneficiaries. In fact, the Government never claimed that Tuomey failed to provide services to its patients as billed, or that any of Tuomey's services were not medically necessary. The Government therefore proved no damages that it could recover under the FCA. The Government failed to prove that "but for" the alleged Stark violations, it would have paid any less for the services required by the Medicare beneficiaries who received Tuomey's services.[6] Because the Government has not lost anything, an award of treble damages

---

[6]     Claims for services rendered in violation of a statute do not necessarily constitute false or fraudulent claims under the FCA. *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 475 (5th Cir. 2012).

is not permitted.  Lastly, as discussed below, the Eighth Amendment Excessive Fines prohibition also bars trebling of the total value of claims the jury determined were paid to Tuomey in violation of the FCA under the circumstances of this case.

## II.     THE CIVIL PENALTIES REQUESTED BY THE GOVERNMENT SHOULD NOT BE IMPOSED AGAINST TUOMEY

In addition to treble damages (for a total of $117,939,195), the Government also seeks the imposition of a $5,500 penalty for each of the 21,730 claims identified by the jury, for a total of $119,515,000 more in judgment.  Because the Government has failed to prove the submission of false claims; because, in any event, the imposition of $119,515,000 in penalties alone would be unconstitutional; and because the Court lacks discretion to reduce the penalty amount statutorily required, the Court should not impose civil penalties in any amount against Tuomey.

### A.     Because the Government Failed to Provide Evidence of False Claims, It Is Entitled to No Penalties

As indicated above, the Government failed to prove at trial that any part-time employed physician made any Stark-prohibited referrals to Tuomey, and thus the Government also failed to prove that Tuomey submitted any false claims.  Civil penalties can be imposed under the FCA only where the defendant is proven to have violated the statute's false claim prohibitions.  *See* 31 U.S.C. §3729(a).  Thus, Tuomey is liable for no statutory penalties.

### B.     The Government's Demand for Gross Trebling and Civil Penalties Totaling $119,515,000 Is Barred by the Excessive Fines Provision of the Eighth Amendment

#### 1.     Legal Standard

The FCA's treble damages and civil penalties provisions are subject to the Constitution's proscription on excessive fines.  The Eighth Amendment's Excessive Fines Clause provides that: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. CONST., AMEND. VIII.  Applying this prohibition, the Supreme

Court has made clear that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998).

Courts apply Eighth Amendment considerations to FCA cases, because the FCA's treble damages and civil penalty provisions are "essentially punitive in nature." *Vermont Agency of Natural Res. v. United States, ex rel. Stevens*, 529 U.S. 765, 784 (2000); *see also United States v. Mackby*, 261 F.3d 821, 830 (9th Cir. 2001) (holding that the Eighth Amendment applies to FCA cases).

The Court should analyze the total amount of the judgment sought – treble damages and civil penalties – in conducting its review under the Excessive Fines Clause. *See, e.g.*, *U.S. ex rel. Satalich v. City of Los Angeles*, 160 F.Supp.2d 1092, 1102-03 (C.D. Cal. 2001). In *Satalich,* the Court found especially noteworthy the FCA's imposition of treble damages in addition to statutory sanctions demonstrates a statutory intent to punish. Since the Court found that the statutory sanction represented payment to the government, at least in part, as punishment, and the treble damages provision – at least in combination with the Act's statutory penalty provision – was not solely remedial, the Court concluded that both the statutory sanction and the treble damages provisions of the FCA were punitive, and therefore, subject to analysis under the Excessive Fines Clause. *Id.*

In undertaking the excessive fines analysis, "[c]ourts have recognized a variety of factors," including: "(1) the extent of the harm caused; (2) the gravity of the offense relative to the fine; (3) whether the violation was related to other illegal activity, and the nature and extent of that activity; and (4) the availability of other penalties and the maximum penalties which could have been imposed." *Bunk II*, 2012 WL 488256 at *4 (citing, *inter alia*, *Bajakajian*,

524 U.S. at 336-39).[7]   Analysis of each of these factors demonstrates that the Government's sought civil penalties are unconstitutionally excessive.

### C.  The Requested Damages Are Unconstitutional

#### 1.  Tuomey's Conduct, Even if Proven, Did Not Harm the Government in Any Way

With respect to the first factor, the extent of the harm caused, it is the Government's burden to demonstrate the harm to the public fisc.  *See, e.g.*, *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 923 (4th Cir. 2003) (The Fourth Circuit has "decline[d] to shift the burden of proof on damages" to the defendant, noting that the FCA "specifically places the burden of proving damages on the government"); *see also United States v. Bourseau*, 531 F.3d 1159, 1173 (9th Cir. 2008) (evaluating excessiveness claim based on findings during bench trial that the Government had proven that it "sustained harm to its treasury").  The Government must demonstrate the harm to the treasury, and it cannot do so.

