IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF SOUTH CAROLINA

CA NO. 3:05-CV-02858 (MBS)

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. MICHAEL K. DRAKEFORD, M.D., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| TUOMEY d/b/a TUOMEY HEALTHCARE SYSTEM, INC. | ) ) ) |
| Defendant. | ) |

REPLY IN SUPPORT
OF UNITED STATES' MOTION
FOR ENTRY OF JUDGMENT
UNDER THE FALSE CLAIMS ACT

Pursuant to the jury's verdict finding defendant Tuomey Healthcare System, Inc. liable for violating the False Claims Act, 31 U.S.C. §§ 3729-33, the United States requested the Court to award treble damages and penalties at the minimum statutory level.  D.E. 818.  Tuomey argues that the Court should decline to do so based on legal arguments that lack merit and factual information that Tuomey elected not to present to the jury.  Tuomey also argues – contrary to binding Supreme Court precedent – that the penalty amount sought by the United States violates the Fifth and Eighth Amendments to the Constitution.  D.E. 825.  For the reasons set forth in the United States' Motion for Entry of Judgment under the False Claims Act, and for the additional reasons set forth below, the Court should now enter judgment in favor of the United States in the total amount of $237,454,195.[1]

---

[1] The United States has repeatedly indicated its willingness to discuss a settlement with the hospital, on appropriate terms, below the amount of the judgment mandated by law.  Among the matters that will have to be discussed in connection with any such settlement are the hospital's willingness to accept responsibility for its past misconduct and to take concrete steps to ensure future compliance with Medicare and Medicaid program rules, including the Stark Law.

I.      **The Jury Properly Determined the Number and Value of Tuomey's False Claims**

The jury determined that Tuomey submitted 21,730 claims in violation of the False Claims Act, with a total monetary value of $39,313,065.  D.E. 813.[2]  Tuomey opposes the mandatory trebling of the damages amount found by the jury on three grounds.  First, Tuomey argues, despite the clear language on the verdict form, that the value of the claims that the jury found were submitted in violation of the False Claims Act was not really "damages."  Second, Tuomey argues that the United States failed to identify any claims that Tuomey submitted for payment.  Finally, Tuomey argues that the damages found by the jury should be reduced based upon a declaration submitted by Donald Moran, whom Tuomey could have – but did not – call to give evidence at trial, subject to cross-examination by the government.  Tuomey's arguments are meritless and should be rejected.

A.      **The Value of the Claims "Knowingly" Submitted to Medicare In Violation of the Stark Law Plainly Is the United States' False Claims Act Damages**

As an initial matter, Tuomey's argument that the jury did not actually identify any damages is  disingenuous.  Tuomey's proposed verdict form utilized virtually the same language for the determination of the number and value of the false claims as the form ultimately adopted by the Court.  Compare D.E. 813 with Exhibit 1 (Tuomey's final proposed verdict form).  Accordingly, Tuomey has waived any challenge to the jury's damages finding based on such language.

---

[2] In its opposition to the United States' Motion for Entry of Judgment under the False Claims Act, Tuomey repeats numerous arguments made in its Renewed Motion for Judgment As a Matter of Law or for a New Trial (D.E. 827).  The United States will respond to those arguments in its response to D.E. 827 and will address here only those directly relevant to the damages and penalties to which the United States is entitled as a result of the jury's verdict.

In any event, the Court's jury charge and verdict form precisely followed both the applicable law and the Court of Appeals' mandate in this case.  The Court of Appeals recognized in its opinion that, pursuant to the Stark Law, "[a] hospital may not submit for payment a Medicare claim for services rendered pursuant to a prohibited referral," that "[t]he United States may not make payments pursuant to such a claim," and that "hospitals must reimburse any payments that are mistakenly made by the United States."  United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc., 675 F.3d 394, 398-99 (4th Cir. 2012), citing 42 U.S.C. §§ 1395nn(a)(1), (g)(1); 42 C.F.R. §§ 411.353(a), (c), (d).  The Court of Appeals observed that the Stark prohibition applies to referrals of eleven "designated health services," including specifically inpatient and outpatient hospital services.  Drakeford, 675 F.3d at 397 n.4.  The Court of Appeals further determined, as a matter of law, that the technical or facility components of the inpatient and outpatient hospital services performed by the physicians were referrals prohibited by the Stark Law if a financial relationship existed between Tuomey and the physicians.  Id. at 407.  Thus, the Court of Appeals directed that if, on remand, the jury determined that Tuomey violated the Stark Law (as it did), then the jury would also be required to "determine the number and value of claims Tuomey presented to Medicare for the payment of facility fees resulting from the facility component referrals made by the physicians, and for which it received payment."  Id. at 405.

In accordance with the Court of Appeals' mandate, this Court instructed the jury, in relevant part, as follows:

### DAMAGES UNDER THE FALSE CLAIMS ACT

If you find that Tuomey has violated the False Claims Act, you must then determine the damages sustained by the government because of the violations. The measure of the government's damages under the False Claims Act is the amount of money that the government paid out by reason of the false claims.  If Tuomey violated the Stark Law, Tuomey was not allowed to submit claims for payment to Medicare for services that were referred by the physicians whose

- 3 -

compensation arrangements violated the Stark Law.  And if Tuomey violated the Stark Law, Medicare was not allowed to pay for any services furnished that were referred by the physicians whose compensation arrangements violated the Stark Law.  Therefore, your calculation of damages should be based solely on what the Medicare program paid to Tuomey in violation of the Stark Law, if any.

