McAnaney - Direct                                661

1    THE COURT: All right.
2    MR. GRIFFIN: Same objection, your Honor.
3    THE COURT: It's admitted.
4    (Plaintiff's Exhibit 76 received)
5    Q. (MR. ACKER) Could you bring up 76? Could you enlarge the
6    bottom section starting with issues raised by compensation
7    methodology? And, Mr. McAnaney, if you would you read
8    paragraph one.
9    A. In our conference call last week it was suggested that the
10   Cejka appraisal was conclusive on the issue of the fair market
11   value and commercial reasonableness of the compensation
12   amount. As I referenced at that time, the phase two
13   regulation commentary provides that while good faith reliance
14   on a proper valuation may be relevant to a party's intent, it
15   does not establish the ultimate issue of the accuracy of the
16   valuation figure itself. There are numerous examples of the
17   OIG and judges finding that a financial arrangement supported
18   by an appraisal was in fact not commercially reasonable or
19   fair value.
20   Q. Now, in the conference call that you had with Tim Hewson
21   and Greg Smith on June 22nd of 2005 did you discuss this issue
22   about having a fair market value opinion letter?
23   A. Yes.
24   Q. And what did you tell Tim Hewson and Greg Smith about
25   that?


GOVERNMENT EXHIBIT

McAnaney - Direct                                    662

1  A.  Well, I concurred that it is not conclusive.  I mean,
2  there was several cases I have been involved in when the
3  government nevertheless brought cases against companies where
4  they had fair market value opinions.
5  Q.  Okay.  And you told that to Tim Hewson?
6  A.  Yes.
7  Q.  Could you turn to page three of this memorandum?  And
8  could you enlarge the bottom half.  And could you read, Mr.
9  McAnaney, seven lines from the bottom of the paragraph,
10 paragraph two, I guess it's above paragraph three, seven lines
11 up, there's a line that starts, you indicated.
12 A.  You indicated that Tuomey actually doesn't lose money on
13 its physician part-time employment arrangements and that the
14 arrangements are commercially reasonable because Tuomey makes
15 money on its facility charges and ancillary services, for
16 example, lab work, CTs, MRIs, et cetera, related to the
17 physicians' referrals.  The compensation to the physicians
18 must be commercially reasonable without taking into account
19 the value of the physician referrals or other business
20 generated between the parties.
21 Q.  And during the June 22, 2005 meeting with Tim Hewson and
22 Greg Smith, did you discuss this issue?
23 A.  I believe we did, yes.
24 Q.  And what did you tell them about it?
25 A.  Well, again, I agree, you can't -- couldn't justify, I

McAnaney - Direct                               663

1  mean, the government did not think it a valid justification to
2  say I can lose money on a physician because I'm making it up
3  on other business they are generating. Again, that had been a
4  major issue in a case I had been involved with when I was in
5  the government.
6  Q. And did you -- you mentioned cases. Did you mention any
7  names of cases to Tim Hewson as part of your conversation on
8  June 22?
9  A. Yes, I did.
10 Q. Which cases did you mention to Mr. Hewson?
11 A. Well, there was a -- I mentioned there had been a case
12 against HCA that had involved some similar issues. There was
13 a case that was referred to as Tenet North Ridge, which it was
14 a hospital in Florida that had involved a physician
15 compensation issue. And then I mentioned particularly there
16 had been a case that had just been resolved, I think, around
17 this time in South Carolina involving the McLeod Health
18 System.
19 Q. Okay. And what statutes were implicated in the McLeod
20 case?
21         MR. GRIFFIN: Objection, your Honor. Unless he
22 conveyed the information during the phone call it's not
23 relevant.
24 Q. (MR. ACKER) Did you indicate to Mr. Hewson what statutes
25 were involved in the McLeod case?

