IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| United States of America ex rel | ) | |
| Michael L. Drakeford, M.D., | ) | C/A No. 3:05-2858-MBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **AMENDED** |
| | ) | **ORDER AND OPINION** |
| Tuomey d/b/a Tuomey Healthcare | ) | |
| System, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

On October 4, 2005, Plaintiff United States of America, ex rel. Michael K. Drakeford, M.D.,

filed a qui tam complaint against Defendant Tuomey d/b/a Tuomey Healthcare System, Inc. The

Government filed amended complaints on December 21, 2007 and November 12, 2008. The

Government alleges it made payments to Tuomey under the Medicare and Medicaid Programs, but

that the claims for payment were unlawful under the Stark Law, 42 U.S.C. § 1395m, and thus

violative of the False Claims Act (FCA), 31 U.S.C. §§ 3729 et seq.

By way of background, § 3729(a) imposes liability on persons who, among other things,

knowingly present, or cause to be presented, a false or fraudulent claim to the United States

Government for payment or approval. Any such person is liable to the United States Government

for a civil penalty of not less than $5,500 and not more than $11,000, as well as three times the

amount of damages that the Government sustains because of the act of that person. Id. Persons

violating § 2729 also are liable to the United States Government for the costs of a civil action

brought to recover any such penalty or damages. The FCA further provides that a private person may

bring a civil action for a violation of § 3729 both for the person and for the United States Government where the private person has information that the named defendant has knowingly submitted or caused the submission of false or fraudulent claims to the United States. See id. § 3730. This legal device is called a "qui tam." See https://www.doioig.gov/docs/falseclaims act.pdf (September 24, 2013).

Regarding the Stark Law and related regulations, the Court of Appeals for the Fourth Circuit has explained:

> The Stark Law, and regulations promulgated pursuant thereto ("Stark Regulations") prohibit a physician who has a "financial relationship" with an entity—such as a hospital—from making a "referral" to that hospital for the furnishing of certain "designated health services" for which payment otherwise may be made by the United States under the Medicare program. 42 U.S.C. § 1395nn(a)(1); 42 C.F.R. § 411.353(a). A hospital may not submit for payment a Medicare claim for services rendered pursuant to a prohibited referral. 42 U.S.C. § 1395nn(a)(1)(B); 42 C.F.R. § 411.353(b). The United States may not make payments pursuant to such a claim, and hospitals must reimburse any payments that are mistakenly made by the United States. 42 U.S.C. § 1395nn(g)(1); 42 C.F.R. § 411.353(c), (d). However, when a physician initiates a service and personally performs it, that action does not constitute a referral under the Stark Law. 42 U.S.C. § 1395nn(h)(5); 42 C.F.R. § 411.351.
>
> The Stark Law and Stark Regulations define a "financial relationship" to include "a compensation arrangement" in which "remuneration" is paid by a hospital to a referring physician "directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. §§ 1395nn(a)(2), (h)(1); 42 C.F.R. § 411.354. An indirect financial relationship exists if, inter alia, there is an indirect compensation arrangement between the referring physician and an entity that furnishes services. An indirect compensation arrangement exists if, inter alia, the referring physician receives aggregate compensation that "varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing" services. 42 C.F.R. § 411.354(c)(2)(ii).

United States ex rel. Drakeford v. Tuomey Healthcare Sys., Inc., 675 F.3d 394, 397-98 (4th Cir. 2012).

2

The Stark Regulations provide that certain enumerated compensation arrangements do not constitute a "financial relationship." An indirect compensation arrangement does not constitute a financial relationship if the compensation received by the referring physician is (1) equal to the "fair market value for services and items actually provided"; (2) "not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician" for the hospital; and (3) "commercially reasonable." Id. (quoting 42 C.F.R. § 411.357(p)).

I. ALLEGATIONS

According to the Government, Sumter Urological Surgery Center, LLC submitted a certificate of need to build a freestanding ambulatory surgery center (ASC) in Sumter, South Carolina. The surgery center was authorized to perform less complicated and lower risk outpatient surgeries outside the confines of a hospital. Tuomey applied for a certificate of need for its own ASC, and later converted it to a certificate of need for an outpatient surgery center (OSC). Both certificates of need were granted in September 2002. This resulted in competition by Sumter Urological Surgery Center against Tuomey for these types of surgical services.

The Government alleged in its complaint that in 2003, Tuomey determined that it would lose revenue in the amount of approximately $9.6 million over a thirteen year period if gastroenterologists redirected their endoscopies away from Tuomey. This was based on a study that concluded 80% of gastroenterologists using Tuomey's facilities would stop doing so if they had access to an ASC or OSC. Accordingly, Tuomey commenced recruiting specialist physicians to enter into part-time employment contracts. According to the Government, the compensation packages paid physicians 31% above and beyond their total net collections as independent contractors, and thus in excess of the fair market value for their services. Specifically,

[b]etween January 1, 2005, and November 15, 2006, Tuomey entered into compensation contracts with 19 specialist physicians. All of the contracts included essentially the same terms. Each contract specified that the physician was required to provide outpatient procedures at Tuomey Hospital or at facilities owned or operated by it. Under each contract, Tuomey was solely responsible for billing and collections from patient and third-party payors for outpatient procedures, and the physician expressly reassigned to Tuomey all benefits payable to the physician by third party payors, including Medicare and Medicaid. Tuomey agreed to pay each physician an annual base salary that fluctuated based on Tuomey's net cash collections for the outpatient procedures. Tuomey further agreed to pay each physician a "productivity bonus" equal to 80 percent of the net collections. Moreover, each physician was eligible for an incentive bonus that could total up to 7 percent of the productivity bonus. Each contract had a ten year term and provided that the physicians would not compete with Tuomey during the term of the contract and for two years thereafter.