When weighing the gravity of the harm for Eighth Amendment purposes, the Court must consider (1) the actual damages resulting from the defendant's conduct, and (2) the egregiousness of the defendant's conduct.  *See, e.g.*, *Solem v. Helm*, 463 U.S. 277, 292 (1983); *United States v. Eghbal*, 548 F.3d 1281, 1285 (9th Cir. 2008).  As discussed in greater detail above, both factors favor Tuomey.

The Government was not harmed by anything that Tuomey did, economically or otherwise.  The patients treated at Tuomey received excellent medical care and Tuomey received the proper amount of reimbursement for those services under the Medicare program,[8] and the

---

[7]     An appeal of the district court's excessive fines holding in *Bunk II* is presently pending.  That appeal has been fully briefed, and oral argument was conducted on May 14, 2013.  *See United States ex rel. Bunk v. Birkart Globistics GmbH & Co.*, 12-1369(L) (4th Cir.).

[8]     As indicated by the attached affidavit from Tuomey's Chief Financial Officer Mark Lovell, Tuomey actually *lost* $21,670,377 on the services it provided to Medicare patients from 2005-2008.

government does not contend otherwise.  To properly calculate economic damages in this framework, the Court must consider "the amount the government paid over and above what the government would have paid if not for the fraudulent activity."  *Bunk II* at *5 (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 551-52 (1943) ("We think the chief purpose of the statutes here was to provide for restitution to the government of money taken from it by fraud ...."); *see also Harrison*, 352 F.3d at 922-23.  The answer in this case is zero.  The Government got what it paid for and suffered no economic harm.

When undertaking the economic harm analysis, the Eighth Amendment does not permit a methodology that would consider as damages all payments to Tuomey from allegedly improper referrals to sustain an unconstitutional award.  Instead, the economic harm is limited to the amount the Government paid above what it would have paid without any fraudulent activity. *Bunk II* at *5; *see also United States ex rel. Stearns v. Lane*, No. 2:08-cv-175, 2010 U.S. Dist. LEXIS 96981, at *10-*13  (D. Vt. Sept. 15, 2010) (harm in housing subsidy FCA case was excess rent, not total rent received); *Coleman v. Hernandez*, 490 F.Supp.2d 278, 282 (D. Conn. 2007) (same).  Even if the Court were to consider the total payments to Tuomey as economic harm, which as a matter of law it should not, the damages sought by the Government demonstrate the gross disproportion of the penalties to the claimed damage.

The attached affidavit from Donald Moran which, among other things, analyzes the size of the alleged claims in the numbers presented by Ruben Steck at trial, illustrates this.[9] *D. Moran Aff.*  Of the alleged claims included in the Steck numbers that were accepted by the jury, 13,009 (59.86% of the total) involved payments to Tuomey of less than $550 each.  This would result in a greater than 10:1 ratio of penalties to payments, which as discussed below

---

[9]     At trial, Mr. Steck testified that Mr. Moran replicated his results.  Daily Transcript April 24, 2013, 111: 14-19.

would amount to a presumptively unconstitutional award.  A total of 17,557 claims (80.78% of the total) were under $1,375, a greater than 4:1 ratio that the Supreme Court has said would be constitutionally suspect.  *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 424-25 (2003).  A total of 19,736 alleged claims (90.81% of the Steck total accepted by the jury) were under $5,500.  In fact, the Steck total included 4,719 claims that were under $100 and *even three claims for which Tuomey was paid less than $1*.  The median dollar amount of claims reviewed by Mr. Steck was $392.36.   The Government's "nickel-and-dime" approach to damages underscores the fact that the Government's colossal demand is unconstitutionally excessive.

Stark Law violations, even if proven, would not create any economic harm for Eighth Amendment purposes, which requires *actual* harm to the United States, as is clear from other courts' analysis of FCA cases.  Courts recognize that "under the False Claims Act, damages should be determined according to the actual loss suffered by the United States as a result of false claims and not according to the total cost of a contract that may have included fraudulent claims."  *United States ex rel. Giles v. Pratt*, 32 F. App'x 432, 433 (9th Cir. 2002) (citing *United States v. Bornstein*, 423 U.S. 303, 317 n.13 (1976)); *see also Ab-Tech Constr. Inc. v. U.S.*, 31 Fed. Cl. 429, 433-34 (Fed. Cl. 1994), *aff'd* 57 F.3d 1084 (Fed. Cir. 1995) (court denied Government's demand for treble damages where the Government got what it paid for); *U.S. v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1279-80 (D.C. Cir. 2010) (trial court directed to consider the value of services defendant provided to the Government in assessing damages). In this case, there is no evidence that the Government has been actually harmed economically at all, as discussed above.