. . .

## THE VALUE AND NUMBER OF CLAIMS PAID BY MEDICARE

If you find that the False Claims Act has been violated, then you must determine the value and the number of the claims for which Tuomey received payment from Medicare.  The relevant claims are the claims for inpatient and outpatient hospital services that were referred by the physicians while they had such part time arrangements with Tuomey.

In determining the value and number of improper claims, you must determine which claims were referred by each physician who had a compensation arrangement that violated the Stark Law.

## PRESENTATION OF CLAIMS

A "claim" includes a request by Tuomey for reimbursement from the Medicare program.  If you find that Tuomey submitted one or more requests for reimbursement from the Medicare program, then you must consider each such request to be a separate claim.  It does not matter if the request for reimbursement was submitted in paper or electronic form; either form constitutes a "claim."

D.E. 810 at 14-15.

Notwithstanding the Stark Law's specific prohibition on the submission and payment of any claims to Medicare for inpatient and outpatient services arising from tainted referrals, and notwithstanding the Court of Appeals' specific directive that the jury must determine the number and value of such claims, Tuomey argues that no damages occurred here because the services represented by the false claims were actually provided.  As we have pointed out on numerous occasions, however, the fact that the services were provided is completely irrelevant in light of Tuomey's Stark Law violation.  The Stark Law itself makes clear that no claims violating its provisions may be submitted, **even if such claims would otherwise be payable by Medicare**. 42 U.S.C. §§ 1395nn(a)(1)(B).   Under the False Claims Act, as this Court properly instructed

the jury, the government is entitled to recover damages sustained "because of" Tuomey's acts.

31 U.S.C. § 3729(a).  As explained by the district court in United States v. Rogan, 459 F. Supp.

2d 692, 726 (N.D. Ill. 2006), aff'd 517 F.3d 449 (7th Cir. 2008):  "The term 'because of' simply

means those damages that were caused by or would not have occurred but for the false claims

and false statements."  (Citing United States v. First Nat'l Bank of Cicero, 957 F.2d 1362, 1374

(7th Cir. 1992)).  The purpose of the Stark Law is to ensure against physicians providing or

ordering unnecessary services.  The government (and Congress) has no confidence that services

rendered in violation of the Stark Law are reasonable and necessary.  Even if the services were

reasonable and necessary, however, the services were not provided to the United States, and thus

courts have recognized that the performance of the services does not reduce or offset the

government's damages.  Thus, the district court in Rogan correctly concluded that "the United

States would have paid [the hospital] nothing for hospital claims related to patients referred to

[the hospital] by physicians with a prohibited financial relationship with the hospital."  459 F.

Supp. 2d at 726.  The Court of Appeals for the Seventh Circuit affirmed this conclusion and

rejected the identical argument Tuomey makes here about the provision of hospital services:

> Nor do we think it important that most of the patients for which claims
> were submitted received some medical care – perhaps all the care reflected in the
> claim forms. . . . [The defendant hospital] did not furnish any medical service to
> the United States.  The government offers a subsidy (from the patients'
> perspective, a form of insurance), with conditions.  When the conditions are not
> satisfied, nothing is due.  Thus the entire amount that [the defendant hospital]
> received on these 1,812 claims must be paid back.

Rogan, 517 F.3d at 453.[3]  Rogan is directly on point because the defendant hospital was found

liable under the False Claims Act for violations of the Stark Law and the Anti-Kickback Statute,

---

[3] The Third Circuit similarly observed that "'[t]he Government does not get what it bargained for
when a defendant is paid by CMS for services tainted by a kickback.'"  United States ex rel.
(Continued)

42 U.S.C. § 1320a-7b (AKS).  The case involved illegal payments for referrals to one physician over six years, and to another over four years, resulting in more than $16.8 million in false claims to the Medicare and Medicaid programs.  After the damages were trebled and the penalties assessed on all the false claims from these two physicians, the district court entered judgment of approximately $64.3 million, 459 F. Supp. 2d at 727, and the Seventh Circuit affirmed.   Thus, it is not surprising that Tuomey's illegal contracts with 18 physicians over a comparable period of time resulted in more than 21,000 individual false claims to Medicare, or that Tuomey improperly received more than $39 million for those false claims.