McAnaney - Direct                                                664

1  A. All those cases involved both Stark and kickback issues.
2       THE COURT: The question was did you convey that to
3  Mr. Hewson.
4  Q. (MR. ACKER) Did you discuss that in the meeting, what
5  laws were implicated?
6  A. Yes.
7  Q. And what did you say to him about which laws were
8  implicated?
9  A. That they were under both Stark and kickback.
10 Q. Okay. In your review of the materials we looked at
11 earlier in Exhibit 209 were you able to determine whether the
12 doctors under these part-time agreements would be making
13 referrals to Tuomey?
14      MR. GRIFFIN: Objection, your Honor. Again,
15 relevance, unless it was conveyed.
16      MR. ACKER: I will rephrase, your Honor.
17 Q. (MR. ACKER) What, if anything, did you discuss during the
18 June 22nd meeting about referrals to Tuomey?
19 A. Well, that they would be making referrals to Tuomey. I
20 mean, that was the -- you don't have to worry about either the
21 kickback or the Stark Law if the physicians aren't making
22 referrals. They are only implicated if a physician's
23 receiving some kind of a benefit and making a referral to the
24 party from whom he's receiving the benefit.
25 Q. Let me go back to ask you this question about the

McAnaney - Direct                                    665

1   June 22nd meeting versus the June 23rd meeting.  On June 22nd
2   who was present on the telephone call?
3   A.  Tim Hewson and Greg Smith.
4   Q.  And yourself?
5   A.  And myself.
6   Q.  And those were the only people?
7   A.  Yes.
8   Q.  On June --
9   A.  I believe so, there may have been other people in their
10  rooms, but those were the only two people I knew and the only
11  two other people I spoke to.
12  Q.  Were those the only two people that spoke to you during
13  that call?
14  A.  Yes.
15  Q.  And you weren't aware of any other people being on?
16  A.  No.
17  Q.  And on the June 23rd call was there an additional person
18  on the call?
19  A.  I think there were an additional two people from another
20  law firm, Hall Render, I believe, who had -- they were a law
21  firm that had been involved in structuring the proposed joint
22  venture.
23  Q.  And do you recall their names?
24  A.  No.
25  Q.  Okay.  But they were from the Hall Render law firm?

McAnaney - Direct                                                    666

1   A.  Yes.
2   Q.  And why were they on the second call but not in the first
3   call?
4   A.  Because their involvement was limited to the joint venture
5   arrangement and not in the employment arrangement.
6   Q.  Okay.  Other than what you've already said, what else did
7   you tell Tim Hewson and Greg Smith about these -- about your
8   assessment, your oral conclusions about these arrangements?
9   A.  In the June -- in the call on June 2nd --
10  Q.  June what date?
11  A.  June 22nd.  I said, first of all, I thought of the two
12  arrangements that were on the table, the employment and the
13  joint venture.  I strongly recommended -- I would strongly
14  recommend the employment arrangement because the kickback
15  statute, which was a criminal statute, has a broad exemption
16  for employment.  So whereas -- so I thought that was very
17  important given the context in which these arrangements were
18  being proposed as I understood them, which was there had been
19  an -- in town there had been an ambulatory surgery center that
20  was owned by some physicians and they were basically
21  recruiting these other physicians to invest in that ASC.  And
22  the hospital was very concerned that if they invested in that
23  ASC they would refer their business to that ASC and the
24  hospital would lose a substantial amount of revenue.  And so
25  that background sort of for the kickback statute was -- it was

McAnaney - Direct                                          667

1   just -- it gave a motive for why they were doing things.
2   Q.  So what else did you tell them at that meeting on
3   June 22nd?
4   A.  So that was the start.  Then I said, and under the Stark
5   Law instead of having a broad exception you have a -- a
6   relatively stricter set of regulations, conditions that you
7   have got to get through.  The first of which is it has to be
8   fair market value for the services provided, and that I
9   thought that I was not convinced that it was fair market
10  value.
11      I read the Cejka opinions.  I'm not a valuator, but I
12  regularly sort of review things to have -- I mean, you get a
13  sense of it.  And it's just not common in my experience to
14  hire physicians and pay them substantially above even their
15  collections, much less their collections minus expenses.  So I
16  said I thought that that in itself made it -- I mean, it would
17  be very hard to sell that.  So I was concerned with the fair
18  market value.
19      The second thing I said is that -- and in particular that
20  context of hospitals losing money on the compensation they
21  paid to physicians that referred them was basically a red flag
22  to the government, that they thought that was -- they had
23  already prosecuted, as I said, they had prosecuted the -- now,
24  these weren't -- they brought cases, they ultimately settled
25  them.  They didn't go to trial, but they had settled cases