Pursuant to the contracts, the physicians performed outpatient procedures at Tuomey facilities. The outpatient procedures generated two billings: a professional fee for the physician for his or her services, also known as the "professional component"; and a facility fee for Tuomey for providing the space, the nurses, the equipment, etc., also known as the "facility component" or "technical component." Subsequent to the performance of the procedures, Tuomey submitted claims requesting reimbursement for both the professional fee and the facility fee to third-party payors, including Medicare and Medicaid. As relevant here, Tuomey presented, or caused to be presented, to Medicare and Medicaid claims for payment of the facility fees generated as a result of outpatient procedures performed pursuant to the contracts.

Tuomey, 675 F.3d at 399.

The Government contended in its complaint that Tuomey presented, or caused to be presented through a fiscal intermediary and carrier, or through the South Carolina Department of Health and Human Services, claims for payment to the Medicaid and Medicare programs for designated health services provided on referrals from the physicians with whom it had entered into prohibited financial relationships. The Government alleged that Tuomey therefore presented false and fraudulent claims. The Government also alleged that Tuomey made false statements on its certificates of cost reports by stating that it was entitled to payment of its claims for the services that

4

allegedly were provided in violation of the Stark Law. The Government asserted the following federal causes of action: violation of the False Claims Act (claims for services rendered as a result of violations of the Stark Law) (Count I); False Claims Act (use of false statements) (Count II); and False Claims Act (false record to avoid an obligation to refund) (Count III). The Government also asserted equitable state law claims as follows: payment under mistake of fact (Count IV); unjust enrichment (Count V); and a claim for disgorgement, constructive trust, and accounting (Count VI). The Government demanded civil penalties and treble damages as to Counts I, II, and III; damages sustained and/or amounts that Tuomey received in error or by which Tuomey was unjustly enriched as to Counts IV and V; and a disgorgement of illegal profits, accounting of revenues unlawfully obtained by Tuomey, and the imposition of a constructive trust upon such revenues as to Count VI.

PROCEDURAL HISTORY

The within action originally was assigned to the Honorable Matthew J. Perry, Jr. On March 5, 2010, Judge Perry commenced presiding over a jury trial. On March 29, 2010, the jury returned a verdict in favor of the Government regarding the question of whether Tuomey violated the Stark Law. The jury also found that Tuomey did not violate the FCA.

The parties thereafter filed post-trial motions. Judge Perry held a hearing on June 3, 2010. On July 13, 2010, Judge Perry issued an order wherein he granted a new trial on the whole issue of the FCA. Also on July 13, 2010, Judge Perry issued an order wherein he found that, (1) pursuant to the jury verdict, Tuomey violated the Stark Law; and (2) Tuomey submitted claims in violation of the Stark Law, and the United States paid those claims in an amount of $44,888.651.00 for services rendered through June 30, 2009. Judge Perry concluded that the United States was entitled to judgment in its favor as to its equitable claims, specifically Count IV (payment by mistake) and

Count V (unjust enrichment) in the total amount of $44,888.651.00, plus prejudgment interest.

On July 16, 2010, Tuomey appealed Judge Perry's order that found the United States was entitled to judgment on Counts IV and V and imposing judgment of $44,888.651.00. Tuomey argued that its Seventh Amendment rights were violated when Judge Perry based his judgment with respect to Counts IV and V on the jury's interrogatory answer regarding the Stark Law, even though the jury verdict had been set aside in its entirety. The case was reassigned to the undersigned on August 12, 2011, subsequent to Judge Perry's passing.

On March 30, 2012, the Fourth Circuit issued its opinion on Tuomey's appeal. The Fourth Circuit observed:

> . . . As already noted, whether there was a financial relationship between Tuomey and the physicians that violated the Stark Law is a factual predicate to liability on the equitable claims. The FCA claim, too, is premised on the existence of such an illegal relationship. As such, the factual issue of whether a financial relationship prohibited by the Stark Law existed is common to the equitable claims and the FCA claim. It follows that the district court was required to submit that issue to the jury before it could resolve the United States' equitable claims.
>
> Here, the district court failed to do precisely that. Although it tried the FCA claim to a jury, and the jury returned a verdict on that claim that indicated that Tuomey had violated the Stark Law but had not violated the FCA, the district court set that verdict aside when it granted the government's motion for a new trial under Rule 59, specifically ordering that the new trial would encompass the whole FCA claim, including whether Tuomey had violated the Stark Law. As a result, the jury's interrogatory answer regarding the Stark Law is now a legal nullity. In other words, following the order granting the Rule 59 motion, a jury had yet to determine the common issue necessary to resolution of both the FCA claim and the equitable claims, i.e., whether Tuomey violated the Stark Law. In granting judgment to the United States on the equitable claims, the district court impermissibly resolved that common issue before a jury had adjudicated it. It thereby deprived Tuomey of its right to a jury trial.

Tuomey, 675 F.3d at 404-05.

The Fourth Circuit thereon remanded the case to the district court for further proceedings.