The non-economic harm analysis shares some of the features described above, "including the adequacy of the services performed and the impact of Defendants' conduct on the integrity of

the government contracting process." *Bunk II*, 2012 WL 488256 at *7. Although the integrity of the administration of a government program like Medicare is no doubt important,[10] just as in *Bunk II*, the Government here did not suffer non-economic harm from anything that Tuomey did. Also, just like in *Bunk*, the Government does not claim that Tuomey failed to provide the services for which it was paid. *Id.* at *8.

A similar analysis of non-economic harm compelled the Supreme Court to deem a Government-requested forfeiture a violation of the Eighth Amendment where the Government's interest in "information regarding the amount of currency leaving the country" was "minimal" when viewed against the $357,144 forfeiture. *Bajakajian*, 524 U.S. at 339. Likewise, here, the Government does not – and cannot – contend that Tuomey's provision of care was in any way deficient or that there was any other non-economic harm based on the 19 part-time physician contracts at issue. As in *Bunk* and *Bajakajian*, the request for treble damages and penalties in this case when compared with the Government's economic and non-economic interests demonstrate the requests' unconstitutionality.

### 2. The Severity of the Fine Far Outweighs the Gravity of the Alleged Offense

The jury said that Tuomey violated the Stark Law. Except for the knowledge element of the indirect compensation arrangement exception, the Stark Law is a strict liability civil statute. 69 Fed. Reg. 16062 (March 26, 2004). However, as evidenced by the parties' prior briefings before this Court, as well as the byzantine Stark regulations and hundreds of pages of CMS commentary published on at least four separate occasions over a seven-year period, determining

---

[10]     As discussed in greater detail in its Rule 50/59 Motion, Tuomey denies that Medicare's program integrity was compromised in any way.

14

whether a particular arrangement between a hospital and physician complies with the law can be very complicated and the answer often is unclear.

Because of those complexities, as the trial testimony unequivocally established and as more fully discussed in Tuomey's Rule 50/59 Motion, Tuomey consulted with multiple law firms and a fair market value consultant, and received opinions as to the fair market value, commercial reasonableness and legality of the contracts. As Troy Barsky, the CMS official responsible for interpreting the Stark Law, said in his 30(b)(6) deposition that was entered into evidence at the trial, it is up to the parties to the transaction to determine if a financial relationship is commercially reasonable and compensation is at fair market value.[11] Barsky depo. Dkt. 789, 40:12-17; 65:22-66:3. Barsky's 30(b)(6) testimony is binding on the Government. *QBE Ins. Corp. v. Jorda Enterprises, Inc.*, 277 F.R.D. 676 (S.D. Fla. 2012); *Ierardi v. Lorillard*, 1991 WL 158911, at *4 (E.D. Pa. Aug. 13, 1991).

The fact that Tuomey's determination that the contracts were commercially reasonable and paid fair market value is sufficient (and not subject to Government second-guessing) is also consistent with the "Prohibition Against Federal Interference" set forth in very first section of the Medicare statute of which the Stark Law is a part. That section says:

> Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, *or compensation of any* officer or *employee of any institution*, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person.

42 U.S.C. §1395 (emphasis added). Tuomey fully complied with any obligations it may have had even if the Stark Law applied to the contract, which it did not.

---

[11]     CMS is statutorily prohibited from issuing advisory opinions on fair market value. Barsky depo. Dkt. 789, 57:4-9. *See also* 42 U.S.C. §1320a-7d(b)(3)(A); §1395nn(g)(6)(B).

Tuomey also disclosed the contracts to the Government when the Relator raised questions about their legality. Tuomey's disclosure of the contracts to the Government and subsequent cooperation with the Government during the investigation that preceded the Government's intervention in this suit would in and of itself be grounds for reduced damages under 31 U.S.C. §3729(a)(2). Moreover, the law in the Fourth Circuit is clear that government knowledge of the underlying facts will defeat an FCA action. *U.S. ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 289 (4th Cir. 2002); *U.S. ex rel. Ubl v. IIF Data Solutions*, 650 F.3d 445, 452 (4th Cir. 2011) cert. denied, 132 S. Ct. 526, 181 L. Ed. 2d 352 (U.S. 2011). *U.S. ex rel. Owens v. First Kuwaiti General Trading and Contracting Co.*, 612 F.3d 724, 729 (4th Cir. 2010).

As the Fourth Circuit ruled in *United States ex rel. Drakeford v. Tuomey*, 675 F.3d 394, 399 (4th Cir. 2012), the only relevant procedures in this case are outpatient procedures performed pursuant to the physicians' employment contracts. This is a key part of the mandate to this Court. The most the Government can argue it suffered as a result of the Tuomey contracts was that theoretically some of the outpatient surgery procedures that the employed doctors performed at Tuomey hospital *might* have been performed instead at the Westmark ambulatory surgery center. In the first place, such an assertion would be entirely speculative. There was absolutely no evidence presented at trial to show that either: (1) the patients or doctors would have chosen Westmark over Tuomey; (2) Westmark would have the capacity to handle those surgeries; or (3) the surgeries would have been clinically appropriate to perform at an ambulatory surgery center.