Tuomey implausibly argues that the individual claims for payment submitted by Tuomey to Medicare using electronic versions of Forms UB-92 and UB-04 were not actually "claims" under the False Claims Act.  However, the False Claims Act broadly defines a "claim" as:

> any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c).  The term "claim" as used in the Stark Law falls squarely within the False Claims Act's definition of the same word, and thus the electronic claims submitted on the UB-92 and UB-04 forms each constitute an individual "request or demand" for money.  The Supreme Court has recognized for decades that Congress defined the term "claim" broadly in an effort to reach "all fraudulent attempts to cause the Government to pay out sums of money."  United States v. Neifert-White Co., 390 U.S. 228, 233 (1968); accord Cook County, Ill. v. United States ex rel. Chandler, 538 U.S. 119, 129 (2003).  The determination of the government's damages for

---

Wilkins v. United Health Group, 659 F.3d 295, 315 (3d Cir. 2011).  The same holds true for services tainted by violations of the Stark Law.

a False Claims Act violation predicated upon a Stark Law violation is straightforward because, as recognized by the Court of Appeals, the Stark Law and its regulations expressly prohibit hospitals from presenting a "claim" for payment to Medicare for improperly referred designated health services, and, if the claim is paid, any amounts collected must be refunded in full.  As ths Court correctly charged the jury, such a claim is actionable under the False Claims Act, if it was presented to the government "knowingly."  See 31 U.S.C. § 3729(b) (defining "knowing; knowingly").  The 21,730 claims for facility fees for inpatient and outpatient hospital services that Tuomey knowingly submitted to Medicare for payment in violation of the Stark Law, and for which it received reimbursement, are the very "claims" at issue under the False Claims Act, as the Court of Appeals plainly recognized when it specifically instructed that the jury must decide the number and value of those claims.  Drakeford, 675 F.3d at 405.

If further proof were needed, the 2001 agency commentary to the Stark regulations made clear that the basic remedy for a violation of the Stark Law is recoupment of the payments made by Medicare for the ineligible services.  66 Fed. Reg. 856, 859 (Jan. 4, 2001).  The agency warned that failure to comply with the Stark Law "can have a substantial financial result.  For example, if a hospital has a $5,000 consulting contract with a surgeon and the contract does not fit an exception, every claim submitted by the hospital for Medicare beneficiaries admitted or referred by that surgeon is not payable, since all inpatient and outpatient hospital services are DHS."  Id. at 860.

There simply is no basis to limit the definition of an actionable "claim" to the hospital's cost reports.  Cost reports are a reconciliation of the periodic payments made to the hospital by the Medicare program throughout the year with the reimbursements actually due to the hospital for all claims for services rendered to Medicare beneficiaries for that year.  See Second Amended Complaint, D.E. 151, at ¶¶ 17-18; see also Rogan, 459 F. Supp. 2d at 709 ("Medicare relied upon

- 7 -

the hospital's cost report to determine whether the provider was entitled to more reimbursement than already received through interim payments or whether the provider was overpaid and was required to reimburse Medicare.") (citing 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1)). Tuomey acknowledges that its Chief Financial Officer, Paul Johnson, signed certifications that the hospital complied with the Stark Law on four cost reports covering unlawful claims for inpatient and outpatient hospital services rendered between 2005 and 2008.[4]  As noted by the Court of Appeals in this case, Tuomey had an obligation to refund to the United States any reimbursements paid on claims that violated the Stark Law.  This obligation is also set forth in the Stark regulations.  42 C.F.R. § 411.353(d).

In fact, the false cost reports represented an additional basis for recovery that the government chose not to pursue.  In the Second Amended Complaint, the United States asserted an alternative theory of recovery under section 3729(a)(7) of the False Claims Act – the "reverse" false claims provision that permits the United States to recover monetary obligations that have been "knowingly" withheld.  Tuomey's cost report for 2005 necessarily included (and failed to disclose and refund) the reimbursements paid by Medicare for improperly referred inpatient and outpatient hospital services.  That cost report was falsely certified on February 21, 2006 – a time by which the jury here necessarily concluded that any advice of counsel defense had expired.  Ex. 2 (2013 Trial Tr. 620, 622 (P. Johnson)).[5]  Thus, under section 3729(a)(7), Tuomey would have been liable not only for the amount of damages found by the jury under

---

[4] Tuomey's 2009 cost report was not available at the time of the first trial.

[5] The jury gave Tuomey "the benefit of the doubt" on its advice of counsel defense, but only through September 2005, the month when Tuomey declined to have former Department of Health and Human Services Office of the Inspector General attorney Kevin McAnaney put his opinion about the physician arrangements in writing and then fired him.  See Ex. 3 (PX 548 and 549).

section 3729(a)(1), but rather the entire $44,888,651 that Tuomey failed to refund to Medicare as required by Stark regulations.  See Ex. 3 (PX 548).  The treble damages in that instance would have exceeded $134 million – some $17 million **more** than what the United States has actually sought.  Further, Tuomey would have been liable for an additional four penalties due to the false certifications in the cost reports.  In the exercise of its prosecutorial discretion, the United States elected not to pursue the additional damages and penalties it could have recovered under section 3729(a)(7).