1   within the two or three years preceding it with North Ridge
2   hospital in Florida, which I said which involved hiring five
3   physicians for salaries significantly above what they had been
4   making prior to their employment.
5        And then the McLeod system was essentially the same
6   charges, they had recruited a lot of -- they had employed a
7   lot of local physicians at salaries substantially above it.
8   So what I said was I thought that was a red flag, that was
9   dangerous from the government because they had seen this fact
10  pattern, they were -- they thought they were familiar with it,
11  they had tried the case or they had at least built cases, so
12  they understood it, and so this would be a -- this wouldn't be
13  a novel theory for them. So I thought it was a -- I thought
14  it was risky from that standpoint.
15       I also thought there were several features of that it in
16  my experience also made in unusual. I had not seen -- I mean,
17  I thought, A, it was a part-time arrangement only to do
18  surgery at the hospital. I had never seen an arrangement like
19  that. I mean, they would continue their practice in the --
20  office practice and they were only being employed to do
21  surgery at the hospitals. So that's not -- in my experience
22  had not been common.
23       The term was exceedingly long, a ten-year term for an
24  employment contract with the non-compete, which effectively
25  meant if they left they couldn't practice any longer in

McAnaney - Direct                                    669

1   Sumter, a 30-mile non-compete, and they couldn't perform
2   surgery so would have had to go somewhere else.  The doctors
3   typically don't -- I mean, typically doctors want shorter
4   terms where they can get out and renegotiate their salaries.
5   So I thought the term was long.
6       And, as I said, the various -- not unusual, but in the
7   entirety the exclusivity, the long-term, the non-compete and
8   then the non-ownership, I thought all of those made it -- made
9   it likely that the government would think the point of this
10  was that they were reinforcing the view they were paying them
11  above fair market value for the referrals.
12  Q.  What, if anything, did you tell Tim Hewson about whether
13  this agreement passed the red face test?
14  A.  Well, that was my way of saying at the beginning -- what I
15  said is that when I looked at the valuation and the fact that
16  all of these doctors were going to be making substantially
17  more than they even collected, that, I mean, when I say a red
18  faced I mean could you make that representation to a
19  government lawyer at the time, and I just didn't think you
20  could.  I don't think it passed the red face test.
21  Q.  And did you use that term with him?
22  A.  I did.
23  Q.  And you mentioned earlier another term, red flag.  Did you
24  use that term with him?
25  A.  I believe I did, yes.

McAnaney - Direct                                                670

1   Q.  What, if anything, did you tell Tim Hewson and Greg Smith
2   about whether this arrangement would be likely to fall within
3   any Stark Law exception?
4   A.  Well, I said I thought it would be very -- I said I
5   thought it would be risky because I thought the fair market
6   valuation was -- I thought that was readily subject to
7   question and that -- and that that would be -- other
8   provisions, I thought it would be problematic.
9   Q.  Could I put up on the screen Exhibit 209, page 13?  Can
10  you remind us what this was?
11  A.  This was the Cejka Consulting presentation that I reviewed
12  prior to the -- Tim Hewson sent me and I reviewed prior to the
13  telephone call on June 22nd.
14  Q.  And what, if anything, did you tell Tim Hewson about this
15  Powerpoint presentation?
16  A.  Well, I said when you -- when you backed up these pages
17  where they laid out the salary, well, say, page --
18  Q.  Page 19?
19  A.  Page 22.
20  Q.  Page 22.  Okay.  Can we pull up page 22?
21  A.  What I said to them I thought if you go to the last
22  column, the column that was net gain above collections, I said
23  I thought that in a case that would be the government's
24  exhibit number one because it just shows they were making more
25  than they were collecting.

```
                    McAnaney - Direct                    671
```