6

The Fourth Circuit concluded:

> the jury must determine on remand whether the contracts took into account the volume or value of referrals. If it so finds, the jury must further determine whether Tuomey could bear its burden of proof with respect to the indirect compensation arrangement exception. Finally, if the jury finds that the contracts created a financial relationship–as defined by the Stark Law–between Tuomey and the physicians, it must determine the number and value of claims Tuomey presented to Medicare for payment of facility fees resulting from the facility component referrals made by the physicians, and for which it received payment.

Id. at 405. The Fourth Circuit issued its mandate on May 22, 2012.

After a period of additional discovery, the case again proceeded to trial on April 16, 2013. On May 8, 2013, the jury returned a verdict finding that Tuomey had violated the Stark Law, that Tuomey had violated the FCA, that 21,730 claims were submitted in violation of the FCA, and that the value of the claims submitted in violation of the FCA equals $39,313,065.00.

This matter now is before the court on post trial motions filed by the parties as follows:

1. Motion for damages and penalties under the FCA, which motion was filed by the Government on May 22, 2013 (ECF No. 818). Tuomey filed a response in opposition on June 5, 2013, to which the Government filed a reply on June 24, 2013.

2. Second motion for summary judgment and/or judgment as a matter of law on the Government's equitable claims, which motion was filed June 5, 2013 (ECF No. 823). The Government filed a response in opposition on June 24, 2013, to which Tuomey filed a reply on July 12, 2013.

3. Motion to require election of remedies, which motion was filed by Tuomey on June 5, 2013 (ECF No. 824). The Government filed a response in opposition on June 24, 2013, to which Tuomey filed a reply on July 12, 2013.

4. Motion for judgment as a matter of law on Counts IV and V of the second amended complaint, which motion was filed by the Government on June 5, 2013 (ECF No. 826). Tuomey filed a response in opposition on June 24, 2013, to which the Government filed a reply on July 12, 2013.

5. Motion for judgment as a matter of law or in the alternative, for a new trial, which motion was filed by Tuomey on June 5, 2013 (ECF No. 827). The Government filed

a response in opposition on July 8, 2013, to which Tuomey filed a reply on July 22, 2013. Tuomey also forwarded a letter to the court on September 12, 2013, in which it apprised the court of <u>United States ex rel. Ketroser v Mayo Foundation</u>, 2013 WL 4733986 (8th Cir. Sept. 4, 2013). The Government provided the court with a responsive letter on September 23, 2013.

## III. <u>DISCUSSION</u>

The court will commence with Tuomey's motion for judgment as a matter of law, or in the alternative, for a new trial. The court's decision regarding Tuomey's motion will inform the disposition of the remaining motions.

## <u>Law/Analysis</u>

### A.  <u>Judgment As a Matter of Law</u>

Tuomey moves for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), which provides:

> (b) RENEWING THE MOTION AFTER TRIAL; ALTERNATIVE MOTION FOR A NEW TRIAL. If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. No later than 28 days after the entry of judgment–or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged–the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59. In ruling on the renewed motion, the court may:
> (1) allow judgment on the verdict, if the jury returned a verdict;
> (2) order a new trial; or
> (3) direct the entry of judgment as a matter of law.

A Rule 50(b) motion for judgment as a matter of law follows the same standard as a Rule 56 motion for summary judgment. <u>Pitrolo v. County of Buncombe</u>, 407 F. App'x 657, 659 (4th Cir. 2011)(citing <u>Dennis v. Columbia Colleton Med. Ctr.</u>, 290 F.3d 639, 644 (4th Cir. 2001)). Therefore, when a jury has returned a verdict, the court may grant a Rule 50(b) motion for judgment as a matter

of law only if, "'viewing the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the only conclusion a reasonable jury could have reached is one in favor of the moving party.'" Id. (quoting Int'l Ground Transp. v. Mayor & City Council of Ocean City, 475 F.3d 214, 218-19 (4th Cir. 2007)). If reasonable minds could differ, the court must affirm the jury's verdict. Id. (citing Dennis, 290 F.3d at 645). In drawing all reasonable inferences in favor of the non-movant, the court may not weigh the evidence or assess the credibility of the witnesses. Id. (citing Dennis, 290 F.3d at 645).

1.      Tuomey first asserts that the Government failed to prove the physician contracts were subject to the Stark Law, because, as a matter of law, there was no proof that physician salaries *varied* with the volume or value of referrals. According to Tuomey, the physicians' compensation was based solely on collections for personally performed professional services. Tuomey contends that the evidence adduced at trial demonstrated that the each physician's base salary was derived from data regarding historical collections, and was designed to ensure that the contracting physicians performed services commensurate with the compensation they were receiving. Tuomey argues that, as such, the arrangements did not fall within the purview of the Stark Law, but instead were acceptable indirect compensation arrangements under 42 C.F.R. § 411.357(p).

The Government presented evidence of a one-to-one relationship between each doctor's aggregate compensation and the volume or value of the doctor's referrals of technical components to the hospital. The Government presented testimony wherein Tuomey acknowledged that each time one of the physicians performed a legitimate procedure on a Medicare patient at Tuomey's facility pursuant to his or her agreements, the physician's compensation would increase. In addition, the Government presented testimony that each time one of the physicians referred a patient to Tuomey's

facility, Tuomey received a facility fee for the services that the hospital provided in connection with the referral.