In the first trial, Mr. Steck testified that the total amount paid to Tuomey for outpatient surgery claims performed by the employed physicians at Tuomey (what he called "Practice Group Related Claims") was $7,359,304. Tr. 1268:4-1269:22. Mr. Moran calculated that Steck's

data reports a count of 10,663 claims and a count of dollars of $6,212,638 for outpatient surgery services performed at Tuomey from October 1, 2005 through June 30, 2009 (the period for which the jury calculated claims and dollars).  Moran Affidavit.  Mr. Moran further calculated the differential between what the Government paid Tuomey and what it would have paid Westmark if all the outpatient surgery work that could go to Westmark did go to Westmark (which it did not and could not).  This differential is $565,312 and involves only 5,046 claims. *Id*.  This is the most that the Government could ever claim it lost as a result of the employed doctors doing outpatient surgery at Tuomey rather than Westmark.  The judgment sought by the Government – $237,454,195 – is more than 420 times this amount.

### 3.      Tuomey's Alleged Conduct in This Case Is Not Connected to Other Illegal Conduct

Tuomey's lack of any illegal conduct related to the Government's allegations or otherwise, is another reason to find the requested damages excessive.  The Stark Law-related allegations in this case are the only allegations of improper conduct.  In contrast, the defendant in *Bunk* was engaged in a price-fixing conspiracy, for which the Government obtained several convictions pertaining to other contracts.  *See* 2012 WL 488256, at *1.  But even in that case, the court held that the illegal conduct related to those other claims under a separate contract was not sufficiently related to the conduct at issue in the trial (even though the original FCA complaint alleged violations of both contracts).  *Id.* at *9.  There are no allegations of additional misconduct in this case.[12]  Like the Supreme Court in *Bajakajian*, it is a significant and

---

[12]     The Government made repeated references to the Anti-kickback statute ("AKS"), 42 U.S.C. §1320a–7b(b), during the trial, in an effort to confuse and prejudice the jury, even though the Government never alleged that Tuomey had violated the AKS.  In any event, the AKS does not apply to employment contracts, 42 U.S.C. §1320a-7b(b)(3)(B), and the OIG has issued an advisory opinion stating that part-time employment contracts like the ones at issue in this case would not implicate the AKS. OIG Adv. Op. 08-22. http://oig.hhs.gov/fraud/docs/advisoryopinions/2008/AdvOpn08-22.pdf.

mitigating fact that the conduct in this case was "unrelated to other illegal activities." 524 U.S. at 337-38.

A sharper contrast emerges when one compares Tuomey's conduct with the defendant's conduct in *United States v. Ahmad*, 213 F.3d 805 (4th Cir. 2000). The court there approved penalties arising out of a structuring violation that "bore an intimate connection" to a larger scheme illegally skirting customs duties. The Court is quickly able to see that Tuomey is not in the same category. Tuomey's contracts with the physicians are the only allegedly improper conduct at issue in this case, and that fact mitigates Tuomey's culpability in the Eighth Amendment analysis and renders the proposed $119,515,000 in civil penalties excessive.

### 4. The Government's Requested Damages Are Unconstitutionally Disproportional to Other Related Penalties

Noting the "surprisingly little jurisprudence concerning how to determine whether a civil penalty is disproportional to harm," the court in *Bunk II* rejected a simple multiple, because there, as here, the Government did not suffer any damages. *See* 2012 WL 488256, at *10. Instead the court considered the following four factors, each of which counsels in favor of rejecting the Government's penalty request in this case:

> (1) the relationship of the mandated civil penalties to the harm, as discussed above; (2) the benefits Defendants derived from the illegally procured...contract; (3) the deference to be afforded to legislative judgments as reflected in the statutory language; and (4) the criminal penalties that pertain to the subject matter of Defendants' conduct, as well as certain other more explicit civil penalties.

*Id.*

As discussed above, and as in *Bunk II*, "the government did not sustain any demonstrable damages and therefore the mandated civil penalties of at least approximately" $119,515,000 "cannot be expressed or justified as a multiple of those damages." *Id.* In addition, in the context

18

of punitive damages, the Supreme Court recognizes that awards exceeding a 4:1 ratio of punitive to actual damages "might be close to the line of constitutional impropriety." *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 424-25 (2003). The Government in this case has not been damaged, and the requested civil penalties and treble damages therefore obliterate the relevant proportionality measures relating to actual damages.