Tuomey's argument that only the cost reports – and not the individual electronically-submitted claims – were actionable false claims makes no sense.  Indeed, such a finding would excuse any health care provider that is not required to file cost reports from liability under the FCA for knowingly submitting, or causing the submission of, false claims for payment to Medicare.  Tuomey cites no support for this extraordinary proposition because there is none.  Instead, Tuomey relies on cases that do not involve the Stark Law or the Anti-Kickback Statute.[6] Rulings that do involve those statutes have consistently held that claims for services submitted in violation these statutes are not payable because compliance with the statutes a condition of payment by the Medicare and Medicaid programs.  E.g., United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 392-93 (1st Cir. 2011) (observing that hospital Provider Agreement and Cost Report both make clear that "the federal Medicare program will not pay claims if the underlying transaction that gave rise to the claim violated" the Anti-Kickback Statute); United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 93, 94, 95 (3d Cir. 2009) ("Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a

---

[6] Tuomey objects, belatedly, to the government's references during the trial to the Anti-Kickback Statute.  However, compliance  with the Anti-Kickback Statute is specifically required by the indirect compensation exception to the Stark Law, which was the provision at issue in this case. 42 C.F.R. § 411.357(p)(1)(iii).

claim submitted to a federally funded insurance program is actionable under the FCA," and

noting that the district court had concluded that the hospital defendant had submitted claims to

Medicare based on services referred by the subject physicians); Rogan, 517 F.3d at 452; United

States ex rel. McNutt v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1259 (11th Cir. 2005)

("The violation of the [Medicare] regulations and the corresponding submission of claims for

which payment is known by the claimant not to be owed make the claims false under section

[ ] 3729(a)(1) . . . ."); United States ex rel. Fry v. Health Alliance of Greater Cincinnati, 2008

U.S. Dist. LEXIS 102411, at ** 11-12 (S.D. Ohio Dec. 18, 2008) ("The submission of UB-92's

in violation of the Stark Statute constitutes a violation of the FCA."); United States ex rel. Pogue

v. Diabetes Treatment Centers of America, 565 F. Supp. 2d 153, 160-61 (D.D.C. 2008).  And, as

noted above, the Fourth Circuit in this case also specified that the jury should determine the

number and value of all claims referred by the subject physicians in violation of the Stark Law.

That ruling by itself is dispositive of this issue.

**B.    Ample Evidence of the Number and Value of Tuomey's False Claims Was Submitted at Trial**

Federal Rule of Evidence 1006 permits the admission of evidence in summary form "to

prove the content of voluminous writings, recordings or photographs that cannot be conveniently

examined in court."  The proponent of the evidence must make the originals or duplicates

available to the opposing party, and the court may order the proponent to produce them in court.

F.R.E. 1006.  There is no dispute that the United States made available to Tuomey, in October

2009, a disk containing copies of all the original electronic claims records that Tuomey

submitted to Medicare for services provided between January 1, 2003 and June 30, 2009 (the

"Acumen disk"), which Ruben Steck utilized to perform his damages computations.  Indeed,

Tuomey admitted in supplemental responses to interrogatories, served on June 29, 2012, that all

the claims representing services performed or ordered by the 18 physicians in question were contained on the Acumen disk.  Exhibit 4.   At trial, Stanford University Professor Thomas MaCurdy, a principal of Acumen, LLC, testified that the electronic records of paid claims contained on the Acumen disk were drawn from original claim repositories maintained by the Centers for Medicare and Medicaid Services (CMS) and that the data included on the disk had been triple-checked for accuracy.  Ex. 5 (2013 Trial Tr. 974:9-980:5).  Further, because the original disk contained more than 27,000 individual records with dozens of fields and included personally-identifiable information of Medicare beneficiaries protected by the Privacy Rule promulgated pursuant to the Health Insurance Portability and Accountability Act of 1996, [cite] (HIPAA), the Court properly permitted the United States to offer the summary exhibits prepared by computer analyst Ruben Steck[7] in lieu of the actual claim records.  Thus, the Court properly admitted Plaintiff's Exhibit 548 and 549 as summary exhibits under FRE 1006, and properly allowed Mr. Steck to testify about them.  See United States v. Janati, 374 F.3d 263, 272-73 (4th Cir. 2004) (recognizing that "Rule 1006 is a rule to admit charts into evidence as a surrogate for underlying voluminous records that would otherwise be admissible into evidence.").  Mr. Steck testified about how he personally verified the information used to prepare PX 548 and 549 and then had it further verified by co-workers to ensure its accuracy.  Ex. 6 (4/24/13 Realtime Tr. 101:5-108:11, 115:17-122:1, 132:4-153:1).  The jury plainly accepted this testimony.

Tuomey argues that because some of the claims might have been adjusted after the date on which Acumen collected them, the Mr. Steck's damages computations are worthless.  That is clearly not true.  Damages need not be determined with the kind of to-the-penny precision

---

[7] As noted in previous filings, Mr. Steck, a computer analyst with decades of experience working with electronic Medicare and Medicaid claims data, used the exact same methodology to perform the damages calculation here as the one accepted by the district court in Rogan and affirmed by the Seventh Circuit.  See Rogan, 459 F. Supp. 2d at 727 n.17.