1  Q. Could we go back to Exhibit 76? And this, Mr. McAnaney,
2  is the memo from Greg Smith to Tim Hewson that you were copied
3  on, is that correct?
4  A. Yes, it.
5  Q. Could we go to page three of this? And this is what --
6  this is Greg Smith's statement of what Tim Hewson said at the
7  bottom, the paragraph that we looked at before, seven lines up
8  from paragraph three.
9  A. Yes.
10 Q. Is that right?
11 A. Yes.
12 Q. During the meeting did Tim Hewson ever deny that he had
13 said what Greg Smith said he said?
14 A. I don't -- I don't recall that he did.
15 Q. Okay. Up to now I have been asking what you told Tim
16 Hewson. Let me ask you what -- if Tim Hewson said anything to
17 you during this meeting. What, if anything, did Tim Hewson
18 say to you about whether he believed that these contracts
19 weren't even implicated by the Stark Law?
20         MR. GRIFFIN: Your Honor, I think that is hearsay,
21 what Tim Hewson said.
22         MR. ACKER: Your Honor, Mr. Hewson was an agent of
23 Tuomey sent to this meeting on behalf of Tuomey by Jay Cox.
24         MR. GRIFFIN: This is --
25         MR. ACKER: Statement of a party opponent.

McAnaney - Direct                                    672

1           MR. GRIFFIN: It's an agency issue. He's an attorney
2   providing a service to Tuomey Hospital.
3           THE COURT: Overruled.
4   Q.   (MR. ACKER) What, if anything, did Mr. Hewson tell you
5   about whether he believed that this contract wasn't even
6   covered by Stark?
7   A.   He said nothing to indicate he didn't think it was
8   covered. The entire discussion was how it complied with the
9   Stark employment exception.
10  Q.   What, if anything, did Mr. Hewson tell you about whether
11  he thought there wasn't a financial relationship between the
12  hospital and doctors?
13  A.   He didn't say anything about that.
14  Q.   What, if any -- let me withdraw that question. If we
15  could pull back up Exhibit 117 and highlight the first
16  paragraph. The last sentence of this paragraph, Mr. McAnaney,
17  says that you will report orally your conclusions as well as
18  an evaluation of any potential compliance issues. Do you
19  believe that you fulfilled that responsibility on June 22nd to
20  June 23rd?
21  A.   Yes, I think so. I mean the clients didn't seem to think
22  there was more to be done.
23  Q.   Okay. And this indicates that you will give an oral
24  conclusion. Did there ever come a time when either of your
25  clients, either Greg Smith on behalf of Dr. Drakeford or Tim

McAnaney - Direct                                      673

1   Hewson on behalf of Tuomey Hospital, asked you to put your
2   opinion in writing?
3   A.  Yes.  At some point thereafter Greg Smith contacted me and
4   asked if I would put it in writing.
5   Q.  And did you -- what was your thought about whether or not
6   you could do that under this engagement letter?
7   A.  Well, I didn't think I could do it without permission from
8   Tuomey, as well.  It was a joint representation.
9   Q.  Okay.  And subsequent to Mr. Smith's communicating to you
10  that he would like to put it in writing did Tuomey contact you
11  about that same issue?
12  A.  Yes, he did.
13          MR. ACKER:  May I approach, your Honor?
14          THE COURT:  You may.
15  Q.  (MR. ACKER)  I've handed you Plaintiff's Exhibit 77.  Do
16  you recognize this document?
17  A.  Yes, do.
18  Q.  And, in general, what is it?
19  A.  This was a letter I received from Tim Hewson at Nexsen
20  Pruet advising me not to put anything in writing.
21  Q.  And this was part of your -- this was in connection with
22  your joint engagement by Tuomey and Dr. Drakeford?
23  A.  It was.
24          MR. ACKER:  Your Honor, I seek to admit Plaintiff's
25  Exhibit 77.

1  A.  I certainly agree with that, so I may very well have told
2  him that.
3  Q.  Now, did you ever say on the call with Tim Hewson or Greg
4  Smith that it was a mathematical certainty that the hospital
5  would lose money on these contracts?
6  A.  I'm pretty sure I did not.  I don't speak in mathematical
7  certainty.
8  Q.  Math is not your strong suit, right?
9  A.  Well, certainly not mathematical certainty.
10 Q.  All right.  And so if someone had written that in a letter
11 and attributed that comment to you, that would not have been
12 an accurate statement.
13 A.  I don't think so.
14 Q.  And you never gave your opinion that these contracts did
15 not meet fair market value or commercial reasonableness.
16 A.  No, I just said I thought they were problematic.
17 Q.  Problematic.
18 A.  Challenging.
19 Q.  And you never said in these conversations that the
20 government would find this to be an easy case to successfully
21 prosecute.
22 A.  I think I may have said that.
23 Q.  That it's easy to prosecute.
24 A.  That they would think it's an easy case to prosecute
25 because they have already done the two or three cases.  And