In the court's view, a reasonable jury could have found the physicians' compensation varied with volume and value of the physicians' referrals to Tuomey. Tuomey's argument is without merit.

2. Tuomey next asserts that the physicians' contracts were not subject to the Stark Law because the Government failed to prove that the compensation under the physicians' contracts *took into account* the volume or value of referrals. In support of its contention, Tuomey relies on testimony of Kim Saccone. Ms. Saccone acknowledged that she had calculated the net present value of money Tuomey would lose in facilities fees if the physicians were to commence conducting endoscopies in their offices, as well as the net present value of professional fees the physicians would earn for those procedures. However, Ms. Saccone denied that her calculations were used in establishing any compensation plan. Further, Tuomey argues that the Stark Law is not implicated simply because Tuomey evaluated the financial impact of potential employment decision.

The court notes that the Government presented evidence from other witnesses tending to show that Tuomey took into account the volume or value of referrals, such as statements of Gregg Martin, William A. Pollard, and Jay Cox. Further, it was for the jury to judge Ms. Saccone's credibility regarding the use of her calculations and to consider her position along with other evidence in the record. A reasonable jury could have found that Tuomey took into account the volume or value of referrals in establishing the physicians' compensation, so as to make the arrangements subject to the Stark Law. Tuomey's argument is without merit.

3. Tuomey next asserts that, assuming the physician contracts were encompassed within the Stark Law, the Government failed to introduce any evidence of referrals, and therefore failed to

show the submission of a false claim. Tuomey contends that the number of false claims found by the jury was based solely on testimony by the Government's expert witness, Ruben Steck. According to Tuomey, Steck's conclusions about the number and dollar value of claims were based on his calculations of how many times one of the contracting physicians was listed on Medicare claims forms as an attending physician. Tuomey argues that the only references on pertinent forms are to "attending physician" and "other physician"; nothing on the pertinent forms identifies the "referring physician." Tuomey asserts that, because nothing in the hospital claims data reviewed by Steck identified referring physicians, his calculations were unreliable, and the jury's finding regarding the number of claims was based on pure speculation.

The court determined it was a jury question whether attending and operating physicians constituted referring physicians under the Stark Law. The court charged the jury the definition of "referring physician" from 42 U.S.C. § 1395nn(h)(5)(B). There was testimony by physicians that they undertook conduct in treating Medicare patients that falls within the definition of "referring physician" for purposes of the Stark Law. The court finds that a reasonable jury could have found evidence of the claims submitted in violation of the FCA. Tuomey's argument is without merit.

4. Next, Tuomey contends that, based on Tuomey's reliance on the advice of counsel, no reasonable jury could have found that the Government met its burden of proving scienter. Tuomey properly asserts that a defendant can be held liable under the FCA only for knowingly submitting a false claim. See 31 U.S.C. § 3729(a); United States ex rel. Godfrey v. KBR, Inc., 360 F. App'x 407, 410 (4th Cir. 2010) (noting that to prevail under the FCA, the Government must prove (1) the defendant made a false statement or engaged in a fraudulent course of conduct; (2) such statement or conduct was made or carried out with the requisite scienter; (3) the statement or conduct

was material; and (4) the statement or conduct caused the government to pay out money or to forfeit

money due) (quoting <u>United States ex rel. Harrison v. Westinghouse Savannah River Co.</u>, 352 F.3d

908, 913 (4th Cir. 2003)).  Tuomey argues that the requisite scienter did not exist because Tuomey

relied in good faith on advice of counsel.

 The jury heard several days of testimony from Tuomey's counsel and others regarding the

investigation undertaken by counsel in preparing the contracts at issue and counsel's considered

opinions that the contracts did not violate the Stark Law.  The jury also heard testimony that in May

2005 Tuomey and Drakeford jointly retained Kevin McAnaney to provide his opinion regarding the

proposed contracts.  McAnaney had served as Chief of the Industry Guidance Branch of the Office

of Counsel to the Inspector General of the Department of Health and Human Services.  As such, he

had been responsible for issuing formal guidance to health care providers.

 McAnaney expressed his concerns that the physician contracts were problematic.  Among

other things, McAnaney cautioned Tuomey that the terms of the contracts would raise a "red flag"

and expose Tuomey to liability because, in his opinion, the physicians were being paid in excess of

fair market value for their services; the physicians would be making referrals to Tuomey, as

prohibited by the Stark Law; the contracts contained "unusual" components, such as the existence

of a lengthy ten-year term; and the contracts were risky in light of litigation pursued by the

Government under similar scenarios.  The jury heard testimony to the effect that Tuomey and

counsel attempted to influence McAnaney in favor of Tuomey.[1]  The jury also learned that, in

September 2005, Tuomey terminated McAnaney's representation and directed him to not prepare

a written opinion.