Regarding whether there was a benefit to Tuomey, the hospital actually experienced a net *loss* of $21,670,377 from Medicare for the fiscal years 2005-2008, i.e., it received less than what it cost to provide services to Medicare patients during the time at issue in this case. Affidavit of Mark Lovell. There is no evidence of any profit received by Tuomey with respect to services provided to patients of the employed physicians whose contracts were at issue in this case. Even if there were such evidence, just like in *Bunk II*, "[t]here is nothing about this level of gain that would justify the minimum mandated civil penalty" that the Government seeks in this case. 2012 WL 488256, at *10.

Statutory penalties must yield to the Constitution. Indeed, "there is nothing in the language Congress adopted in the False Claims Act that suggests that Congress ever contemplated that civil penalties would be imposed at the level required here under facts similar to this case." *Id.* It is the courts, and not the legislature, that have used the "per claim" mechanism to ratchet up the civil penalty amounts to their current astronomically high level.

As the court in *Bunk II* correctly recognized, the FCA permits civil penalties for violations of the statute, but "Congress did not say, as it did in other federal statutes, that a civil penalty shall be assessed for *each false claim* or that a Court, in its discretion, may impose a civil penalty up to a certain amount." *Id.* The plain language of the statute provides simply that any person who violates the statute's false claim prohibitions "is liable to the United States

Government for a civil penalty of not less than $[5,500] and not more than $[11,000]." 31 U.S.C. §3729(a).

Finally, the relevant criminal fines under the FCA's criminal analog underscore the excessiveness of the penalties sought in this case.[13]  As the *Bunk II* court noted, the criminal FCA and its corresponding fine provision permit a fine of "not more than $500,000" or "not more than the greater of twice the gross gain or twice the gross loss" 2012 WL 488256, at *11 n.14 (citing 18 U.S.C. §287 and quoting 18 U.S.C. §3571(c)(3), (d)).  As discussed above, the Government in this case suffered no financial loss and Tuomey benefited from no financial gain, and thus the appropriate fine under the criminal provision would be $0 or the statutorily stipulated $500,000.  But even if the Court accepts the Government's position that the Government suffered $39,313,065 in damages by virtue of paying Medicare claims for quality services provided to Medicare beneficiaries, the $119,515,000 penalty that the Government seeks would exceed significantly the permissible criminal fine of two times $39,313,065 ($78,626,130 total).  Even assuming the Government's civil penalties theory of imposing $5,500 per claim under those provisions, the low-end penalty is plainly unconstitutional and shocks the conscience.  *See* 2012 WL 488256, at *11 ("It would nonetheless appear that however calculated, the maximum criminal fines that could be imposed for the Defendants' conduct..., were it a proper basis for a criminal sanction, would be a small fraction of the civil penalties mandated under the FCA on the facts of this case.").  The relevant criminal fines in this area demonstrate that the Government's sought penalties in this case are unconstitutionally excessive.

---

[13]    Tuomey has not been charged with any crimes nor did it or anyone acting on its behalf engage in criminal behavior.

### 5.    The Award Sought by the Government Would Violate Tuomey's Due Process Rights

The amount of damages demanded by the Government would also violate the Due Process Clause of the Fifth Amendment. Courts have held that punitive damages can violate the due process rights of defendants if they are excessive. As the Supreme Court has stated, awards exceeding a 4:1 ratio of punitive to actual damages "might be close to the line of constitutional impropriety" and a 10:1 ratio would almost always be a due process violation. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 424-25 (2003). Excessive damage awards have also been held to amount to a taking of property from the defendant without due process. *Philip Morris USA v. Williams*, 549 U.S. 346, 349 (2007). Moreover, statutory damage awards can result in a deprivation of due process when they are "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *St. Louis, I.M. & S. Ry. Co. v. Williams,* 251 U.S. 63, 66-67 (1919). The due process clause protects against sanctions which are "downright irrational." *Hudson v. United States*, 522 U.S. 93, 103 (1997).

When these cases are considered in conjunction with the fact that the Government is seeking this ruinous award based on the jury's finding that Tuomey violated the Stark Law, the resulting deprivation of due process becomes more apparent. As explained more fully in the Rule 50/59 Motion (consistent with its position throughout this litigation), Tuomey did not violate the Stark Law. In fact, the Stark Law did not apply to the contracts in question because the compensation of the physicians was only based on their personally performed professional services and thus by definition did not vary with or take into account referrals because personally performed professional services do not constitute referrals.