Tuomey demands, but rather a reasonable estimate by the jury is sufficient.  Bigelow v. RKO

Radio Pictures, Inc., 327 U.S. 251, 264-65 (1946) ("[T]he jury may make a just and reasonable

estimate of the damage based on relevant data, and render its verdict accordingly."); see also

Rogan, 517 F.3d at 453 (rejecting notion that district court had to examine each of the more than

1,800 individual claims and approving statistical sampling and extrapolation); Lahey, 399 F.3d at

18 n.19 (same); United States v. Conner, 262 Fed. Appx. 515, 519 (4th Cir. 2008) (in criminal

case, holding that "[e]xtrapolation is an acceptable method to use in making a reasonable

estimate of the amount of loss under the sentencing guidelines").  Not only were Mr. Steck's

calculations sufficiently precise, but indeed, there is no question that the United States overall

damages actually exceeded those calculations because Tuomey continued to bill Medicare under

the illegal contracts for at least another nine months after June 30, 2009.  Moreover, Tuomey

introduced **no** evidence whatsoever to counter Mr. Steck's analysis of the damages.  Tuomey had

a full opportunity to cross-examine Mr. Steck.  It is obvious from the verdict that the jury

credited Mr. Steck's testimony and computations.  Tuomey's belated attempt to challenge that

verdict with an alternate theory of damages, never before disclosed and presented through the

declaration of an unqualified "expert,"[8] is totally improper and should be rejected out of hand.

---

[8] Tuomey originally sought to insert Donald Moran as "expert" shortly after remand from the
Court of Appeals.  This Court properly exercised its discretion to disallow any new experts.  D.E.
632.  Tuomey later proffered Mr. Moran as its Rule 30(b)(6) designee regarding certain issues
pertaining to Tuomey's Medicare claims for the services illegally referred by the 18 physicians,
and the Court allowed Tuomey to do this.  D.E. 730.  However, Tuomey opted **not** to call Mr.
Moran.  Had Tuomey called Mr. Moran, the United States would have demonstrated – based on
Mr. Moran's deposition testimony in the United States ex rel. Baklid –Kunz v. Halifax Hospital
Medical Center, No. 6-09-CV-1002-ORL-31 DAB (M.D. Fla.) – that (1) Mr. Moran could not
personally conduct, replicate or competently challenge the complex claim analysis done by Mr.
Steck because, in Mr. Moran's own words, he has "not written a line of SAS code since 1979."
(Ex. 7 (Moran Dep. 101:10-102:3)); (2) Mr. Moran's testimony about whether the "attending"
and "operating" fields on the UB-92 and UB-04 claim forms fall within the Stark Law's
definition of "referring physician" was based upon a "common sense" understanding of the law
(Continued)

Tuomey agreed that the Court could take judicial notice of the CMS manual's definitions of "attending" and "operating" physicians on the claim forms.   The Court included those terms in its jury instructions.  The Court also fashioned its charge defining "referring physician" directly from the Stark Law.  The district court in <u>Rogan</u> found that the "attending" and "operating" physicians designated on the claim forms fall within the broad definition of "referring physician."  <u>Rogan</u>, 459 F. Supp. 2d at 713 & note 11, 722.  The jury in this case made the same finding.  Thus, the jury's determination of damages is fully in accord with statutory language and directly relevant precedent.  Tuomey's challenge is not only improper, but entirely meritless.

## II.     Tuomey Did Not Self-Disclose

Incredibly, after six years of litigation – including two four-week trials and an appeal – Tuomey contends that it is entitled to the reduced damages afforded to parties that self-disclose False Claims Act violations.  <u>See</u> Tuomey Opp. Br. at 16.  Section 3729(a) limits a defendant's liability to double damages if, (A) "the person committing the violation  . . . furnished officials of the United States responsible for investigating false claims violations with all information known to such person about the violation <u>within 30 days</u> after the date on which the defendant first obtained the information," (B) "such person fully cooperated with any Government investigation of such violation," and (C) "at the time such person furnished the United States with the

---

(<u>id.</u> at 60:2-65:21); and (3) Mr. Moran was unable to say whether or not his approach was consistent with the approach accepted by the district court in <u>Rogan</u> – i.e., the approach utilized by Mr. Steck and accepted by the jury in this case (<u>id.</u> at 76:14-83:17).  It is clear that Tuomey made a strategic decision not to call Mr. Moran and allow him to be subjected to cross-examination.  Having elected not to call Mr. Moran during the trial, Tuomey cannot now attempt to attack the jury's conclusions with hearsay statements from this individual.

information about the violation, no . . . civil action . . . had commenced under this title with respect to such violation. . . ." (Emphasis added.) Tuomey met none of these requirements.

To this day, Tuomey refuses to accept any responsibility for its wrongdoing, and instead blames the government for continuing to pay claims while affording Tuomey full due process rights.[9] Further, Tuomey's attorneys specifically denied to Assistant United States Attorney Jennifer Aldrich that they were making a self-disclosure on Tuomey's behalf.  Ex. 8 (5/7/2013 Realtime Tr. 13:6-11).  Moreover, Tuomey failed to provide the government with any useful information – much less the complete cooperation and disclosure required by the statute – before Dr. Drakeford filed this action on October 5, 2005.  Indeed, Tuomey did not even terminate the illegal contracts until after the first jury found the hospital in violation of the Stark Law.  Plainly, the scorched earth litigation strategy that Tuomey has pursued for more than seven years is not the type of "cooperation" that Congress envisioned when it provided a lower liability level for the prompt and full self-disclosure of False Claims Act violations.