McAnaney - Cross                                                693

1  their view was if you are paying more than it had that made it
2  a relatively simple case.
3  Q. But you didn't predict the outcome of any such prosecution
4  in that conversation, did you?
5  A. No. I wouldn't do that.
6  Q. Okay.
7          MR. GRIFFIN: Thank you. That's all I have.
8                       REDIRECT EXAMINATION
9  BY MR. ACKER:
10 Q. Mr. McAnaney, you were asked on cross-examination whether
11 you said that under certain circumstances it's okay to pay
12 more than collections. Do you recall that question?
13 A. Yes.
14 Q. And did you believe it was appropriate under these
15 circumstances?
16         MR. GRIFFIN: Objection, your Honor. Unless he
17 conveyed it in the call his personal opinion is not relevant.
18         MR. ACKER: I'll be glad to rephrase.
19 Q. (MR. ACKER) Did you tell Tim Hewson whether you believed
20 it was appropriate under these circumstances?
21 A. I'm not sure that I told him that. I think I said in some
22 circumstances specifically, I mean, typically where there's a
23 high indigent load, a high payor load where people can't earn
24 an income, those kind of situations.
25 Q. Okay. Did you tell Mr. Hewson that your assessment of the

McAnaney - Redirect                                              698

1   compensation and the fact that it was this part-time
2   arrangement, that it was a lot of money for a part-time
3   arrangement, which I hadn't seen.  So I just thought it was a
4   very unusual arrangement that would draw a lot of scrutiny if
5   it became public.
6   Q.  I want to clarify one thing you were asked about on
7   cross-examination.  Who was on the first call on June 22nd?
8   A.  To my knowledge, it was Greg Smith and Tim Hewson and
9   myself.  What I don't know is whether they may have had
10  somebody else in their offices with them.  I don't think they
11  were on speaker phones, is my recollection, so I don't think
12  so, but --
13  Q.  Okay.  And on the June 23rd conference call who was
14  present?
15  A.  Tim Hewson, Greg Smith, Steve Pratt, and I thought at
16  least for a part of the time there was a second lawyer from
17  Hall Render, but I may be -- I may be misremembering.
18  Q.  Okay.  You were asked on cross-examination that -- whether
19  you were asked to give a legal opinion and your answer was not
20  on the ultimate issue.  What did you mean by that?
21  A.  Well, I mean, I guess, I don't know what -- I mean, I was
22  asked -- I was giving my views as to the compliance of the
23  arrangements with these statutes.  What I didn't was
24  ultimately I didn't give an opinion on the ultimate issue of
25  did they comply with the law or did they not.

McAnaney - Redirect                                              699

1   Q.  And why didn't you do that?
2           MR. GRIFFIN:  Objection, your Honor, relevance.
3           MR. ACKER:  I believe they opened it on
4   cross-examination.
5           THE COURT:  The objection is overruled.
6           THE WITNESS:  I was specifically asked not to.
7   Q.  (MR. ACKER) By whom?
8   A.  By Tim Hewson.
9           MR. ACKER:  Thank you.  I have no further questions.
10          THE COURT:  Any recross?
11          MR. GRIFFIN:  Just briefly.
12                      RECROSS EXAMINATION
13  BY MR. GRIFFIN:
14  Q.  Mr. McAnaney, you were asked not to.  Are you referring to
15  the September 2005 letter?
16  A.  No, no, no.  It was during --
17  Q.  On the front end?
18  A.  Early on in the conversation.  He -- I think he was
19  comfortable that they were lawful and they had other
20  arrangements, was what he explained, so he didn't -- he didn't
21  want our opinion, my opinion on that issue.
22          MR. GRIFFIN:  Okay.  Thank you.
23          THE COURT:  All right.  Thank you.  You can step
24  down, you're excused.
25          THE WITNESS:  Thank you.