The parties agree that the jury evidently rejected Tuomey's advice of counsel defense

commencing with Tuomey's knowledge of McAnaney's position, grounded on the fact that the jury

excluded damages from fiscal year 2005 in making its determination.  Although Tuomey argued at

trial that McAnaney's opinion was "tainted" by Drakeford's counsel and that it responsibly followed

up on McAnaney's comments by seeking an opinion from another attorney, Steve Pratt, a reasonable

---

[1] The Government introduced an email exchange between Tuomey's counsel and a representative of Tuomey that reads as follows:

> (**From Tuomey to counsel**): [T]his all sounds good.  I do remain a little worried that McAnaney may be predisposed to refute the credibility of the plans.  I can't help but believe that Dr. Drakeford may have encouraged [his counsel] to find as much fault with our proposals as possible and to have him conclude that if ANY risk exists to advise them not to pursue the plans.
>
> So........First and foremost I want an open and honest review but after stating that I am suspect of their motives, I'll state that I have my own.  I believe the outcome (after all the scrutiny and advice we have received) should be as we have defined it to date.  That is, that both plans are not without some risk, that each has to be implemented as designed to work and manage that risk, and that either could be challenged, but that both are defensible as we understand the legal environment today.  I think it is key that we not let McAnaney and/or Smith conclude that because some risk exists that Smith's client should not participate.  We know that the risk of challenge exists......the issue is whether or not the plans are defensible.
>
> Just my two cents worth............
>
> (**Response from counsel to Tuomey**):  I share your concerns and have already tried to steer McAnaney towards your desired outcome.  I talked to McAnaney at some length earlier this week providing extensive background on Tuomey's compliance due diligence as to both deals and why we concluded that they were both defensible.  I wish I had a better feel for Drakeford's end game strategy, but we'll just have to continue playing along and influence the outcome of the game as best we can.

jury could have found that Tuomey possessed the requisite scienter once it determined to disregard McAnaney's remarks. Tuomey's argument is without merit.

5.      Finally, Tuomey contends that it is entitled to judgment as a matter of law because the Government failed to prove damages. In addition to its contention that the evidence relied upon by the jury was speculative, Tuomey asserts that the Government received value in exchange for its payments to Tuomey. According to Tuomey, the Government received the medical services it paid for, and it paid the same amount it would have paid had the services been performed by another hospital. Relying on <u>United States ex rel. Harrison v. Westinghouse Savannah River Co.</u>, 352 F.3d 908, 913 (4th Cir. 2003), Tuomey argues that the government received what it paid for, and therefore there were no actual damages under the FCA.

The court previously has rejected Tuomey's argument, and distinguished <u>Harrison</u> as based on a cause of action arising solely under the FCA. Here, the FCA causes of action are based on the Stark Law, which prohibits *any* payment of an impermissible claim. Specifically, 42 U.S.C. § 1395nn(a) provides, in relevant part:

(g) Sanctions

(1) Denial of payment

No payment may be made under this subchapter for a designated health service which is provided in violation of subsection (a)(1) of this section.

(2) Requiring refunds for certain claims

If a person collects any amounts that were billed in violation of subsection (a)(1) of this section, the person shall be liable to the individual for, and shall refund on a timely basis to the individual, any amounts so collected.

(3) Civil money penalty and exclusion for improper claims

Any person that presents or causes to be presented a bill or a claim for a service that such person knows or should know is for a service for which payment may not be made under paragraph (1) or for which a refund has not been made under paragraph (2) shall be subject to a civil money penalty of not more than $15,000 for each such service. The provisions of section 1320a-7a of this title (other than the first sentence of subsection (a) and other than subsection (b)) shall apply to a civil money penalty under the previous sentence in the same manner as such provisions apply to a penalty or proceeding under section 1320a-7a(a) of this title.

(4) Civil money penalty and exclusion for circumvention schemes

Any physician or other entity that enters into an arrangement or scheme (such as a cross-referral arrangement) which the physician or entity knows or should know has a principal purpose of assuring referrals by the physician to a particular entity which, if the physician directly made referrals to such entity, would be in violation of this section, shall be subject to a civil money penalty of not more than $100,000 for each such arrangement or scheme. The provisions of section 1320a-7a of this title (other than the first sentence of subsection (a) and other than subsection (b)) shall apply to a civil money penalty under the previous sentence in the same manner as such provisions apply to a penalty or proceeding under section 1320a-7a(a) of this title.

Following Tuomey's argument to its logical conclusion, the Government nearly always would obtain a benefit in terms of health care services provided under Medicare or Medicaid. Thus, under most circumstances, the Government would be limited to civil penalties. Such a result is contrary to the plain wording of the statute, which prohibits payment of claims if those claims are the result of referrals from physicians with whom the hospital has a financial relationship, and mandates the refund of any amounts so collected. The court is aware of no exception or qualification that the amount of damages can be mitigated by the value of the medical services. Accord United States v. Rogan, 517 F.3d 449, 453 (7th Cir. 2008) (deciding that the entire amount received on 1,812 claims must be reimbursed, regardless of whether the patients for which claims were submitted received medical care); cf. United States ex rel. Roberts v. Aging Care Home Health, Inc., 474 F. Supp. 2d 810 (W.D. La. 2007) (awarding under equitable theories the full value of the claims the

15

defendant submitted in violation of the Stark Law).

A reasonable jury could have concluded that Tuomey submitted 21,730 false claims and was improperly reimbursed $39,313.065.00. Tuomey's argument is without merit.

B. <u>Motion for a New Trial</u>

Tuomey moves for a new trial pursuant to Fed. R. Civ. P. 59(a), which provides:

**(a) In General.**
(1) Grounds for New Trial. The court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows:
(A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . .

A court should grant a new trial if (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence that would prevent the direction of a verdict. <u>Watkins v. Casiano</u>, 413 F. App'x 568, 569 (4th Cir. 2011)(quoting <u>Knussman v. Maryland</u>, 272 F.3d 625, 639 (4th Cir.2001)). In ruling on a motion for a new trial, a court weighs the evidence and considers the credibility of witnesses. <u>Maron v. Va. Polytechnic Inst. & State Univ.</u>, 508 F. App'x 226 (4th Cir. 2013 (citing <u>King v. McMillan</u>, 594 F.3d 301, 314 (4th Cir. 2010)).

1. Tuomey first contends the jury's determination that Tuomey violated the Stark Law is against the clear weight of the evidence, because the Stark Law did not apply to the physician contracts. Tuomey again argues that the contracts at issue did not vary with, or take into account, the volume or value of referrals. The court disagrees. As noted hereinabove, the Government presented extensive evidence tending to rebut Tuomey's contention that the physician contracts fell outside the Stark Law. The court cannot say that the jury verdict is against the clear weight of the evidence. Tuomey's argument is without merit.

2.      Tuomey next asserts that it proved that it reasonably relied on and followed the advice of counsel in constructing the physician contracts at issue.  Tuomey contends that it sought the advice of counsel in good faith after identifying a risk of not having enough surgical specialists available to meet its needs.  Tuomey asserts that it provided full and accurate information to counsel, including McAnaney and Pratt.  Tuomey further asserts that it reasonably relied on experienced counsel's representations that the contract provisions complied with all laws, including the Stark Law; that the physician compensation did not vary with or take into account the volume or value of referrals or the hospital's technical fees; and that the fair market analysis was reliable.

Tuomey further contends that it was justified in relying upon counsel to evaluate McAnaney's comments and relying upon counsel's fundamental disagreement with McAnaney's criticism whether the physicians would be receiving fair market value for their services, as well as counsel's assessment that McAnaney no longer was a neutral party but had been influenced by Drakeford's counsel.  Tuomey observes that it obtained the opinion of Pratt, who advised Tuomey that the Stark Law did not apply to the physician contracts, subsequent to McAnaney's remarks and thus was justified in rejecting McAnaney's apprehensions.

For the reasons discussed above and included in the record, credible evidence was presented at trial from which a jury could reject Tuomey's advice of counsel defense once Tuomey determined to disregard McAnaney's admonitions in favor of moving forward with the physician contracts.  The court cannot say that the jury verdict is against the clear weight of the evidence.  Tuomey's argument is without merit.

3.      Tuomey asserts that Steck's summary evidence was based on an unreliable and inaccurate, and hence inadmissible, reporting by the underlying data collection agency.  Thus,

according to Tuomey, the jury verdict that Tuomey violated the FCA is against the clear weight of the evidence.

On October 15, 2013, the Government filed a motion in limine seeking, among other things, to preclude Tuomey from challenging the authenticity or reliability of the underlying data. See Mot. In Limine Concerning the Data Concerning the Number and Value of Claims, ECF No. 670. The court held a hearing on January 15, 2013, at which time it denied the Government's motion, leaving Tuomey free to attack the underlying data during trial. Significantly, Tuomey does not argue that the court erred in allowing the Government to present summary evidence based upon inadmissible data, that it was precluded from cross-examining Steck, or that it was precluded from introducing its own expert testimony to counter Steck's computations. Rather, Tuomey pursued a trial strategy of denying application of the Stark Law in the first instance. Consequently, Tuomey elected not to challenge the Government at trial with respect to the underlying data, or to present an alternate methodology by which the jury could assess Steck's computations.

The court cannot say that the jury verdict is against the clear weight of the evidence. Tuomey's argument is without merit.

4. Tuomey next contends that, because the damage award rested on speculation, Tuomey is entitled to a new trial *nisi remittitur* on damages. Tuomey asserts that the jury was required to determine which of the 21,730 claims were for outpatient services that were performed by Tuomey pursuant to a referral from one of the contracting physicians. In support of its argument, Tuomey argues that Steck's numbers are grossly inflated and included claims when the contracting physician was not the attending physician, claims for patients admitted through the emergency room and thus "self-referred," and outpatient claims when contracting physician was not the referring physician.

As noted previously, Tuomey was entitled to offer its own expert and its own alternate damages calculations, but elected not to do so. Nevertheless, Tuomey thoroughly cross-examined Steck and challenged his conclusions. The jury heard the evidence presented to it, judged the credibility of Steck, and adopted his calculation of damages.

The court cannot say that the jury verdict is against the clear weight of the evidence. Tuomey's argument is without merit.

5.       Tuomey asserts that a new trial is necessary to avoid a miscarriage of justice. Tuomey reiterates its argument that the Stark Law did not apply to the physician contracts because the physicians' compensation did not vary with or take into account their referrals to Tuomey. Tuomey again asserts that the Government did not prove any referrals to Tuomey by the physicians, and that the Government's claims and damages are excessive and based upon unreliable data. Finally, Tuomey again urges that it relied on the advice of counsel in good faith throughout the conception, design, and implementation of the physician contracts. Tuomey contends that the Government confused the jury and incorrectly led it to believe that "if Tuomey talked or thought about referrals then it had violated Stark and the FCA." Mot. For Judg. As a Matter of Law, or in the Alternative, for a New Trial 53, ECF No. 827-1. Tuomey contends that the Government misused evidence of intent to support its theory that Tuomey "had bad intent (i.e., to stifle competition) and was greedy (i.e., it wanted to force patients to pay more by having procedures done at Tuomey." Id. at 54. Tuomey states that allowing a verdict to stand that is the product of improper and misleading argument renders a grave injustice.