As Attorney Steve Pratt pointed out in his opinion letter to Tuomey and his unrefuted testimony at trial, this position is based on the Stark regulations and on the CMS commentary to

21

those regulations.  Tuomey justifiably relied on his advice and interpretation of the commentary, which has consistently established a "bright line" rule with respect to the volume and value standard.  *See, e.g.*, 66 Fed. Reg. 877 (Jan. 4, 2001).  That is why the Fourth Circuit stated that the jury was to decide "whether the contracts, *on their face*, took into account the volume or value of anticipated referrals."  *U.S. ex rel. Drakeford v. Tuomey*, 675 F.3d at 409 (emphasis added).

The only explanation for the jury's verdict, then, is that the jury read into the law a subjective intent element which does not appear in the statute, regulations or commentary.  To the extent that the jury based its verdict on a heretofore unrecognized subjective intent standard, imposing a colossal damage award would deny Tuomey due process since it did not have fair warning of what the law prohibited.  Such a result would offend fundamental notions of fairness.  *U.S. v. Pennsylvania Indus. Chemical Corp.*, 411 U.S. 655, 674 (1973). Due process requires that a defendant receive fair warning as to what conduct the Government intended to prohibit. *United States v. Martinez*, 92 F.3d 1183 (4th Cir. 1996).

As the Fourth Circuit observed:

> There can be no doubt but that the statutes and provisions in question, involving the financing of Medicare and Medicaid, are among the most completely impenetrable texts within human experience. Indeed, one approaches them at the level of specificity herein demanded with dread, for not only are they dense reading of the most tortuous kind, but Congress also revisits the area frequently, generously cutting and pruning in the process and making any solid grasp of the matters addressed merely a passing phase.

*Rehab. Ass'n of Virginia, Inc. v. Kozlowski*, 42 F.3d 1444, 1450 (4th Cir. 1994).  This is especially true with respect to the Stark Law, which is part of the Medicare statute.  The regulations and commentary about what the Stark Law means have been issued in four phases

and run on for hundreds of pages.  Even the Government's 30(b)(6) witness, Mr. Barsky, had difficulty explaining the regulations in his deposition testimony read at trial and at one point said that *he* would need to consult with *his* attorneys about whether the commentary had the force of law.  Barsky depo. Dkt. 789, 61: 2-8.  As one court has observed:  "The Congress hoped that the Stark law would provide 'bright line rules' to guide physicians and health care providers.  For a variety of reasons, this objective has proven elusive."  *United States ex rel. Villafane v. Solinger,* 543 F.Supp.2d 678, 685 (W.D. Ky. 2008).  Awarding damages in the nine-digit range based on a jury finding that Tuomey violated a law that even the Government's own official interpreter cannot explain, and to which now the jury has apparently added a subjective intent element, would be "severe and oppressive" and "obviously unreasonable" so as to violate Tuomey's due process rights.

### D.     Because an Award of Civil Penalties at the Level the Government Seeks Would Be Unconstitutional, No Such Penalties Should Be Awarded

Where, as here, the civil penalties to be imposed are constitutionally impermissible, no civil penalty is appropriate.  The most recent example of a court determining that the FCA's civil penalties regime violates the Constitution in a particular case is *Bunk II*.  There, the court determined that the defendant provided 9,136 invoices reflecting pricing that was obtained in violation of the contract with the Government and therefore "each of these invoices constitutes a false claim for the purposes of assessing a penalty under the" FCA.  2012 WL 488256, at *4.

In closely considering the issue, the court in *Bunk II* ruled that "having determined that the mandatory, nondiscretionary penalty imposed under the FCA is unconstitutional as applied in this case, the Court concludes that it does not have the discretion to fashion some other civil penalty other than the one required by statute, as that statute has been construed by the Fourth Circuit."  *Id.* at *11.  The court canvassed other FCA cases in which the courts there fashioned a

lower, constitutionally permissible penalty. *Id.* at \*12 (collecting authorities). Nevertheless, the court determined that it lacked the discretion to order a reduced penalty in light of the fact that "Congress mandated a civil penalty that authorized the courts to exercise a certain scope of discretion but no more," or more to the point, "the FCA authorizes a court to set the amount of the penalty within a certain range, but does not grant the court authority to impose a total penalty below the amount derived after the exercise of that discretion within the prescribed range." *Id.*

*Bunk* is not the only court to determine that no civil penalties are to be awarded when the result is an unconstitutionally excessive fine. In *United States v. Cabrera-Diaz*, 106 F.Supp.2d 234, 242 (D.P.R. 2002), the court considered the proper quantum of damages for overpayments of anesthesia time in the amount of $237,600.39 for the year 1994 and $211,773.89 for the year 1995, representing a total of $449,374.28. *See id.* at 237. Based on an audit indicating that 455 of 461 sampled claims were overstated, the court determined that the "not discretionary" civil penalties that "would range between $2,275,000.00 and $4,550,000.00" were unconstitutionally excessive. 106 F.Supp.2d at 242. The relationship of civil penalties to the Government's claimed damages for the two years is 5.06:1 at the low end and 10.1:1 at the high end. Because the Government has not been damaged by Tuomey's conduct at all, any resulting ratio of imposed multi-million dollar civil penalties would be unconstitutional. As the court did in *Cabrera-Diaz,* this Court should "deem this amount to be excessive and therefore no civil penalties are hereby imposed." *Id.*; *see also United States v. Fadul,* 2013 WL 781614, at \*13 n.15 (D. Md. Feb. 28, 2013) ("It is questionable whether [a demand for] a civil penalty of $151,118,000.00 – could withstand constitutional scrutiny.").