III.    **The Treble Damages and Penalties Award Sought by the United States Is the Statutory Minimum and Raises No Constitutional Concerns**

Tuomey argues that the imposition of treble damages and penalties at the statutory minimum would be excessively "punitive" and would run afoul of the Fifth and Eighth Amendments.  This argument is meritless with respect to both components of the award.

A.    **Treble Damages In This Case Are Remedial, Not Punitive**

As the Supreme Court recognized in <u>Neifert-White</u>, the False Claims Act is a "remedial statute [that] reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts

---

[9] We fully addressed this argument in our response to Tuomey's motion in limine on the subject, D.E. 666, which the Court denied at the January 15, 2013 hearing.  D.E. 730.  We incorporate that response (D.E. 692) here in order not to burden the Court with repetitive arguments.

to cause the Government to pay out sums of money." 390 U.S. at 233. It has long been recognized that some liability beyond the amount of the fraud is "necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims," United States v. Bornstein, 423 U.S. 303, 315 (1976), including costs of detection and investigation. United States v. Halper, 490 U.S. 435, 445. In Bornstein, the Court observed that Congress intended the then-extant double damages provision to ensure the Government was made completely whole where money was taken from it by fraud. 423 U.S. at 314-15. In Cook County, Ill. v United States ex rel. Chandler, 538 U.S. 119 (2003), the Court explained that the treble damages provision enacted in the 1986 amendments to the False Claims Act also has numerous compensatory features. Id. at 130-31. The Court observed that the trebling the damages accounts for the government's obligation to share 15 to 30 percent of the proceeds of a False Claims Act recovery with a qui tam relator, as well as the absence of a "separate provision for prejudgment interest, which is usually thought essential to compensation. . . ." Id. at 131. The Court further observed that the treble damages provision was adopted in the 1986 amendments to the act as a kind of substitute for consequential damages. Id. at 131 n.9. Thus, all of these factors demonstrate that something more than double damages is required in this case to properly compensate the United States for its losses.

Indeed, this case illustrates why Congress passed the False Claims Act and has, over more than a century, acted to strengthen it. The hospital – which receives over 40 percent of its revenues from Medicare – decided to pay the physicians a portion of the facility fees generated by their work to thwart nascent competition for lucrative outpatient procedure referrals, and kept the crucial information hidden in closed-door meetings and limited-access spreadsheets. As a result, Medicare and its beneficiaries were forced to pay higher prices for services that could, in the majority of cases, have been performed at a lower cost to both. The distortion of medical

decisionmaking by the payment of financial incentives is the principal concern of the Stark Law

and the reason why its prohibition is so broad, its exceptions are so specific, and it lacks a

scienter requirement.[10]  If Dr. Drakeford had not disclosed these arrangements to the government

through his qui tam action, Tuomey's scheme might still be in place, since Tuomey refuses to

concede what two juries have found obvious:  the arrangements were illegal.

> **B.    The Damages and Penalties Award Sought by the United States Comports with the Fifth and Eighth Amendments**

Tuomey argues that the Court should ignore Congress's directive and refuse to treble the

damages found by the jury and to assess no penalties, based upon the Excessive Fines Clause of

the Eighth Amendment, the Due Process Clause of the Fifth Amendment and a single  inapposite

district court case that is currently on appeal to the Fourth Circuit.[11]  Tuomey's argument not

only would defeat Congress' intent in passing the Stark Law and the False Claims Act, but it also

ignores Supreme Court and circuit court precedents that contradict the premises of its argument.

As we have argued above, more than double damages in this case must be considered

remedial.  The non-remedial portion of the treble damage award (if any) and the penalty award

must comport with the Excessive Fines Clause of the Eighth Amendment.  However, Supreme

Court precedent makes clear that a court considering an Excessive Fines challenge to a

---

[10] It should also be noted that the Stark Law itself provides for the imposition civil money penalties against a person who presents or causes to be presented a claim for a service that the person "knows or should know" is ineligible for payment.  The penalty may reach up to $15,000 for each such service, and the person may also be subject to exclusion from the program.  42 U.S.C. § 1395nn(g)(3).  These sanctions provisions underscore Congress's determination to impose significant financial consequences for violations of the Stark Law.

[11] The case Tuomey cites, United States ex rel. Bunk v. Birkart Globistics, 2012 WL 488256 (E.D. Va. Feb. 14, 2012) (D.E. 825-7), involved price-fixing with respect to Department of Defense contracts for relocation services, where a criminal conviction and fine had already been imposed.  The case has nothing to do with the Stark Law or AKS.  Moreover, it is not binding on this Court and, as the government has argued on appeal, is erroneous in several respects.

statutorily prescribed penalty must accord substantial deference to Congress's judgment as to an appropriate sanction and enforce the statute to the fullest extent consistent with the Constitution. The Supreme Court has thus held that a court may not bar the imposition of a statutorily authorized civil penalty under the Excessive Fines Clause unless the sanction is "**grossly** disproportional to the gravity of the defendant's offense." United States v. Bajakajian, 524 U.S. 321, 334 (1998) (emphasis added). The relevant factors for assessing whether a False Claims Act penalty award is unconstitutionally excessive were further discussed in United States v. Mackby, 339 F.3d 1013 (9th Cir. 2003). These factors include (1) the extent of and harm caused by the defendant's violation; (2) the defendant's involvement in other illegal activities; and (3) the total fine available and the availability of other penalties. Other courts have added as a factor the question whether the defendant is within the class of persons to whom the law is directed. See also United States v. Amerigroup Illinois, Inc., 488 F. Supp. 2d 719, 744-48 (N.D. Ill. 2007). Considering all of these factors, the award sought by the United States is clearly within constitutional bounds.