The court has determined that a reasonable jury could have found in favor of the Government and rendered a verdict in the amount awarded. The court further has determined that the verdict is

not against the clear weight of the evidence. It follows that allowing the jury verdict to stand will not result in a miscarriage of justice. Tuomey's argument is without merit.

The court has reviewed United States ex rel. Ketroser v. Mayo Foundation, 2013 WL 4733986 (8th Cir. Sept. 4, 2013), offered by Tuomey in support of its contention that the Government failed to prove the requisite scienter needed to violate the FCA. In Ketroser, the Court of Appeals for the Eighth Circuit found that a Medicare regulation was unclear as to whether a written report of a pathologist's examination of a tissue slide was required to be prepared as a condition of reimbursement. The Eighth Circuit determined that the defendant's reasonable interpretation of any ambiguity inherent in the regulation "belies the scienter necessary to establish a claim of fraud under the FCA." Id. at *6. Ketroser is distinguishable from the case at bar. There is no question that compliance with the Stark Law is a condition of payment by Medicare.

* * *

For the reasons stated, Tuomey's motion for judgment as a matter of law, or, in the alternative, for a new trial (ECF No. 827), is **denied**. The court affirms the jury verdict. The court now turns to the parties' motions regarding the Government's state law claims for equitable relief.

C.  Defendant's Renewed Motion for Summary Judgment and/or Judgment as a Matter of Law on Government's Equitable Claims

Defendant's Motion to Require Election of Remedies

United States' Motion for Entry of Judgment on Counts IV and V of the Second Amended Complaint

The three motions referenced in this section concern Tuomey's equitable remedies of mistake of fact and unjust enrichment. Tuomey asserts in its motion for summary judgment and/or judgment as a matter of law that the Government is barred from seeking to recover money damages based on

its equitable state law claims because the Government has an adequate remedy at law, i.e., monetary damages for violation of the FCA, as found by the jury. Tuomey moves the court to dismiss with prejudice the equitable causes of action and enter judgment in favor of Tuomey on those counts.

In its motion to require election of remedies, Tuomey argues that, now that a jury verdict has been rendered on the FCA cause of action, it is appropriate to require the Government to choose its remedy as between its legal claim under the FCA and its equitable state law claims.

In its motion for summary judgment, the Government concedes that it has elected to pursue its remedies under the FCA, but seeks judgment in its favor under the state law claims in the event the FCA verdict or judgment are set aside or vacated on appeal. The Government asserts that it is entitled to recover $44,888.651.00, plus applicable prejudgment interest. The Government contends that it does not seek duplicative relief and states that, once the Government's judgment under the FCA becomes final and unappealable, $39,313,065.00 of the alternative judgment under Counts IV and V, as well as the associated interest payment, would be subsumed within the FCA judgment.

It is well settled that a suit in equity will not lie when there is an adequate remedy at law. Banner Life Ins. Co. v. Noel, 505 F. App'x 250, 254 n.4 (4th Cir. 2013) (quoting Catholic Soc. Of Relig. Literary Educ. v. Madison Cnty., 74 F.2d 848, 850 (4th Cir. 1935)). At present, the jury has found in favor of the Government and awarded monetary damages as it deemed appropriate. The court declines to enter judgment in favor of the Government or otherwise rule on the Government's equitable state law claims when it has prevailed on its FCA causes of action. Accordingly, Tuomey's motion for summary judgment and/or judgment as a matter of law (ECF No. 823) and motion to require election of remedies (ECF No. 824) are **denied, without prejudice**. The Government's motion for entry of judgment on Counts IV and V of the second amended complaint

(ECF No. 826) also is **denied, without prejudice**.

D.     United States' Motion for Entry of Judgment Under the False Claims Act

The Government moves the court to enter judgment for a civil penalty for the 21,730 false claims the jury determined Tuomey submitted in violation of the Stark Law.

Title 31, United States Code, Section 3729(a) provides that any person who knowingly presents, or causes to be presented, to the United States a false or fraudulent claim for payment or approval, is liable to the United States Government for a civil penalty of not less than $5,000.00 and not more than $10,000.00, as adjusted by the Federal Civil Penalties Inflation Act of 1990, plus three times the amount of damages that the Government sustains because of the act of that person. The minimum civil penalty set forth in § 3729(a) was raised effective September 29, 1999 to $5,500.00, and the maximum civil penalty was raised to $11,000.00. See 28 C.F.R. § 85.3(a)(9). The Government contends that it is entitled by law to an assessment of $119,515,000 ($5,500 X 21,730), plus damages of three times the jury verdict, or $117,939,195 ($39,313,065 X 3), for a total civil penalty of $237,454,195.00.

In response to the Government's motion, Tuomey generally reasserts its arguments raised in its Rule 50(b) and Rule 59(a) motions, specifically, (1) the Government failed to prove the submission of any false claims; and (2) the Government failed to prove or provide evidence of any damages. The court finds Tuomey's arguments to be without merit for the reasons stated hereinabove.