Congress's intent to restrict the Court's discretion in imposing civil penalties is evidenced by the FCA's explicit language imposing a civil penalty "not less than" $5,500 and "not more

than" $11,000 on "any person who" commits an FCA violation. *See* 31 U.S.C. §3729(a)(1) (as adjusted for inflation). In contrast, within the same section, Congress provided for "reduced damages" allowing the court to reduce the defendant's liability to "not less than 2 times the amount of damages" under certain circumstances. *See id.* §3729(b). Congress's inclusion of reduced damages, coupled with "not less than" and "not more than" language *in the same section* of the statute, is strong evidence of Congress's intent to limit the court's discretion and not allow the court to impose lower penalty amounts or lower levels of damages. *Cf. Westfarm Assocs. Ltd. P'shp v. Washington Suburban Sanitary Comm'n*, 66 F.3d 669, 678-79 (4th Cir. 1995) ("Congressional inclusion of provisions for fee awards in some situations under CERCLA strongly suggests a deliberate decision not to award fees in other situations.") (citing *Key Tronic Corp. v. United States*, 511 U.S. 809 (1994)).

An examination of other statutes demonstrates that Congress is able to prescribe sliding-scale penalties when it so chooses. Citing a provision of the ERISA statute, the court in *Bunk II* recognized that law's provision that penalties for violation of a certain notification provision can be "in the court's discretion...in the amount of up to $100 a day." 2012 WL 488256, at *12 (citing 29 U.S.C. §1132(c)(1)(B)). This "up to" variable language is absent in the FCA, which gives "the courts the limited discretion to determine the amount of that penalty only within the minimum-maximum range." *Id.* The *Bunk* court declined to rewrite the FCA to implement a penalty scheme that Congress did not enact. *See id.*

Because in *Bunk*, as here, the Government's requested civil penalty violates the Eighth Amendment's prohibition on excessive fines, the Court should not award any civil penalties.

## III.    THE GOVERNMENT MISSTATES THE NUMBER OF CLAIMS

The Court need not reach the constitutional issue of whether $119,515,000 in penalties is excessive or violates Tuomey's due process rights, however, because the Government has

25

misstated the number of claims for which penalties may apply.  The maximum number of claims that the Government even attempted to offer evidence about is four – not 21,730.  Imposing a penalty of the proposed $5,500 for four claims, for a total of $22,000, would not violate the Constitution.

If any false claims were submitted (and they were not) and the Government offered competent evidence of those claims (which it did not), the only ones relevant would be the Medicare cost reports filed by Tuomey and not the UB-92/UB-04 forms that were the source of the information summarized by Mr. Steck. Other courts in health care FCA cases involving cost reports, as this case does, have held that the actual "claims" were the cost reports, not the UB-92 or UB-04 forms.  For example, one district court rejected the Government's claim that each UB-92 form should be counted as a false claim, holding that such forms "were false or fraudulent because, and only because, the Providers' cost reports were false" and therefore "the government is entitled to recover statutory penalties under the FCA only for the Providers' submission of 'false or fraudulent' cost reports."  *Visiting Nurse Ass'n v. Thompson*, 378 F.Supp.2d 75, 99 (E.D.N.Y. 2004); *see also U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F.Supp.2d 25, 70-71 (D.D.C. 2007) ("factually accurate UB-92 did not constitute submission of a false claim simply because of underlying fraud at the health care facility.  But that fraud was not truly consummated until the cost report was submitted. It is the cost report that contained the false statements, did the damage, and completed the fraud."); *U.S. ex rel. Augustine v. Century Health Services*, 289 F.3d 409, 414-415 (6th Cir. 2002) (cost report filed by home health agency found to constitute false certification.).

The Government only presented the certification pages from four Tuomey cost reports (Plaintiff's Ex. 290-292).  This is not sufficient proof of what the cost reports said.  But even

giving the Government the benefit of the doubt that these certification pages constituted evidence of false claims, at most there was only evidence of four claims that could be relevant for the purposes of establishing an FCA violation.