The submission of false claims causes harm to the government well beyond economic damages. Congress, stating that "[t]he cost of fraud cannot always be measured in dollars and cents," agreed that "fraud erodes public confidence in the government's ability to efficiently and effectively manage its programs" and found that even in cases where there is no dollar loss, fraud undermines the integrity of government programs. S. Rep. No. 99-345 at 3, reprinted in 1986 U.S.C.C.A.N. at 5268. Courts have accordingly recognized that the government may recover penalties solely upon proof that false claims were made, without *any* proof of economic damages. Id. at 5273 (collecting cases); see also United States ex rel. Bahrani v. Conagra, Inc., 465 F.3d 1189, 1203 (10th Cir. 2006). Thus, as the Fourth Circuit has held:

> [S]urely, no proof is required to convince one that to the
> Government a false claim, successful or not, is always costly.  Just
> as surely, against this loss the Government may protect itself,
> though the damage be not explicitly or nicely ascertainable.
>
> The Act seeks to reimburse the Government for just such losses.
> For a single false claim $2,000 [the penalty amount in effect in
> 1959] would not seem exorbitant.  Furthermore, **even when
> multiplied by a plurality of impostures, it still would not
> appear unreasonable when balanced against the expense of the
> constant Treasury vigil they necessitate.**

Toepleman v. United States, 263 F.2d 697, 699 (4th Cir. 1959) (emphasis added).

Fraud like that committed by Tuomey in this case – where the payments for physician referrals were hidden in spreadsheets and discussed behind closed doors – is difficult to detect. That, in turn, underscores the need for penalties high enough to make a potential wrongdoer wary of risking sanction in circumstances where his secretive conduct makes the risk of detection low. Cf. BMW of North America, Inc., 517 U.S. at 582 (high punitive damage awards may comport with due process where "injury is hard to detect or the monetary value of noneconomic harm [is] difficult to determine"); Rogan, 517 F.3d at 454 ("The lower the rate of a fraud's detection, the higher the multiplier required to ensure that crime does not pay"); United States v. Jiminez, 507 F.3d 13, 20 (1st Cir. 2007) ("From a deterrence perspective, a stiffer penalty is logically called for when the risk of detection decreases"); see generally Richard A. Posner, Economic Analysis of Law 262, 277 (8th ed. 2011) (same).  Congress has authorized stiff financial penalties to ensure that those who would defraud the government of public funds face appropriate punishment for past misconduct and a strong deterrent to future wrongdoing.  See Pub. L. No. 101-410, § 2, 104 Stat. 890 (1990) (authorizing inflation-adjusted increases to civil money penalties in order to "maintain the deterrent effect of civil money penalties and promote compliance with the law").

Tuomey cannot demonstrate "gross disproportionality" on the facts of this case. The ratio of the penalty award sought by the United States here to the single damages found by the jury is only about 3:1. But under the Supreme Court's rationale in <u>Chandler</u>, even this ratio is overstated because it does not account for the relator's entitlement to a 15 to 25 percent share of the recovery, nor does it include prejudgment interest, which would total more than $23 million. Accounting for these factors, the actual ratio of penalties to compensatory damages here is less than 2:1 and may indeed be nearly 1:1. Either way, the ratio falls well within constitutional bounds. The Supreme Court noted in <u>State Farm Mutual Automobile Ins. Co. v. Campbell</u>, 538 U.S. 408 (2003), that a punitive damages to compensatory damages ratio that did not exceed single digits would generally comport with the Fifth Amendment. As the Seventh Circuit observed in <u>Rogan</u>, where the court approved a penalty to compensatory damages ratio of less than 4:1: "It's hard to see why the [Supreme] Court's approach to punitive damages under the Fifth Amendment would differ dramatically from analysis under the Excessive Fines Clause. (If there is to be a difference, one would think that a fine expressly authorized by statute could be higher than a penalty selected <u>ad hoc</u> by jury.)." 517 F.3d at 454.