Tuomey urges that the Government's demand for trebling of the jury verdict and civil penalties of $119,515,000.00 is barred by the excessive fines provision of the Eighth Amendment. The Excessive Fines Clause of the Eighth Amendment prohibits the government from imposing

22

excessive fines as punishment.  <u>Korangy v. U.S. Food & Drug Admin.</u>, 498 F.3d 272, 277 (4th Cir. 2007).  While Eighth Amendment claims often arise in the criminal context, civil sanctions may fall within the scope of the amendment.  <u>Id.</u> (citing cases).  Civil fines serving remedial purposes do not fall within the reach of the Eighth Amendment.  <u>Id.</u>  However, if a civil sanction "'can only be explained as serving in part to punish,'" then the fine is subject to the Eighth Amendment.  <u>Id.</u> (quoting <u>Austin v. United States</u>, 509 U.S. 602, 610 (1993).  If the civil penalty is punitive and thus subject to the Eighth Amendment, it will be found constitutionally excessive only if it is "'grossly disproportional to the gravity of [the] offense.'"  <u>Id.</u> (quoting <u>United States v. Bajakajian</u>, 524 U.S. 321 (1998)).

There is some authority for the proposition that damages imposed under the FCA are essentially punitive in nature.  <u>See</u> <u>Vermont Agency of Nat'l Res. v. United States ex rel. Stevens</u>, 529 U.S. 765, 784-85 (2000) ("The very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers.") (quoting <u>Texas Indus., Inc. v. Radcliff Materials, Inc.</u>, 451 U.S. 630, 639 (1981)).  However, the United States Supreme Court subsequently interpreted its language in <u>Vermont Agency</u> as providing a reason not to read "person" to include a State.  <u>Cook County v. United States ex rel. Chandler</u>, 538 U.S. 119, 130 (2003).  The Court observed that "treble damages have a compensatory side, serving remedial purposes in addition to punitive objectives."  <u>Id.</u>  The Court further noted that "some liability beyond the amount of the fraud is usually 'necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims.'"  <u>Id.</u> (quoting <u>United States v. Bornstein</u>, 423 U.S. 303, 315 (1976).  The Court explained:

The most obvious indication that the treble damages ceiling has a remedial place

under this statute is its qui tam feature with its possibility of diverting as much as 30 percent of the Government's recovery to a private relator who began the action. In qui tam cases the rough difference between double and triple damages may well serve not to punish, but to quicken the self-interest of some private plaintiff who can spot violations and start litigating to compensate the Government, while benefitting himself as well. The treble feature thus leaves the remaining double damages to provide elements of make-whole recovery beyond mere recoupment of the fraud. It may also be necessary for full recovery even when there is no qui tam relator to be paid. The FCA has no separate provision for prejudgment interest, which is usually thought essential to compensation, and might well be substantial given the FCA's long statute of limitations[.] Nor does the FCA expressly provide for the consequential damages that typically come with recovery for fraud[.]

Id. at 131. The Court also expressed its opinion that the treble damages provision "was, in a way, adopted by Congress as a substitute for consequential damages." Id. at 131 n.9. At bottom, the Court recognized a difference between governmental entities and private parties being subject to treble damages, finding that where a governmental agency is involved, the question is whether "the local taxpayer should make up for an undeserved benefit, or the federal taxpayer be permanently out of pocket . . . ." Id. at 131. The court cannot say that the civil penalties authorized by Congress with respect to the FCA are grossly disproportional to the gravity of Tuomey's offense.[2] Tuomey's conduct as found by the jury calls into question the efficacy of administering the Medicaid and Medicare programs and promotes self-interest to the detriment of federal taxpayers. Tuomey's contention is without merit.

Finally, Tuomey argues that, if any false claims were submitted, the Government offered competent evidence only with respect to certification pages from four Medicare cost reports filed by

_____

[2] Tuomey also argues that the amount of damages demanded by the Government would violate Tuomey's rights under the Due Process Clause of the Fifth Amendment. Tuomey notes that the imposition of punitive damages can violate the due process rights of defendants if they are excessive. See State Farm Mut. Auto. Ins. v. Campbell, 538 U.S. 408, 424-25 (2003). Because the court finds that the civil penalties set forth in the FCA are neither punitive nor excessive under the circumstances, the court need not address this argument.

Tuomey. Tuomey argues that the particular forms that were the source of information summarized by Steck–UB-92/UB-04 forms–did not constitute "claims" under the FCA. Tuomey argues that, at most, it should be held liable for civil penalties of $22,000.00 ($5,500.00 X 4).

The court has found that a reasonable jury could conclude the existence of 21,730 false claims. The court is not inclined to overturn the jury's determination. Tuomey's argument is without merit. The Government's motion for entry of judgment under the FCA (ECF No. 818) is **granted**.

## IV.  CONCLUSION

For the reasons stated herein and appearing in the record, the Government's motion for damages and penalties under the FCA (ECF No. 818) is **granted**. The Government's second motion for summary judgment and/or judgment as a matter of law on the Government's equitable claims (ECF No. 823) is **denied, without prejudice**. Tuomey's motion to require election of remedies is **denied, without prejudice**. The Government's motion for judgment as a matter of law on Counts IV and V of the second amended complaint (ECF No. 826) is **denied, without prejudice**. Tuomey's motion for judgment as a matter of law or in the alternative, for a new trial (ECF No. 827) is **denied**. The Clerk of Court shall enter judgment under the FCA in the amount of $237,454,195.00, plus interest at the legal rate.

**IT IS SO ORDERED**.


/s/ Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina
October 2, 2013
Nunc pro tunc date: September 30, 2013.