A similar approach has been adopted by other courts. In *Hays v. Hoffman*, 325 F.3d 982 (8th Cir. 2003), the Eighth Circuit, on its own motion, rejected the district court's determination on the number of claims due to evidence presented at trial that was "woefully inadequate for this purpose." *Id*. at 993. The determination of the number of claims was based primarily on the testimony of an auditor who had no firsthand knowledge of how the nursing homes whose claims were at issue were reimbursed by Medicaid, and who testified about cost reports that were never admitted into evidence. The Eighth Circuit rejected the district court's determination that 336 false claims were submitted and reduced the number to eight. *See also United States ex rel. Smith v. Gilbert Realty*, 840 F.Supp. 71, 74-75 (E.D. Mich. 1993) (where fine based on 58 false claims would be excessive, court reduced number of false claims to the seven certifications defendants made to the government and imposed a civil penalty for those seven claims); *United States v. Advance Tool Co.*, 902 F.Supp. 1011, 1017-18 (W.D. Mo. 1995) (case where no damages to the government, but 686 false claims submitted, minimum statutory fine would be unconstitutional; court reduced number of false claims to 73 – representing each type of tool that did not meet quality standards – and imposed the minimum civil penalty for each), *aff'd on other grounds*, 1996 U.S. App. LEXIS 13238 (8th Cir. 1996) (per curiam) (unpublished).

As *Bunk II* recognized, "the FCA does not explicitly state that a civil penalty is to be assessed per false claim," but instead "states only that someone who violates the statute by engaging in certain conduct is 'liable for a civil penalty between $5,500 and $11,000.'" 2012 WL 488256, at *14. Equally applicable here, "[t]hat language, on its face, permits an alternative

reasonable interpretation," including "that a civil penalty should be applied for each act that violated the statutory prohibition, which, as applied in this case, is each a factually false statement, not each claim paid as a result of that false statement." *Id.* The *Bunk* court found one statement, a false certification made in a bid document to the military, factually false and awarded civil penalties based on that one statement. *Id.*

Applying the cost report approach – should the Government establish liability, of course – the civil penalties would be $22,000: the $5,500 per claim penalty sought by the Government times the four cost report certifications that it entered into evidence.[14]

## CONCLUSION

The Government's requested penalties in this case bear no relationship to the alleged harm in this case. Each of the patients at issue received excellent medical care, for which the Government was obligated to pay in the amount it did pay, and thus the Government has not been damaged. This case is but one in a long line of False Claims Act cases, culminating with *Bunk*, in which the Government's requested penalties are at odds with the Constitution and fundamental fairness. *See, e.g.*, *United States v. Krizek*, 111 F.3d 934, 940 (D.C. Cir. 1997) (recognizing unfairness of a civil penalty in an FCA case when "the government's definition of claim permitted it to seek an astronomical $81 million worth of [penalties] for alleged actual damages of $245,392").

The Government is not entitled to the trebling of any damages in this case, since it has not met its burden of proving any financial loss – i.e., damages – to the Government. Moreover,

---

[14]     Actually, two of the four cost reports have been deemed to be final by CMS through its intermediary Palmetto GBA. Affidavit of Mark Lovell. This decision was made with knowledge of the allegations in this case, and is final. 42 C.F.R. §405.1807. The Government is therefore estopped from seeking recovery under the FCA for reimbursement it has already approved, with full knowledge of the facts. The other two cost reports are not final and therefore cannot be claims that were paid in violation of the FCA.

an award of "treble damages" totaling $117,939,195.00 when the Government has not suffered any financial loss is barred by the Eighth Amendment Excessive Fines provision and the Due Process clause of the Fifth Amendment.

Likewise, the Government is not entitled to the imposition of penalties under the FCA, for a number of reasons. The imposition of the proposed penalties would violate the excessive fines provision of the Eighth Amendment and due process provisions of the Fifth Amendment, and the FCA does not give the Court the discretion to reduce the statutory fines below a minimum of $5,500 per penalty. In the alternative, the actual number of false claims submitted by Tuomey was not 21,730 as asserted by the Government, but rather four, because the UB-92/UB-04 forms relied on by the Government for its claims count do not in fact constitute claims. Final cost reports submitted annually to Medicare constitute claims.

Respectfully submitted,


/s/ James M. Griffin
James M. Griffin (Fed. ID 1053)
Margaret N. Fox
Lewis, Babcock & Griffin, L.L.P.
Post Office Box 11208
Columbia, SC 29211
803-771-8000

E. Bart Daniel
Seven State Street
Charleston, SC 29401
843-722-2000

Matthew Hubbell
Seven State Street
Charleston, SC 29401
843-720-3184

Daniel M. Mulholland III
Horty, Springer & Mattern, P.C.
4614 Fifth Avenue
Pittsburgh PA 15213
412-687-7677

Attorneys for Defendant
Tuomey Healthcare System, Inc.

June 5, 2013
Columbia, South Carolina