A penalty to compensatory damages ratio of 3:1 or less is clearly justified by Tuomey's conduct in this case. Yet Tuomey contends that because it is a not-for-profit hospital (as are the vast majority of hospitals in the country), it should be exempt from the full legal consequences of its actions. As Tuomey itself has pointed out, the False Claims Act provides a **legal** remedy, not an equitable remedy. Accordingly, the impact of the judgment on Tuomey's mission has no bearing on the propriety of the judgment required by the law. If it were otherwise, virtually every hospital in the country would feel free to ignore the Stark Law without facing the significant consequences intended by Congress for those who knowingly commit Medicare fraud. Simply put, there would be no deterrent whatsoever to violating the Stark Law, contrary

- 19 -

to Congress' clear intention, and the abuses the Stark Law was enacted to prevent would proliferate, at great cost to the Medicare program and its individual beneficiaries.[12]

Tuomey argues that its misconduct here is unrelated to other misconduct. That is simply untrue. The Stark Law also applies to claims for services submitted to the Medicaid program. However, the United States exercised its prosecutorial discretion not to seek recovery of the Medicaid damages caused by Tuomey's misconduct, which would have added millions more to the single damages figure and thousands more false claims. Further, the government could have sought penalties at the top end of the range – which would have doubled the amount of the penalties – but elected not to do so. Accordingly, Tuomey's damages and penalties are substantially lower than they otherwise would have been had the government elected to pursue the maximum remedies available to it.

Perhaps most significantly, as noted above, it is Tuomey's own management and Board who are responsible for permitting the damages and penalties to mount to the level ultimately found by the jury. Paragraph 14.15 of the physician contracts allowed either party to cancel without recourse if the agreement or any part of it were "deemed to be contrary to local, state or federal law by counsel for either party or, [i]n the opinion of counsel, present[ed] substantial legal risk to either party or to the Hospital. . . ." See, e.g., Ex. 9 (PX 33) ¶ 14.15 (McDuffie contract). Under this provision, Tuomey could have terminated the contracts in June 2005 after Kevin McAnaney – a lawyer Tuomey jointly retained with Dr. Drakeford – voiced his concerns about the substantial risk that the arrangements violated the Stark Law. At that point, the refund for the Stark Law violation would have totaled less than $5 million, and False Claims Act

---

[12] It should be noted that it is not only Medicare and its beneficiaries who were subjected to higher prices and co-pays as a result of Tuomey's misconduct, but every other insurer and insured who had to pay extra for health care procedures performed at the hospital that could have been performed in an ambulatory surgery center or in a doctor's office at a lower cost.

liability could have been avoided.  Instead, as Dr. McDuffie testified at the first trial, Tuomey

persuaded Dr. McDuffie and his partners not to terminate the contracts because doing so might

make them look guilty.  Ex. 10 (2010 Trial Tr. 518:19-520:22, 524:20-525:25).  Tuomey could

have terminated the contracts once it learned in early 2006 that the government was investigating

them.  And Tuomey could have terminated the contracts in September 2007, when the United

States intervened in the case.  But Tuomey's executives and management decided to throw

caution to the wind and refused to terminate the contracts until the first jury declared them

illegal.  Now, a second jury has also found the contracts illegal and, having heard Mr.

McAnaney's testimony, has also found that Tuomey knowingly submitted 21,730 false claims to

the Medicare program, for which Medicare paid $39,313,065.  Tuomey should not now be heard

to argue that this Court should relieve it of the consequences of its own cavalier attitude toward

the law.

## Conclusion

    For the reasons stated above and in the United States' Motion for Entry of Judgment

Under the False Claims Act, the Court should treble the damages found by the jury and assess

penalties for each false claim at the minimum statutory level of $5,500 per false claim for a total

award to the United States of $237,454,195.

                              Respectfully submitted,

                              STUART F. DELERY
                              Acting Assistant Attorney General


                              /s/ G. Norman Acker, III
                              G. NORMAN ACKER, III
                              Special Attorney and
                              Assistant United States Attorney
                              Eastern District of North Carolina
                              310 New Bern Ave., Suite 800
                              Raleigh, NC 27601

- 21 -

Telephone:  (919) 856-4530
Facsimile: (919) 856-4820
E-mail:  norman.acker@usdoj.gov

 /s/ Tracy L. Hilmer
MICHAEL D. GRANSTON
TRACY L. HILMER
Attorneys, Civil Division
United States Department of Justice
Post Office Box 261, Ben Franklin Station
Washington, D.C. 20044
Telephone:  (202) 307-0474
Facsimile:  (202) 514-0280
E-mail:  tracy.hilmer@usdoj.gov

Attorneys for the United States

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 24th day of June, 2013, I served a copy of the foregoing upon the below-listed counsel of record electronically through the Court's electronic case filing system or by placing a copy of the same in the U.S. Mails, addressed as follows:

Kevin M. Barth, Esq.
Ballenger Barth & Hoefer, LLP
205 North Irby Street
P.O. Box 107
Florence, SC 29503

Sandra L.W. Miller, Esq.
Womble Carlyle Sandridge and Rice
550 S Main Street
Suite 400
Greenville, SC 29601

James M. Griffin, Esq.
Lewis, Babcock & Griffin, LLP
P. O. Box 11208
Columbia, SC 29211

Daniel M. Mulholland, III, Esq.
Horty, Springer & Mattern, P.C.
4614 Fifth Avenue
Pittsburgh, PA 15213

E. Bart Daniel, Esq.
Attorney at Law
7 State Street
P. O. Box 856
Charleston, SC 29402

Matthew R. Hubbell, Esq.
Attorney at Law
7 State Street
Charleston, South Carolina 29401


/s/ Tracy L. Hilmer
Tracy L. Hilmer